```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW YORK
 2                       - - - -

 3   VICTOR CALLENDER,          *      CIVIL ACTION NO.
                                *      1:15-CV-05813-AKH
 4            Plaintiff,        *
                                *
 5            vs.               *
                                *
 6   FORSTER & GARBUS, LLP and  *
     DISCOVER BANK,             *
 7                              *
              Defendants.       *
 8   -------------------------  *

 9

10

11                 DEPOSITION OF

12            JOEL D. LEIDERMAN, ESQ.

13              COMMACK, NEW YORK

14             SEPTEMBER 28, 2016

15

16

17

18

19

20   REPORTED BY: WANDA WILKINS, CSR NO. 30XI00117400

21   JOB NO.      139075

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW YORK
 2                         - - - -

 3   VICTOR CALLENDER,           *       CIVIL ACTION NO.
                                 *       1:15-CV-05813-AKH
 4             Plaintiff,        *
                                 *
 5             vs.               *
                                 *
 6   FORSTER & GARBUS, LLP and   *
     DISCOVER BANK,              *
 7                               *
               Defendants.       *
 8   -------------------------   *

 9

10

11              Deposition of JOEL D. LEIDERMAN,

12   ESQ., taken on behalf of plaintiffs, at FORSTER

13   & GARBUS, LLP, 60 Vanderbilt Motor Parkway,

14   Commack, New York 11725, commencing at 11:00

15   a.m., on Wednesday, September 28, 2016, before

16   Wanda Wilkins, CSR No. 30XI00117400.

17

18

19

20

21

22

23

24

25
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
 1              A P P E A R A N C E S:

 2

 3    LAW OFFICES OF AHMAD KESHAVARZ

 4           Attorneys for Plaintiff

 5           16 Court Street, 26th Floor
             Brooklyn, New York 11241
 6           (718) 522-7900
             ahmad@newyorkconsumerattorney.com
 7

 8    BY:  AHMAD KESHAVARZ, ESQ.

 9

10    RIVKIN RADLER, LLP

11           Attorneys for Defendants

12           926 RXR Plaza
             Uniondale, New York  11556-0926
13           (516)357-3000
             carol.lastorino@rivkin.com
14

15    BY:  CAROL A. LASTORINO, ESQ.

16

17
      ALSO PRESENT:
18
                MARK GARBUS, ESQ., FORSTER & GARBUS
19

20

21

22

23

24

25
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
 1              I N D E X

 2

 3  WITNESS

 4  JOEL D. LEIDERMAN, ESQ.

 5

 6  EXAMINATION                          PAGE

 7  By Mr. Keshavarz                       6

 8

 9

10               E X H I B I T S

11  NUMBER          DESCRIPTION          PAGE

12  P-1             Income Execution       35

13  P-2             eCourts Printout       64

14  P-3             Order to Show Cause - Pfau  83

15                  vs. Forster & Garbus, et al

16  P-4             Brown v. Forster & Garbus  109

17  P-5             A Document             121

18  P-6             Collection Notes       136

19  P-7             Sections from the Discover  158

20                  Retainer Agreement

21

22

23

24

25
```

```
 1    INSTRUCTIONS NOT TO ANSWER

 2       PAGE            LINE

 3       166 22

 4

 5    INFORMATION REQUESTED

 6      PAGE            LINE

 7       (None)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
 1    J O E L   D.   L E I D E R M A N, residing at 60
 2       Vanderbilt Motor Parkway, Commack, New York
 3       11725, is duly sworn by a Notary Public of
 4       the State of New Jersey and testifies under
 5       oath as follows:
 6
 7               MR. KESHAVARZ:  Let the court
 8       reporter note that there is a witness
 9       here who's going to be testifying later
10       today.  Mr. Garbus?
11               MR. GARBUS:  Yes, Garbus,
12       G-A-R-B-U-S.
13               MR. KESHAVARZ:  I object to the
14       witness's appearance at the deposition of
15       the corporate representative for fear
16       that it may intentionally or
17       unintentionally affect the testimony of
18       Mr. Garbus and I'll ask that the witness
19       be excluded.
20               Will you consent to that?
21               MS. LASTORINO:  No, I do not
22       consent.  Mr. Garbus is permitted to be
23       here, under Local Civil Rule 30.3 of the
24       Southern District Court, which provides
25       that, "A witness or a potential witness
```

1    in the action may attend the deposition

2    of a party or witness unless otherwise

3    ordered by the Court."

4          MR. KESHAVARZ:  Other than to

5    affect Mr. Garbus's testimony, what

6    reason is he here for?

7          MS. LASTORINO:  I don't need to

8    give you a reason other than he's

9    permitted to be here.  He's here.  If you

10   want to get the Court on the phone, get

11   Judge Hellerstein on the phone.

12         MR. KESHAVARZ:  To make the record

13   clear, I'll object to Mr. Garbus's

14   testimony and recall the right to recall

15   him.

16         MS. LASTORINO:  You have no basis

17   for that.  So, let's get the Court on the

18   phone.

19         MR. KESHAVARZ:  I also want to

20   raise the issue, since we're going to a

21   jury trial, the jury can weigh the

22   credibility of Mr. Garbus's affect -- the

23   credibility of Mr. Garbus's testimony,

24   based on the fact that he is listening to

25   the testimony of the corporate

```
1          representative, Mr. Leiderman, over
2          plaintiff's objection.
3   BY MR. KESHAVARZ:
4          Q.    Mr. Leiderman --
5                MS. LASTORINO:  Excuse me.  Hold
6          on one second.
7                MR. KESHAVARZ:  Go ahead.
8                MS. LASTORINO:  For what you said
9          before, let's get the Court on the phone.
10               MR. KESHAVARZ:  Why?
11               MS. LASTORINO:  Why shouldn't we?
12               MR. KESHAVARZ:  I preserved my
13         objection.
14               MS. LASTORINO:  He's not going to
15         be produced another time.  So, why don't
16         we get Judge Hellerstein on the phone?
17               MR. KESHAVARZ:  If I preserved the
18         objection.  It's not a bridge we have to
19         cross now.  It could be a bridge we can
20         cross later.  I just want to preserve the
21         record.
22               Can we go off the record for a
23         second?
24               (Whereupon there is an
25         off-the-record discussion.)
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
1          MS. LASTORINO:  Are we back on the
2    record?
3          MR. KESHAVARZ:  Yes, we're back on
4    the record.
5          MS. LASTORINO:  I just want the
6    record to reflect that I suggested
7    calling the Court now to resolve this and
8    Mr. Keshavarz does not want to.
9          MR. KESHAVARZ:  And so the record
10   is clear, I don't believe that I'm under
11   obligation to call the Court at this
12   time.  The issue goes to two issues.  One
13   goes to the credibility of Mr. Garbus.
14   So the jury can infer on the fact that
15   he's attending over plaintiff's
16   objection.
17          (Whereupon there is a brief
18   interruption.)
19          MR. KESHAVARZ:  And two, I want to
20   raise the prospect of it being a basis
21   for recalling Mr. Garbus at a later time.
22   That's not an issue that I believe you
23   have to have the Court intervene on
24   because it hasn't been raised yet.
25          MS. LASTORINO:  And again, we
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
 1          object to and we will not produce him
 2          another time, so.
 3                    EXAMINATION
 4  BY MR. KESHAVARZ:
 5          Q.    Mr. Leiderman, good morning?
 6          A.    Hi.
 7          Q.    Thanks for your time today.  Have
 8  you ever been known by any other name other than
 9  Joel Leiderman?
10          A.    No.
11          Q.    Do you have a middle initial?
12          A.    D as in David.
13          Q.    What does D stand for?
14          A.    David.
15          Q.    In preparation for your deposition
16  today, did you review any documents?
17          A.    Yes.
18          Q.    What documents did you review?
19          A.    I reviewed some letters, a copy of
20  a restraining notice, I reviewed some notes on
21  the file.
22          Q.    Anything else?
23          A.    Today?
24          Q.    At any point.
25          A.    You know, basically, the
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
1    information that's been produced in discovery.
2          Q.     Okay.  Are any of the documents
3    that were reviewed in preparation of your
4    testimony a document that has not been produced
5    in discovery?
6          A.     No.
7          Q.     Okay.  And what was the reason for
8    your reviewing those documents in preparation
9    for your testimony today?
10         A.     Because I was being deposed.
11         Q.     Did you speak with anyone --
12   without the content, did you speak with anyone
13   in preparation for your deposition today?
14         A.     I spoke to Ms. Lastorino.
15         Q.     And when was that?
16         A.     I spoke with her this morning.  I
17   spoke with her yesterday.  I might have had a
18   conversation last week or two and I met with her
19   a couple of weeks ago.
20         Q.     I understand.  During the meetings
21   with Miss Lastorino --
22                Is it Miss or Ms.?
23                MS. LASTORINO:  Ms. is fine.
24         Q.     Ms. Lastorino -- was anybody else
25   present?
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
 1           A.     Mr. Garbus was at the meeting at
 2      her office.
 3           Q.     At any other times you spoke with
 4      Ms. Lastorino, was there anyone else, other than
 5      Mr. Garbus?
 6           A.     This morning, Mr. Forster stopped
 7      in to say hello.
 8           Q.     Anyone else?
 9           A.     No.
10           Q.     Okay.  On the phone calls that you
11      were on with Ms. Lastorino, was anyone else on
12      the phone?
13           A.     No.
14           Q.     Okay.  Other than reviewing the
15      documents you indicated, did you take any other
16      steps in preparation for your testimony today?
17           A.     I asked some people in the office
18      certain things that I might have not been
19      completely familiar with.  So, I asked some
20      people in the office.
21           Q.     Who?
22           A.     Karen Pizzimenti.
23           Q.     Can you spell it?
24           A.     P-I-Z-Z-I-M-E-N-T-I, I believe.
25           Q.     Who else?
```

```
1          A.     Scott Miller.

2          Q.     Scott Miller?

3          A.     Scott Miller.  Scott Miller.

4          Q.     Yes, Miller.  Anyone else?

5          A.     Joe Durante.

6          Q.     Anyone else?

7          A.     Pat McDowell.

8          Q.     Anyone else?

9          A.     Candace Newman.  That's probably

10   it.

11         Q.     All right.  And when did you speak

12   with these individuals?

13         A.     Within the last week.

14         Q.     Okay.  Did you speak with them

15   separately?

16         A.     Yes.

17         Q.     Okay.  How long did your meeting

18   with Lauren Pizzimenti last?

19         A.     Karen.

20         Q.     Karen Pizzimenti.  How long did

21   that meeting last?

22         A.     Five minutes on two different

23   occasions.

24         Q.     And what is her role?

25         A.     She works in the compliance
```

1    department.

2         Q.     And what is the compliance

3    department?

4         A.     The compliance department is the

5    department of the firm that handles complaints

6    and other issues if a person seeks validation

7    the debt or disputes the debt, it will go to

8    people in the compliance department.  They also

9    interact with clients, in terms of issues

10   involving consumers.

11        Q.     Is she the head of the compliance

12   department?

13        A.     No, she's not.

14        Q.     And what did you speak with her

15   about?

16        A.     I asked her -- there were certain

17   initials -- as we go through the notes, which I

18   assume we will be doing today -- there were

19   certain initials of people who handled the

20   account of Victor -- what is it?  Victor

21   Callender?  Vincent Callender?

22             MS. LASTORINO:  Victor.

23        A.     Victor Callender and I wasn't

24   quite sure of the names.  Many of whom are not

25   here any longer, no longer employed by Forster

1    and Garbus and so, I wanted to make sure that I

2    understood who those people were.

3            Q.    Did you speak with Miss Pizzimenti

4    about anything else?

5            A.    No.

6            Q.    Who are those people, if you

7    recall, that Miss Pizzimenti said were in the

8    collection notes but you didn't recall the name

9    of?

10           A.    Janelle Lewis, Shaheed Williams.

11   Let me think.  I wanted to confirm who T.R. as

12   that's Theresa Rock but I knew that.  I just

13   wanted confirmation of that.  John Lane, Brianna

14   Erb, E-R-B.  I forget -- her name is Sue --

15   something like Sueheidi Mejia (ph).

16           Q.    Anyone else?

17           A.    Not that I can remember.  As we go

18   through the notes, I'll be glad to testify.

19           Q.    So, the individuals you just

20   listed, those are all people who are involved

21   with the collection of the putative debt against

22   Mr. Callender?

23           A.    They were involved with the

24   account of Victor Callender.

25           Q.    And were they involved in the

```
 1   attempts to collect the account against Mr.
 2   Callender?
 3          A.     Yes, I guess so.
 4          Q.     And the account you mean by
 5   collecting on the vacated Judgment?
 6          A.     Well, yes.
 7          Q.     By "the account," do you mean
 8   Forster & Garbus's attempts to collect on the
 9   vacated Judgment?
10                 MS. LASTORINO:  Objection to form.
11          Q.     You may answer.
12          A.     Yes.  However, we will get into
13   the issue of the vacated Judgment, I'm sure, in
14   later testimony.
15          Q.     But I'm just trying to get --
16          A.     Yes, is the answer.
17          Q.     And it's normal to anticipate an
18   answer but for the court reporter, who is
19   scowling at me now, I need to make a clear
20   record.  So please pause for a second.  Let me
21   finish the question.
22                 So, the question is when Forster &
23   Garbus says it is collecting the account, when
24   you say the words "account," you mean the
25   vacated Judgment as to Mr. Callender?  Is that
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

1    what you mean by "account"?

2              MS. LASTORINO:  Again, objection

3         to form.

4         A.     Yes.

5         Q.     Thank you.  And when was your

6    meeting with Karen Pizzimenti?

7         A.     I don't know the date.  Within the

8    last two weeks, on two occasions.

9         Q.     When did you meet with Mr. Miller,

10   Scott Miller?

11        A.     It was over the telephone.

12        Q.     And how long did that call last,

13   approximately?

14        A.     Thirty seconds.

15        Q.     And what was said?

16        A.     I don't even remember the question

17   I asked.  It just had to do with something in

18   the notes that I wanted clarification on and

19   there were a few conversations, one or two.

20   Maybe more than one.

21        Q.     And what is Mr. Miller's

22   involvement?

23        A.     He's the director of collections.

24        Q.     What does that mean?

25        A.     He's in charge of the collection

```
 1   departments.  So, the supervisors report to him,
 2   supervisors of the various client units.  He has
 3   liaison with the clients, as well, client
 4   meetings, which are primarily over the
 5   telephone.
 6           Q.     Who is Joe Durante?
 7           A.     He works in the IT department.
 8           Q.     And when did you speak with him?
 9           A.     Yesterday.
10           Q.     And how long was that
11   conversation?
12           A.     Thirty seconds.
13           Q.     And what was that?
14           A.     We were trying to get some letters
15   that were produced yesterday by Ms. Lastorino.
16           Q.     Do you know, were those letters
17   digitally scanned and Forster & Garbus --
18           A.     No, they were not scanned.
19           Q.     You have to wait until I finish
20   the question because she's scowling at me again.
21                  So, you spoke with Mr. Durante
22   yesterday to get additional documents,
23   collection letters, sent to Mr. Callender that
24   your attorney produced yesterday.  Is that
25   correct?
```

```
1            A.      Yes.
2            Q.      And are you saying that those
3    letters were not digitally scanned copies?
4            A.      That is correct.
5            Q.      Were they recreated documents?
6            A.      Yes.
7            Q.      And how did you know to recreate
8    the documents in that manner?
9            A.      When I was reviewing the notes and
10   I was not familiar -- and that may be one of the
11   reasons I called one of the persons on this
12   list.  I don't remember who -- that these
13   letters were not scanned but they could be
14   digitally -- they could be reproduced based on
15   the electronic record; and so, in learning that,
16   then these letters that I would have testified
17   to and would testify to, as we go through the
18   notes, we now can actually and have provided the
19   copies to you, yesterday and this morning.
20           Q.      Okay.  How do you know that the
21   content of those letters that were produced
22   yesterday are the correct content of the letters
23   that were alleged to be sent by Forster & Garbus
24   to Mr. Callender?
25           A.      I rely upon the integrity of our
```

```
 1    computer system and the business practices.
 2          Q.     So, these are form letters that
 3    are -- these are form letters that Forster &
 4    Garbus has that are merged with the data files
 5    that Forster & Garbus has.  Is that correct?
 6          A.     Yes, that's primarily how it's
 7    done.
 8          Q.     So, each of the letters that were
 9    produced yesterday, you have a template for each
10    of those letters?
11          A.     There's a template for the
12    letters.
13          Q.     And those are the letters -- those
14    are among the letters that Forster & Garbus
15    regularly use to collect debts.  Is that
16    correct?
17          A.     Yes, um-hum.
18                 MR. KESHAVARZ:  Thank you.  Let's
19          go off the record.
20                 (Whereupon there is an
21          off-the-record discussion.)
22                 MR. KESHAVARZ:  Can you read the
23          last question and answer, please?
24                 (Whereupon the last question and
25          answer are read back by the reporter.)
```

```
 1    BY MR. KESHAVARZ:

 2            Q.      Let me pause for a second by going

 3    over some of the ground rules about a

 4    deposition.  Have you ever had your deposition

 5    taken before, sir?

 6            A.      Yes.

 7            Q.      Approximately how many times?

 8            A.      About five, six, something like

 9    that.

10            Q.      So, then you pretty much know how

11    it works, but if I ask you a question and you

12    don't understand, will you please ask me to

13    rephrase it?

14            A.      I will.

15            Q.      And if I ask you a question and

16    you do not ask me to rephrase it and you answer

17    it, is it reasonable for me to assume that you

18    understood the question.

19            A.      I guess so.

20            Q.      Okay.  So, Pat McDallia (ph) --

21            A.      Dowell.

22            Q.      Dowell, McDowell.  How long did

23    you speak with Pat McDowell?

24            A.      Two minutes.

25            Q.      And these were all conversations
```

```
 1    in preparation for your testimony?

 2           A.      Correct.

 3           Q.      And what was said?

 4           A.      To get the copies of these

 5    letters.  She was assisting in that.

 6           Q.      And by "those letters," you mean

 7    the letters that were produced yesterday?

 8           A.      Correct, um-hum.

 9           Q.      And what is her role?

10           A.      She's director of operations.

11           Q.      And what is the role of the

12    director of operations?

13           A.      She's in charge of general

14    operations of the firm, including client

15    relations regarding affidavits of service and

16    new referrals and referral issues and client

17    directives.

18           Q.      What do you mean by "affidavits of

19    service issues"?

20           A.      Affidavits of facts.  I'm sorry.

21    Affidavits in support of the entry of judgment.

22    Did I say "affidavit of service"?  Sorry.

23    Affidavits of facts securing information from

24    the client, allowing us to proceed with the

25    lawsuit and judgment.
```

```
 1            Q.      Thank you.  Now, there was -- the
 2   last person was Candace?
 3            A.      Candace Newman.
 4            Q.      And how long did you speak with
 5   Miss Newman for?
 6            A.      Also, a few minutes, yesterday.
 7            Q.      And what was the --
 8            A.      Same thing, trying to get the
 9   letters.
10            Q.      For the court reporter, what was
11   the discussion yesterday with Miss Newman?
12            A.      With Miss Newman, again,
13   assisting -- I was trying to get them so I asked
14   various people because I didn't know who was
15   going to be available to do it, so.
16            Q.      And what's her title?
17            A.      I don't know her title.  She's in
18   the auditing department.  I don't know if she
19   has a title, per se.  She's director of
20   auditing, if you want.
21            Q.      Okay.
22            A.      Assistant.
23            Q.      So, what do you do, Mr. Leiderman?
24            A.      Chief cook and bottle washer.  I
25   get involved in compliance issues.  I act as
```

```
 1   liaison with outside counsel, generally, on
 2   FDCPA matters.  I handle special projects for
 3   the firm.  I get involved with reviewing letters
 4   and on the collection floor.  Most of the
 5   collectors or supervisors will come to me if
 6   they have any questions or need direction on
 7   things.  If I need to review letters that need
 8   to be sent, liaise with -- I handle problem
 9   calls.  You know, telephone calls if there are
10   people who need to speak to an attorney,
11   generally.  I'm in the office every day.  I
12   don't go to court.  So, I'm available in the
13   firm to handle those kinds of issues.
14           Q.     Are you one of the partners at the
15   firm?
16           A.     I'm not a partner, no.
17           Q.     Who are the partners at the firm?
18           A.     Ronald Forster and Mark Garbus.
19           Q.     Who sets the policies and
20   procedures for compliance with the FDCPA at
21   Forster & Garbus, if you know?
22           A.     It would be the partners and, I
23   guess, myself, primarily.
24           Q.     Anyone else?
25           A.     In terms of setting the policies
```

```
 1   and the procedures, other people might write the
 2   procedures but ultimately, it would be approved
 3   by the partners.
 4          Q.     But the partners are the ones who
 5   make the decision about what policies and
 6   procedures are in place?
 7          A.     I guess, yes, um-hum.
 8          Q.     Are the partners the ones who are
 9   in charge of making sure that there's compliance
10   with Forster & Garbus's policies for compliance
11   with the FDCPA?
12          A.     Yes, and other persons, such as
13   myself and the compliance officer, Ann
14   Visecchia, to implement the policies.
15          Q.     What is Ann Visecchia's title
16   then, please?
17          A.     She's the manager or director --
18   I'm not sure of that title -- of the compliance
19   department.
20          Q.     By the way, I never got this on
21   the record.  You're the court representative for
22   Forster & Garbus today?
23          A.     Yes.
24          Q.     Okay.  So, let me just ask you --
25                 (Whereupon there is an
```

```
 1              interruption.)
 2        Q.      So, Forster and Garbus garnished
 3   Mr. Callender's wages based on a vacated
 4   Judgment.  Is that correct?
 5              MS. LASTORINO:  Objection to form.
 6        A.      Yes.  When the case came in to us
 7   in 2009 -- it was referred to us in 2009 -- it
 8   was a valid Judgment.  That Judgment was valid
 9   up until the time that Mr. Callender brought an
10   Order to Show Cause and successfully brought the
11   Judgment vacated.  However, Forster & Garbus was
12   not aware of that until the time that Mr.
13   Callender's wages were garnished to the extent
14   of approximately $210.00 and we received a
15   letter from -- I believe it was the Urban
16   Justice Center, who advised us, at that time,
17   that the Judgment, unbeknownst to us, had been
18   vacated; and at that time, within a few days
19   thereafter, moneys that had been detected,
20   including marshal's poundage were refunded to
21   Mr. Callender.
22        Q.      Do you know if there were any fees
23   that were associated with the garnishment of Mr.
24   Callender's wages, based on a vacated Judgment,
25   that were not returned to Mr. Callender?
```

1          A.     No, I do not.

2          Q.     Why -- I'm sorry.  Is that the

3     reason why Forster & Garbus garnished my

4     client's wages, based on a vacated Judgment?

5     Were you satisfied that that's the reason?

6                 MS. LASTORINO:  Objection to form.

7          A.     As far as Forster & Garbus knew,

8     it was a valid Judgment, and that's why we

9     garnished his salary.

10          Q.     Okay.  What meaningful attorney

11     review, if any, did Forster & Garbus undertake

12     prior to garnishing my client's wages?

13          A.     Mr. Callender was notified on many

14     occasions of the involvement of our firm and

15     that a Judgment had been entered.  Mr. Callender

16     did not do anything to advise this firm that the

17     Judgment had been vacated.  In fact, he had made

18     a complaint to the Department of Consumer

19     Affairs.  In that complaint, he alleged that he

20     had never had a Discover account, Discover card

21     account.  Nevertheless, prior to that time, he

22     had already, with a Discover card account --

23     this particular account -- had gone to court and

24     had the Judgment vacated; but yet, in his

25     complaint to the Department of Consumer Affairs,

1   he never once mentioned the Judgment.  He never

2   once said anything about a judgment.  He denied

3   that he had a Discover card.  That account was

4   considered, therefore -- his complaint was

5   considered to be a fraud or false identity

6   claim, so that we ceased collection on it at

7   that time.  We went back to the client.  The

8   client investigated that.  They were able to

9   manage the application and the signatures and

10  the addresses and the billing statements, et

11  cetera, and determined that it was an invalid

12  fraud.  So, there was no knowledge at Forster &

13  Garbus that the Judgment had been vacated.  The

14  notice to the -- the Order to Show Cause was not

15  served on Forster & Garbus, despite the fact

16  that Mr. Callender was aware, based on many

17  letters sent to him over the course of time,

18  between 2009 and the date the Judgment was

19  vacated.  Never once notified us that he did not

20  owe the debt until he, you know, alleged same to

21  the Department of Consumer Affairs and never did

22  anything to serve us with the Order to Show

23  Cause, despite knowledge of the fact that our

24  client was trying to collect that Judgment.

25          Q.      Anything else?

```
 1          A.     No.  At this point, that's my
 2   answer.
 3          Q.     All right.  But I just want to
 4   make sure that the record is clear.  Prior to
 5   issuing -- prior to Forster & Garbus garnishing
 6   my client's wages, based on a vacated Judgment,
 7   what -- up top point, what meaningful attorney
 8   review did Forster & Garbus take to determine
 9   whether the Judgment it was executing on was
10   valid, when it issued the execution?
11                 MS. LASTORINO:  Objection to form.
12          You can answer.
13          A.     When the Judgment was entered --
14   when the account was referred to us with the
15   Judgment, we sent a letter, pursuant to the Fair
16   Debt Collections Practices Act, identifying the
17   fact that there was a -- that there was a
18   Judgment and advising that this firm was now
19   seeking to collect that Judgment; and under the
20   FDCPA, the debt is assumed to be valid and the
21   Judgment is assumed to be valid unless the
22   consumer disputes it, which he did not do at
23   that time.  Therefore, we proceed with the
24   assumption that the debt is valid.  We follow up
25   with several letters in an attempt to contact
```

1   the consumer to try to collect on it.

2                 The question of meaningful

3   involvement is an interesting issue on

4   post-judgment cases.  You seem to allege that

5   the attorney has to be meaningfully involved in

6   every, every aspect of that case.  However, if

7   you look at the history of meaningful

8   involvement under the FDCPA, I believe it has to

9   do more with the impression of a least

10  sophisticated consumer.  Least sophisticated

11  consumer, okay -- if something comes out on

12  attorney letterhead, there have been courts that

13  have said that that raises the price of poker;

14  and so, in New York, we have the Greco vs.

15  Trauner case, which allows a disclaimer to be

16  placed in that.  But that's on pre-legal cases,

17  pre-litigation cases.  This is a judgment file.

18  So, clearly, I think even the least

19  sophisticated consumer would recognize that a

20  letter from a law firm that says a Judgment has

21  been entered -- well, the price of poker has

22  already gone up.  It went up when he was sued in

23  2005.  Okay.  He was aware of that Judgment on

24  several occasions.  So, in terms of attorney

25  meaningful involvement, there's no obligation

```
 1   that we go forward, other than to seek to
 2   collect what we consider to be a valid debt for
 3   various reasons.  We rely on the client that the
 4   Judgment was entered.  It was, in fact, a valid
 5   Judgment at that time the case was referred to
 6   us, in 2009.  It was a valid Judgment in 2005,
 7   when it was entered.  It was a valid Judgment,
 8   up until the court determined that it was not a
 9   valid Judgment, based on an Order to Show Cause
10   which was not served upon Forster & Garbus and
11   that Forster & Garbus had no awareness of.
12              So, in terms of our involvement,
13   had Mr. Callender sought to contact our office
14   in such a way as to bring to our attention that
15   for some reason, this Judgment was not valid,
16   that would have been explored, but I don't see
17   that in anything that I reviewed.  I don't see
18   it in the -- I don't see it in the service of
19   the Order to Show Cause, which was not served
20   upon Forster & Garbus, despite the fact that
21   Forster & Garbus had sent many and had many
22   communications to Mr. Callender when Mr.
23   Callender made his DCA complaint.  He did not
24   say, "Oh, this Judgment is invalid.  I have a
25   Judgment against me.  Forster & Garbus is
```

```
 1   seeking to, you know, collect a judgment, which
 2   is enforceable."  That was not his complaint to
 3   the DCA.  His complaint to the DCA is "I didn't
 4   have a Discover card."
 5            Q.      So, let me make sure if I
 6   understand your -- you raise a lot of issues.
 7   So, let's go through them.
 8            A.      Surely.
 9            Q.      And I thank you for that.  I
10   appreciate it.  One thing I'm trying to get
11   specifically, is it Forster & Garbus's position
12   that when it executes on someone's wages, based
13   on an alleged Judgment, is it Forster & Garbus's
14   position that it is not required to do a
15   meaningful attorney review of the facts and
16   circumstances of the consumer's account, the
17   alleged Judgment, prior to executing on those
18   wages?
19            A.      No.  There was a review done.
20   There's a review done by an attorney before the
21   execution is issued and an attorney reviews the
22   restraining notice; but it's based on
23   information that is retained in the file at that
24   time, such as, you know, a Judgment, Judgment
25   information.  The restraining notice or income
```

1  execution could not be issued if there was a
2  vacated Judgment because that Judgment and
3  information would be reviewed -- would be
4  removed from the computer file.  So, it would be
5  impossible to produce a Judgment -- a
6  restraining notice or an income execution or a
7  post-judgment enforcement device.  So, the
8  review is done based on the records that are
9  there.
10             As to whether or not there was a
11  bankruptcy, some of our clients do require
12  certain, what we call, "scrubs."  Bankruptcy,
13  military, deceased and they require that at
14  various times; and over the years, that's
15  changed.  So, in 2009, I can't tell you exactly
16  which clients and what that -- you know, who
17  required certain scrubs, but a lot of clients
18  today require scrubs.  Not only upon the initial
19  referal, which is maybe what the procedure was
20  back in 2009, but now, they're required before
21  you enter the Judgment and before you seek to
22  execute on the Judgment.  So, before doing so,
23  we will run another bankruptcy scrub to make
24  sure that the person didn't file bankruptcy in
25  the interim.  We will do a military scrub to

1   make sure the person is not in active military

2   service and we may do, in some cases, a decedent

3   scrub to make sure the person didn't die in the

4   interim.

5           Q.      Did you do anything else?

6           A.      Well, you know, we may review the

7   notes on the case, if there's a -- you know,

8   but --

9           Q.      Anything else?

10          A.      Well, you know, again, it would

11  have to be -- for an income execution, it would

12  have to be a place of employment that was --

13  where we believed the person works or for a

14  bank, a bank account.

15          Q.      Anything else?  Anyone else?

16          A.      No, not that I can think of right

17  now.

18                  MR. KESHAVARZ:  Can you read my

19          last question back to me, please?  Or two

20          questions back, I guess.

21                  (Whereupon the referenced

22          questions are read back by the reporter.)

23          Q.      Let me ask a narrower question,

24  more of a yes or no question.

25                  Is it for Forster & Garbus's

1    position that it is -- well, strike that.

2            Let me just mark this.

3            (Whereupon P-1, Income Execution,

4        is marked for identification.)

5        Q.    So, before I go on to Exhibit 1,

6    is it Forster & Garbus's position that it is

7    required to do a meaningful attorney review

8    prior to the issuance of an income execution on

9    a putative judgment and everything that you just

10   talked about is the meaningful attorney review?

11   Is that what you mean?

12       A.    More or less, yes.

13       Q.    Is there anything about a

14   meaningful attorney review that Forster & Garbus

15   believes it should conduct that you haven't

16   discussed?

17       A.    No.

18       Q.    Is there -- I said "believes."

19   So, is there anything that Forster & Garbus

20   actually does to do a meaningful attorney review

21   other than what we've discussed?

22       A.    I think I've answered it.

23       Q.    That's it.  Right?

24       A.    Yes.

25       Q.    Why does -- does Forster & Garbus

```
 1   have a different policy for a meaningful
 2   attorney review to execute on judgments where
 3   Forster & Garbus has obtained a judgment, as
 4   opposed to it being an account where a prior law
 5   firm had entered the Judgment?
 6            MS. LASTORINO:  Objection to form.
 7       A.    Okay.  Over the years, we've
 8   developed where judgments that are referred that
 9   were entered by somebody else, we now make sure
10   that we have a copy of the actual Judgment, as
11   opposed to just relying upon client information
12   and we also check with the courts at the time of
13   referal to make sure that that was -- that the
14   Judgment, you know, is valid and hasn't been,
15   for example, vacated.  We do that at the time of
16   referal.  We don't do that subsequently, other
17   than the meaningful review of the file that I
18   described before.  So, there's no difference,
19   other than the referal period.  Once the
20   Judgment has been referred to us and we verify
21   that, we do the same steps, whether it was a
22   Judgment entered by Forster & Garbus or a
23   Judgment entered by another firm that Forster &
24   Garbus took over.
25            Q.    And when Forster & Garbus obtained
```

```
1   the judgment account from Discover as to Mr.
2   Callender, are you saying that the Judgment had
3   not, at that point, been vacated?
4            A.     That is correct, in 2009.  I
5   believe the account was referred in December of
6   2009.  That was a valid Judgment.  That is
7   correct, and we also, approximately a month
8   later, sent to Mr. Callender a letter advising
9   of our involvement in the account; that we
10  were -- that a Judgment had been entered.  That
11  letter was sent and was not responded to by Mr.
12  Callender.  Therefore, under the FDCPA, we
13  believe that is states that we may assume that
14  the debt is valid.
15           Q.     You said -- correct me if I'm
16  wrong.  You said that there is a change in the
17  policy in terms of judgment accounts Forster &
18  Garbus gets for execution, where Forster &
19  Garbus was not the attorney getting the
20  Judgment.  Are you saying that there was a
21  change at Forster & Garbus's policy as to how to
22  treat those accounts?  Is that right?
23           A.     We do more -- yes, in a sense,
24  yes, um-hum.
25           Q.     When did that change happen?
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

1        A.      It started in around November

2    2014, when we started to make some of these

3    changes.

4        Q.      What was the impetus for making

5    these changes?

6        A.      Just probably better practice that

7    perhaps there were some cases that came out that

8    we reviewed.  I don't really remember the

9    impetus of it but, you know, we started to do

10   that.

11       Q.      Is one of the reasons that Forster

12   & Garbus changed it's policy because it was sued

13   for violating the FDCPA for executing on vacated

14   judgments?

15              MS. LASTORINO:  Objection to form.

16       A.      I'm not sure.  As far as I know,

17   there was one other case, which you're familiar

18   with, that involved that issue.  I don't

19   remember the date of that case.  If that was

20   around the time you're alleging, then, yes, that

21   might have been the impetus; but other than that

22   case, I don't know of any other cases where

23   there's been an FDCPA alleged violation or even

24   any knowledge of a Judgment having been vacated

25   without our knowledge and then we proceeded to

```
 1   try to collect on it.  So, I understand that you
 2   may be trying to make this an issue of, "Oh, you
 3   know, there are so many vacated judgments that
 4   we're seeking to execute on," but, you know,
 5   that's not it.  So, you know, we always try to
 6   better our practice.
 7                 I was present in a commercial
 8   lawyers conference for five years.  We always
 9   try to do the best we can and always try to
10   advise our members to keep up with the law and
11   to do things, you know, to -- because there are
12   changes in the law all the time, in the FDCPA.
13   There are decision that come up all the time,
14   and you think you're doing something right and
15   all of a sudden, a decision comes out and now,
16   all of a sudden, the practice that everybody's
17   been doing for years and years and years, the
18   Court says, "Oh, you can't do that anymore."
19   So, we try to adapt our practice to that and
20   then we get sued because now, this new practice
21   is challenged by someone else who's saying,
22   "That's not it."  So, we try to keep up.
23                 So, if it was the Francis case,
24   which is the case that I think you're alluding
25   to, if that was around November of 2014, then
```

```
 1    yes, that would have been the impetus for
 2    implementing that procedure.
 3            Q.     Just so the record is clear, the
 4    Francis case was a lawsuit brought by my office
 5    against Forster & Garbus and others for Forster
 6    & Garbus executing on a vacated Judgment.
 7            A.     That is correct, um-hum.
 8            Q.     Thank you.  Other than this case,
 9    Mr. Callender's and Mr. Francis's case, has
10    Forster & Garbus ever been sued for collecting
11    on a vacated Judgment?
12                   MS. LASTORINO:  Objection but you
13            can answer.
14            A.     Not that I'm aware of.
15            Q.     But you're the person in charge
16    with FDCPA clients --
17            A.     Yes.
18            Q.     Just so the court record is clear,
19    you're the person in charge of FDCPA compliance
20    at Forster & Garbus.  Is that correct?
21            A.     Yes.
22            Q.     You are the main person at Forster
23    & Garbus who gets involved in FDCPA suits when
24    Forster & Garbus is sued.  Correct?
25            A.     Yes.
```

```
 1          Q.      So, if there was another lawsuit
 2   against Forster & Garbus for violating -- for
 3   executing on a vacated Judgment, you would know
 4   that?
 5          A.      I believe so.
 6          Q.      And so the record is clear, there
 7   are no other instances where Forster & Garbus
 8   was sued for collecting on a vacated Judgment
 9   other than Mr. Francis and Mr. Callender?
10          A.      As far as I remember, no.
11          Q.      I'm just looking at a copy of
12   Francis's complaint.  We can print it out if you
13   want, but the signature is dated, by my office,
14   June 26, 2015.  So, this new policy, it did
15   not -- you did not take this new policy of
16   checking as to the validity of judgment at the
17   time date of assignment, you didn't have that
18   changed before November 26, 2015?
19          A.      I said '14.  We changed it in '14.
20   We started changing in '14.
21          Q.      But the Francis lawsuit was filed
22   in June 2015.
23          A.      But the referral might have been
24   before that.
25          Q.      What do you mean that the
```

1    referral --

2            A.      The referral of the account.   I

3    don't know the fact -- I don't remember the fact

4    pattern of it, okay, but it had a different fact

5    pattern than in the Callender case, if I recall.

6    It had something to do with a judgment that had

7    been recalled and then reassigned.   So, there

8    may have been some different factors in there.

9            Q.      All right.   Let me show you what's

10   been previously marked as Plaintiff's Exhibit 1.

11   Tell me if you recognize that document?

12           A.      That's an income execution that

13   was issued by Forster & Garbus in the matter of

14   Discover Bank --

15                   MS. LASTORINO:  Do you have

16       another copy?

17           A.      -- Discover Bank versus Victor

18   Callender that was issued by Forster & Garbus.

19           Q.      When is that income execution

20   dated?

21           A.      12/3 of '14.

22           Q.      Do you have any reason to believe

23   that it wasn't signed on that date?

24           A.      No.

25           Q.      So, we've gone back and forth

1    about when this change in policy was.  Was

2    Forster & Garbus's change in policy that we

3    discussed before or after the signing of the

4    income execution that's Exhibit 1?

5         A.     Well, I said there were policy

6    change.  I didn't say exactly all of the policy

7    changes, but we started to verify judgments upon

8    referal of accounts, as I said, on or about

9    November of '14, I believe is when we started to

10   implement that, trying to get copies of the

11   Judgment.  So that policy would have been a few

12   weeks before the date of this, if it was

13   implemented in November of '14.  Of course, this

14   account was referred in December of 2009.  So

15   that policy would not have applied to this

16   account.

17        Q.     So, the policy was only applied to

18   accounts that were -- judgment accounts that

19   were forwarded to Forster & Garbus after

20   November of 2014.  Correct?

21        A.     Yes.

22        Q.     So, if there was a judgment

23   account that was forwarded to Forster & Garbus

24   before November of 2014, even if you're

25   executing on that Judgment even today, are you

1  saying you would not check -- well, strike that.

2  Let me just make sure I understand what the

3  policy change was.

4              You're saying beginning November

5  2014, Forster & Garbus's policy was to get a

6  copy of the putative judgment from the judgment

7  creditor on the date of the assignment of the

8  Judgment of account to Forster & Garbus?

9       A.     Correct.  And would not work the

10 account until we got a copy and a judgment

11 account might be referred to us but if the

12 client didn't provide the Judgment for three

13 months, no communication was made with the

14 consumer, you know, until that time, until we

15 got a copy of the Judgment.

16      Q.     And how would you obtain a copy of

17 the Judgment?

18      A.     We would either ask the client for

19 it or in some cases, we would go to the Court

20 and try to obtain a copy ourselves or perhaps if

21 there was another attorney, you know, prior to

22 us, you know, maybe get it from his office, but

23 we would try to secure a copy of the Judgment

24 and confirm.

25      Q.     Okay.  The other change in policy,

1   other than getting a copy of the Judgment, what
2   was the other change in the policy?
3          A.     Well, we started to -- and this is
4   more recently and probably prompted by your
5   lawsuit, okay, was to now not only get a copy of
6   the Judgment but to also verify at the time of
7   referal that that Judgment was still valid; and
8   we do that by contacting -- by checking eCourts
9   and by contacting the courts directly.  We don't
10  just do eCourts.  We also go on the courts'
11  websites or call the court clerks.
12         Q.     But when you said you would check
13  eCourts or the court file, you said that was a
14  policy that was after November of 2014?  Is that
15  right?
16         A.     Yes, um-hum.
17         Q.     When did Forster & Garbus begin
18  checking eCourts at the time of the referal of
19  an alleged judgment account to determine whether
20  there's been an Order to Show Cause to vacate
21  that Judgment?
22         A.     I'm not sure of the exact date.
23  It would be probably the latter part of 2015, or
24  the beginning of 2016.
25         Q.     So, this change in policy would

```
 1    only be at the time of referal?  It wouldn't
 2    apply to judgment accounts that were transferred
 3    prior -- that were previously transferred for
 4    collection?
 5          A.      Right, that is correct.
 6          Q.      Why not?
 7          A.      Because I don't think there's a
 8    duty for us to do so.  If you look at, I
 9    believe, two instances of cases where this came
10    about and yet, you know, the number of judgments
11    could be in the thousands of these types of
12    cases, several thousand a year.  Okay.  I don't
13    think it's a required business practice or
14    required of the firm to go and check on every
15    single case before we do the income execution of
16    thousands of judgments where one or two might
17    result in this situation.
18                Secondly, okay, we have also taken
19    the practice of now filing substitutions of
20    attorneys or notices of appearance so that, you
21    know -- and the -- we also, you know, again,
22    when we get a judgment, the income execution or
23    bank restraints is not the first notice that
24    this person is getting.  So, there's requested
25    communication from the consumer with us.  Again,
```

```
 1   when we send out the first letter, the first
 2   letter says, "If you dispute the validity of
 3   this debt, you know, you can do so and we'll
 4   provide you with a copy of the Judgment, if you,
 5   you know, want."  If the consumer responds,
 6   then, of course, we will do so.  If he doesn't
 7   respond, again, we assume the Judgment is valid.
 8          Q.      Let's follow up on that last
 9   point.  So, are you saying it's Forster &
10   Garbus's position that if it sends a consumer a
11   notice that they have 30 days to dispute the
12   validity of the debt.  That's called, generally,
13   a G Notice.  Is that right?
14          A.      Generally, right, 1692.
15          Q.      So, let's just call that the --
16          A.      Validation notice.
17          Q.      The 30-day validation notice.  Is
18   it Forster & Garbus's position that if it sends
19   out a 30-day validation notice, regarding the
20   collection of a Judgment where that Judgment was
21   transferred from another law firm, is it Forster
22   & Garbus's position that it is not required to
23   take any steps to determine the validity of the
24   Judgment?
25                  MS. LASTORINO:  Objection to form.
```

1        A.      Well, again, I already testified

2   to that:  That, one, we have a right to rely on

3   our client's information that there's a valid

4   Judgment; and, two, as I stated, we do obtain

5   copies of the Judgment; and, three, as we can

6   assume, after a 30-day period, that the Judgment

7   is valid and so without anything more, I think

8   it's proper for us to assume that the Judgment

9   is valid, unless brought to our attention in

10  some way that the Judgment is not valid.  Now,

11  there are situations where people will contact

12  us and say, "I didn't know about the Judgment

13  and I wasn't served properly."  That's a

14  different issue.  That's a separate issue, you

15  know, and we'll respond to that accordingly.

16  That would be a dispute and handled in a way

17  that is -- you know, we'll follow the dispute

18  rules.

19        Q.      And the dispute rules are?

20        A.      Well, we would send it to the

21  compliance department.  We would research the

22  case, check the -- you know, check the affidavit

23  of service, ask for information about the

24  service, you know:  Was the person living at

25  that address at that time; and then, we will

```
1    determine the course of action.  Maybe try to
2    settle the case.  Some people are willing to
3    settle but they're not aware of the Judgment.
4    Doesn't mean they don't own the debt.  So that
5    we may resolve the issue with the debtor at that
6    point.
7              Q.    Tell me if this is a true
8    statement or not.  It would take about 30
9    seconds or less to check eCourts to determine if
10   Mr. Callender's -- Mr. Callender had vacated his
11   Judgment?
12                   MS. LASTORINO:  Objection.
13             A.    I don't know.  Maybe a little
14   longer.
15             Q.    A minute?
16             A.    Maybe, two minutes.
17             Q.    Two minutes.  And eCourts is the
18   courts' web system that, for the counties in New
19   York and many of the populated counties in New
20   York State, they list what actions are taken in
21   a collection lawsuit.  Correct?
22                   MS. LASTORINO:  Objection.
23             A.    In all lawsuits.
24             Q.    In all lawsuits.  It will tell you
25   the date that a lawsuit has been filed.
```

```
 1   Correct?
 2        A.    I believe so.
 3        Q.    It will tell you the disposition
 4   date.  Correct?
 5        A.    Yes.
 6        Q.    It will tell you if there's been
 7   an Order to Show Cause to Vacate the Judgment
 8   that's been filed.  Correct?
 9        A.    I'm not sure if it's on all cases.
10   Disposition date, in some cases, if you go on to
11   a basic screen and you look at the disposition
12   date, it doesn't tell you what happened; but
13   there is -- and I don't know if it's in all, you
14   know, CALA courts, but they report, you know,
15   the motion practice.  It may very well be, but
16   again, as I've said before, if there are 3500
17   judgments -- well, actually, there are more.
18   Because if you're imposing this on not just
19   judgments such as in Mr. Callender's case,
20   referred by other clients, but to say that we
21   would have to judge -- do it on every case in
22   our office.  I think it's unreasonable.  I don't
23   think it's a reasonable and required practice.
24        Q.    When you said "3500," what did you
25   mean?
```

```
1          A.     Well, I'm saying if there were
2    3500 judgments referred in a year to us, that
3    kind of classification.
4          Q.     Is that accurate?
5          A.     For -- yeah, that may be for at
6    least, you know, recent years.
7          Q.     Okay.  And so you're --
8          A.     And that's a small portion.  I'll
9    just go on to say that's a small portion of, you
10   know, tele-referrals.
11         Q.     So, for this 3500 a year, that
12   would be a new judgment account?
13         A.     Judgments that were referred by --
14   this have been obtained by other parties.
15         Q.     I just want to make sure I'm
16   clear.  Those would be new judgment accounts --
17   strike that.
18                I'm just trying to understand your
19   testimony.  Are you saying that there would be,
20   roughly speaking, about 3500 new judgment
21   accounts sent to Forster & Garbus each year
22   where Forster & Garbus was not the firm that
23   obtained the Judgment?  Correct?
24         A.     Yes.
25         Q.     Okay.  So, right now, there would
```

1    be tens of thousands of judgment account files

2    that Forster & Garbus is collecting on, where

3    Forster & Garbus did not obtain the Judgment?

4    Is that accurate?

5                    MS. LASTORINO:   Objection.

6         A.     I would say no, because many of

7    those judgments would have been closed out and

8    everything like that.  So, we're not talking

9    about that kind of volume.

10        Q.     Just roughly, about how many

11   judgment accounts does Forster & Garbus collect

12   on in a year where Forster & Garbus is not the

13   firm that obtained the Judgment?

14                   MS. LASTORINO:   Objection.

15        A.     I really don't know the number on

16   that, you know.  There would have to be several

17   thousands of them -- I'll admit to that -- that

18   are still with the firm.  It's doesn't mean

19   we're collecting -- when you say, "collecting on

20   it," it doesn't mean we're collecting money on

21   them.  They're active in our office -- still

22   active in our office.  Doesn't mean that we're

23   collecting any money or, you know, doing

24   anything with them.  They're just there.

25        Q.     But generally speaking, your job

```
 1    at Forster & Garbus in collecting judgments is
 2    to, you know, collect them, to execute on
 3    them --
 4            A.     Yes, but only a very small portion
 5    of judgments are ever collected.
 6            Q.     By "collected," you mean,
 7    actually, money received?
 8            A.     Correct.
 9            Q.     But there's a larger number where
10    you're try to -- I mean -- strike that.
11                   For all the judgment accounts,
12    you're trying to obtain money to collect on the
13    judgments.  Right?
14            A.     Yes.
15            Q.     And for all those accounts, when
16    you say you're trying to collect on it, one
17    common way is to issue bank restraints or income
18    executions.  Right?
19            A.     That is a way to do it, but it's
20    not done willy-nilly, you know.
21            Q.     But if Forster & Garbus has a
22    basis to think that they know whether the
23    consumer has a job, or banks, it's Forster &
24    Garbus's normal course, in collecting judgments,
25    to issue an income execution or bank restraint.
```

1    Right?

2            A.    Yes.

3            Q.    Okay.  And you're saying because

4    of the several thousand judgment accounts that

5    Forster & Garbus is collecting on, where Forster

6    & Garbus did not obtain the Judgment, because

7    there's so many judgments, are you saying that's

8    why it's not reasonable for Forster & Garbus to

9    have to check eCourts each time it is forwarded

10   an account?

11               MS. LASTORINO:  Objection.  Judge

12           Hellerstein ruled --

13               MR. KESHAVARZ:  Wait, wait, wait,

14           no.  He opened the door.

15               You can answer the question.

16               MS. LASTORINO:  Judge Hellerstein

17           ruled that you're limited to due

18           diligence in this action.

19               MR. KESHAVARZ:  He answered the

20           question before.  I'm just trying to make

21           sure I understand it.  He answered the

22           question.  So, I'm just trying to nail it

23           down.

24               MS. LASTORINO:  Your scope of

25           questioning is not permitted by the

```
 1   Judge's order.
 2          MR. KESHAVARZ:  I'm just trying to
 3   nail down what your testimony is.  We can
 4   reread the transcript, if you want.  We
 5   can go through all of that.
 6          MS. LASTORINO:  And I'm telling
 7   that you're asking for things --
 8          MR. KESHAVARZ:  Reread the
 9   transcript.
10          MS. LASTORINO:  -- that are
11   disproportionate pursuant to the Judge's
12   order dated September 22, 2016, which
13   says, "Plaintiff should focus on what the
14   defendant did by way of due diligence in
15   this case, in the Callender matter."  So,
16   you can go to another question.
17          MS. LASTORINO:  Can you read back
18   the last three questions and the last
19   three answers?  We can be here all day,
20   if you'd like.  Go ahead.
21          (Whereupon the referenced
22   questions and answers are read back by
23   the reporter.)
24          MS. LASTORINO:  I have to make a
25   call to the office.  I'll be a second.
```

```
 1              MR. KESHAVARZ:  Actually, I'd like
 2         to stay on the record, then.  I don't
 3         want the witness to leave.
 4              (Whereupon there's a brief
 5         recess.)
 6   BY MR. KESHAVARZ:
 7         Q.    We talked a minute ago about
 8   relying on what your client tells you as a basis
 9   of a meaningful attorney review to collect on a
10   Judgment.  Do you remember that?
11         A.    Yes.
12         Q.    Now, most of the collection
13   agreements by which Forster & Garbus collects,
14   the typical agreement disclaims any warranties
15   about the accuracy of the information.  Correct?
16              MS. LASTORINO:  Objection.  I'm
17         sorry.  Can you just read that back?
18              (Whereupon the last question is
19         read back by the reporter.)
20              MS. LASTORINO:  I don't understand
21         your question.
22              Do you understand his question.
23              MR. KESHAVARZ:  Well, don't -- if
24         you have a question about -- and I know
25         you're not intending to do this.  I'm
```

```
1              just saying if you have a question about
2              the clarity of a question, then the
3              proper response is an objection to the
4              form of the question.
5                   MS. LASTORINO:  Well, I did object
6              to it.  So, I'm just asking him if he's
7              okay with the question.
8                   MR. KESHAVARZ:  Well, that's
9              where I think -- and I know you're not
10             intending to do this, but I think the
11             effect of that, even unintentional, would
12             be to affect the testimony of anyone in
13             that position.
14                  MS. LASTORINO:  It's not, Ahmad,
15             please.
16        Q.      But do you understand my question,
17   sir?
18        A.      I understand it.
19        Q.      And what's your answer?
20        A.      My answer is I'm not familiar with
21   the contract provisions of all the clients.  I'm
22   not familiar with that being a clause that I
23   focused in on and I think that in terms of
24   whether there's a clause or not, there's quite
25   often that there is terminology such as that,
```

```
 1   and I'm not saying there is in the contracts.
 2   I'm not saying -- your representation that "most
 3   of the contracts," I wouldn't concede to that.
 4   I have no idea whether most of them or any of
 5   them have that clause in it.  Nevertheless, if
 6   it did have that clause, it doesn't mean that
 7   the information is not reliable; and when you
 8   have clients who provide us with reliable
 9   information -- and Discover is one of the best
10   clients in that regard -- that there would be
11   any reason not to believe the accuracy of the
12   information.  So, whether there's a clause like
13   that makes no difference as to whether or not
14   the information is accurate.
15        Q.    So, whether the debt collector
16   says -- well, if that's the answer to your
17   question, that's the answer to your question.
18             For collection on Discover
19   accounts, do you know, one way or the other,
20   whether Discover disclaims warranties about the
21   accuracy of the information?
22        A.    I have no idea.
23        Q.    But even if Forster -- strike
24   that.
25             Are you saying that even if
```

```
1    Discover disclaimed the accuracy of the
2    information and said that it's the duty of the
3    attorney to independently make a determination
4    as to the validity of a Judgment to collect, are
5    you saying that even if there was such a clause,
6    you're entitled to rely on the client to
7    determine whether the Judgment is valid --
8              MS. LASTORINO:  Objection to form.
9         Q.      -- at the time of execution?
10             MS. LASTORINO:  Objection to form.
11        A.      What difference does it make --
12   why did you say, "at the time of execution"?
13   Execution can come many years after the
14   referral.
15        Q.     All right.  So, let me rephrase
16   that.  Is it your position that if Discover --
17   really any judgment creditor -- sends you a
18   Judgment to be collected on, if their agreement
19   explicitly disclaims the accuracy of the
20   information, and says "that's the duty of the
21   law firm to independently determine the validity
22   of the accounts," are you saying that it would
23   not be Forster & Garbus's duty to independently
24   select the validity of the accounts?
25             MS. LASTORINO:  Objection to form.
```

```
 1          A.     I think there's very many factors
 2    that go into that.  I think we can rely on the
 3    information of the client, despite any
 4    representation that you're stating, as well as
 5    the fact that we communicate with the consumer
 6    and ask him to, you know, dispute the debt or to
 7    seek confirmation of the debt; and if he doesn't
 8    do so, that becomes an assumption and it's an
 9    assumption that the debt is valid and that the
10    Judgment is valid.
11          Q.     And because of that assumption --
12          A.     And as I said, also, we do obtain
13    copies of the judgments and so --
14          Q.     Well, if the Judgment has been
15    vacated, there would, obviously, by definition,
16    always be a Judgment.  Right?
17               MS. LASTORINO:  Objection.
18          A.     Again, that's a different
19    scenario.  That's not talking about the Judgment
20    at the time of referral.  So, subsequently, to me
21    this is a Wernoff (ph), this case, Callender.
22          Q.     Wernoff, Callender and Mr. Francis
23    is another instance of that happening?
24          A.     Right.
25          Q.     And Miss Brown is another instance
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
1    where Forster & Garbus was sued for collecting
2    on a vacated Judgment.  Right?
3            A.    I don't remember that one.
4            Q.    Didn't it settle a few months ago?
5            A.    I'm not familiar with that.
6            Q.    Were you at a settlement
7    conference?
8            A.    Oh, Miss Brown?
9            Q.    Yeah.
10           A.    Who is Miss Brown?  I don't
11   remember her.
12           Q.    Lashawn Brown?
13           A.    Lashawn Brown.  Again, I have to
14   recollect.
15           Q.    Let me ask you this:  Does Forster
16   & Garbus keep track of the times that it's
17   alleged to be executed on a vacated Judgment?
18                 MS. LASTORINO:  Objection to form.
19           A.    I don't -- I wouldn't say there's
20   a list, okay, but if it becomes an issue, it's
21   something that's brought to our attention.
22           Q.    What do you mean "becomes an
23   issue"?
24           A.    Well, in other words, a lawsuit or
25   a debtor brings it to our attention.
```

1          Q.     But my question is, specifically,
2     does Forster & Garbus track the number of times
3     that it is alleged to be collecting on a vacated
4     Judgment?
5          A.     No, not per se.
6          Q.     It doesn't track the number of
7     times Forster & Garbus has been sued for
8     collecting on a vacated Judgment.  Correct?
9          A.     Not particularly for that
10    instance, no.
11         Q.     It doesn't keep track of letters
12    from consumers where they allege that a Judgment
13    has been vacated?  Forster & Garbus doesn't
14    collect that.  Correct?
15         A.     No.  Well, there's general
16    categories but I don't believe so, no, not
17    separately for that.
18         Q.     And Forster & Garbus doesn't keep
19    track of even when consumers' attorneys contact
20    them, like the Urban Justice Center did here,
21    and tell Forster & Garbus that they're
22    collecting on a vacated Judgment.  Forster &
23    Garbus doesn't track the number of times it gets
24    those complaints.  Right?
25                 MS. LASTORINO:  Objection to form.

```
 1           A.      Not that I know of.

 2           Q.      Why not?

 3           A.      Because I don't think -- I think

 4    it's a rare instance and so that it's not

 5    something that we would keep track of, but we

 6    would pay attention if we saw it as an issue.

 7    So, for example, one or two cases a year, if it

 8    did come up -- and it's not even that many --

 9    then I don't think we would set up a policy to

10    track that type of issue because it's not an

11    issue that's come to our attention as being an

12    issue, a real issue.

13           Q.      Does Forster & Garbus have a

14    specific policy to avoid collecting on vacated

15    judgments?

16           A.      We would never collect on a

17    vacated Judgment if we knew it had been vacated.

18    That would be our policy.

19           Q.      Is there any other policy that

20    Forster & Garbus has to avoid collecting on

21    vacated judgments, other than what you just

22    said?

23           A.      No.  My prior testimony speaks for

24    itself on that issue.

25                   MR. KESHAVARZ:  Can you mark this,
```

```
 1          please.
 2                  (Whereupon P-2, eCourts Printout,
 3          is marked for identification.)
 4          Q.      How long does it take, generally
 5   speaking, for Forster & Garbus to find whether
 6   or not a consumer is employed or has a bank
 7   account for Forster & Garbus to issue a bank
 8   restraint or a wage garnishment?
 9          A.      No set time.  I have no idea.  It
10   would be -- in some cases, you find it, you know
11   within a few months of a referral, you know, or
12   of a Judgment and in some cases, it could be
13   years.
14          Q.      And what steps does Forster &
15   Garbus take to determine if there's a place of
16   employment or bank account to execute upon?
17          A.      We use certain services that are
18   provided to locate jobs and things like that in
19   banks.
20          Q.      And once that is located, how long
21   does it take for the income execution or the
22   bank restraint to go out?
23          A.      Probably fairly quickly, you know,
24   within a few weeks.
25          Q.      And how long does it take to
```

1    prepare and issue those income executions or

2    bank restraints?

3           A.    Once they are requested, they're

4    produced pretty much, you know, a day later or

5    same day -- a day later or whatever.

6           Q.    About how long does it take, just

7    roughly speaking, to do that?  Like for Mr.

8    Callender, for example.  They issued an income

9    execution.  How long did it take, typically, for

10   Forster & Garbus to be able to issue an income

11   execution or bank restraint?

12          A.    I don't understand the question.

13          Q.    So, you have the system in place

14   where you find out if there's a bank account.

15   Right?  To be executed upon.  Right?  You have

16   to verbalize your answer.

17          A.    Yes.

18          Q.    And there's a process to determine

19   whether the consumer has a place of employment

20   to garnish wages.  Correct?

21          A.    Yes.

22          Q.    And once that information is

23   obtained, what is the next step in collecting

24   that Judgment?

25          A.    I believe it would first be

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
1    reviewed by a supervisor, you know, to say,
2    "okay," you know, confirm to issue the income
3    execution and that would then be put through for
4    processing to the data processing area, which
5    would produce the actual document, which would
6    then go to the attorney for review; and then
7    issue to the judgment units to send out to the
8    enforcement officer, the bank.
9         Q.    When you say it's forwarded to the
10   attorney for review, what review do you know the
11   attorney is supposed to take?
12        A.    They would look at the Judgment
13   and they would, you know, see the information
14   that's on the Judgment.  There's a job.  There's
15   a Judgment date.  There's Judgment information.
16   Perhaps look at the notes on the account and
17   then proceed with the signing of the execution.
18        Q.    So, all the steps that the
19   attorney would take in this attorney review you
20   just talked about, all the steps the attorney
21   would take is just to determine that they're
22   executing on the right bank account or executing
23   on the right employer.  Correct?
24        A.    Well, yes.
25        Q.    They're not checking anything
```

1    else.  Correct?

2           A.      They might.  You know, I can't

3    speak for the individuals as to everything they

4    may look at, but the answer is, generally, that

5    would be the information.  Again, the Judgment

6    itself, the document itself could not be

7    produced even if there was no judgment

8    information, you know.  So that they would rely

9    on the integrity of the system to then issue the

10   -- to sign off on the execution.

11          Q.      But they would only look to see if

12   there was a judgment for accounts that are --

13   new accounts that are placed for collection on

14   judgments after November 2014.  Correct?

15          A.      I'm sorry.  I misunderstood your

16   question.

17          Q.      This issue about checking

18   judgments, that would only be checking to see if

19   there's a Judgment in the file at the date of

20   the placing of the account after November 2014,

21   where the placement was after November 2014.

22   Correct?

23          A.      Well, it doesn't mean we didn't

24   have copies of Judgment prior to 2014.  We're

25   talking, you know, a policy change but that

```
 1    doesn't mean that on many cases prior to 2014,
 2    we did not obtain a copy and did not have a copy
 3    of the Judgment.  I would say prior to 2014, in
 4    the majority of cases, we did have copies of the
 5    judgments.
 6            Q.     How do you know that?
 7            A.     Because I've been here since 2008,
 8    and based on the clients, I believe we had, you
 9    know, copies of judgments.
10            Q.     So, how long does that whole
11    process take, the issue the Judgment?  Ten
12    minutes?  An hour?
13            A.     What do you mean "issue the
14    Judgment"?  I don't understand.
15            Q.     From the date that -- the time
16    period to find the account, the bank account, to
17    find the employer, for it to go through this
18    supervisor.  What does the supervisor do?
19            A.     Well, the supervisor would look at
20    the information and say, "Okay.  Issue the
21    income execution or the restraining notice."  So
22    they would review the account at that point.
23            Q.     And by "okay," you mean the
24    likelihood of it being profitable for Forster &
25    Garbus to be able do that?
```

```
 1          A.    I wouldn't comment on that in that
 2    way at all.
 3          Q.    How would you comment on it?
 4          A.    I would comment on it to make sure
 5    that -- to look at the account to see if it's
 6    appropriate to issue an income execution or
 7    restraining notice, based on other factors, such
 8    as, as discussed before.  It was a scrub done.
 9    Were there any disputes relative to the finding
10    of that asset that would prevent the issuance of
11    income execution or restraining notice.  So,
12    they would do that review and if it was clean,
13    there's no military issue, that the person was
14    in the active military, no bankruptcy, no
15    deceased, nothing to indicate, you know,
16    something that would prevent, stop it from
17    going, you know, such as a recent dispute.  For
18    example, let's say we found a bankruptcy and
19    somebody, just the day before, wrote a letter
20    saying "I wasn't served with the summons."  They
21    may not issue the restraint.
22          Q.    Do you keep track to determine if
23    that happens that the consumer complains about
24    service prior to issuing income execution or
25    wage garnishment?
```

1        A.      I don't keep track of that but the
2    compliance department would keep track of any --
3    because if that was an issue then it would go to
4    the compliance department and the compliance
5    department would then respond to that dispute
6    and would stop the -- you know, no income
7    execution would go out at that point.  If we had
8    an income execution that had been issued, let's
9    say, first stage and the person disputes
10   service, we won't send it second stage.  It
11   would go to the compliance department.
12       Q.      What's the second stage?
13       A.      The second-stage income execution
14   is the execution served by the enforcement
15   officer on the job.  The first stage is served
16   upon the individual and that gives the
17   individual an opportunity to dispute that income
18   execution and dispute, you know, if he has a
19   dispute regarding the Judgment prior to the
20   service upon the job.  So, in Mr. Callender's
21   case, for example, presumably he was served with
22   the first-stage income execution by the City
23   marshal and yet, failed to respond to the City
24   marshal by saying, "What's this Judgment?  This
25   Judgment was vacated," et cetera.  He failed to

```
 1    do anything like that, which resulted in then
 2    the issuance of the second-stage income
 3    execution, the second-stage income execution
 4    upon this job, in which approximately $210.00
 5    was deducted.  Had he notified the sheriff or
 6    the -- the marshal, in this case, at first
 7    stage, that he was disputing the Judgment, he
 8    never knew about it, that would have stopped the
 9    execution, gone to the compliance department for
10    investigation.  He didn't do that in this case.
11    He failed to mitigate any of his damages, or
12    take steps to notify us that the Judgment had
13    been vacated.
14          Q.     So, in that respect, you're saying
15    that it's his fault?
16          A.     I'm sorry.  What?
17          Q.     In that respect, you believe it's
18    his fault?
19          A.     I believe there's a lot of fault
20    on Mr. Callender in this case.  We'll go back to
21    the Department of Consumer Affairs when he
22    failed to notify the Department of Consumer
23    Affairs, in his complaint, that he was disputing
24    a Judgment, which he should have been well aware
25    of, based upon numerous letters that had been
```

1    sent to him.  He failed to say anything about

2    the Judgment at all.  In fact, alleged that he

3    never had a Discover card; and in this case,

4    also, with the income execution, the whole idea

5    of providing a first-stage execution to the

6    consumer himself without going to the employer

7    is to give the consumer an opportunity to make

8    voluntary payments, or in the case of a dispute,

9    he could dispute it; and, as I said, we would

10   then stop the execution until we had a chance to

11   investigate that dispute.

12         Q.     Well, let me make sure I'm clear.

13   Does Forster & Garbus track the number of times

14   it gets complaints by consumers saying, "You're

15   attempting to collect on a vacated Judgment"?

16         A.     I don't know -- I don't think

17   specific to that because I don't think that

18   instance arises.  Okay.  We may keep track on

19   people who say they were never served with the

20   summons.

21         Q.     Okay.  So, you have -- you have a

22   number of times that consumers -- you keep track

23   of the number of times that consumers contend

24   that they were never served with the Judgment

25   you are collecting on.  Right?

1          A.      I'm not sure.  I would have to --
2    I know there are some general categories and I
3    don't know if we just keep numbers or we just
4    categorize it, you know, as to the nature of the
5    complaint; but I don't think there's one
6    specifically for vacated -- judgments previously
7    vacated and the reason for that is because it's
8    not a common instance.
9          Q.      What did you keep track of the
10   number of times that the consumer says you're
11   collecting on a Judgment where they have never
12   been served?
13         A.      I don't know the number.
14         Q.      Does Forster & Garbus track that?
15         A.      When you say "track it," what do
16   you mean?
17         Q.      Does Forster & Garbus track how
18   often consumers claim that you're attempting to
19   collect on a Judgment where the consumer was
20   never served?
21         A.      We might have some statistics on
22   that or at least, you know, we can -- there may
23   be some statistics.
24         Q.      How often does that happen?
25         A.      I don't know.

1          Q.     So, there would be some statistics
2    on that?
3          A.     Perhaps.
4          Q.     By who?
5          A.     Ann Visecchia.
6          Q.     So, you say "categories and
7    statistics."  What do you mean by "categories"?
8    Categories of disputes by consumers or what do
9    you mean?
10         A.     By consumers, yes.
11         Q.     Categories of disputes by
12   consumers of what?
13         A.     Well, it could be balance, you
14   know.  "I don't owe the balance."  "I don't owe
15   the account."  Or challenge the balance.  That
16   might be a category.  "Never served with the
17   summons."  We may have them just by people who
18   request documentation.  So, these would be broad
19   categories.
20         Q.     And these categories are kept
21   because some the creditors that you collect for
22   require tracking of this information?
23         A.     Not that I know of, no.  I don't
24   believe that's the case.
25         Q.     Do you have any idea whatsoever

```
 1   about how many times consumers contended that
 2   Forster & Garbus was collecting on a Judgment
 3   where they were never served?
 4              MS. LASTORINO:  Objection.
 5        A.    I don't know.
 6        Q.    Can you obtain that information?
 7        A.    I might be able to.
 8        Q.    How long would it take you to find
 9   out?
10        A.    Well, let's -- I may be able to
11   tell you how many people claimed they were never
12   served.  I'm not saying that I can provide you
13   with any statistics on how many people say they
14   were never served and where monies were being
15   collected.
16              MS. LASTORINO:  And again, I'm
17         going to object on the scope of that as
18         exceeding the limitations.  You're asking
19         for --
20              MR. KESHAVARZ:  You never moved to
21         quash on that ground.  You only moved to
22         quash on the number --
23              MS. LASTORINO:  He made the Order
24         clear as to what the scope of discovery
25         is, as to due diligence on this action.
```

```
 1                    MR. KESHAVARZ:  You're mistaking.
 2                    MS. LASTORINO:  No, I'm not.  So,
 3          I object to the request.
 4                    MR. KESHAVARZ:  Okay.  Objection
 5          to the form of the question.
 6          Q.    So, how long would it take for you
 7    to find out this category of the number of times
 8    that consumers contend you're collecting on a
 9    Judgment where they were never served?
10                    MS. LASTORINO:  Objection.
11          Q.    You can answer.
12          A.    I'm sorry.  What?
13          Q.    You can answer.
14                    THE WITNESS:  Can I answer?
15                    MS. LASTORINO:  Actually, I'm
16          seeing this exceeding the scope of the
17          Judge's Order.
18          Q.    Okay.  You can answer the
19    question.
20                    MS. LASTORINO:  No, because --
21                    MR. KESHAVARZ:  You can get the
22          Judge on the phone, if you to ask --
23                    MS. LASTORINO:  I guess we're
24          going to have to.
25                    MR. KESHAVARZ:  He said that he
```

1          keeps track of this.  I'm asking -- so,

2          he's answered that question.  The

3          question is how long would it take you to

4          find out that information.  He's already

5          answered the question on the subject.

6          So, the question is how long would it

7          take you to find out that information.

8               MS. LASTORINO:  Is that what the

9          last question was before this?

10              MR. KESHAVARZ:  Regardless of

11         that, let me just ask you the question.

12         Q.    How long would it take you to find

13    out how many times that Forster & Garbus has

14    been collecting on a Judgment where the consumer

15    contends that they were never served?  How long

16    would it take you to find that out?

17              MS. LASTORINO:  You can answer how

18         long.  You can answer that question.

19         A.    Probably not too long.

20         Q.    A few minutes?

21         A.    Well, maybe -- maybe more than

22    that but, you know, maybe before the end of the

23    week -- or the end of the day.  Is that what

24    you're looking for?

25         Q.    I'm just asking.  The question is

```
 1   this:  You talk to your IT person.  You say,
 2   "Hey, how many complaints do we get from
 3   consumers contending that we're collecting on a
 4   Judgment where they were never served?"  How
 5   many is that?  How long does that take?  A few
 6   minutes?  Half an hour?
 7        A.    Maybe, perhaps.
 8        Q.    Would you be willing to obtain
 9   that information during lunch?
10             MS. LASTORINO:  Objection.
11        Q.    You can answer.  My question is
12   would you be willing to obtain that information
13   during lunch?
14        A.    Well, I would be willing to see if
15   that information is available.
16        Q.    Okay.
17        A.    And if so, I'll make -- now, I
18   don't know if --
19             MS. LASTORINO:  I'm going to
20        object that the information --
21             MR. KESHAVARZ:  Wait.  He's in the
22        middle of an answer.
23             MS. LASTORINO:  I'm sorry.  You
24        can finish.
25        A.    You're categorizing in such a way
```

```
 1   and I'm not agreeing that your characterization
 2   is correct.  Okay.  So that you're saying "on
 3   judgments."  We might not break it down by
 4   judgments.  It might just be disputes where
 5   people allege lack of service, not breaking it
 6   down, judgment versus non-judgment.
 7            Q.     Is there some sort of a --
 8            MS. LASTORINO:  I was saying an
 9       objection.  I let him finish.  So, my
10       objection is --
11            MR. KESHAVARZ:  Wait.  Go ahead.
12            MS. LASTORINO:  My objection is,
13       this line of questioning is exceeding the
14       limitation in Judge Hellerstein's
15       September 22, 2016 Order, which
16       specifically said it's due diligence on
17       the Callender matter.
18            MR. KESHAVARZ:  May I?
19            MS. LASTORINO:  Sure.
20            THE WITNESS:  Maybe we should get
21       Hellerstein on the phone.
22            MS. LASTORINO:  We'll do that.
23            MR. KESHAVARZ:  What's that?
24            MS. LASTORINO:  We will get
25       Hellerstein on the phone.
```

```
1                    MR. KESHAVARZ:  Mark that for a
2          decision by the Court.
3                    He already said he could check it
4          during the lunch.
5                    THE WITNESS:  Well, I could
6          withdraw that.
7                    MS. LASTORINO:  I objected to it,
8          so.
9                    THE WITNESS:  Since there's going
10         to be an objection and since you're
11         saying it's going to be on the record,
12         then there's no reason for me to do so
13         until the Judge orders it.
14                   MS. LASTORINO:  Right.
15                   THE WITNESS:  So, that's my
16         position at this point.
17                   MR. KESHAVARZ:  All right.  If we
18         have to retake the deposition, we'll have
19         to retake the deposition.
20                   THE WITNESS:  That's fine.  I'm
21         available, and it won't require a
22         deposition because it will require a
23         number.
24    BY MR. KESHAVARZ:
25         Q.    Can you identify what Exhibit No.
```

```
 1    2 is?  Well, let me just ask you.  Is that the
 2    eCourts' printout for --
 3                    MS. LASTORINO:  Can you identify
 4           it for the record, so it's clear?
 5           Q.     Well, let me ask you, is that a
 6    copy -- well, I'm identifying it as a copy of
 7    the eCourts printout for Mr. Callender's
 8    account, the judgment account that Forster &
 9    Garbus was executing on.  Is that what it
10    appears to be?
11                    MS. LASTORINO:  Excuse me.  I just
12           want to let the record reflect, since you
13           didn't say the date, this exhibit, it has
14           a date on the bottom of 9/27/2016, 7:34
15           p.m.
16                    MR. KESHAVARZ:  It says what it
17           says.
18                    MS. LASTORINO:  I just want the
19           record to reflect that.
20           Q.     Okay.  The question is, is that
21    the eCourts -- does that appear to be the
22    eCourts' listing for the lawsuit where you were
23    attempting to execute on a vacated Judgment?
24    Right?
25           A.     Yes.
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
 1            Q.    So, if Forster & Garbus checked
 2    and spent the 30 seconds, 60 seconds, two
 3    minutes, to look up eCourts, would Forster &
 4    Garbus have executed my client's wages?
 5                  MS. LASTORINO:  Objection.
 6                  (Whereupon the witness reviews the
 7            document.)
 8            A.    No.
 9            Q.    Why not?
10            A.    Because it indicates the Judgment
11    had been vacated.
12            Q.    Any other reason?
13            A.    Not that I know of, not that I can
14    see, based on this.
15                  MS. LASTORINO:  I have a question
16            on the exhibit because you have a Bates
17            stamp at the end that wasn't produced to
18            me and it was actually -- it was printed
19            yesterday.  So, I would like to have
20            documents made available to me, if you're
21            showing them to the witness, and you
22            should be current with your production.
23                  MR. KESHAVARZ:  Okay.
24                  MS. LASTORINO:  Okay.  And if
25            there are other documents, too, after the
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
 1              Bates Stamp 215, then I would like to
 2              have all of those records.  I should have
 3              had them already, before today.
 4                   MR. KESHAVARZ:  Understood.
 5                   You can mark this as an exhibit.
 6                   (Whereupon P-3, Order to Show
 7              Cause - Pfau vs. Forster & Garbus, et al,
 8              is marked for identification.)
 9              Q.   Please, review Plaintiff's Exhibit
10    No. 3 and let me know when you're done.
11                   (Whereupon the witness reviews the
12              document.)
13                   MS. LASTORINO:  Excuse me, Ahmad.
14              I don't have any of these documents.
15                   MR. KESHAVARZ:  Understood.
16                   MS. LASTORINO:  Well, you've been
17              taking -- I've been very tolerant with
18              you on producing documents to you and you
19              know that.  How are we arriving at a
20              deposition and the day of, you're just
21              putting into evidence Bates-stamped
22              documents that I have never received
23              before today?
24                   MR. KESHAVARZ:  Understood.
25              Q.   Review Exhibit 3 and let me know
```

```
 1   when you're done.
 2              MS. LASTORINO:  And I just want
 3         the record to reflect that I should have
 4         received these documents prior to today
 5         and it's not conducting discovery in good
 6         faith just to be producing them now.
 7         Q.    Go ahead.  Let me know when you're
 8   done, please.
 9              THE WITNESS:  Let me get a drink
10         of water.
11              MR. KESHAVARZ:  Take your time.
12              (Whereupon there is a brief
13         recess.)
14              MS. LASTORINO:  I'm going to
15         reserve my right to move to preclude
16         plaintiff's reliance on what he's marked
17         as Deposition Exhibit P-3, insofar as
18         he's just producing this document today
19         and has never served it on defense
20         counsel prior to today, notwithstanding
21         his obligation that he should have served
22         every document in his client's
23         possession, custody or control or
24         anything else that plaintiff intends on
25         using as an exhibit at today's
```

```
 1          deposition.
 2    BY MR. KESHAVARZ:
 3          Q.     Please, review Exhibit No. 3 and
 4    let me know when you're done, please.
 5          A.     I'm done.
 6          Q.     Can you identify what the document
 7    is?
 8          A.     It's called an Order to Show Cause
 9    in the Matter of the Petition of the Honorable
10    Ann Pfau against various defendants, Index No.
11    2009-8236, in the Supreme Court of County of
12    Erie.
13          Q.     Who is the first defendant?
14          A.     Unfortunately, Forster & Garbus.
15          Q.     So, the filed lawsuit contended
16    that Forster & Garbus and others were using
17    process servers that were systematically filing
18    false Affidavits of Service.  Isn't that
19    correct?
20                 MS. LASTORINO:  Objection to form.
21          A.     Yes.
22                 MS. LASTORINO:  Just let me
23          object, first.
24                 THE WITNESS:  I'm sorry.
25                 MS. LASTORINO:  Go ahead.
```

**JOEL D. LEIDERMAN, ESQ. on 09/28/2016**

```
 1            A.     Yes.
 2            Q.     So, is it common for consumers to
 3    file Orders to Show Cause to vacate judgments
 4    that they collect -- they contend -- strike
 5    that.
 6                   What steps did Forster & Garbus
 7    take, if any, in response to the Pfau lawsuit?
 8            A.     We responded to the Order to Show
 9    Cause.
10            Q.     And what policies and procedures
11    did Forster & Garbus change in response to the
12    Pfau lawsuit?
13                   MS. LASTORINO:  Before we proceed,
14            I'm going to object on the grounds
15            that -- along with my other objections --
16            that this is not relevant.  It's not
17            likely to lead to relevant evidence.
18            It's just solely designed to harass.
19                   Also, can I please have the
20            production of other documents right now,
21            before we proceed because I see that my
22            Bates stamp ends at 214 and I see that
23            this picks up at Bates Stamp 235.
24                   THE WITNESS:  What does yours end
25            at?
```

```
 1              MS. LASTORINO:   214.
 2              MR. KESHAVARZ:   I provide to
 3    opposing counsel, documents Bates stamped
 4    Callender 215 to Callender 303.   As
 5    opposing counsel has noted, looking at
 6    page 215, was eCourts web printout that
 7    was created last night.
 8              MS. LASTORINO:  So, 214 to -- did
 9    you say, to 303?
10              MR. KESHAVARZ:   215.  You have
11    214.
12              MS. LASTORINO:   215 to 303, you
13    said?
14              MR. KESHAVARZ:   That is correct.
15              MS. LASTORINO:   Okay.  So, we're
16    going to have to take a break now.  I'm
17    going to look at the documents because
18    these should have been produced prior to
19    today and I have a right to see the rest
20    of the document production.
21              MR. KESHAVARZ:  All right.  Well,
22    let me just ask him a question.
23              MS. LASTORINO:  I want to look at
24    the documents.
25              MR. KESHAVARZ:  Look at the
```

1        documents.  Take your time.  It's nothing

2        earth shattering.

3              MS. LASTORINO:  What's earth

4        shattering is you're not conducting

5        discovery in good faith.  You like to be

6        right on top of everyone else, if they're

7        a second late with discovery, but yet,

8        you come to a deposition with numerous

9        documents.  I mean we're going from 215

10       to 303 without even serving them on me

11       before the deposition even started.  You

12       just take documents out, you mark them as

13       exhibit, without ever seeing them before,

14       on my part.  That's really, really not

15       conducting discovery in good faith and I

16       reserve all my rights to make a motion to

17       the Court for whatever the Court deems

18       appropriate.

19       Q.    Will you turn your attention to

20    Exhibit 3, I believe Bates stamp --

21             MS. LASTORINO:  Just a minute.

22             MR. KESHAVARZ:  You can actually

23       look at the exhibit, if you like.  It's

24       the same document.

25             MS. LASTORINO:  And this is

```
 1          subject to my other objections, too.  In
 2          addition to the objection that this
 3          really, again, exceeds the scope of the
 4          Judge's Order.  How does this have
 5          anything to do with due diligence on
 6          Callender's matter?
 7                  MR. KESHAVARZ:  Are you done?
 8                  MS. LASTORINO:  Well, I'm asking.
 9          I don't believe this is proper
10          questioning.
11                  MR. KESHAVARZ:  I understand.
12          Q.      Will you go on Exhibit 3 to page
13     254 and let me know --
14                  MS. LASTORINO:  Subject to those
15          objections, without waiving anything, you
16          can take a look at the exhibit.
17          Q.      Exhibit 3, page 254.
18                  MS. LASTORINO:  And please, your
19          hand gestures.  Keep them to yourself.
20          Don't give me the rush-along hand
21          gesture.  Okay?  And let the record
22          reflect that that was happening.
23                  MR. KESHAVARZ:  I'm not sure what
24          that means, but okay.
25          Q.      When you're done --
```

```
 1          A.     I'm done.

 2          Q.     Have you had a chance to review

 3   Exhibit 3, Callender 254?

 4          A.     I'm sorry.  What?

 5          Q.     Have you had a chance to review

 6   that document?

 7          A.     Yes.  I'm just looking at it, yes.

 8          Q.     All right.  Let me just ask you,

 9   regardless of what the document says, the Pfau

10   lawsuit contends that there were instances of --

11   you know, hundreds of instances where process

12   servers claimed to be at the same place at the

13   same time.  Right?

14               MS. LASTORINO:  Objection.

15          A.     I wouldn't say hundreds of times

16   because the exhibit you're presenting does not

17   show hundreds of times.

18               (Whereupon there is a brief

19          interruption and the reporter asks the

20          witness to repeat his answer.)

21               MS. LASTORINO:  Would like the

22          question read back?

23               THE WITNESS:  I'll step back from

24          that.

25          A.     Yes, I looked at the third column.
```

```
 1   I didn't look at the second column, yes.
 2         Q.      But the general question is -- I
 3   think you answered it already, but since you had
 4   a pause in between --
 5         A.      Yes, I answered it.
 6         Q.      Let me make sure the question is
 7   clear.  So, the Pfau lawsuit contended that
 8   Forster & Garbus and other debt collectors,
 9   other debt-collecting law firms were using
10   process servers that systematically executed
11   false Affidavits of Service.  That is, the
12   allegation was that the process server claimed
13   to be at one location serving when that wasn't
14   true.  Is that, in a nutshell, what the Pfau
15   lawsuit was about?
16               MS. LASTORINO:  Objection to form.
17         A.      Yes.
18         Q.      In response to the Pfau lawsuit,
19   what changes, if any, did Forster & Garbus make
20   to its policies and procedures?
21               MS. LASTORINO:  Objection.
22         A.      We engaged process servers.  We
23   insisted that process servers use GPS and photo.
24   When they went out to serve, they were required
25   to have smart phones and take pictures, you
```

```
 1   know.  We also review -- we have review of the
 2   information in terms of -- well, first of all,
 3   even before the Pfau lawsuit and afterwards, in
 4   terms of times of service, you know, so that the
 5   service had to be spread out.  Not just at the
 6   same time every day.  It would have to be
 7   served, you know, one time -- if there were more
 8   than one attempt, attempts in the morning,
 9   attempts in the afternoon, attempts in the
10   evening.  The process servers are required to
11   take pictures of and have GPS coordinates to
12   review the affidavits of service.  You have to
13   understand something about the Pfau lawsuit.
14   The Attorney General spent an awful lot of money
15   and time and was able to do it because they had
16   the ability to go into court and coordinate
17   service information from various attorney law
18   firms, you know.  So that it became evident that
19   a person who was in two locations at the same
20   time wasn't necessarily on a Forster & Garbus or
21   a Cohen & Slamowitz case.  It could have been a
22   Forster & Garbus and a Wolpoff & Abramson case.
23   So that the -- you know.  So, it was a
24   tremendous amount of investigation to come up
25   with this.  The result was a consent order,
```

1  which speaks for itself, and there was

2  implementation of certain changes, such as I

3  said, with the process servers taking pictures,

4  taking GPS coordinates, that kind of

5  information; and limiting, you know, again

6  limiting the times they could serve and telling

7  them they could only serve at certain times of

8  the day.

9          Q.    Okay.  Do you believe the

10  allegations in the Pfau lawsuit as to the

11  process servers reporting -- well, strike that.

12              Let me just ask you this:  It's

13  common for -- strike that.

14              What is "sewer service"?

15              MS. LASTORINO:  Objection to form.

16          A.    Sewer service is commonly meant

17  that service which was not properly effectuated

18  but a false affidavit, in effect, was made by

19  the process server.  So, they call it sewer

20  service because it would be as if you threw the

21  summons down the sewer.

22          Q.    So, in the Pfau lawsuits, the

23  documented hundreds of times where the process

24  servers had filed sewer service affidavits.

25  Correct?

```
 1            A.      Yes.
 2            Q.      And are you aware of the Sykes
 3    Class Action against Mel Harris?
 4            A.      Yes.
 5            Q.      And it's your understanding that
 6    as part of the settlement that Mel Harris now
 7    are vacating a hundred and ninety thousand
 8    judgments based on systematic sewer service?
 9            A.      Whatever the number is.
10            Q.      Is that roughly correct?
11            A.      I understand there were judgments
12    that had to be vacated.  I have no idea about
13    the numbers.
14            Q.      Would you say it was a mass number
15    of vacation of judgments?
16            A.      I won't comment on that because I
17    haven't read the Sykes case in years.
18            Q.      So, were you aware of the class
19    action settlement?
20            A.      Yes, Leucadia, yes.
21            Q.      And part of the settlement is
22    they're going to vacate a bunch of judgments?
23            A.      Right.
24            Q.      The allegation was that Samserv
25    was filing maybe a hundred thousand false
```

```
 1   affidavits of service so Mel Harris could get a

 2   Default Judgment based on that false affidavit

 3   of service.  Is that basically your

 4   understanding of what Sykes is about?

 5              MS. LASTORINO:  Objection to form.

 6        A.    Yes.

 7        Q.    Now, given the widespread

 8   allegations of sewer service, orders to show

 9   cause to vacate judgments are fairly common.

10   Correct?

11        A.    And less common today after the

12   Pfau decision.

13        Q.    But before the Pfau decision --

14   when was that?

15        A.    2010, I think was the -- it was a

16   2009 index number.  I think it was settled in

17   2010, if I remember.

18        Q.    So, up to the Pfau decision, it

19   was common for consumers to file orders to show

20   cause to vacate judgments because they contend

21   they were never served.  Right?

22              MS. LASTORINO:  Objection to the

23        form.

24        A.    Say that again?  Repeat the

25   question.  Did you say "after the Pfau
```

1   decision"?

2           Q.      Well, let me ask, up to the Pfau

3   decision, was it fairly common for consumers to

4   file orders to show cause to contend that they

5   were never served with the summons and

6   complaint?

7                   MS. LASTORINO:  Objection to form.

8           A.      I don't know what you mean by

9   "common."  You know, it all depends on number of

10  suits versus number of orders to show cause.  It

11  was always orders to show cause filed pre-Pfau,

12  post-Pfau, okay, on that issue.  That's not an

13  uncommon issue to be found before the Court.

14  Were there more cases percentage-wise before

15  Pfau than after Pfau, I would say probably, you

16  know, and that would be my best guesstimate.

17  Okay.  Because now the process servers

18  themselves are held, you know, after Pfau with

19  the picture-taking.  We know they have to go out

20  there because we don't -- you know, we insist on

21  seeing the pictures.  We insist on getting those

22  pictures and the GPS coordinates.  So that --

23  and then subsequently, the Department of

24  Consumer Affairs licensed process servers in New

25  York and imposed very strict rules.  So, the

```
 1   result is that I think there are probably less
 2   orders to show cause on the issue of service of
 3   summons than there was pre-Pfau.
 4        Q.    For summonses that were served
 5   after Pfau.  Right?  I mean if the summons was
 6   served ten years ago, there would still be --
 7        A.    Yes.  I guess you could classify
 8   it.
 9        Q.    So, the question is clear, when
10   your saying it's less common, you mean less
11   common for judgments that are entered after Pfau
12   than before Pfau.  Right?
13        A.    Yes.  Less orders to show cause,
14   yes, after Pfau, yes.
15        Q.    But for judgments that were
16   entered prior to 2010, for those judgments, it
17   was fairly common for consumers to file orders
18   to show cause, contending that the process
19   server never served them.  Right?
20             MS. LASTORINO:  Objection to form.
21        A.    And again, I don't know what
22   the word "common" means.  You know, if there's a
23   hundred thousand lawsuits and a thousand orders
24   to show cause, is that common?  It's, obviously,
25   based on a percentage.  So, what you say is
```

1    common, is that 50 percent or is it 1 percent?

2        Q.    And what do you think?  For

3    judgments pre-Pfau?

4        A.    It certainly is a small

5    percentage-wise of the number of judgments that

6    are entered that are challenged.  Number-wise,

7    you know, if you sue a hundred thousand people,

8    you're going to get a certain level.  If you sue

9    two hundred thousand people, you might get twice

10   that level, but as a percentage, you know, it

11   still might be a small percentage.

12       Q.    Does Forster & Garbus treat

13   judgments that were entered prior to Pfau

14   differently than judgments that were entered

15   after Pfau?

16            MS. LASTORINO:  Objection to form.

17       Q.    In terms of executing on those

18   judgments.

19       A.    No.

20       Q.    Okay.  Why not?

21       A.    Because a judgment is a judgment

22   is a judgment.  A judgment is good for 20 years.

23   If I have no reason to believe that that

24   Judgment -- you know, if I believe that there's

25   a Judgment that's enforceable, then it's

```
 1   enforceable.  Whether it was entered ten years
 2   ago, eight years ago, three years ago, you know,
 3   two years ago, there can be issues as to the
 4   particular Judgment.  That would be true
 5   pre-Pfau, post-Pfau.  A person alleges he wasn't
 6   served and says he wasn't living at that address
 7   and produces evidence that he wasn't living at
 8   that address, it doesn't matter if it was
 9   pre-Pfau or post-Pfau.  We would treat it the
10   same way.  We would ask him to show proof that
11   he didn't live at that address.
12            Q.    And then what?
13            A.    Then we might vacate -- probably
14   vacate the Judgment.
15            Q.    Do you know how often -- let me
16   ask you this.  For judgments that were
17   searched -- strike that.
18                  For judgments that Forster &
19   Garbus collects where Forster & Garbus is not
20   the attorney that got the Judgment, but 3500 new
21   accounts a year, does Forster & Garbus keep
22   track of how many orders to show cause are filed
23   for those 3500 or so judgment accounts Forster &
24   Garbus gets each year?
25            A.    No.
```

1       Q.     But for the judgments -- including
2   the judgments -- those 3500 judgment accounts
3   you get every year, were you saying that Forster
4   & Garbus -- correct me if I'm wrong -- that
5   Forster & Garbus keeps track of complaints for
6   consumers that they were never served with those
7   summons and complaints for those judgments?
8              MS. LASTORINO:  Objection to form.
9       Q.     Are you saying you did or you
10  didn't keep track of that?
11      A.     I said that if a person disputes
12  that may be a category that our compliance
13  department might be able to produce a number of
14  complaints that fall into a category of
15  disputing service.
16      Q.     But why doesn't Forster &
17  Garbus -- strike that.
18             By disputing service, you mean
19  phone calls or letters by consumers.  Correct?
20      A.     Disputing --
21      Q.     Well, by disputing service, this
22  characterization that you --
23      A.     It's that a person makes a
24  complaint saying I was never served with the
25  summons.

1        Q.      Okay.  But of those complaints --
2    strike that.
3             Are you talking about complaints
4    that are orders to show cause or not orders to
5    show cause?
6        A.      No.  Things that would go through
7    compliance, not orders to show cause.
8        Q.      Okay.  If Forster & Garbus keeps
9    track of complaints where consumers say they
10   were never served the collection lawsuit that
11   you're executing on, why do you only keep track
12   of it if there's no Order to Show Cause that's
13   found?
14            MS. LASTORINO:  Objection to form.
15       A.      The answer is one goes to the
16   compliance department and one goes to the legal
17   department.  It's a different category.  Those
18   are legal cases and we know the number of orders
19   to show cause that were filed.
20       Q.      How many?
21       A.      I don't know.
22       Q.      So, I guess -- are you saying you
23   do know the number of Orders to Show Cause that
24   are filed to vacate judgments that Forster &
25   Garbus have collected.  Correct?

```
 1          A.     Yes, we would know the number of
 2    Orders to Show Cause served upon the firm, yes.
 3    We keep track of how many Orders to Show Cause
 4    we get monthly.
 5          Q.     And how many are they?
 6          A.     I have no idea.
 7          Q.     Okay.  But those are the only
 8    instances where Forster & Garbus -- strike that.
 9                 That raises another question I
10    wanted to ask.  The original law firm here was
11    either Wolpoff & Abramson or -- I think it
12    was Wolpoff or Mann Bracken, whichever one it
13    was.  Mann Bracken, Wolpoff & Abramson, they
14    suddenly imploded and abandoned all these
15    collection lawsuits that were being filed.
16    Right?
17          A.     I believe so, yes.
18          Q.     They have abandoned tens of
19    thousands of cases -- collection lawsuits that
20    had been filed, of which, they have abandoned
21    tens of thousands of cases.
22                 MS. LASTORINO:  Objection to form.
23          A.     When you say, "abandoned," I
24    understand they went out of business or
25    something like that.
```

```
 1           Q.    But they didn't -- so, the cases
 2    where they were the attorney of record, those
 3    big cases just languished after Wolpoff &
 4    Abramson and the other firm shut down.  Right?
 5           A.    I have no idea what happened with
 6    the cases.
 7           Q.    Wolpoff & Abramson and what was
 8    the other one?
 9           A.    Mann Bracken.
10           Q.    Mann Bracken, yes.  So, does
11    Forster & Garbus track to see if the law firm
12    that got the Judgment -- it was either Wolpoff &
13    Abramson or Mann Bracken, for the accounts it
14    gets for judgment collection, where Forster &
15    Garbus didn't obtain the Judgment, does it keep
16    track of who the law firm was that got the
17    Judgment?
18           A.    Not that I know of.
19           Q.    Not just for Wolpoff & Abramson
20    but Mann Bracken.  Forster & Garbus doesn't keep
21    track of any of the law firms that obtained the
22    Judgment for which Forster & Garbus collected?
23                 MS. LASTORINO:  Objection to form.
24           A.    Not a separate characterization,
25    no.
```

```
 1           Q.      So, if there -- strike that.
 2                   Forster & Garbus didn't file
 3   Notice of Substitution in Mr. Callender's
 4   collection lawsuit.  Correct?
 5           A.      Correct.
 6           Q.      And is it your firm's policy to
 7   not file attorney substitutions in the Court
 8   file if it is a judgment account that's placed
 9   with Forster & Garbus?
10                   MS. LASTORINO:  Objection to form.
11           A.      We've changed our procedures over
12   the years and we always wanted to file
13   substitutions of attorneys, if we could and we
14   do so now; and if we need to file Notice of
15   Appearance as counsel for plaintiff or
16   Substitution of Attorney, we do so, you know,
17   but not as much as in the past.
18           Q.      By doing so, you mean doing so in
19   judgment account cases where -- let me just use
20   shorthand.  When I say "judgment account cases,"
21   will you understand that to mean where a
22   judgment is obtained by a firm other than
23   Forster & Garbus?
24           A.      Yes, if you define it as such.
25           Q.      And that's generally how you've
```

1    understood I've been using the term "judgment

2    accounts"?

3              A.    Yes, um-hum.

4              Q.    So, are you saying for judgment

5    accounts, it's now the policy of Forster &

6    Garbus to file a Notice of Appearance or

7    Substitution of Counsel for all of the judgment

8    accounts it's collecting?

9              A.    Yes.

10             Q.    Is it only the new judgment

11   accounts it's collecting or the prior ones or

12   the ones that was -- strike that.

13                   Is it only the judgment accounts

14   that were placed after a certain date or is it

15   all judgment accounts that Forster & Garbus is

16   collecting on?

17             A.    Placed after a certain date.

18             Q.    When was that date?

19             A.    Approximately 2014 or 2015,

20   probably.

21             Q.    Around that November 2014 date,

22   something like that?

23             A.    Yes, somewhat, you know, and

24   again, we had -- you know, not that we weren't

25   doing that beforehand but more so afterwards.

```
 1          Q.    It was the policy and procedure
 2    after November of 2014?
 3          A.    Yes.
 4          Q.    To provide -- to file a Notice of
 5    Appearance or a Substitution for judgment
 6    accounts.  Correct?
 7          A.    Um-hum.
 8          Q.    Say, "yes" or "no."
 9          A.    Yes.
10          Q.    But it wasn't policy or procedure
11    before that point?
12          A.    Right.
13          Q.    All right.  Do you know or do you
14    not know what percentage of judgment accounts
15    placed prior to November 2014, that Forster &
16    Garbus made a Notice of Appearance or
17    Substitution on?
18          A.    No, I dot no.
19          Q.    When you file Notice of Appearance
20    or Substitution, do you serve the consumer with
21    that Notice or that Substitution?
22          A.    You know, I don't know the answer
23    to that.
24          Q.    Because if you filed the Notice or
25    the Substitution in the court file, Mr.
```

```
 1    Callender could have served you a copy of the
 2    Order to Show Cause.  Right?
 3                MS. LASTORINO:  Objection to form.
 4          A.    I guess he could have, as he could
 5    have since he was well aware of our firm's
 6    involvement in the case and he knew we were
 7    seeking to collect the Judgment.
 8          Q.    Well, it says in the Complaint
 9    that he was confused.  He didn't know which
10    account you were guys were collecting on because
11    he just vacated the Judgment.  Can you
12    understand why a consumer would be confused by
13    that or no?
14          A.    I don't have any idea.
15          Q.    All right.  Why is it Forster &
16    Garbus's policy now to file Notice of Appearance
17    or Substitution -- Substitution of Counsel?
18          A.    I think we, as better practice, we
19    always seek to go and improve our -- you know,
20    our practices.
21          Q.    In what way do you believe that
22    improves your practice?
23          A.    Well, this case is something that
24    would say, "maybe we should do that more."
25    "Maybe we should make sure we do that."
```

1          Q.      So, you're saying one of the
2    triggers for the change in policy was Mr.
3    Callender's lawsuit?
4          A.      Well, no, I'm not saying that but
5    I'm saying a case like this would, you know.
6          Q.      Would what?
7          A.      Would, you know, show that maybe
8    we learn from, you know, as we go along.  So, it
9    just brings to our attention.
10          Q.      When you start doing this,
11    consumers can start serving you with the Order
12    to Show Cause to Vacate.  Right?
13          A.      Right, but it hasn't been a
14    problem.  With the exception of a few cases, I
15    don't know where that's been an issue.
16          Q.      Because you don't keep track of
17    it?
18          A.      But I can observe.  I know what --
19    you know, without keeping actual records of it,
20    I have a general understanding of how often
21    these things arise.  We don't have to have, you
22    know, strict numbers to know that there are
23    problems.
24          Q.      So, to your recollection, the only
25    times Forster & Garbus has been sued for

```
 1   collecting on a vacated Judgment was from Mr.
 2   Callender and Mr. Francis.  Right?
 3          A.    I guess, you know, I guess.
 4          Q.    To your recollection, there aren't
 5   any other instances where that's happened?
 6          A.    To my recollection, no.
 7                MR. KESHAVARZ:  Mark that, please.
 8                (Whereupon the document is marked
 9          P-4 for identification.)
10          Q.    Sir, if you can take a look at
11   Exhibit No. 4.  Let me know when you're done.
12                MS. LASTORINO:  I'm going to just
13          reiterate the same objections I had when
14          plaintiff's counsel introduced the other
15          documents into evidence.  I won't go
16          through the whole litany but I'm
17          preserving the same objections and
18          motions.
19                (Whereupon the witness reviews the
20          document.)
21          A.    Okay.
22          Q.    Is that the Brown lawsuit against
23   Forster & Garbus for executing on a vacated
24   Judgment?
25          A.    Yes.
```

```
 1          Q.     That's Bates stamped Callender 263
 2    to Callender 303.  Correct?
 3          A.     You're asking me?
 4          Q.     Yes.
 5          A.     263 to 303, yes.
 6          Q.     Why was Forster & Garbus executing
 7    on the vacated Judgment?
 8                 MS. LASTORINO:  Objection to form.
 9          A.     I won't answer that.
10                 MS. LASTORINO:  I'm objecting on,
11           again, this is just designed to harass.
12           There is nothing relevant as to this.
13           He's answering your question as to what
14           was due in the Callender matter, as per
15           the Court's Order.
16          A.     And that case was probably settled
17    and it was settled and --
18                 MS. LASTORINO:  Not -- I'm sorry.
19           Go ahead.
20          A.     And it's probably a
21    confidentiality agreement.  I'm not going to
22    answer this.  The case speaks for itself.  It's
23    a public record.
24                 MS. LASTORINO:  Excuse me.  Also
25           objecting on your -- I guess this was
```

```
 1          your intention of your surprise tactic, I
 2          guess, to not give someone notice before.
 3          So, that's really, really not in good
 4          faith and, in my opinion, sanctionable.
 5          We'll leave it up to the Court.
 6          Q.     So, you say the reason why -- one
 7   of the reasons why you executed on the vacated
 8   Judgment as to Mr. Callender is that you didn't
 9   know, the client never told you, and Mr.
10   Callender never told you that the Judgment was
11   vacated.  Right?
12                 MS. LASTORINO:  Objection to form.
13          Go ahead.  You can answer.
14          A.     Primarily, yes.
15          Q.     And what is the reason that
16   Forster & Garbus executed on Miss Brown's --
17   executed against Miss Brown for a Judgment that
18   had been vacated, as per Plaintiff's Exhibit 4?
19                 MS. LASTORINO:  Objection.  We
20          could mark it for a ruling.  This is
21          beyond the scope.
22          A.     Since the complaint speaks for
23   itself and the case was settled and since I
24   can't remember the specifics of that case, I
25   can't comment.
```

```
 1              Q.     Well, you can --
 2              A.     I can't comment on it because I
 3    don't remember the specifics of the case and I'm
 4    not going to now, being surprised by this, have
 5    to, all of a sudden, do any investigation.
 6                   MS. LASTORINO:  Right.  If you
 7              want to call the Court, let's do it right
 8              now.
 9                   MR. KESHAVARZ:  Call the Court for
10              what?
11                   MS. LASTORINO:  We are objecting
12              to this line of questioning on a document
13              that has nothing to do with Callender's
14              case, on something you just surprised us
15              with.  Let's get the Judge's opinion on
16              it.
17                   MR. KESHAVARZ:  He testified that
18              it only happened to Callender and
19              Francis.  Now, we know that it happened
20              again.  So, I'm trying to figure out how
21              many times Forster & Garbus has been sued
22              for executing a vacated Judgment.
23                   MS. LASTORINO:  I think the
24              document speaks for itself.  He told you
25              he doesn't have a recollection of it, so.
```

```
 1          Q.      Please, review Exhibit No. 4 and
 2    let me know when you're done.
 3                  MS. LASTORINO:  Which one?
 4                  MR. KESHAVARZ:  Exhibit No. 4,
 5          please.
 6          A.      That's the Brown thing.
 7                  MS. LASTORINO:  Oh, no.  I'm
 8          objecting.  Let's mark it for a ruling.
 9          Q.      Please, reviews Exhibit No. 4 and
10    let me know when you're done.
11          A.      On advice of my attorney, I'm not
12    going to review it.
13                  MR. KESHAVARZ:  Is there any basis
14          for the objection, other than what you've
15          stated?
16                  MS. LASTORINO:  I stated several
17          objections.
18                  MR. KESHAVARZ:  All right.  Let's
19          make sure the record is clear.  What's
20          the basis for the objection for me not
21          being able to ask the witness to review
22          Exhibit 4?
23                  MS. LASTORINO:  Okay.  You know
24          what?  Review the exhibit.
25                  (Whereupon the witness reviews the
```

```
1              exhibit.)
2         A.      All right.
3         Q.      What was the reason for executing
4    on Miss Brown's -- executing on a vacated
5    Judgment as to Miss Brown?
6              MS. LASTORINO:  Objection.
7         A.      I won't answer that.
8              MR. KESHAVARZ:  Basis?
9              MS. LASTORINO:  He testified
10         before that he wasn't aware of it.  So,
11         you're asking him to speculate.
12              MR. KESHAVARZ:  No, no.
13              MS. LASTORINO:  The allegations
14         are allegations, Ahmad.  You're asking
15         him to give credence to the allegations
16         of a document that he says he's not aware
17         of.
18         Q.      Did Forster & Garbus execute on a
19    vacated Judgment as to Miss Brown, as per
20    Exhibit 4?
21              MS. LASTORINO:  Objection.  Asked
22         and answered.
23              MR. KESHAVARZ:  Not answered.
24              MS. LASTORINO:  He said he doesn't
25         know.
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
 1            MR. KESHAVARZ:  You know, if you
 2       have an objection to form, that's fine.
 3            Go ahead.  You can answer.
 4            MS. LASTORINO:  The objection to
 5       form is that it was asked and answered.
 6            MR. KESHAVARZ:  Objection to form
 7       preserves all of those organizations.
 8       Q.    So the question is well, pointing
 9  your attention to Exhibit 4, the Brown complaint
10  against Forster & Garbus.  Why did Forster &
11  Garbus execute on a vacated Judgment as to Miss
12  Brown?
13       A.    I can't answer the question why.
14  You can ask me whether or not we did.  The
15  answer is yes.  That's obvious from the
16  Complaint and the case, but I can't answer why.
17  I don't know the facts of case now.  It goes
18  back awhile.
19       Q.    It was it filed in 2015?
20       A.    Yeah.
21            MS. LASTORINO:  Again, these are
22       someone's allegations.  So, I object to
23       you asking him the credence of somebody's
24       allegations in a complaint.
25       Q.    The suit was filed in August of
```

1    2015?

2           A.      This case has been settled.  So,

3    it was settled and it speaks for itself.

4           Q.      It was settled in the last few

5    months.  Right?

6           A.      It was settled, though.  It was

7    settled and it speaks for itself.  So, I don't

8    have to go in -- I don't have to relitigate a

9    case that's already been litigated, and that was

10   involved in a lawsuit that was settled to the

11   satisfaction of Miss Brown and her attorney.

12                  MS. LASTORINO:  And again, I

13           object because this lawsuit has nothing

14           to do with the due diligence that was

15           conducted as to Callender's case, which

16           the Judge made clear is the scope of

17           discovery here.

18           Q.      Wait a minute.  Let me make sure

19   Forster & Garbus's position is clear here.  Are

20   you saying it doesn't matter how many times

21   Forster & Garbus was sued on vacating a

22   Judgment, that has no relevance at all as to any

23   issue for Mr. Callender?  Is that Forster &

24   Garbus's position?

25                  MS. LASTORINO:  Objection to form.

```
 1          A.      I'm saying on this case, that
 2   there's no reason for me to comment onto the
 3   why's and wherefore's on a case that's been sued
 4   and settled.   That's my answer.
 5          Q.      All right.
 6          A.      That's my answer.
 7          Q.      Does it matter to Forster & Garbus
 8   how many times it's been sued on collecting on a
 9   vacated Judgment in terms of its defenses to Mr.
10   Callender's case?
11                  MS. LASTORINO:  Objection to form.
12          Q.      You can answer the question.
13                  MS. LASTORINO:  I'm sorry.  Did
14          the beginning of that question -- can you
15          read it back because I thought it said
16          "does it matter," but I'm not a hundred
17          percent sure.
18                  (Whereupon the last question is
19          read back by the reporter.)
20                  MS. LASTORINO:  I'm objecting to
21          that question.  That is so argumentative.
22          Why don't you rephrase your question.
23          Q.      You can answer the question.
24                  MS. LASTORINO:  It's
25          argumentative.
```

```
1              MR. KESHAVARZ:  That's fine.
2         You've preserved that objection by
3         objecting to the form of the question.
4              You may answer the question.
5         A.    I really have trouble in answering
6    the question.  It's so broad.  When you say,
7    "Does it matter?"  What does "matter" mean?
8    Well, we're always concerned if there are
9    problems with an account.  So, in that sense, it
10   matters.  Does it matter as to the individual
11   case that we're talking about here where Judge
12   Hellerstein has ruled that it's specific to that
13   case?  No, I guess it doesn't matter because
14   Callender's case stands alone, as to the issue
15   of whether or not we proceeded on a vacated
16   Judgment on Callender.  So, you know, that's how
17   I'll answer that question.
18        Q.    Putting aside whatever Judge
19   Hellerstein may have or may not have ruled, is
20   it Forster & Garbus's position that it is not
21   relevant to Mr. Callender's claims whether
22   Forster & Garbus have been sued once or a
23   hundred times for collecting on a vacated
24   Judgment?  Is that Forster & Garbus's position,
25   prior to executing on Mr. Callender's wages?  Is
```

```
 1    that Forster & Garbus's position?
 2                   MS. LASTORINO:  Objection to form.
 3          A.       And again, I have a question with
 4    the relevancy, you know, in terms of, you know,
 5    numbers.  Does -- you throw out a figure of
 6    three and then you throw out a figure of a
 7    hundred.  Well, a hundred is a lot different
 8    than three.  A thousand is a lot different than
 9    three.  Four thousand is a lot different than
10    three.  So, in terms of Mr. Callender's case,
11    you know, just as in other situations, there
12    could be a problem here and there.  If it's not
13    an endemic problem, then it may not be relevant
14    to Mr. Callender's case, which is a
15    fact-specific case.  That's what you sued us on.
16    That is the case at hand.  That is the case
17    that's relevant here.  That's Forster & Garbus's
18    position.  We'll address the issues in
19    Callender.
20          Q.       Just so I'm clear, you're saying
21    that it's Forster & Garbus's position it's not
22    relevant how many times -- it's not relevant to
23    Mr. Callender's case or your defenses to Mr.
24    Callender's case, how many times Forster &
25    Garbus has been sued previously for executing on
```

```
 1   a vacated Judgment?
 2                MS. LASTORINO:  Objection.  You're
 3           putting words in his mouth.
 4           A.     Right.  I'm not going to answer
 5   that.  Let the Court decide what's relevant.
 6           Q.     Do you understand the question?
 7           A.     No, not really.
 8           Q.     All right.  Well, let me rephrase
 9   the question.  I'll be glad to.
10                Is it Forster & Garbus's position
11   that it's not relevant to Mr. Callender's claims
12   or Forster & Garbus defenses as to how many
13   times Forster & Garbus has previously been sued
14   for executing on a vacated Judgment?
15           A.     I'm not in a position to comment
16   on whether it's relevant or not, on behalf of
17   Forster & Garbus.
18           Q.     Forster & Garbus doesn't have a
19   position either way?
20                MS. LASTORINO:  What was the
21           question?
22           Q.     Forster & Garbus doesn't have a
23   position either way?
24           A.     I think that's what this is -- you
25   brought this case.  I don't have a decision on
```

1   it, as to whether or not.  Okay.

2                 MR. KESHAVARZ:  You can mark that,

3        please.

4                 (Whereupon the document is marked

5        P-5 for identification.)

6        Q.    Please, take a look at Exhibit No.

7   5 and let me know when you are done, sir.

8                 (Whereupon the witness reviews the

9        document.)

10                (Whereupon there is an

11       off-the-record discussion.)

12                MR. KESHAVARZ:  You know what?  We

13       can just take a break for lunch now and

14       come back in about an hour.  Off the

15       record.

16                (Whereupon the lunch recess is

17       taken.)

18   BY MR. KESHAVARZ:

19       Q.    Good afternoon.  So, Mr.

20   Callender's account, judgment account, was with

21   Forster & Garbus for about six years.  Right?

22       A.    Yes, approximately.

23       Q.    Is that about average for judgment

24   accounts to be with the firm?

25       A.    I wouldn't say there's an average

```
 1    because it depends on the client.  Some clients
 2    recall judgment.  So, it depends on the
 3    activity.  So, it varies.  There's no, quote,
 4    average.  You know, some clients leave us with
 5    the accounts, pretty much, forever, I guess.
 6    Other clients recall the accounts relatively
 7    quickly, if you don't find an asset and don't
 8    collect on it.
 9          Q.     What is relatively quickly?
10          A.     A year.
11          Q.     So, for Mr. Callender's account,
12    there were a few attempts to collect on the
13    Judgment.  There was information subpoenaed to
14    Banco Popular, in addition to the wage
15    garnishment.  Is there like a typical range of
16    garnishments, income executions that are done?
17          A.     Just if we find -- you know, if we
18    have a reason to believe he has an account or
19    job located, we don't do things like sell real
20    property out from under the person.  We don't
21    send a marshal down to their house to seize
22    their personal property.  We don't seize
23    automobiles.  So, it's relatively limited in
24    terms of the enforcement devices that we use.
25    Basically, income executions and restraining
```

```
 1    notices with property executions.  If there's
 2    joint accounts, you might have to do a turnover
 3    proceeding and liens on real property.  If we
 4    believe the person owns real property, we file a
 5    lien.
 6          Q.    The restraint on the bank is a
 7    freeze on the bank account?
 8          A.    A freeze on the bank account, yes.
 9          Q.    So, for him, it happened about two
10    or three maybe times.  Is that about average,
11    normal?  Three, four, five?
12          A.    I'm sorry.  I didn't catch the
13    first part.
14          Q.    About how many times is it
15    normal -- you have accounts that are usually
16    there between one year and forever.  To use your
17    words, "forever."  About how many income
18    executions or bank restraints, typically, on
19    average would they issue?
20                MS. LASTORINO:  Objection to form.
21          A.    There's no -- every account is
22    different, obviously.  When you say an
23    average -- I mean, usually, you're lucky on an
24    account if you find one bank account, you know,
25    that has money in it because now, with the
```

1   Exempt Income Protection Act, many accounts, the

2   banks don't hold the money because the people

3   have less than the exempt amount.  So, there's a

4   lot less bank account restraints these days than

5   there were in the past.  So, and most people

6   don't maintain more than one bank account, you

7   know.  I would say the average consumer does not

8   maintain multiple accounts.  Once and awhile,

9   you'll find -- you might find two bank accounts

10  restrained, you know, find assets that you

11  restrain in maybe two bank accounts.

12              Same thing.  Obviously, employment

13  is one at a time.  So, if you find a job, you

14  issue the income execution but it's not like

15  you'll see six income executions on file.  You

16  might see two, you know, if he left a job and

17  then he found a job subsequently.  So, you might

18  see two income executions, probably at most, on

19  any file, over however many years you're talking

20  about.  Same thing with the banks.

21       Q.      Well, the bank account, I would

22  think it would be harder to find the right bank.

23  I would imagine you would have to do several

24  bank accounts until you found one.

25              MS. LASTORINO:  Objection to form.

1        A.        Obviously, it's harder to bind a

2   bank -- well, it's hard to find either,

3   truthfully, you know; and again, with the Exempt

4   Income Protection Act, whereas in the past, you

5   would be able to restrain more money.  You can't

6   do that anymore.

7        Q.        I'm just trying to wonder the

8   number of times you tried to restrain because --

9   I'm just wondering about how many times you have

10  to go before you make a hit, to use the --

11            MS. LASTORINO:  Objection to form.

12        Are you talking about on Callender's

13        matter?  What are you talking about?

14        Q.        Do you understand the question?

15        A.        Yes.  I mean there's only a

16  limited number of banks and you focus in on the

17  banks that are most likely to have money in

18  them.  So, proximity to his location, work

19  because most people bank at work.  So, you hit

20  those banks; and if you don't hit them -- we

21  don't do more than one restraint per bank.

22        Q.        All right.

23        A.        So, basically, if I serve a

24  restraining notice on say Citibank or Banco

25  Popular, in this case, then I would never serve

1    one again on Banco Popular.

2         Q.    Because, you know, there's no

3    month there?

4         A.    And because under the -- we

5    interpret the restraining notice section to

6    limit you to one time.

7         Q.    So, one of the documents -- and we

8    can go through them if you want -- it said

9    something about bank -- do you use a service?

10   It was like a bank -- what do you call it?  Is

11   there a service that you use that -- bank

12   finder?

13        A.    Bank finders.

14        Q.    What is that?

15        A.    That's a program that is in-house.

16   It's a service, I think, that's sold -- you buy

17   this program and you incorporate it into and it

18   basically gives you the location of the banks

19   and you can geographically say, if he lives

20   here, you know, how many banks in this area and

21   then you can serve restraining notices on those

22   banks.

23        Q.    The main criteria, then?

24        A.    I think geographic location is the

25   main criteria.  Yes, it's one of the main

```
 1   criteria, um-hum.
 2        Q.    Now, for the 3500 new judgment
 3   accounts you get every year, how many attorneys
 4   generally sign those?  Is there a range of
 5   attorneys?  One or two attorneys or --
 6              MS. LASTORINO:  Objection to form.
 7        A.    Sign what?  You said "sign" what?
 8        Q.    That's a good question.  The
 9   income -- the wage execution -- wage
10   garnishments or the income executions.  That's
11   the same thing.  Let me restart that question.
12              So -- wait.  Let me just ask you,
13   Exhibit No. 1, the income execution, it has a
14   form with two attorneys' names underneath.
15   Ronald Ferraro and Olivia DeBellis and then,
16   it's apparently signed by Ronald Ferraro.  For
17   that time period, were those the two attorneys
18   that were signing the income executions, the
19   bank restraints?
20        A.    Income executions based on this
21   form, yes.
22        Q.    So, for that period of time, those
23   two attorneys would be the ones who signed the
24   income executions for the judgment accounts?
25        A.    Yes, um-hum.
```

```
1           Q.     Are there different attorneys who
2    signed for the information subpoenas or it would
3    be the same attorneys?
4           A.     Yes, I believe so.
5           Q.     Yes, which one?
6           A.     Yes.
7           Q.     Yes, they're the same or --
8           A.     No, no.  They're different
9    attorneys.  They're different attorneys.
10          Q.     Are there one or two attorneys
11   that do that or do you know?
12          A.     I believe Mr. Garbus signs off on
13   some of the restraining notices.
14          Q.     So, for the time period at issue
15   here, 2015, I think, it would be Mr. Garbus that
16   would sign most of the bank restraints and it
17   would be Mr. Ferraro or Miss Olivia --
18          A.     DeBellis.
19          Q.     DeBellis that would sign the wage
20   restraints.  Is that right?
21          A.     Yes.  There might be other
22   attorneys who might also sign the restraining
23   notices from time to time but, you know,
24   usually, we -- in this case, there were two
25   names.  It doesn't mean other attorneys couldn't
```

1    sign it.  I've signed restraining notices,

2    income executions, if necessary.

3            Q.    But generally speaking?

4            A.    Right, and, you know, in this case

5    Olivia DeBellis didn't sign the income

6    execution.  It was Ronald Ferraro who signed the

7    income execution.

8            Q.    I'm just trying to find out,

9    generally speaking, in 2015, would it be, Mr.

10   Garbus would be the main person signing the

11   income bank restraints and Mr. Ferraro and Miss

12   DeBellis would be signing the executions?

13           A.    I would say, based on the review

14   of this document, yes, um-hum.

15           Q.    And would that be the same number

16   of attorneys that would be signing income

17   executions and bank restraints for the last few

18   years?

19               MS. LASTORINO:  Please, note my

20           objection in connection with seeking

21           discovery on other matters, over a period

22           of years that Judge Hellerstein also

23           ruled is beyond the scope of discovery.

24           Q.    Go ahead.

25           A.    I would say yes, you know.  There

```
 1   were always some attorneys who signed whether --
 2   in this period of time, it appears to be Mr.
 3   Ferraro and Miss DeBellis.
 4        Q.     But it would be about the same
 5   number of attorneys?
 6        A.     Yes, um-hum.
 7             MR. KESHAVARZ:  Can I take a quick
 8        break?
 9             (Whereupon there is a brief
10        recess.)
11   BY MR. KESHAVARZ:
12        Q.     So, you talked about the new
13   policy at Forster & Garbus for new accounts that
14   are placed with Forster & Garbus after November
15   2014, that you would check to see if the
16   Judgment creditor forwarded you a copy of the
17   Judgment.  Right?
18        A.     Yes.
19        Q.     And you would also check on
20   eCourts to see if there's an Order to Show Cause
21   filed.  Correct?
22        A.     Yes.
23        Q.     Why don't you do that for existing
24   judgment accounts that you have that were placed
25   prior to November of 2014, such as Mr.
```

1    Callender's?

2              MS. LASTORINO:  Objection to form.

3         A.    Again, I think I've answered that

4    in my prior testimony.  You can go back and

5    refer to my answers on the other questions.

6    You've asked the same question now a few times.

7         Q.    I apologize.  If I'm asking that

8    again, I apologize, but what was the answer or

9    what is the answer?

10             MS. LASTORINO:  Objection, as it

11        has been asked and answered.

12             You can answer.

13             THE WITNESS:  Can I answer?

14             MS. LASTORINO:  For the tenth

15        time.

16        A.    Basically, there's no reason to

17   doubt the validity of the Judgment based on the

18   prior proceedings in the particular matters that

19   would require us, under any theory, I believe,

20   to go and check eCourts, for example, as you've

21   stated.

22        Q.    Then, why change the policy?

23        A.    Again, for better practice and,

24   you know -- I mean there's nothing wrong with

25   always trying to improve yourself and to the

```
 1    improvement of the firm.  We always try to do
 2    the best we can and to follow the law and if the
 3    law changes, to make changes.
 4         Q.    Is one concerned that there are
 5    too many old judgment accounts that you're
 6    collecting on in order to check eCourts on?
 7              MS. LASTORINO:  Objection to form.
 8         A.    No.  I don't know if that's the
 9    reason.  Again, I think I've answered the
10    question.
11         Q.    Okay.  Thank you.
12              So, as to Mr. Callender, the
13    executing on the vacated Judgment, does Forster
14    & Garbus feel like it did anything wrong in
15    issuing the income execution as Exhibit 1?
16              MS. LASTORINO:  Objection to form.
17         A.    No, I don't believe it feels it
18    did anything wrong when issuing the execution,
19    based upon the knowledge that it had.  For
20    example, in 2013, I believe it was -- 2012, I
21    believe it was, December, when Mr. Callender
22    made his complaint to the Department of Consumer
23    Affairs, we sent -- we stopped the collection
24    proceedings at that time, you know, no further
25    asset locating, no further collection, seized
```

1   all communication with Mr. Callender until we

2   went back to the client with the DCA complaint.

3   We forwarded the DCA complaint to them for their

4   investigation and subsequently, they reported

5   back to us that the dealt was valid and that we

6   can proceed with collections.  There was no

7   reason to doubt, again, that there was anything

8   wrong with the Judgment at that time.  The

9   client verified that the debt was due and owing

10  and we proceeded on, you know, subsequently, you

11  know, months afterwards, after the client had

12  given us that information to, again.  Seek to

13  recover and collect on the debt.

14          Q.     So, the answer is no, Forster &

15  Garbus doesn't believe it did anything wrong in

16  issuing the income execution against Mr.

17  Callender, that's Exhibit 1.  Is that right?

18          A.     At the time we issued the income

19  execution, we believed we had the right to issue

20  the income execution.  That's correct.

21          Q.     And if Forster & Garbus had to do

22  it over again, would it do anything differently

23  or do you feel you've followed the proper

24  procedure at that time?

25                 MS. LASTORINO:  I object to form.

```
 1              A.      I won't answer as to whether or
 2    not we followed the proper procedure.  I would
 3    say that, obviously, if we knew the Judgment had
 4    been vacated, we would not have issued the
 5    income execution.  In fact, our system wouldn't
 6    allow us to produce the income execution because
 7    had known the Judgment was vacated, we would
 8    have removed the Judgment information from the
 9    system and not been able to do any kind of
10    post-judgment enforcement.
11              Q.      When you got the dispute from Mr.
12    Callender about fraud, why didn't you look at
13    the court file?
14              A.      Because there was no reason to
15    look at the court file.  Mr. Callender was not
16    alleging any issue with a Judgment or that he
17    wasn't -- he was alleging fraud.  He was saying,
18    "I never had a Discover account."  So, if he
19    never had a Discover account -- we went back to
20    Discover and Discover said, "Yes, he did have a
21    Discover account.
22              Q.      But Discover asked you to take a
23    look at the court file.  Right?
24              MS. LASTORINO:  Objection.
25              A.      I'm sorry.  What?
```

```
 1           Q.     Didn't Discover ask you to take a
 2    look at the court file?
 3                  MS. LASTORINO:  Object to form.
 4           A.     How would I know what Discover
 5    did?
 6           Q.     Well, it's in the collection notes
 7    but if Discover asked you to take a look at the
 8    court file, do you believe Forster & Garbus
 9    should have done that?
10                  MS. LASTORINO:  Objection to form.
11           A.     I have no idea what you're talking
12    about that Discover told us to do.
13           Q.     If Discover told Forster & Garbus,
14    when Forster & Garbus sent the dispute letter
15    from Mr. Callender, Forster & Garbus -- if
16    Discover told Forster & Garbus to go ahead and
17    pull the court file, if they did that -- if they
18    said that, is that a responsibility for Forster
19    & Garbus to do?
20                  MS. LASTORINO:  Objection to form.
21           He already said he doesn't know.  If you
22           want to show him a document, show him a
23           document.
24                  MR. KESHAVARZ:  I'm just --
25           please, mark that as an exhibit.
```

```
 1                   (Whereupon the document is marked
 2          as P-6 for identification.)
 3          Q.    Please, review Exhibit P-6 and let
 4   us know when you're done.
 5                   (Whereupon the witness reviews the
 6          document.)
 7          A.    I'm done.
 8          Q.    Are those Forster & Garbus's
 9   collection notes regarding the judgment account
10   it was collecting on Mr. Callender?
11          A.    Yes.
12          Q.    There's 75 pages of documents that
13   I received last week.  Let me ask you, if you
14   turn your attention to page 113.  If you read
15   112 or 113, just read those to yourself and let
16   me know when you're done, please.
17                   (Whereupon the witness reviews the
18          document.)
19          Q.    Are you done?  I'm sorry.  Take
20   your time.
21          A.    Yeah, I'm done.
22          Q.    So, looking at page 113, was
23   Discover, in fact, asking Forster & Garbus to
24   send it any answer filed, any internal notes and
25   the Judgment, if applicable, and all other
```

```
 1   documents pertaining to the account?
 2                  MS. LASTORINO:  Objection to form.
 3          Q.     Discover asked Forster & Garbus to
 4   do that.  Correct?
 5                  MS. LASTORINO:  Objection to form.
 6          A.     The notes speak for themselves.
 7          Q.     And you believe that to be true?
 8          A.     If that's what it says.
 9          Q.     And you believe those notes to be
10   accurate in that regard?
11          A.     In terms of what they requested,
12   it says.  It says, "copies of any answers --"
13   it says what it says.  "All internal notes,
14   Judgment."
15          Q.     So, why didn't Forster -- strike
16   that.
17                  If Discover was asking Forster &
18   Garbus to go and get a copy of the answer that
19   was in the Court file, a copy of the Judgment
20   and other documents, why didn't Forster & Garbus
21   do that?
22                  MS. LASTORINO:  Objection to form.
23          A.     I think it's because usually --
24   this is, more or less, I believe a form type of
25   response from the client.  Now, generally, if an
```

```
1   Answer was filed, we'd have a copy in our
2   office.  Now, we provide them with what we have
3   scanned to the computer, the Summons, the
4   Complaint, the Answer, the Judgment, if we
5   obtained it.  In this case, this was referred
6   already as a judgment file and he was not -- Mr.
7   Callender was alleging fraud or false identity.
8   Okay.  I think on Forster & Garbus's part, that
9   we provided them with information and they
10  investigated it from a fraud aspect.  So, they
11  looked at the application.  They looked at the
12  signatures.  They looked at the addresses.  They
13  looked at the billing statements and responded
14  accordingly.
15          Q.    So, if a consumer were sued and
16  they claimed that the account was fraudulent,
17  that would be an affirmative defense they
18  usually raise in their Answer.  Right?  "This is
19  not my account.  This is fraudulent."  Right?
20              MS. LASTORINO:  Object to the
21         form.
22         A.    I guess.
23         Q.    So, if Mr. Callender was claiming
24  fraud and Discover said Forster & Garbus,
25  please, look at the Judgment, if there is one,
```

1    and look at the Answer.  One reason to look at

2    the Answer would be to see if Mr. Callender

3    filed an Answer that alleged fraud.  Right?

4                 MS. LASTORINO:  Objection to form.

5        A.    I can only speculate.

6        Q.    I mean that's what Discover wanted

7    Forster & Garbus to do.  Right?

8        A.    I don't really know.  I'm not

9    Discover.  So, I really don't know what they

10   wanted, you know.  As I said, any time there's a

11   false dispute or false identity dispute, they

12   will say "send us your documents."  That's what

13   we do.  We send the documents that we have in

14   our file.  There was nothing to indicate, in

15   this particular complaint, that there was

16   anything wrong with the Judgment.  He was

17   claiming that, you know, it wasn't him; that he

18   never had a Discover card.

19       Q.    Well, let me ask you this because

20   you're the corporate representative of Forster &

21   Garbus.  You're all Forster & Garbus

22   encapsulated into one person for purposes of

23   this case and this trial.  So, I'm just trying

24   to nail down Forster & Garbus's position as to

25   this issue.

```
 1                 So, it's Forster & Garbus's
 2    position now that if Discover says it wants
 3    Forster & Garbus to look at the Answer,
 4    including any allegations of fraud in the Answer
 5    and the Judgment, is it Forster & Garbus's
 6    position that it should have done that or it
 7    should not have done that?
 8                 MS. LASTORINO:  Objection to form.
 9            You're characterizing it in the way you
10            want to characterize it.
11                 MR. KESHAVARZ:  Objection to the
12            form.  That's fine.  You can object to
13            the form.
14                 You can answer the question.
15            A.     There was no Answer in this file.
16    So, there was nothing to look at in terms of an
17    Answer.  There was a Judgment since 2005.  The
18    Judgment is res judicata on the issue of
19    liability and the responsibility to pay the
20    Judgment.  So, there was no answer, okay.  There
21    wouldn't -- you know, had there been an Answer,
22    it wouldn't have been a Default Judgment and so,
23    there was no Answer to respond to the Complaint.
24    There was no Answer.
25            Q.     But when you were executing on the
```

```
 1    Judgment and during this fraud dispute, you
 2    never looked on eCourts to see if there was an
 3    Answer filed.  Right?
 4                  MS. LASTORINO:  Objection to form.
 5         A.    Correct.
 6         Q.    And you never sent someone to the
 7    courthouse to see if an Answer was ever filed.
 8    Correct?
 9         A.    Correct.
10         Q.    Because if an Answer was filed in
11    the consumer-alleged fraud, that's something you
12    would believe Discover would want to know.
13    Right?
14                  MS. LASTORINO:  Objection to form.
15         A.    Again, there was no indication,
16    based on the fact that there was a Judgment,
17    that that was an Answer on file.
18         Q.    Well, how do you do that?  I mean
19    people have judgments against them after filing
20    an Answer by losing in court.  Right?  Is that
21    true?
22         A.    I guess.
23         Q.    So, when Forster & Garbus
24    continued to execute, continued to collect on
25    the Judgment, it didn't know whether Mr.
```

```
 1    Callender had filed an Answer or not.  Right?
 2                  MS. LASTORINO:  Objection to form.
 3         A.     I guess that would be correct.
 4         Q.     And so, they didn't know he filed
 5    an Answer and the Answer said "This is indeed
 6    fraud."  Forster & Garbus didn't know that when
 7    it executed on his wages.  Right?
 8         A.     Just give me a second.
 9         Q.     Take your time.
10                (Whereupon the witness reviews
11         documents.)
12         A.     I don't think I can answer that
13    question at this time, without further review of
14    certain documents, to answer that effectively.
15                  MR. KESHAVARZ:  Can you read what
16         my last question was?
17                (Whereupon the last question is
18         read back by the reporter.)
19         Q.     Let me ask you, sir, when Discover
20    asked you to check for the Answer in the court
21    file to see if there was even a Judgment, why
22    didn't Forster -- strike that.
23                  Forster & Garbus should have, in
24    fact, done that.  Right?
25                  MS. LASTORINO:  Objection to form
```

```
 1              and your characterization of what
 2              Discover said.
 3                   MR. KESHAVARZ:  Preserved as an
 4              objection.
 5                   Go ahead.
 6         A.    Again, I also -- you know, you're
 7    putting certain language in there, which I don't
 8    agree to.  You gave me a date of the summons
 9    before and I don't remember what that date was.
10    Could you provide me with the date of that
11    Summons and Judgment?
12         Q.    The summons on the collection
13    lawsuit?
14         A.    Yes.
15         Q.    And the date of the Judgment?
16         A.    That is correct.
17         Q.    Well, let me -- that's a good
18    point.  So, when Forster & Garbus collects on
19    judgment accounts such as Mr. Callender, it
20    doesn't get it, certainly before November 2014,
21    it doesn't get a copy of the Judgment?
22         A.    Well, it did in many cases, as I
23    testified before.
24         Q.    In some cases it did?
25         A.    Oh, yes, it did, in many cases,
```

1    well before 2014.

2         Q.    Forster & Garbus didn't require

3    the Judgment creditor to produce a copy of the

4    Judgment that it wanted Forster & Garbus to

5    execute upon.  Right?

6         A.    There was certain cases where we

7    did not have copies of the judgments and we

8    would still continue with collection efforts.

9         Q.    Because you didn't requirement the

10   copy of the Judgment prior to executing.  Right?

11              MS. LASTORINO:  Objection to form.

12        A.    I guess.

13        Q.    Okay.  So, as the collection law

14   firm, on behalf of the judgment creditor like

15   Discover, you provide your best legal advice and

16   opinion to Judgment creditors like Discover.

17   Correct?

18              MS. LASTORINO:  Objection to form.

19        A.    We provide them with information,

20   sure.

21        Q.    And you provide an independent

22   legal analysis and termination as to the

23   collection of the putative judgments that they

24   want to you collect.  Right?

25              MS. LASTORINO:  Objection to form.

1          A.     Yes, to a certain extent, you

2     know, if there was -- certainly, as attorneys,

3     we have to act as attorneys and we have a, you

4     know --

5          Q.     You have a duty?

6          A.     Duty of responsibility, sure.

7          Q.     And that duty is to find out

8     whether the facts and circumstances would

9     warrant the execution on alleged judgments, as

10    Mr. Callender.  Right?

11                MS. LASTORINO:  Objection to form.

12         Q.     That's what your obligations?

13         A.     And that obligation can be filled

14    in many ways, as I previously testified.

15         Q.     But let me ask you this:  Just

16    looking at exhibit --

17         A.     P-6?  Is that what it is?

18         Q.     Yes, Exhibit 6, page FG113.  That

19    is dated -- those communications are dated

20    December 28, 2012.  Correct?

21         A.     Yes, um-hum.

22         Q.     So, given what -- strike that.

23                And the information under the memo

24    section, those are -- that's what Discover is

25    telling Forster & Garbus.  Correct?

```
 1           A.      Yes.

 2           Q.      So, when it says on page FG113,

 3    for December 28, 2012, "Also, please, include

 4    copies of any Answer filed, all internal notes

 5    and Judgment, if applicable, and all other

 6    documents," should Forster & Garbus have checked

 7    the Court file at that point?

 8                   MS. LASTORINO:  Objection to form.

 9           A.      I guess that's the question to ask

10    the Judge and the jury.

11           Q.      And as the attorney for Forster &

12    Garbus, is it Forster & Garbus's position that

13    Forster & Garbus should have checked the Court

14    file on December 28, 2012, when Discover asked

15    Forster & Garbus to "please, include copies of

16    any Answer filed, all internal notes, judgments,

17    if applicable, and all other documents"?

18           A.      I believe, again, as I said

19    before, this is a Discover request, which is --

20    you know, everything is through a computer.

21    Everything is coded.  So, there's a coded

22    message.  That doesn't necessarily mean that in

23    every case you have to respond to everything

24    that is in this file.  So, in this case, this is

25    a Judgment that at that point, was almost 10
```

```
 1   years old and that Discover placed with us as a
 2   judgment file.  As far as I know, and this is
 3   why I asked you for the dates before, there was
 4   no Answer filed in the original action; that
 5   this was a Default Judgment that was sent to us.
 6   So, and the Complaint did not allege anything
 7   about the Judgment or state that he filed an
 8   Answer.  He said he doesn't have a Discover card
 9   and so, the investigation centered on whether or
10   not he had a Discover card and in this
11   particular case, we relied on the information
12   that Discover came back to us and said "Yes, in
13   fact, he did have a Discover card.  This is his
14   card."  I don't think there's been, you know --
15   withdraw that.
16              Based on that, we went forward.
17              MR. KESHAVARZ:  Objection to the
18         nonresponsive part of that answer.
19              MS. LASTORINO:  And I object to
20         his characterization of it being
21         nonresponsive.
22         Q.    You said "Default Judgment."
23   Forster & Garbus had no idea if the Judgment was
24   entered by default or not.  Right?
25              MS. LASTORINO:  Objection to form.
```

1        A.      And I requested that I had to see
2    other documents.
3        Q.      Well, my question was on December
4    28, 2012, is it Forster & Garbus's position that
5    it should have checked the Court file; and on
6    December -- on that date, December 2012, Forster
7    & Garbus didn't know if it was a Default
8    Judgment or not.  Correct?
9        A.      No.  I said I need more
10   information.  I need to look at other documents.
11       Q.      If you look at -- I'm worry.  Were
12   you done?
13       A.      I'm done.
14       Q.      Okay.  If you look at Exhibit 6,
15   page FG77?
16       A.      I'm sorry.  FG77?
17       Q.      Yes.
18       A.      Right, um-hum.
19       Q.      It says that there's been a
20   Judgment entered.  Correct?
21       A.      Yes.
22       Q.      Right?
23       A.      Yes, it does say that.
24       Q.      There's no indication whether the
25   Judgment against Mr. Callender was a Default

1    Judgment.  Correct?

2           A.      Not at that place, no.

3           Q.      At what?

4           A.      Not on that place in the notes,

5    um-hum.

6           Q.      All right.  The evidence that

7    Forster & Garbus had in its possession, custody

8    and control, in December 2012, Forster & Garbus

9    did not know whether Judgment was entered by

10   default or not.  Correct?

11                  MS. LASTORINO:  Objection to form.

12          A.      And again, as I have stated now,

13   on two or three previous occasions, there are

14   other documents that I could look at and then I

15   can perhaps answer that question as to whether

16   or not it was a default.

17          Q.      What other documents would you

18   look at?

19          A.      We've produced -- I'd have to look

20   at the -- and I think we -- I'd have to look at

21   the -- what is it?  The F-9 notes that you

22   provided?

23                  MS. LASTORINO:  Um-hum.

24          A.      The F-9 notes and there's another

25   screen I could look at and based on that --

1   well, you gave me the dates.  So, if you give me

2   the dates, I can respond.  Tell me the date the

3   Summons was served and the date the Judgment was

4   entered and I can explain my answer.

5        Q.    Well, I'm just going on what

6   Forster & Garbus knew on December 2012?

7        A.    Well, you don't know what I knew

8   until you give me that information because I

9   have other screens and if you give me those

10  dates, which I can look up or if you can just

11  give them to me, I will give you an explanation.

12  How does that sound?

13       Q.    Would that be a date that would be

14  listed on the document production?

15       A.    You said it before.  You opened up

16  earlier this morning and you said, "the Summons

17  was served" such and such date and "the Judgment

18  was entered on" such and such a date.  You

19  provided that information this morning.  I

20  didn't write it down and I don't remember, but

21  you had the information.  You gave it to me.

22       Q.    I think you're talking about the

23  date the Francis complaint was filed for Forster

24  & Garbus's executing on the vacated Judgment.

25       A.    No.  I thought you mentioned it in

```
 1   this case.
 2          Q.     But, in any event --
 3                 MS. LASTORINO:  Let him finish.
 4          A.     All right.  So, this is where --
 5                 MS. LASTORINO:  I don't think
 6          there's a question pending.
 7          Q.     Go ahead.
 8          A.     No.  In other words, by the date
 9   of the Summons versus the date of the Judgment,
10   I can tell whether it was a Default Judgment.
11          Q.     All right.  On December 2012,
12   Discover asked Forster & Garbus to determine if
13   there was even a Judgment.  Right?
14                 MS. LASTORINO:  Objection to form.
15          A.     You're speculating as to what that
16   wording means.
17          Q.     What does it mean to you?
18          A.     For example, as I said, this was a
19   form -- every time there was a dispute, they
20   request this information.  So, if there was a
21   placement by Discover Bank where Forster &
22   Garbus had obtained the Judgment, then Discover
23   may not have had a copy and would want us to
24   produce a copy.  They generally want us to
25   produce what we have in our file; and when I say
```

```
 1    "our file," the documents that was scanned to
 2    our file and that have been provided to you in
 3    discovery.  So, if they wanted another copy of
 4    the Judgment, we would provide them with another
 5    copy of the Judgment at that point.  This was a
 6    placement where the client had already referred
 7    it to us as a judgment account.
 8           Q.     But they never provided you with a
 9    Judgment?
10           A.     No.  Doesn't mean they didn't have
11    it.  Just means they didn't provide it to us.
12           Q.     When they said they want you to
13    include a copy of a Judgment, if applicable,
14    it's Forster & Garbus's position that that does
15    not mean Discover wanted you to get a copy of
16    the Judgment.  Is that --
17           MS. LASTORINO:  Again, objection
18       to form.
19           Q.     Is that Forster & Garbus's
20    position?
21           A.     I wouldn't say "position."  It's
22    what is and didn't happen.  Did we provide a
23    copy of the Judgment?  No.  That's the answer.
24    I'm not going to say "position," "not position,"
25    "position," "not position."  Ask a question.
```

1    "Did we provide a copy of the Judgment?"  The

2    answer is we didn't provide a copy of the

3    Judgment at that time.

4         Q.    Is it Forster & Garbus's position

5    that if Mr. Callender had filed an Answer, even

6    alleging fraud, that as long as there was a

7    Judgment, it was immaterial to Forster & Garbus

8    as to whether it could execute on the Judgment,

9    that the Answer contained fraud allegation?

10         MS. LASTORINO:  Objection to form

11         and almost incomprehensible, that

12         question.

13         A.    Well, again, I don't think there

14    was, you know, any kind of thought process along

15    that basis but, hypothetically, if an Answer was

16    filed and it alleged fraud and if a Judgment was

17    entered, then that fraud claim was denied

18    because the affirmative defense would have been

19    dismissed or a Judgment would not have been

20    allowed; and, therefore, his subsequent fraud

21    claim would have been resolved in the court, but

22    we still probably would have referred it as a

23    dispute to the client, in any event, because

24    he's now realleging that, you know, and -- but

25    in any event, if there was a Judgment entered

```
 1   after a fraud in an Answer -- a judgment is a

 2   judgment is a judgment.  When I lecture and I

 3   give examples.  I say whether it's a judgment

 4   based on default, whether it's a judgment based

 5   on the merits or whether it's a judgment based

 6   on the stipulations, it's a judgment and can be

 7   enforced under Article 52 if the CPLR.

 8        Q.    So, it's Forster & Garbus's

 9   position that even if there was fraud and a

10   fraud allegation it had no problem executing on

11   that Judgment.  Right?

12              MS. LASTORINO:  Objection to form.

13         You're recharacterizing testimony.  He

14         answered the question.

15         A.    I answered the question I think

16   relatively well.

17              MS. LASTORINO:  Don't try to

18         change his testimony.

19              MR. KESHAVARZ:  I'm asking him a

20         question --

21              MS. LASTORINO:  You're

22         recharacterizing his testimony.

23              MR. KESHAVARZ:  -- and asking if

24         he agrees with it.

25         A.    If there was a judgment, whether
```

```
 1  there was a fraud allegation, whether there was
 2  a statute of limitations allegation, whether or
 3  not there was -- you know, denials are put in
 4  answers all the time.  Affirmative defenses are
 5  put in answers all the time and after the Court
 6  ruling, whether by Summary Judgment or trial or
 7  arbitration or whatever, if there's a Judgment,
 8  there's a Judgment and it doesn't matter at that
 9  point.  It's res judicata on the issue of his
10  liability and there's nothing to indicate that
11  Mr. Callender did, in fact, file an Answer in
12  the original Complaint.
13        Q.    Yeah but you didn't -- there's
14  no -- but Forster & Garbus never checked.
15  Right?
16        A.    Right, but again --
17        Q.    Just tell me if it's Forster &
18  Garbus's position whether this a true statement.
19  By "attorney," I going to mean Forster & Garbus.
20             Does Forster & Garbus warrant to
21  Discover that it will exercise reasonable care
22  and best efforts to attempt to collect a
23  judgment account, as to Mr. Callender?
24             MS. LASTORINO:  Objection to form
25        as to whether something is a true
```

```
 1          statement.  Why don't you ask him a
 2          question.
 3                  MR. KESHAVARZ:  That was the
 4          question.
 5                  MS. LASTORINO:  It wasn't a proper
 6          question.
 7          A.      Yeah.  Would you repeat that?
 8   That was a little confusing to me.
 9          Q.      That's fine.
10          A.      Because you put it in such a way,
11   is it our position that -- so, you know,
12   let's --
13                  MS. LASTORINO:  Let him ask the
14          question again.
15          A.      Ask the question again, please.
16                  MS. LASTORINO:  Are you going to
17          give him the benefit of what you're
18          reading from?  Do you want to show him
19          something?
20                  (Whereupon there is an
21          off-the-record discussion.)
22                  MS. LASTORINO:  Okay.  Then
23          explain that to him.
24                  He wants to clarify something on
25          one of your earlier questions.
```

1        Q.        Go ahead.

2        A.        Remember when I asked you for the

3    dates.  I knew there were dates.

4                  MS. LASTORINO:  He just needed his

5            recollection refreshed.

6        A.        So now, in looking at P-2, okay,

7    the eCourts information, which shows that the

8    date of the filing of the Summons and Complaint

9    was July 27, 2005 and it shows the disposition

10   date of 12/21/2005, which I believe is the date

11   of the Judgment.  It would be impossible in the

12   Civil Court of the City of New York, County of

13   New York, to obtain a Judgment on the merits in

14   that period of time.  It had to have been a

15   Default Judgment.  There's no way that this

16   court could enter a Judgment in that short

17   period.

18       Q.        So, are you saying that when

19   Discover told Forster & Garbus, in December of

20   2012, to get a copy of the Answer, that Forster

21   & Garbus should have looked on eCourts?  Is that

22   what you're saying?

23       A.        No, I'm not saying that.  I'm just

24   saying that this appears to be a Default

25   Judgment.

1        Q.      Because now you're looking on

2    eCourts.  Right?

3        A.      Yes.

4        Q.      But if you were looking on eCourts

5    this whole time, then you would have never been

6    executing on this vacated Judgment.  Right?

7                MS. LASTORINO:  Objection to form.

8        A.      And again, we have --

9        Q.      Is that right?

10       A.      If we had checked eCourts but I

11   testified before as to that.

12               MR. KESHAVARZ:  If you can mark

13         this, please.

14               (Whereupon P-7, sections of the

15         Discover Retainer Agreement, is marked

16         for identification.)

17       Q.      I'm showing you what's been marked

18   as Plaintiff's Exhibit 7.  It's sections of the

19   Discover Retainer Agreement with Forster &

20   Garbus.  Discover produced the sections of the

21   Retainer Agreement.  It stated, I believe, the

22   obligations of Forster & Garbus in collecting on

23   Discover accounts.  So, I want you to review it

24   but I'm going to ask you a question on page

25   Callender 220, top paragraph.  For the record,

```
 1    Plaintiff's Exhibit 7 are pages 216 Callender to
 2    Callender 220.  So, if you could review the
 3    document, then I'm going to point to the top
 4    paragraph that starts on page 220.
 5          A.     Page what?  220?
 6          Q.     Yes, Bates Stamp 220, top
 7    paragraph.  If you can read that paragraph in
 8    particular and let me know when you're done.
 9          A.     Starting with --
10          Q.     The top paragraph on page
11    Callender 220.
12          A.     "Laws, License and Requirements"?
13          Q.     Correct.
14          A.     "And any other --" you want me to
15    read this whole thing?
16          Q.     Well, just read it to yourself.
17          A.     Oh, read it to myself, yes.
18                 (Whereupon the witness reads the
19          document.)
20          A.     Okay.  I've read it.
21                 MS. LASTORINO:  Which paragraph?
22                 THE WITNESS:  This part.
23                 MS. LASTORINO:  Okay.
24          Q.     So, it states -- tell me if I'm
25    reading this correctly.  "Attorney further
```

1   warrants that it shall exercise reasonable care

2   and best efforts in attempting to collect

3   accounts."  Did I read that correctly?

4                   MS. LASTORINO:  The document

5          speaks for itself.

6          Q.     Did I read it correctly?

7          A.     Yes.

8          Q.     And does Forster & Garbus in fact

9   use, exercise reasonable care and best efforts

10  in attempting to collect Discover accounts?

11         A.     Absolutely.

12         Q.     And it goes that -- goes on to say

13  that Forster & Garbus shall not engage in any

14  collection or judicial enforcement action which

15  may be deemed unfair, abusive, deceptive or

16  harassing.  Is that correct?

17         A.     That's what it says.

18         Q.     And Forster & Garbus in fact --

19  well, let me ask you this:  Do you believe

20  executing on my client's wages, when there was

21  no Judgment, in Forster & Garbus's opinion, does

22  it believe that that's unfair, abusive,

23  deceptive or harassing?

24                  MS. LASTORINO:  Objection to form.

25         A.     At the time we issued the income

1   execution, I believe we were not unfair, not

2   abusive, not deceptive or not harassing, okay,

3   and that we were complying with the directives

4   of Discover Bank.

5          Q.    Do you think it was unfair to Mr.

6   Callender to execute on a vacated Judgment,

7   regardless of your knowledge?

8               MS. LASTORINO:  Objection to form.

9          Regardless of his knowledge?

10         Q.    For Mr. Callender, what you know

11  is not the issue.  So, when it says here that

12  you shall not engage in unfair conduct, do you

13  think executing on a vacated Judgment to Mr.

14  Callender is unfair or do you not believe that's

15  unfair?

16              MS. LASTORINO:  Objection to form.

17         A.    I would imagine from Mr.

18  Callender's point of view, it would be --

19              MS. LASTORINO:  Don't speculate as

20         to the opine on someone else's subjective

21         belief.  What kind of proper question is

22         that?

23              MR. KESHAVARZ:  Don't instruct

24         your witness.

25              MS. LASTORINO:  Your client could

```
 1              testify as to that.
 2                   MR. KESHAVARZ:  Object to form.
 3              He answered the question, so it's fine.
 4                   MS. LASTORINO:  He said --
 5                   MR. KESHAVARZ:  No.  Thank you.
 6         Q.    Going on to the next sentence.
 7    "DBSC."  That's basically Discover.  Right?
 8         A.    Basically, yes.
 9         Q.    So, "Attorney acknowledges that
10    Discover is relying upon the experience of the
11    attorney, Forster & Garbus, in regard to the
12    matters assigned to it."  Does Forster & Garbus,
13    in fact, acknowledge that?
14         A.    By signing the retainer?
15         Q.    Is it Forster & Garbus's position
16    today that Discover is relying upon the
17    expertise of Forster & Garbus in the collecting
18    of accounts such as the vacated Judgment?
19                   MS. LASTORINO:  Objection to form
20              and again, you're asking to opine as to
21              what another entity is relying on.
22                   MR. KESHAVARZ:  Don't instruct
23              your witness.
24                   MS. LASTORINO:  I'm not.
25                   MR. KESHAVARZ:  Either object to
```

1        form or not and that's all you're

2        admitted to do.

3                MS. LASTORINO:  That's the basis

4        of the objection.

5                MR. KESHAVARZ:  That's all you can

6        say.

7                You may answer.

8        A.      And basically, again, you know, it

9    says what it says in there and if we signed off

10   on this retainer, then the language speaks for

11   itself.

12       Q.      So, it's Forster & Garbus's

13   position that Discover is relying on your

14   representations, for example, on whether the

15   Judgment is vacated or not?

16       A.      Whether they actually are or not,

17   I don't know, in this particular case.

18       Q.      But they're supposed to?

19               MS. LASTORINO:  Objection to form.

20       A.      Well, I don't know what their

21   internal practices are.

22       Q.      Okay.  And it goes on to say that

23   "Discover expects of attorney, Forster & Garbus,

24   to proactively utilize its expertise with regard

25   to matters in this paragraph, whether

```
 1   specifically directed by Discover or not."  Is
 2   that correct?
 3          A.     Where are you reading that?  I
 4   don't see that.
 5          Q.     The last sentence.
 6                 MS. LASTORINO:  Last sentence
 7          where?
 8                 MR. KESHAVARZ:  First paragraph,
 9          page 220.  I'm substituting the word --
10          when it says, "attorney," it means
11          Forster & Garbus.  Right?  And DBSC is
12          Discover.  So, I'm just swapping those --
13          A.     So, you're saying "DBSC expects
14   attorney to proactively utilize its expertise"?
15   Is that the sentence you're referring to?
16          Q.     Yes.
17          A.     Okay.
18          Q.     So, for Mr. Callender and all
19   judgment accounts and all accounts from
20   Discover, Forster & Garbus is supposed to
21   proactively utilize its expertise regarding the
22   collection of that account.  Right?
23                 MS. LASTORINO:  Objection to form.
24          A.     And again, I'll just go by the
25   wording.  It says what it says.
```

1          Q.     And that's your responsibility.
2    Right?  Forster & Garbus's responsibility?
3                 MS. LASTORINO:  Objection to form.
4          A.     It says what it says.
5          Q.     The answer is yes?  Is the answer
6    yes?
7          A.     Okay.
8          Q.     Is the answer yes?
9          A.     Yes, I guess the answer is yes,
10   pursuant to the retainer.
11         Q.     Okay.  And it's required --
12   Forster & Garbus is required to do that
13   regardless if Discover specifically says that or
14   not.  Right?
15         A.     That's what it says.
16         Q.     So, is it Forster & Garbus's
17   position that despite its contractual
18   requirement to utilize its expertise
19   proactively, that it still was not under any
20   obligation to check eCourts to see whether the
21   ten-year-old Judgment against Mr. Callender was
22   vacated?
23                 MS. LASTORINO:  Objection to form.
24         A.     Absolutely.
25         Q.     Absolutely?

```
 1          A.      Absolutely.

 2                  MR. KESHAVARZ:  Can you read the

 3          first part of the question?

 4                  (Whereupon the referenced question

 5          is read back by the reporter.)

 6          Q.      And by "absolutely," you mean

 7    absolutely not required to check eCourts.

 8    Correct?

 9          A.      Absolutely.

10          Q.      Absolutely not required to check

11    eCourts.  Right?

12          A.      Absolutely -- yes.

13          Q.      Thank you.  So, we have -- the

14    Complaint makes a request for punitive damages.

15    One of the pattern jury charge questions on

16    punitive damages is the income assets, relative

17    financial positions of the parties.

18                  MS. LASTORINO:  Is this a

19          question?

20                  MR. KESHAVARZ:  Can I finish?

21                  MS. LASTORINO:  Go ahead.

22          Q.      So, let me ask you, what is the

23    income of Forster & Garbus, if you know?

24                  MS. LASTORINO:  Objection.

25                  And you don't have to answer that.
```

```
 1          Q.    Do you know what the answer to the
 2     question is?
 3               MS. LASTORINO:  You're asking if
 4          he knows the answer?  Because I'm not --
 5          Q.    Do you know the answer?
 6               MS. LASTORINO:  Objection.  The
 7          objection is, it so far exceeds the scope
 8          of discovery in this case.  Just mark it
 9          for a ruling.
10               MR. KESHAVARZ:  Except that it's
11          part of the pattern jury charge.
12               MS. LASTORINO:  I don't care what
13          you're saying the pattern jury charge
14          says.  It exceeds discovery and he's not
15          going to answer that.  This is not a
16          class action.
17               MR. KESHAVARZ:  I know but the
18          punitive damage question allows and
19          requires a jury to consider the relative
20          financial positions of the parties, the
21          income and the assets.
22               MS. LASTORINO:  I'm directing him
23          not to answer based on, really, like
24          Judge Hellerstein said, "seeking to swat
25          a fly with a howitzer."  I'm not going to
```

```
1        allow him to answer that.  It is not
2        relevant to this case.  It far exceeds
3        discovery.  This is not an class action
4        where net worth of the law firm is a
5        factor.
6              MR. KESHAVARZ:  Well, let me take
7        it one at a time.
8        Q.    First of all, do you know?
9              MS. LASTORINO:  It's irrelevant if
10       he knows or not because I'm telling him
11       that he's not answering.  If you want to
12       make a motion, let's make a motion.
13       Let's get the Court on the phone right
14       now.
15             MR. KESHAVARZ:  Are you
16       instructing him not to answer whether he
17       knows what Forster & Garbus's income is?
18       Are you instructing him not to answer
19       whether he knows?
20             MS. LASTORINO:  You could answer
21       if you know or if you don't know.
22             And then, he's not answering what
23       it is.  So, what difference does it make?
24       Q.    One step at a time.  Do you know
25   what the Forster & Garbus -- the law firm.  It's
```

```
 1   an LLP?
 2           A.      It's an LLP, yes.
 3                   MS. LASTORINO:  Actually, you know
 4           what?  I am directing him not to answer.
 5           It's not relevant.
 6                   MR. KESHAVARZ:  Whether he knows?
 7                   MS. LASTORINO:  Right.  It's not
 8           relevant.  This is not a class action.
 9           This far exceeds the scope of discovery,
10           Ahmad.  You know that.  The income the
11           law firm?  No.
12                   MR. KESHAVARZ:  Are you disputing
13           that the income and worth is not a factor
14           for punitive damage question?
15                   MS. LASTORINO:  You're assuming,
16           first of all, that there's punitive
17           damages and punitive damages are not
18           dependent on the net worth of the firm.
19           I'm going to object to that.
20                   MR. KESHAVARZ:  Are you disputing
21           that's one of the factors for the jury to
22           consider?
23                   MS. LASTORINO:  I'm not going to
24           agrees as to what you're reading from.
25           It's also a legal question.  I mean
```

```
1            you're asking him to give you an answer

2            on something that you're saying is a

3            pattern jury instruction.  It's

4            inappropriate.  It exceeds the scope of

5            discovery.

6                 MR. KESHAVARZ:  You're not going

7            to let him testify as to even whether he

8            knows the net worth, the income, the

9            assets of Forster & Garbus are?  Is that

10           what you're saying?

11                MS. LASTORINO:  I will let him

12           answer if he knows or doesn't know and

13           that's it.  I'm not allowing him to

14           answer anything after that.  If he even

15           knows.  Maybe he doesn't.

16                MR. KESHAVARZ:  Maybe we'll find

17           out.

18           Q.    Do you know what the income of

19     Forster & Garbus is?

20           A.    No.

21           Q.    Do you have any idea what the

22     income is?  No idea --

23                MS. LASTORINO:  He answered no.

24           How many times are you going to ask that

25           question?  I let you ask that question if
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

```
1              he knew or he didn't know.  He said,
2              "no."  That's the answer.
3         Q.    Do you have any idea what it is
4    for the last year?
5              MS. LASTORINO:  Objection.
6         A.    No.
7         Q.    Do you have any idea what it is
8    this year?
9              MS. LASTORINO:  Objection.
10        A.    Certainly not.
11        Q.    Any of the prior years?
12             MS. LASTORINO:  Objection.
13        A.    Again, I don't know the income.
14             MS. LASTORINO:  It's yes or no.
15        You answered it five times.
16        A.    I'm not a partner of the firm.
17        Q.    Do you know what the face value of
18   the accounts that Forster & Garbus attempts to
19   collect are?
20             MS. LASTORINO:  Objection.
21        Q.    You can answer.
22        A.    No.
23        Q.    Do you know what the face value of
24   the judgment accounts at Forster & Garbus --
25             MS. LASTORINO:  I'm going to
```

```
1              object to this.  Let's get the Judge on
2              the phone.
3                   MR. KESHAVARZ:  About whether he
4              even knows the face value of these
5              accounts?
6                   MS. LASTORINO:  What else are you
7              going to go -- he's saying that he
8              doesn't know.  Are you going to go
9              through every single --
10                   MR. KESHAVARZ:  Well, let me
11              finish.  Let me finish asking the
12              question.  Let him answer.  If you stop
13              interrupting, we'll get through this much
14              faster.
15                   MS. LASTORINO:  Well, start asking
16              appropriate questions.
17              Q.    All right.  You don't know the
18      face value of all the portfolios that Forster &
19      Garbus attempts to collect on.  Is that right?
20              A.    That's correct.
21              Q.    Do you know what the face value
22      approximately is for the portfolios of judgment
23      accounts that Forster & Garbus attempts to
24      collect on?
25                   MS. LASTORINO:  Objection.
```

```
 1          A.     No, I do not.
 2          Q.     Do you know what the average or
 3   range of average face value of the judgment
 4   accounts that Forster & Garbus collects is?
 5              MS. LASTORINO:  Objection.
 6          A.     I don't even understand that
 7   question.
 8          Q.     Well, that's a perfectly valid
 9   response because I asked you to ask me to
10   clarify.
11              So, the face amount of the
12   judgments, for the judgment accounts that
13   Forster & Garbus collects on, do you know what
14   the -- the total amounts of those judgments are?
15              MS. LASTORINO:  Objection.
16          A.     No.  Asked and answered.  I said
17   that.  No.
18          Q.     Do you know what the average value
19   of the judgments are?
20              MS. LASTORINO:  Objection.  This
21              is really getting abusive now.
22          A.     No, I don't.
23          Q.     Do you know what the net worth of
24   Forster & Garbus is?
25              MS. LASTORINO:  Objection.
```

```
1                    You don't have to answer.  This is
2          really -- this is really abusive.  This
3          is grounds for a motion.
4                    MR. KESHAVARZ:  I'm asking if he
5          knows.  You said, "Yes, he can answer.
6          Yes, he can answer."
7                    MS. LASTORINO:  But you keep
8          going.  You ask some questions and then
9          that's it.  I mean you can spend the next
10         hour asking these questions.  He doesn't
11         know.  That's inappropriate, anyway,
12         because if he knew, where is it leading
13         towards?  It's not discoverable.
14         A.    And I don't know the answer to it.
15         Q.    So, let me just make sure we're
16   clear because you seem to be -- I can literally
17   see the gears moving in your head, but putting
18   that aside --
19                   MS. LASTORINO:  Which I don't even
20         know what that means.
21         Q.    Let me ask you this.  Do you know
22   what the net worth of Forster & Garbus is?
23                   MS. LASTORINO:  You just asked
24         that question.
25         Q.    You may answer.
```

```
 1          A.    I don't know.

 2              MS. LASTORINO:  That's it.  That's

 3          it.

 4              MR. GARBUS:  Is it time to leave?

 5              MS. LASTORINO:  We're going to

 6          call the Court.  I'm not going to engage

 7          in this anymore.

 8              MR. KESHAVARZ:  Well, he says he

 9          doesn't know.

10              MS. LASTORINO:  So, then why do

11          you keep asking him the same question a

12          different way, if he doesn't know?

13              MR. KESHAVARZ:  Because income is

14          one thing and assets are another thing.

15              MS. LASTORINO:  But he answered

16          everything already.  You keep asking him

17          the same question.

18              MR. KESHAVARZ:  No. I think I've

19          asked him four different --

20              MS. LASTORINO:  You asked the same

21          question.  I would move on.

22          Q.    How many people work at Forster &

23      Garbus?

24          A.    Approximately a hundred and

25      seventy-five.
```

1        Q.      How many of those are attorneys?

2        A.      I believe twelve.

3        Q.      Do you know what the payroll is

4    for Forster & Garbus?

5                MS. LASTORINO:  Objection.

6        A.      No.

7        Q.      Okay.  Do you know the total

8    number of accounts Forster & Garbus collects on?

9        A.      No.

10       Q.      Do you know -- Forster & Garbus,

11   the LLP, do you know who the general partner of

12   the LLP is?

13       A.      No.

14       Q.      Is there a general partner?

15       A.      I don't know.

16       Q.      All right.  Looking at Exhibit No.

17   1, the income execution, do you know if those

18   signatures are physical ink pen and paper

19   signatures or is it a digital signature, if you

20   know?

21                MS. LASTORINO:  Objection to

22           classifying it as signatures, plural.

23       Q.      You may answer the question.

24       A.      These would be original

25   signatures.  Then, scanned into the computer, so

1    that you don't see the ink but these would have

2    been the original scan.

3         Q.     Thanks.  I was looking at the

4    collection notes and I didn't see anything about

5    sending out the CPLR 5222 notices.  Does Forster

6    & Garbus send those out?

7              MS. LASTORINO:  Objection to form.

8         Was that a statement or a question?

9         Q.     Does Forster & Garbus send those

10   out?

11             MS. LASTORINO:  That you didn't

12        see it?  You want him to answer if you

13        didn't see something?

14             MR. KESHAVARZ:  If you would stop

15        interrupting, this would go so much

16        faster.

17             MS. LASTORINO:  If you ask proper

18        questions, I wouldn't have to do this.

19             MR. KESHAVARZ:  If you have an

20        objection to the form of the question,

21        you can add them.

22             MS. LASTORINO:  I have been,

23        Ahmad, and it's not improving with your

24        questioning.  You still ask the same

25        improper questions:  Compound, your

```
 1              beliefs, someone else's belief.  Ask
 2              appropriate questions.  It would go a lot
 3              easier.
 4                   (Whereupon there is an
 5              off-the-record discussion.)
 6              Q.     Do you know what a CPLR 5222
 7    Notice is?
 8              A.     Are you talking about the
 9    exemption claims?  Yes.
10              Q.     And what is it?
11              A.     Okay.  Pursuant to 5222-a of the
12    CPLR, entitled the "Exempt Income Protection
13    Act," you're required, when serving a
14    restraining notice, to serve two copies of the
15    restraining notice to the bank, together with
16    exemption claim forms and a notice to the
17    judgment debtor, a notice regarding exemptions
18    that are allowed by law, such as disability,
19    Social Security, et cetera.  Those forms were
20    sent to Banco Popular in accordance with 5222.
21    I think we provided that in discovery.
22              Q.     Maybe I'm getting the number wrong
23    of the CPLR because I'm more of federal court
24    practice in there but isn't Forster & Garbus and
25    judgment creditors generally supposed to give a
```

```
 1   notice, once a year, to judgment debtors about
 2   the exempt assets or is that incorrect?
 3                  MS. LASTORINO:  Objection to form.
 4        A.      There is a provision for, okay,
 5   that.  However, the exemption notice, 5222-a
 6   provides that you provide a notice of that form
 7   and a copy of the -- you can do two things:  You
 8   can either serve a copy within a year prior or
 9   you can serve a copy with the restraining notice
10   within four days of the service of the
11   restrainer notice.  CPLR 5222-a provides that
12   the bank serve a copy of the restraining notice
13   and the exemption claim form upon the judgment
14   debtor, so he does get that notice of
15   exemptions.
16        Q.      So even, if Forster & Garbus
17   hadn't given notice for say four years, are you
18   saying so long as it gives the notice along with
19   the bank restraint, then it's complied with its
20   obligations?
21                  MS. LASTORINO:  Objection to form.
22        Q.      Is that what you mean?
23        A.      Well, that could be an
24   interpretation of what I said.
25        Q.      And is that Forster & Garbus's
```

1    position?

2                    MS. LASTORINO:   Objection to form.

3         A.     I'm not saying there is a

4    position.

5         Q.     All right.

6         A.     This is a legal question.

7         Q.     Well, let me ask you a factual

8    question because I didn't note in the collection

9    notes any indication that there was a CPLR 5222

10   Notice, other than for the restraints, but I

11   didn't see one that's sent out every year or at

12   all, other than the restraints.  Does Forster &

13   Garbus not send out these notices every year?

14        A.     No, no.  We do.  There is a

15   program in effect to do that.

16        Q.     You have the collection notes that

17   are Exhibit 6?

18        A.     I see.  I know, um-hum.

19        Q.     Is there anything in there that

20   indicates that these 5222 notices were actually

21   sent to Mr. Callender every year?

22        A.     It doesn't have to be sent to Mr.

23   Callender every year unless you're going -- you

24   know, you have a right to either send it to him

25   in advance or within four days of the service of

1    the restraining notice.  That's what the statute

2    says.  So, Mr. Callender wasn't served the 5222

3    Notice, other than with the income execution.

4    Is that right?

5                    MS. LASTORINO:  Objection to form.

6        A.      The income execution doesn't

7    require 5222 notices.  It's a different section.

8    It's not a bank.  There's no exempt assets for

9    your place of business.  So, it's not required

10   for the income execution.  It's 5231 that's the

11   income execution statute.  It's not in there.

12       Q.      Well, when was the last time

13   Forster & Garbus gave Mr. Callender a 5222

14   Notice?

15                   MS. LASTORINO:  Objection to form.

16       A.      That notice -- I'm not sure.  I

17   don't know.  There's nothing in the notes to

18   reflect that.

19       Q.      There's nothing in the notes to

20   reflect that?

21       A.      No.

22       Q.      If the 5222 notices were sent to

23   Mr. Callender, would that be reflected in the

24   collection notes?

25       A.      Probably.

```
 1          Q.    But you're saying you don't see
 2    any indication of that?
 3          A.    That is correct.
 4          Q.    Do you know why that might be?
 5          A.    Okay.  Let me just see.
 6                (Whereupon the witness looks
 7          through documents.)
 8                MR. KESHAVARZ:  While you're doing
 9          that, I'm going to take a break.  Let's
10          go off the record.
11                (Whereupon there is a brief
12          recess.)
13    BY MR. KESHAVARZ:
14          Q.    Okay.  You were going to answer.
15                What was the last question?
16                (Whereupon the last question is
17          read back by the reporter.)
18          A.    No, I don't know the reason.
19          Q.    Other than the bank restraint,
20    when Forster & Garbus attempts to collect on
21    judgments, is it Forster & Garbus's position
22    that it's not required to send out a CPLR 5222
23    Notice, if it wasn't a bank restraint?
24          A.    It only applies to bank restraints
25    and property executions, a bank execution.  It
```

```
 1   does not apply to income executions.
 2          Q.     So, income executions or other
 3   attempts to collect on judgments, it's Forster &
 4   Garbus's position that it's not required to send
 5   out a CPLR 5222 Notice to the consumer, at any
 6   point?
 7                 MS. LASTORINO:  Objection to form.
 8          A.     A 5222 applies to bank restraints
 9   and so that section applies to bank restraints,
10   not to income executions.  It applies to
11   property executions, under 5232, I believe, and
12   5222 for bank restraints.
13          Q.     All right.  Well --
14          A.     I was just going to say other than
15   there were no other bank restraints on this
16   account.
17          Q.     So, for other attempts, other than
18   bank restraints, income executions, collection
19   letters, so forth, is it Forster & Garbus's
20   position that it's not required to send out a
21   5222 Notice, at any point, prior to taking those
22   other steps?
23                 MS. LASTORINO:  Objection to form.
24                 You can answer.
25          A.     As to income executions, et
```

```
1  cetera, as far as letters go, you know, we
2  comply with Department of Financial Service
3  rules, which are recently in effect, that
4  provide for an exemption notice.  That's the new
5  rules under the Department of Financial Services
6  but this wasn't in effect in 2010, or
7  whatever -- 2009, but we do comply with those
8  recent requirement notices.
9              MR. KESHAVARZ:  I appreciate your
10         time, sir.
11             THE WITNESS:  Thank you.
12             MR. KESHAVARZ:  All right.  Your
13         attorney gets to ask you questions, if
14         she wants.
15             MS. LASTORINO:  I have no
16         questions.
17             (Whereupon the proceedings are
18         concluded at 4:15 p.m.)
19
20
21
22
23
24
25
```

JOEL D. LEIDERMAN, ESQ. on 09/28/2016

1          C E R T I F I C A T E

2

3               I, Wanda Wilkins, a Certified

4     Court Reporter and Notary Public of the State of

5     New Jersey, certify that the foregoing is a true

6     and accurate transcript of the stenographic

7     notes of the deposition of said witness who was

8     first duly sworn by me, on the date and place

9     hereinbefore set forth.

10              I FURTHER CERTIFY that I am

11    neither attorney nor counsel for, nor related to

12    or employed by, any of the parties to the action

13    in which this deposition was taken, and further

14    that I am not a relative or employee of any

15    attorney or counsel employed in this action, nor

16    am I financially interested in this case.

17

18

19    _____

20              Wanda Wilkins, CCR
          LICENSE NO. 30XI00117400

21

22

23

24

25