## Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No.: 1:15-cv-05813-AKH
-----------------------------------------x
VICTOR CALLENDER,
                              Plaintiff,
         - against -
FORSTER & GARBUS, LLP and
DISCOVER BANK,
                              Defendants.
-----------------------------------------x

                              477 Madison Avenue
                              New York, New York
                              October 25, 2016
                              12:31 p.m.

       DEPOSITION of VICTOR CALLENDER, the
Plaintiff in the above-entitled action,
held at the aforementioned time and place,
taken before Ashley Shugar, a Shorthand
Reporter and Notary Public of the State of
New York, pursuant to the Federal Rules of
Civil Procedure, Notice and stipulations
between Counsel.

               *    *    *
```

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

## Page 2

A P P E A R A N C E S:

THE LAW OFFICE OF AHMAD KESHAVARZ
Attorneys for Plaintiff
    16 Court Street, 26th Floor
    Brooklyn, New York 11241
BY: AHMAD KESHAVARZ, ESQ.
    ahmad@newyorkconsumerattorney.com
    JESSICA MOODY, ESQ.
    jessica@newyorkconsumerattorney.com

RIVKIN RADLER LLP
Attorneys for Defendant
FORSTER & GARBUS, LLP
    926 RXR Plaza
    Uniondale, New York 11556
BY: CAROL A. LASTORINO, ESQ.
    carol.lastorino@rivkin.com
FILE: 12607-2

          *   *   *

## Page 3

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;
    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;
    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

         *   *   *

## Page 4

V I C T O R   C A L L E N D E R, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:
        (Defendant's Exhibit A, Notice to Take Oral Deposition, was marked for identification.)
EXAMINATION BY
MS. LASTORINO:
    Q.   Hello, Mr. Callender. My name is Carol Lastorino. I represent the Defendant, Forster & Garbus, in this case.
         I'm going to ask you some questions. I want you to give me a full response, not a nod or a shake of the head. This way, the court reporter can take down your response.
         MR. KESHAVARZ:  You mean oral answer.
BY MS. LASTORINO:
    Q.   If you don't understand my question, ask me and I'll rephrase it.
         Before we get started, I just marked as Defendant's Exhibit A the Notice

## Page 5

to Take Oral Deposition, which is dated and was served on September 12th, 2016, which was sent to your attorney and provided that your deposition was going to be taken at the offices of Rivkin Radler, 477 Madison Avenue, 20th Floor, New York, New York, on October 25th, 2016 at 11:00 a.m.  It is now 12:30 p.m., and I just want the record to reflect that.
         And I had a prior e-mail communication back when this was served with Ahmad Keshavarz, plaintiff's attorney, that there is a presumption the deposition takes place in the county where the action is commenced.  The action is commenced in the Southern District, which is New York County, not Kings County.  But we are starting this deposition an hour and a half late.
         MR. KESHAVARZ:  Okay.  Then let me get my statement on the record.
         I've been practicing New York law for 16 years.  This is the first time in my entire career where we've

## Page 6

had deposition of a party in a location other than that party's attorney.  It's common courtesy for most attorneys.  Apparently, it's not common courtesy here.  When there was a Notice of Deposition at Rivkin Radler, I promptly notified opposing counsel that I would produce my client at my office as common courtesy has been.
    I would also note that I attempted to take the deposition of the corporate representative of Forster & Garbus at the Manhattan office of Rivkin & Radler.  Opposing counsel refused to take the deposition, requiring me to drive an hour and a half to Long Island to take the deposition of the corporate representative.
    I would also note that I had a doctor's appointment this afternoon because I'm ill, and I had to cancel it because I had to haul all the way

## Page 7

out here, which I don't think is courteous.
         MS. LASTORINO:  And let --
         MR. KESHAVARZ:  If you have --
         MS. LASTORINO:  No.  Let the record further reflect, since you wanted to put something on the record, that when you told me that you did not want the deposition here, I explained to you that it was going to take place here based on the presumption.  Your manner of practicing, I can't tell you why you don't know what the general rules and presumptions, including the presumption that the 30(b)(6) witness is produced for deposition where he resides or conducts business.
         So, that being said,
BY MS. LASTORINO:
    Q.   Mr. Callender, tell me everything you did to get ready for this deposition today?

## Page 8

         MR. KESHAVARZ:  Objection to the form of the question.
         You may answer.
BY MS. LASTORINO:
    Q.   You could answer.
         THE WITNESS:  What do --
         MR. KESHAVARZ:  You can answer.
BY MS. LASTORINO:
    Q.   You can't -- you can't ask your attorney a question.
         MR. KESHAVARZ:  Just -- just listen to --
BY MS. LASTORINO:
    Q.   When I ask you a question, just so you know, and a question is pending, you can't ask your attorney or speak to your attorney to help him -- have him help you testify.
         So tell me everything that you did to prepare for this deposition today.
    A.   Just met -- mentally just went over how we got to this position.  How we -- how we got to this position.
    Q.   Did you review any documents?

## Page 9

    A.   Whatever documents I had in my possession.
    Q.   And what -- what documents did you have in your possession that you reviewed?
    A.   Letters from Forster & Garbus, the letter that I had when I went to court and I had, you know, the dismiss -- they dismissed the cases.  All those letters, I just went over the whole file.
    Q.   And what letters from Forster & Garbus did you review?
    A.   The letters I sent to -- the letters that I received from Forster & Garbus back in 2012 and the letter I sent to the State wanting to inquire about -- wanted to inquire about why I was getting the letters; that's what -- that's what I was reviewing.
    Q.   When you say "the letter to the State," what do you mean by that, the State?
    A.   What's it called?  Well, when I started getting the letters, I had to

## Page 10

write -- I wrote the State because I wanted to find out what it was.
    Q.   Are you talking about the New York City Department of Consumer Affairs?
    A.   Right.  Yeah, that's the --
    Q.   Okay.
    A.   -- that's them, yeah.  So -- because I -- I went over that stuff.
    Q.   And the letters --
         You said you received letters from Forster & Garbus?
    A.   Right.
    Q.   About how many letters did you receive from --
    A.   Five.
    Q.   I'm sorry?
    A.   Five.
    Q.   About five letters?
    A.   Uh-huh.
    Q.   Did you meet with your attorney to prepare for deposition?
         MR. KESHAVARZ:  She's not asking you what was said.

## Page 11

BY MS. LASTORINO:
    Q.   No, I'm not asking you what was said.  I'm just asking you did you meet with --
    A.   Yes.
    Q.   -- your attorney?
    A.   Yes.
    Q.   And when did you meet with your attorney?
    A.   This morning, I got to the office around 10 -- 10 -- 10 o'clock.
    Q.   Did you meet --
    A.   10:45 -- 10 o'clock.
    Q.   Did you meet with him prior to this morning to prepare for deposition?
    A.   No.
    Q.   Was --
         Who was present in the meeting this morning with your attorney?
    A.   Just my attorney.
    Q.   Just the two of you?
    A.   Uh-huh.
    Q.   Mr. Callender, where do you currently reside?

## Page 12

    A.   I live in the Bronx.
    Q.   Can you give me the specific address?
    A.   765 East 225th Street.
    Q.   And that's an apartment?
    A.   Apartment, yeah, 2B.
    Q.   Apartment 2?
    A.   2B.
    Q.   How long have you lived at that address?
    A.   I've been living there now a year.
    Q.   So you have been there since November of 2015?
    A.   2015? Yeah. Yes.
    Q.   So no longer than that?
    A.   No longer than that.
    Q.   And where did you live prior to that address?
    A.   986 Leggett Avenue.
    Q.   I'm sorry?
    A.   986 Leggett Avenue.
    Q.   And that's in the Bronx?
    A.   That's in the Bronx.

## Page 13

    Q.   And when did you reside there?
    A.   2014 of March.
    Q.   You started March of 2014?
    A.   Yeah.
    Q.   Until when?
    A.   Until August -- September 2015.
    Q.   And then where did you live in between September to November of 2015?
    A.   I was hanging out with my friends.  I was living at a friend's.
    Q.   You were living at your friend's house?
    A.   Uh-huh.
    Q.   And where was that?
    A.   Do I have to answer that question?
         MR. KESHAVARZ:  Yeah.
         THE WITNESS:  It's in the Bronx.
BY MS. LASTORINO:
    Q.   Do you know the address?
    A.   No, I don't know the address.  I just know how to get there.
    Q.   Prior to the Leggett Avenue

## Page 14

V. CALLENDER

2 address, where did you live before that?
3 A. 37 -- 379 West 127th Street.
4 Q. Apartment?
5 A. 31, I think. I'm not sure.
6 Q. In the Bronx?
7 A. That's in Manhattan. 10027.
8 Q. And what time frame --
9 What dates did you live there?
10 A. I can't remember. I know I
11 moved in there 2010 of October. That's
12 what I know. I know I moved in there at
13 that time.
14 Q. And how long were you there
15 for?
16 A. That, I don't know off the top
17 of my head. I have to see a calendar.
18 Q. And where did you live before
19 that?
20 A. 408 West 130th Street,
21 Apartment 12.
22 Q. And what dates did you live at
23 that address?
24 A. I lived there from '99 -- '99
25 of September to 2010, October.

## Page 15

V. CALLENDER

2 Q. When you moved from one address
3 to the next, did you file anything with the
4 United States Postal Service for a change
5 of address?
6 A. Yeah.
7 Q. Did you do -- did you submit --
8 Did you do that online or
9 submit a paper to the post office?
10 A. I submitted a paper. I can't
11 remember if I did it for all of them, but
12 that's something that I do.
13 Q. But that's generally your
14 practice --
15 A. Right.
16 Q. -- when you move from one
17 address to another?
18 A. Right.
19 Q. Are you currently married?
20 A. I'm married, but we're
21 separated.
22 Q. What is your -- what is her --
23 What is your wife's name?
24 A. Michelle Callender.
25 Q. When did you marry?

## Page 16

V. CALLENDER

2 A. In 2003.
3 Q. And when did you separate?
4 A. In 2015.
5 Q. A month?
6 A. What month was that? I think
7 it was July.
8 Q. Do you have children?
9 A. Yes, I do.
10 Q. How many?
11 A. Three.
12 Q. And what are their names and
13 ages?
14 A. Mykal.
15 Q. I'm sorry?
16 A. Mykal. Mykal, M-Y-K-A-L. He's
17 10.
18 Isabelle is 8.
19 And Naima is 5.
20 Q. Do they reside with you?
21 A. No.
22 Q. They reside with Michelle?
23 A. Yeah.
24 Q. And where does she reside?
25 A. She's also in the Bronx. I

## Page 17

V. CALLENDER

2 don't have the address on hand right now.
3 It's Fowler Avenue in the Bronx.
4 Q. And have your three children
5 been living with Michelle in the Bronx at
6 Fowler Avenue in the Bronx since you
7 separated in July 2015?
8 A. Yes.
9 Q. Who is Carol Callender?
10 A. That's my mom.
11 Q. Are you currently employed?
12 A. Yes.
13 Q. Where do you work?
14 A. At Blink -- Blink Fitness.
15 Q. And when did you start working
16 at Blink Fitness?
17 A. I started last week.
18 Q. And what do you do there?
19 A. Train. Trainer.
20 Q. You're a trainer?
21 A. (Nods head.)
22 Q. Where did you work prior to
23 Blink Fitness?
24 A. What I did? I did my own thing
25 outside. I was -- I was doing the same

5 (Pages 14 - 17)

## Page 18

V. CALLENDER

2 thing, training, but I was doing it
3 outdoors. Running boot camps.
4 Q. Who were you working for?
5 A. I worked for myself.
6 Q. How long did you do that for?
7 A. I do it all summer.
8 Q. So this past summer, that's
9 what --
10 A. That's what I did.
11 Q. And what did you do before
12 that?
13 A. I worked at Dollar Tree.
14 Q. When did you start working at
15 Dollar Tree?
16 A. 2015. No, no, no. 2014 --
17 sorry -- of like November.
18 Q. November 2014?
19 A. Yeah.
20 Q. And when did your employment
21 there terminate?
22 A. It didn't terminate until March
23 of this year. But I got promoted to
24 manager after working there and I didn't
25 like that position.

## Page 19

V. CALLENDER

2 Q. You didn't like being promoted?
3 A. I didn't like the position. I
4 didn't like the amount of work I was being
5 given for the amount of staff that I had.
6 Q. I'm sorry, the amount of?
7 A. Staff that I had.
8 Q. Staff?
9 A. Yes.
10 Q. When you first started at
11 Dollar Tree in November of 2014, what was
12 your title?
13 A. I was working stock. I was
14 working stock.
15 Q. And where -- which location?
16 Which Dollar Tree location?
17 A. Pelham. Pelham Manor; that's
18 in the Bronx.
19 Q. Who was your supervisor?
20 A. His name was Khan. He's no
21 longer there.
22 Q. And when you first started
23 working at Dollar Tree, was it a part-time
24 or a full-time job?
25 A. It was part-time.

## Page 20

V. CALLENDER

2 Q. How many hours a week did you
3 work?
4 A. Like 25 -- 25 hours.
5 Q. And how much -- what was your
6 salary?
7 A. I don't know. I got to -- what
8 was that?
9    MR. KESHAVARZ: You don't have
10 to look at a calendar.
11    THE WITNESS: No, I have to do
12 the math.
13 Like, I don't know it off the
14 top of my head.
15    MR. KESHAVARZ: So you just
16 listen to the question. If you know
17 the answer, then say. If you don't
18 know, then say.
19    THE WITNESS: No, I don't know.
20 I don't know.
21 BY MS. LASTORINO:
22 Q. You don't know what your salary
23 was?
24 A. No, not off the top of my head.
25 I would have to calculate that.

## Page 21

V. CALLENDER

2 Q. Was it 10 -- more than $10 an
3 hour?
4 A. No, it was less than $10 an
5 hour.
6 Q. Less than 10?
7 A. Yeah.
8 Q. Was it less than $8 an hour?
9 A. No, it was more than $8.
10 Q. Did there come a point in time
11 when you were working at Dollar Tree that
12 you became a full-time employee?
13 A. No, it doesn't work like that
14 in that -- in that business. No.
15 Q. So you were --
16 A. It doesn't work like that.
17 Q. How does it work?
18 A. They hire people for part-time
19 and keep them part-time so they don't have
20 to pay benefits. That's how it works. The
21 only people that gets benefits is managers.
22 I call it slave labor. That's what I call
23 that.
24 Q. So when you were promoted to
25 manager -- I'm sorry.

6 (Pages 18 - 21)

## Page 22

V. CALLENDER

2 Q. What -- what date was that?
3 Did you give me a date for that?
4 A. The promotion?
5 Q. Yeah.
6 When did the promotion take
7 place?
8 A. The end of 2015. November or
9 December.
10 Q. And when you got the promotion,
11 did you -- did your salary increase?
12 A. Yeah.
13 Q. And what'd it increase to?
14 What was your --
15 A. It was 14.
16 Q. $14 an hour?
17 A. $14 an hour.
18 Q. And did you also work the same
19 25 hours per week?
20 A. No. I worked more than that.
21 I worked maybe 35 to 40 hours.
22 Q. And when you were promoted to
23 manager, did you then receive benefits --
24 A. No.
25 Q. -- from Dollar Tree?

## Page 23

V. CALLENDER

2 A. No. You have to go through
3 like another process.
4 Q. And what's that process?
5 A. A trial -- what was that?
6 Trial period or something. Yeah.
7 Q. And you didn't make it through
8 the trial period?
9 A. It's not that I didn't make it;
10 I didn't want to make it through the trial
11 period. I was manager who was given
12 responsibilities to do like work for like
13 ten other people. That's crazy.
14 Q. How does it work at Dollar
15 Tree? Does -- does one store --
16 The store you were working at,
17 how many managers does one store have?
18 A. They have four managers in the
19 store.
20 Q. So there were three other
21 managers when you --
22 A. Right.
23 Q. -- were promoted?
24 A. Yeah.
25 And so I was doing my work and

## Page 24

V. CALLENDER

2 being a cashier also, taking care of the
3 cash, doing cash deposits, doing
4 everything. Making orders, I was making
5 orders. I would show up at night sometimes
6 to take in the trucks, then go home to
7 sleep, then wake back up and then go back
8 again to work. Slave labor. It's too much
9 work for one man.
10 Q. Where did you work before
11 Dollar Tree?
12 A. Unified -- UNFI. It's
13 united -- United Food Distribution Company.
14 Q. And where is that located?
15 A. It's in New Hampshire.
16 Q. And where did you work when you
17 worked for them?
18 A. I worked in the city. I worked
19 in the city.
20 Q. So they were primarily located
21 in New Hampshire, but they had a city --
22 A. Yeah.
23 Q. -- location?
24 A. Yeah.
25 Q. What did you do there?

## Page 25

V. CALLENDER

2 A. The trucks came from New
3 Hampshire to the city so we delivered food
4 products to stores.
5 Q. Did you drive a truck?
6 A. No, I didn't -- I didn't drive
7 the truck.
8 Q. So what was your specific job
9 description?
10 A. Delivery. Delivery. We were
11 doing delivery. Delivery.
12 Q. So somebody else drove the
13 truck and then --
14 A. Yeah.
15 Q. -- you --
16 A. We delivered.
17 Q. You delivered?
18 A. We did, the truck driver and
19 us.
20 Q. Oh, I see.
21 A. Yeah.
22 Q. And when did you start your
23 employment at United Food Distribution?
24 Distribution or distributor?
25 A. I'll just call it United Food.

7 (Pages 22 - 25)

## Page 26

V. CALLENDER

2 A. Yeah, just call it United.
3 UNF --
4 Q. When did you start working at
5 United Food?
6 A. I don't know the date right off
7 the top of my head. I gotta go back years.
8 Q. Well, how many years did you
9 work there?
10 A. Maybe I worked there for seven
11 years. Yeah.
12 If I had known I would answer
13 these question, I'd have brought all that
14 stuff with me. I mean dates, I don't know
15 all the dates.
16 Q. So you were there for seven
17 years.
18 And what -- what was your
19 salary?
20 A. I was getting paid total $16 an
21 hour.
22 Q. And was that a part-time job or
23 full-time?
24 A. It was full-time.
25 Q. How many hours a week?

## Page 27

V. CALLENDER

2 A. Like 40 hours.
3 Q. And do you recall an
4 approximate date as to when you stopped
5 working there?
6 A. Yeah, it's in 2014, though.
7 Q. Do you remember the month?
8 A. I think it's September.
9 Q. Did you leave voluntarily?
10 A. I didn't leave. They just --
11 they just went through changes. The
12 company went through changes, and
13 they just -- they just went through
14 changes. They -- they wanted to stop
15 bringing -- sending the trucks down -- down
16 to the city. It was costing too much money
17 and all that kind of stuff, so they just
18 did cutbacks. So they just cut the lower
19 half out, which is -- which was us, so --
20 Q. So you were laid off?
21 A. Yeah, if you want to call it
22 that.
23 Q. And then the job after United
24 Food was Dollar Tree?
25 A. Right.

## Page 28

V. CALLENDER

2 Q. About how close in time did
3 you -- were you terminated from United Food
4 and then started the Dollar Tree job?
5    MR. KESHAVARZ: Objection to
6 the form of the question.
7 BY MS. LASTORINO:
8 Q. Do you understand the question?
9 A. No, I don't.
10 Q. When you were laid off from
11 United Food --
12 A. Uh-huh.
13 Q. -- and then you -- your next
14 job was at Dollar Tree?
15 A. Right.
16 Q. How long were you --
17 Were you unemployed in between
18 or did you start working --
19 A. Yeah, I was --
20 Q. -- right away?
21 A. -- unemployed. I was
22 unemployed. But I didn't -- I didn't sign
23 up for unemployment or anything like that
24 because I don't believe in that stuff. I
25 believe in working for my money. So . . .

## Page 29

V. CALLENDER

2 Q. How long were you unemployed?
3 A. A couple of months.
4 When did I get the job at
5 Dollar Tree? In October?
6 Again, I -- 2014 -- I mean 2000
7 -- 2014, that's when I got laid off at
8 United. Maybe September, I don't know
9 exactly the month, but it's in that year.
10 I think -- I'm thinking it's like July or
11 September, I'm not sure. But I know I got
12 hired by Dollar Tree around October of that
13 year, 2014.
14 Q. You could have collected
15 unemployment, if you wanted?
16 A. Like I said, me, I don't
17 believe -- that's not something that I -- I
18 like to work. So I mean, to sit down and
19 do -- what is that? Like I don't even --
20 in my -- I'm from Trinidad. I'm from the
21 Caribbean. I'm a worker, so I don't -- I
22 don't understand what that is. I mean, I
23 don't -- I just like to work.
24 Q. So you never collected
25 unemployment --

8 (Pages 26 - 29)

## Page 30

    V. CALLENDER
 2   A.  No, I never --
 3   Q.  -- in your life?
 4   A.  No, I didn't.  I never did.
 5   Q.  How did you feel when you lost
 6  your job with United Food?
 7   A.  How did I feel?  I -- how did I
 8  feel at the time?
 9   Q.  Yeah, at the time.
10   A.  Well, I have to find another
11  job, that's how I felt at the time.  I have
12  to find work.
13   Q.  Were you stressed at losing
14  your job at United Food?
15   A.  No.  What I was stressed
16  about -- I'll tell you what I was stressed
17  about, I was stressed because I -- a couple
18  of months before, I paid a broker like
19  $2,000 to get this apartment and then I had
20  to do the broker fee plus the month rent
21  plus the security, and then I lost my job.
22   All right?
23       So then my stress came because
24  I just moved into this place and I just
25  went into my savings, used it up for this

## Page 31

    V. CALLENDER
 2  space and then I lost the job.  So now my
 3  focus is I need to find work so I can
 4  continue paying my bills and feeding my
 5  family.
 6       That was the focus.  So I was
 7  stressed.  I'm going to get stressed
 8  because if I don't have money, I might end
 9  up on the street, right?
10       So I'm stressed out about that.
11   Q.  Now, during the time that you
12  got married in . . .
13   A.  2003.
14   Q.  Thank you.
15       2003, did Michelle work at all?
16   A.  No, my wife never worked.
17   She -- she didn't work when she was with
18  me.
19   Q.  Did she ever -- did she work at
20  all during the time you were married --
21       When I met --
22   Q.  -- before you were separated?
23   A.  When I met her, she had a --
24  she had a little job.  But when we met,
25  she -- she stopped working.

## Page 32

    V. CALLENDER
 2   Q.  What about up until the time
 3  you separated, did she ever work?
 4   A.  When she had to.  She had to go
 5  and get a job.
 6   Q.  And when did -- when did
 7  that --
 8       When did she go get a job?
 9   A.  She went to find -- she went to
10  work, I think in like, I don't know,
11  December or November that year.
12   Q.  And just of what year are we
13  talking about?
14   A.  2014.
15   Q.  Okay.  And where did she go
16  work when she found that job?
17   A.  She went to work at Wollman
18  Rink.
19   Q.  Where?
20   A.  Wollman Rink.  Wollman Rink,
21  the ice skating facility.  I can't remember
22  what she was doing.  Wollman Rink, I think
23  she was -- well, you need -- she was the
24  manager or something.  I don't know.
25   Q.  And was a part-time job or a

## Page 33

    V. CALLENDER
 2  full-time job?
 3   A.  At the time -- at the time, I'm
 4  not sure.
 5   Q.  Now, when she got that job, did
 6  your childcare situation change at all?
 7   A.  It helped a little bit.
 8   Q.  How so?
 9   A.  Because she was working and I
10  was -- I was out of work, right, but she
11  was working.
12   Q.  So it helped for the expenses?
13   A.  Right, it helped a little bit.
14   Q.  Mr. Callender, have you ever
15  been deposed before?
16   A.  I don't understand the
17  question.
18   Q.  Well, today you're at a
19  deposition where there's a court reporter,
20  I'm asking you questions.
21   A.  Uh-huh.
22   Q.  So a situation like this.
23       Have you ever had a situation
24  like this where you were deposed?
25   A.  Never in my life.

9 (Pages 30 - 33)

## Page 34

    V. CALLENDER
 2   Q.  Did you ever testify in court
 3  before?
 4   A.  Yes.
 5   Q.  And when was that?
 6   A.  That was in -- in 2012.  That's
 7  when I had to go see about the case.  When
 8  I filed a motion -- a motion to vacate, I
 9  had a court order so I had to go for the
10  court for that.
11   Q.  And when you're talking about
12  "the case," are you talking about the
13  Discover Bank matter?
14   A.  Yes.
15   Q.  Is that the only time you
16  testified in court?
17   A.  No.  I had two other judgments
18  that I had to testify.
19   Q.  And what -- let's take one at a
20  time.
21       What was -- what was one
22  judgment that you had to testify?
23   A.  I think it was Citibank.  I
24  can't remember the other name -- the other
25  one.

## Page 35

    V. CALLENDER
 2   Q.  And when was that?
 3   A.  In the same -- in the same
 4  year.
 5   Q.  So that was in 2012 --
 6   A.  2012.
 7   Q.  -- as well?
 8   A.  In the same year, around the
 9  same time around.  I can't remember the
10  months, but I know it was between January
11  and -- and August all that stuff went down.
12   Q.  And was there a judgment
13  against you in Citibank?
14   A.  Yes, there was a judgment
15  against me, that's why I had to go to
16  court.  There was two -- there was two
17  judgments -- no, three judgments, the
18  Discover, Citibank, and the other one I
19  can't remember.
20   Q.  You can't remember the third
21  one?
22   A.  I think it was Chase.  I don't
23  know if it was Chase.  I'm not sure.
24       Because they have different
25  names.  Like they have -- I know it was AS-

## Page 36

    V. CALLENDER
 2   A-  -- AIS and then there was -- I don't
 3  know if that's the same as Mel Harris.  I
 4  don't know, so I'd have to look at the --
 5  the documents to --
 6   Q.  Well, I'm -- I'm going to get
 7  back to the Discover Bank one, but let's
 8  just take these other ones --
 9   A.  Yeah.
10   Q.  -- one at a time.
11       The Citibank one --
12   A.  Uh-huh.
13   Q.  -- when did you learn that you
14  had a judgment -- that Citibank had a
15  judgment against you?
16   A.  The same day I went -- the same
17  day I found out about the judgment against
18  me for -- for this case --
19   Q.  So did you --
20   A.  -- the Discover.
21   Q.  So did you find out that there
22  were three judgments against you the same
23  day?
24   A.  Yeah.
25   Q.  And tell me how you came to

## Page 37

    V. CALLENDER
 2  know that.
 3   A.  Well, I -- when I pulled a
 4  credit report.
 5   Q.  And when did you do that credit
 6  report, do you remember?
 7   A.  I can't remember the exact --
 8  that was in 2012.  I remember my birthday
 9  in 2012, but I can't remember exactly the
10  day when I pulled that.
11   Q.  And what was --
12   A.  I know when I -- I pulled it,
13  and then I went to the courts to ask
14  questions and they told me that I needed to
15  file a motion to vacate, something like
16  that.
17   Q.  What was the reason that you
18  obtained a credit report in 2012?
19   A.  What was the reason?  I don't
20  know.  I was going -- I was going -- I went
21  to a financial seminar or something like
22  that and they said that's one of the things
23  I needed to do, so I went and pulled the
24  credit report, you know.
25   Q.  Was there anything else on the

10 (Pages 34 - 37)

## Page 38

    V. CALLENDER
 2  credit report other than the three
 3  judgments?
 4   A.  That's what I can remember.
 5   Q.  So were there any other liens?
 6   A.  The only thing that stood out
 7  to me was those judgments.  That's the
 8  things that stood out to me.
 9       And when I took it to the
10  lawyers, they said that's important so
11  that's -- that's what I was focusing on.  I
12  had to focus on those.
13   Q.  When did you show that to a
14  lawyer?
15       MR. KESHAVARZ:  She's not
16   asking you what she said.
17       MS. LASTORINO:  I said "when."
18       THE WITNESS:  Yeah, yeah, yeah.
19   It's the same year.  It's 2012.  I
20   can't remember the exact date or the
21   month.
22   BY MS. LASTORINO:
23   Q.  So you consulted with a
24  lawyer --
25   A.  Yeah.

## Page 39

    V. CALLENDER
 2   Q.  -- in 2012?
 3   A.  Yeah, the ones that -- you go
 4  to the courthouse and it's like free, you
 5  can go and ask questions.
 6   Q.  And do you remember what month
 7  that was in 2012?
 8   A.  No, I don't remember the month.
 9  I can't remember the month.
10   Q.  Was it before you testified in
11  court?
12   A.  Yeah, it was before.
13   Q.  And do you remember the name of
14  the attorney that --
15   A.  No.
16   Q.  -- you consulted with?
17   A.  Uh-uh.
18   Q.  Did they assist you with
19  preparing any paperwork that you had to
20  submit to court, these attorneys?
21   A.  What do you mean assist?
22   Q.  Did they help you -- okay.
23   Let --
24   A.  What do you mean, like they
25  helped me write the information down?  What

## Page 40

    V. CALLENDER
 2  do you mean?
 3   Q.  Well, did you have to --
 4       Before you testified in court,
 5  did you have to fill anything out?  Any
 6  kind of paperwork?
 7   A.  I had to get -- I got legal
 8  advice and they told me what I needed to
 9  do; I needed to file a motion to vacate.
10   Q.  And the attorneys told you
11  this?
12   A.  Yes, that's what they told me.
13  At the time I didn't know what that meant,
14  I mean, until I asked questions.
15   Q.  And did you obtain the forms
16  that you had to fill out or did they give
17  them to you?
18   A.  They had -- it was a courtroom
19  so I had to go get them downstairs.  It was
20  a court building, yeah.
21   Q.  And then you went over those
22  forms with your -- with those --
23   A.  With my lawyer.
24   Q.  -- lawyers?
25   A.  Yeah.

## Page 41

    V. CALLENDER
 2   Q.  And was that the procedure on
 3  all three of these judgments?
 4   A.  Yes.
 5   Q.  Do you know the amount of the
 6  Citibank judgment?
 7   A.  No, not off the top of my head.
 8   Q.  Was it more than $10,000?
 9   A.  I said I don't know.  I don't
10  know off the top of my head.
11   Q.  So you don't know even an
12  approximate amount?
13   A.  No, because it was -- that --
14  all that stuff happened like in 2012.
15  That's like the last time I looked at that.
16  I can't remember -- I can't remember that.
17   Q.  So after you filled out the
18  paperwork, what happened next with the
19  Citibank case?
20   A.  What happened after I filled
21  out the paperwork in the courthouse?
22   Q.  Right.
23   A.  What happened next?  I had to
24  go and mail it.  They told me what I needed
25  to do.  I had to go mail the information

11 (Pages 38 - 41)

## Page 42

    V. CALLENDER
 2  out, so I mailed it out.  Then I got a
 3  little card in the mail telling me I needed
 4  to show up in court, so I went to court.
 5       I got -- you know, for each of
 6  them, they sent me a court appearance, so I
 7  had to go all three of them.  Not on the
 8  same day, but I appeared to all three of
 9  them.
10   Q.  Do you remember who you mailed
11  the information to?
12   A.  Whatever information -- I don't
13  remember that.  Whatever -- there's an
14  address that's on the paperwork and that's
15  the -- the people I mailed it -- mailed it
16  to, whoever showed up on the paperwork.  It
17  came in with the paperwork, but I was just
18  following procedure.  Like the paper, it
19  gives like the address and you just
20  transfer the information onto the paper.
21   Q.  Now, with respect to the -- it
22  was Discover, Citibank, and then you said
23  Chase?
24   A.  Yeah, but I'm -- yeah, yeah.  I
25  think it's Chase, but I'm not sure.

## Page 43

    V. CALLENDER
 2   Q.  And do you -- do you know what
 3  that judgment amount was?
 4   A.  No, I don't know.  Off the top
 5  of my head, I don't know.
 6   Q.  So what happened with the
 7  judgment in Citibank?  Did you get that
 8  vacated?
 9   A.  I don't know.  I know one of
10  them got -- I know one of them -- I had to
11  pay for one.  And one of them -- and the
12  other one, they didn't -- they never showed
13  up so it got vacated.
14   Q.  So -- so one you -- the
15  judgment -- in one of the cases, the
16  judgment that was against you went away --
17   A.  Yeah.
18   Q.  -- so to speak?
19   A.  Yeah, one of them went away,
20  because the -- the defendant never showed
21  up.
22   Q.  And in the other one -- what
23  happened in the other one?
24   A.  The other one I had to pay.
25  Came to a settlement.

## Page 44

    V. CALLENDER
 2   Q.  And did you have an attorney
 3  representing you in connection with the
 4  settlement?
 5   A.  No.
 6   Q.  And what did you agree to pay
 7  on that?
 8   A.  1500.
 9   Q.  That one payment in full?
10   A.  One payment in full, 1500.
11   Q.  Are you familiar with printouts
12  from the court, WebCivil Local or
13  something?
14   A.  Right, right, that's where I
15  went.
16   Q.  And did you print something out
17  from that?
18   A.  Right, that's where I went.
19  And that's the first step.  No, that was
20  the second step.
21       MS. LASTORINO:  Can you mark
22   this.
23       (Defendant's Exhibit B,
24   WebCivil Local Case Search Results,
25   Bates stamped Callender 17, was

## Page 45

    V. CALLENDER
 2   marked for identification.)
 3   BY MS. LASTORINO:
 4   Q.  Mr. Callender, I want you to
 5  take a look at what's been marked as
 6  Defendant's Exhibit B.
 7       MR. KESHAVARZ:  Do you have an
 8   extra copy for counsel?
 9       MS. LASTORINO:  I don't.
10       THE WITNESS:  (Document
11   review.)
12       MR. KESHAVARZ:  Wait a minute.
13   There are two different
14   documents here, Callender 17 and
15   Callender 34.
16       MS. LASTORINO:  Yeah.
17   There's -- yeah, there's -- yeah.
18       MR. KESHAVARZ:  They're
19   separate documents.
20       MS. LASTORINO:  All right.  Let
21   me -- I'll -- I'll mark the --
22       MR. KESHAVARZ:  I mean, I'm
23   just asking you --
24       MS. LASTORINO:  Yeah, no, I
25   have it attached to that.  We can do

12 (Pages 42 - 45)

## Page 46

V. CALLENDER

 1  it as two. I don't mind. So he's
 2  not confused.
 3  BY MS. LASTORINO:
 4    Q.  Here, take a look at that.
 5    A.  (Document review.)
 6        Yeah, I know what this is.
 7    Q.  Have you seen that before?
 8    A.  Yeah.
 9    Q.  And what is that?
10    A.  Something I got at the
11  courthouse, it shows my judgments.
12    Q.  Do you recognize that
13  handwriting on that page?
14    A.  Do I recognize --
15        Which handwriting?
16    Q.  Do you see handwriting?
17        There's question marks and
18  there's -- in the second column, there's
19  some handwritten notations.
20        Do you see them?
21    A.  Yeah, I see the handwriting.
22    Q.  Is that your handwriting?
23    A.  No.
24    Q.  Do you know whose handwriting

## Page 47

V. CALLENDER

 1  it is?
 2    A.  No.
 3    Q.  Do you recall going over this
 4  document with someone?
 5    A.  I've seen this, yeah.
 6    Q.  Did you go over this document
 7  with an attorney?
 8    A.  Yeah.
 9    Q.  So could that be the attorney's
10  handwriting?
11        MR. KESHAVARZ:  Objection.
12        Just -- just pause for a second
13  between when she asks a question and
14  when you answer.
15        THE WITNESS:  Okay.
16        MR. KESHAVARZ:  It's fine.
17        THE WITNESS:  Yeah.
18        MR. KESHAVARZ:  You don't have
19  your deposition taken every day.
20        THE WITNESS:  Right.
21        MR. KESHAVARZ:  So objection to
22  the form of the last question.
23  BY MS. LASTORINO:
24    Q.  You can answer.

## Page 48

V. CALLENDER

 1        Could that be your --  the
 2  attorney that you met with, could that be
 3  his or her handwriting?
 4        MR. KESHAVARZ:  Objection to
 5  form.
 6        THE WITNESS:  It could be.
 7  BY MS. LASTORINO:
 8    Q.  All right.  Let's just take a
 9  look at this now.
10        Do you see the first one where
11  it says "Kings County Civil Court"?
12    A.  Uh-huh.
13    Q.  It says, "Plaintiff, 9201 Kings
14  Highway" --
15    A.  Uh-huh.
16    Q.  -- "Association"?
17        Is -- is that a case against
18  you?
19    A.  I don't know.
20    Q.  Did you ever hear of 9201 Kings
21  Highway?
22    A.  Nope.
23    Q.  Okay.  No. 3, do you see where
24  it says "American Express" --

## Page 49

V. CALLENDER

 1    A.  Uh-huh.
 2    Q.  -- "Plaintiff firm, Mel S.
 3  Harris; Defendant, Victor Callender"?
 4    A.  Uh-huh.
 5    Q.  Was that a case against you?
 6    A.  I guess.  I'm not sure.
 7    Q.  Well, do you recall that being
 8  one -- something that came up on the credit
 9  report?
10    A.  No, not -- maybe it came up on
11  the credit report, but . . .
12    Q.  Did you have an American
13  Express credit card?
14    A.  Yeah, but this has -- this has
15  nothing to do with this, like this case
16  here.  I mean, it has a question mark next
17  to it, but it has nothing to do with what
18  we're here for.  This has nothing to do
19  with that.
20    Q.  Well, I'm asking you about
21  these other matters.
22    A.  Okay.
23    Q.  So this American Express, do
24  you recall being sued by American Express?

13 (Pages 46 - 49)

## Page 50

V. CALLENDER

 1    A.  Maybe I was sued, but I
 2  never -- I never had to go to court for --
 3  for anything with American Express.
 4    Q.  And do you know why they would
 5  have sued you?
 6        MR. KESHAVARZ:  Objection to
 7  the form of the question.
 8        If you know the answer, you can
 9  answer.
10        THE WITNESS:  No, I don't know.
11  BY MS. LASTORINO:
12    Q.  Did you default on any credit
13  card payments that you had on your American
14  Express card?
15    A.  I can't remember.
16    Q.  Take a look at the fourth one?
17    A.  Uh-huh.
18    Q.  You see where it says "Capital
19  One Bank" --
20    A.  Right.
21    Q.  -- "versus Victor Callender"?
22    A.  Uh-huh.
23    Q.  Is that a case against you?
24    A.  What year is this?

## Page 51

V. CALLENDER

 1    Q.  I'm just asking you if this was
 2  a case against you.
 3    A.  I never went to court for
 4  anything like this for any Capital One.
 5    Q.  Did you have a credit card with
 6  Capital One?
 7    A.  Yeah, I had a Capital One
 8  credit card.
 9    Q.  And do you know if they sued
10  you in connection --
11    A.  No, I don't.
12    Q.  -- with the credit card?
13    A.  No.
14    Q.  And you see that notation in
15  the second column?  Does that say "paying
16  now"?
17    A.  The second column of where?
18    Q.  Next to the Capital One, to the
19  left.
20    A.  Oh, okay.
21    Q.  You're asking me if it says
22  "paying now"?
23    A.  Yeah.
24        Is that what it looks like to

## Page 52

V. CALLENDER

 1  you?
 2    A.  Yeah, that's what it look like.
 3    Q.  Does reading that refresh your
 4  recollection as to a Capital One case
 5  against you and what transpired in that
 6  case?
 7    A.  Well, I don't think it's a case
 8  against me.  It's not a case.  This just
 9  shows that it's a judgment, but they have
10  no case because I never went to court.
11    Q.  So do you know, sitting here
12  today, did Capital One Bank have a judgment
13  against you?
14        MR. KESHAVARZ:  Objection to
15  the form of the question.
16        THE WITNESS:  I don't know.
17  BY MS. LASTORINO:
18    Q.  Take a look at No. 7.
19        Do you see that?
20    A.  Right.
21    Q.  In the fourth column, it says
22  "Rushmore Recoveries"?
23    A.  Uh-huh.
24    Q.  And in the fifth column, it

## Page 53

V. CALLENDER

 1  says Victor C. Callender as the defendant?
 2    A.  Correct.
 3    Q.  Is this --
 4    A.  Yes.
 5    Q.  Is this one of the judgments
 6  that you testified to --
 7    A.  Yes.
 8    Q.  -- about before?
 9    A.  Right, that I paid off.
10    Q.  And No. 8 on this form --
11    A.  Uh-huh.
12    Q.  -- do you see where it says
13  "AIS Services"?
14    A.  Uh-huh.
15    Q.  In the fifth column, it says
16  "Carol Callender."
17        Is that your mother?
18        MR. KESHAVARZ:  Objection to
19  the form of the question.
20        You may answer.
21        THE WITNESS:  Yeah, it's my
22  mother's name.
23  BY MS. LASTORINO:
24    Q.  Is the information that you see

14 (Pages 50 - 53)

## Page 54

V. CALLENDER

 1  in No. 8, is that another one of the
 2  judgments --
 3        MR. KESHAVARZ:  Object.
 4        Correct.
 5  BY MS. LASTORINO:
 6    Q.  -- on the credit card report?
 7    A.  I have no clue.  I see my mom's
 8  name, but I have -- I have no clue.
 9    Q.  Did you have any credit cards
10  jointly with your mother?
11    A.  I can't remember.
12    Q.  Do you know --
13        Do you remember if you were a
14  defendant in a lawsuit by AIS Services?
15        MR. KESHAVARZ:  Objection to
16  the form of the question.
17        THE WITNESS:  AIS Services.
18  AIS.
19        I don't know.  I don't know who
20  AIS Services is.
21        MS. LASTORINO:  Can you mark
22  this.
23        (Defendant's Exhibit C,
24  WebCivil Local Case Detail, was
25  marked for identification.)

## Page 55

V. CALLENDER

 1  BY MS. LASTORINO:
 2    Q.  Take a look at what's been
 3  marked Defendant's C.
 4        MR. KESHAVARZ:  Do you have a
 5  copy for me?
 6        MS. LASTORINO:  I don't have
 7  extra copies.
 8  BY MS. LASTORINO:
 9    Q.  Did you look at it yet?
10    A.  No, I didn't look at it because
11  I want to put these side to side.
12        (Document review.)
13        MR. KESHAVARZ:  I would note
14  there's no Bates stamp on this
15  document.
16        MS. LASTORINO:  Yeah, I didn't
17  get to Bates stamp it yet.
18        MR. KESHAVARZ:  So you have a
19  document that's being used as an
20  exhibit that apparently has not been
21  produced in discovery?
22        MS. LASTORINO:  No, it hasn't
23  been yet.
24        MR. KESHAVARZ:  It hasn't been

## Page 56

V. CALLENDER

 1  produced in discovery?
 2        MS. LASTORINO:  Right.
 3        MR. KESHAVARZ:  Why not?
 4        It's printed out October 24th,
 5  so --
 6        MS. LASTORINO:  Yeah, that was
 7  yesterday, so I'll be more than happy
 8  to Bates stamp it for you.
 9  BY MS. LASTORINO:
10    Q.  Did you take a look at it?
11    A.  Yeah, I looked at it.
12    Q.  Okay.
13        Do you see the case name?  It
14  says, "AIS Services APO Chase Manhattan
15  Bank" --
16    A.  Uh-huh.
17    Q.  -- "versus Callender, Carol M.,
18  Callender, Victor C."?
19    A.  Uh-huh.
20    Q.  You testified earlier that one
21  of the judgments was Chase Bank.
22        Does this --
23    A.  I said it might have been

## Page 57

V. CALLENDER

 1  Chase.
 2    Q.  Okay.  Does this refresh your
 3  recollection as to it --
 4    A.  Right.
 5    Q.  -- being Chase?
 6        MR. KESHAVARZ:  Objection to
 7  the form of the question.
 8        You may answer, if you know.
 9        THE WITNESS:  Repeat the
10  question.
11        MS. LASTORINO:  Can you read it
12  back.
13        (The requested portion of the
14  record was read back.)
15        MR. KESHAVARZ:  Objection to
16  the form of the question.
17        You may answer, if you know.
18        THE WITNESS:  Right.  Yes.
19        This is one.
20  BY MS. LASTORINO:
21    Q.  Okay.  And is this the one
22  where --
23    A.  I showed up to court and they
24  wasn't there -- nobody showed up to

15 (Pages 54 - 57)

## Page 58

V. CALLENDER

 1  represent.
 2    Q.  Okay.  So this is the one where
 3  the default judgment was vacated?
 4    A.  Right.
 5    Q.  Okay.
 6    A.  That's when I showed up and
 7  nobody's there.  I took two days off work.
 8  I lost payday, two days, and no one showed
 9  up.
10    Q.  So -- and you testified before
11  that you did have a credit card with Chase,
12  right?
13        MR. KESHAVARZ:  Objection to
14  the form of the question.
15        You may answer, if you know.
16        THE WITNESS:  Well, if this
17  says I had a -- yeah.
18  BY MS. LASTORINO:
19    Q.  So after --
20        So by vacate -- having the
21  judgment vacated, you didn't have to pay
22  any money on this account, right?
23        MR. KESHAVARZ:  Objection to
24  the form of the question.

## Page 59

V. CALLENDER

 1        You may answer, if you know.
 2        THE WITNESS:  I don't know.  My
 3  recollection, if it's vacated, then I
 4  don't have to pay anything on that,
 5  if it's vacated.
 6  BY MS. LASTORINO:
 7    Q.  Okay.
 8    A.  Because they didn't -- they
 9  never showed up.
10    Q.  So other than those judgments
11  against you, were you ever -- were you sued
12  for anything else?
13        MR. KESHAVARZ:  Objection to
14  the form of the question.
15        You may answer, if you know.
16        THE WITNESS:  Other than the
17  judgments --
18  BY MS. LASTORINO:
19    Q.  Right.
20    A.  -- if I was sued for anything?
21        I can't -- I can't recall.
22        If we're talking 2012, those
23  are the only things I knew I was being sued
24  for.

## Page 60

V. CALLENDER

 1    Q.  Well, I'm talking about ever.
 2    A.  Ever.
 3    Q.  Were you ever sued as a
 4  defendant?
 5        MR. KESHAVARZ:  Objection to
 6  the form of the question.
 7        You may answer, if you know.
 8        THE WITNESS:  No, not that I
 9  can recall.  Never been sued.
10  BY MS. LASTORINO:
11    Q.  How about being the person who
12  sued somebody else?  Other than this
13  instant case, did you ever sue anybody
14  else?
15    A.  No.
16    Q.  So this is the first lawsuit
17  you ever commenced?
18    A.  Yes.
19    Q.  Do you know what the FDCPA is?
20    A.  No.
21    Q.  So in connection with the
22  Discover Bank -- now, let's go to the
23  Discover Bank judgment.
24        You testified that you learned

## Page 61

V. CALLENDER

 1  about that judgment the same time you
 2  learned about the two other judgments
 3  against you when you obtained a credit
 4  report --
 5    A.  Right.
 6    Q.  -- correct?
 7    A.  Discover.
 8    Q.  What's the first thing you did
 9  after you learned about the Discover Bank
10  judgment now, I want to focus on?
11    A.  I went to the court.  And
12  that's when they gave me information on
13  filing a motion to vacate.
14    Q.  And who did you meet with at
15  the court?
16    A.  I can't remember the lawyer's
17  name.  They were free lawyers.
18    Q.  Three?
19    A.  Free.  They were free.
20    Q.  Oh, free lawyers?
21    A.  Yeah, from the city.
22    Q.  And then you obtained paperwork
23  that you had to fill out?
24    A.  Yes, I obtained the paperwork

16 (Pages 58 - 61)

### Page 62
V. CALLENDER
1  
2  and they walked me through filling out the
3  paperwork.
4  Q.  And what did you do after you
5  filled out the paperwork?
6  A.  They told me I needed to mail
7  it to the address, whatever address was on
8  the -- on the paperwork.
9  Q.  So the attorneys told you where
10 to mail it?
11 A.  No.  There was a paper with
12 like -- with the judgments and the mailing
13 address.  So the address that I took from
14 that, that's the address that I used from
15 the information.
16 Q.  And where did you get that
17 information from?
18 A.  Where'd I get it from?  I
19 can't -- I can't remember.
20 Q.  Did you look --
21 A.  I just can't remember.
22 Q.  -- at a court file?
23 A.  I can't remember.  That, I
24 can't remember.
25     I don't know if I got the

### Page 63
V. CALLENDER
1  
2  address off the credit report.  I don't
3  know if -- if I had to go -- I don't think
4  I went on the Internet, but I don't think I
5  had to go -- I don't know if I got it down
6  at the courts.  I don't know.  I can't
7  remember.  But I know I had gotten the --
8  the address.
9  Q.  And where did you send it?
10      MR. KESHAVARZ:  Objection to
11 the form of the question.
12      THE WITNESS:  Whatever the
13 address was.
14 BY MS. LASTORINO:
15 Q.  Did you send it to a law firm?
16 A.  I don't know if it was a law
17 firm.  I remember a name like Cormick
18 Avenue, Cormick something.  I don't know.
19 Q.  And then what happened after
20 you mailed it?
21 A.  After a couple weeks or a
22 couple of months, I got a card in the mail
23 stating that I had to go to court.
24 Q.  And did you go to court?
25 A.  Of course.  I took -- I had to

### Page 64
V. CALLENDER
1  
2  take the day off and lose pay to go to
3  court.  I went to court, sat in the back
4  and --
5  Q.  What day --
6  A.  I'm sorry?
7  Q.  And no one showed up.
8  A.  And what day was that?
9  Q.  Off the top of my head, I can't
10 remember the date.  Sorry.
11 A.  Just sometime 2012?
12 Q.  Yes, in 2012.  I can't remember
13 the date.  Maybe -- I know it's between
14 January and August.  I know it's not later
15 than that.
16 Q.  Now, were all three of these --
17 when I say "three of these," I'm talking
18 about the two other judgments against you
19 and the Discover Bank judgment, you had to
20 go to court on all three?
21 A.  Yeah, but I don't think -- it's
22 not the same day; different day, different
23 months.
24 Q.  But all in 2012?
25 A.  Yes.

### Page 65
V. CALLENDER
1  
2  Q.  And then after you showed up in
3  court and you said nobody was there?
4  A.  Yeah.
5  Q.  Then what happened?
6  A.  I don't know.  The judge, I
7  think, gave me a paper that said -- that
8  said something about returning it to the
9  calendar year, and I remember asking him
10 about that, what that means.  I can't
11 remember his answer, but then I got -- when
12 I got home, a couple weeks later, I got
13 another notice that I had to return back to
14 court again.
15 Q.  And did you go back to court?
16 A.  Of course I was there.  Another
17 day I lost pay.
18 Q.  And what happened on that date?
19 A.  No one ever showed up.
20 Q.  So you were able to get the
21 default judgment vacated?
22 A.  I asked the judge if there's
23 going to be another time for me to come
24 back, because I can't be taking days off my
25 work and these people are not showing up.

17 (Pages 62 - 65)

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400

---

### Page 66
V. CALLENDER
1  
2  And he said, no, that's it.
3  So I said, what do I do from
4  now?  He said, make sure you keep the
5  paperwork because they have a tendency of
6  coming back to haunt you, so keep your
7  paperwork.
8  Q.  The judge told you that?
9  A.  The judge told me that.  He
10 said make sure you keep your paperwork.
11 Q.  And did you?
12 A.  I kept my paperwork in a secret
13 compartment, hidden away, just like the
14 judge said.
15 Q.  And did you give those papers
16 in the secret compartment to your attorney
17 in this case?
18      MR. KESHAVARZ:  Objection to
19 the form of the question.
20      You may answer it.
21      THE WITNESS:  Yes.
22 BY MS. LASTORINO:
23 Q.  So all of those papers were
24 provided to your attorney?
25 A.  Yeah, the paperwork that the

### Page 67
V. CALLENDER
1  
2  judge gave me I gave to the attorney -- to
3  the attorney.
4  Q.  Did you have a credit card with
5  Discover Bank?
6  A.  If there's a judgment against
7  me and my name on it, yes, I did.
8  Q.  Now, in terms of the three
9  judgments, two of which you testified were
10 vacated and one of which you settled
11 with --
12 A.  Right.
13 Q.  -- do you recall which judgment
14 you vacated first?  Was it the Discover
15 Bank or the Chase?
16 A.  I can't remember which one
17 was -- was first.
18 Q.  Was it a month apart?  Two
19 months apart?
20 A.  I can't remember.
21 Q.  Now, you testified earlier that
22 you received several letters, approximately
23 five, from Forster & Garbus?
24 A.  Uh-huh.
25 Q.  Can you tell me what they said,

### Page 68
V. CALLENDER
1  
2  what you recall?
3  A.  They were saying that I owed
4  9-- -- like around $9,000, to Forster &
5  Garbus.  That's what I remember.
6  Q.  And is it your understanding
7  that all of those five letters said the
8  same thing, that you owed that amount of
9  money?
10 A.  Yeah, and I had a case that was
11 vacated so there was no way that I could
12 owe $9,000.  I was free at that time.
13 Q.  Did you ever tell Forster &
14 Garbus that you vacated the judgment?
15 A.  No.  I -- I sent them a
16 letter -- I sent them -- I remember sending
17 them a letter asking them to prove that I
18 owe that money.  That's what I did.
19 Q.  And what did you tell them in
20 that letter?
21 A.  I can't remember off the top of
22 my head what I told them.  It was a long
23 letter.
24 Q.  I'm sorry, I didn't --
25 A.  It was a long letter so I can't

### Page 69
V. CALLENDER
1  
2  remember word-for-word.  But I just wanted
3  them to show me proof that I owed them that
4  money because I didn't know who Forster &
5  Garbus was.  And that year, I had -- I had
6  cases that was vacated so I didn't owe
7  anybody any money so I don't know where
8  this $10,000 or 9,000 and change was coming
9  from.
10      MS. LASTORINO:  Can you mark
11 that.
12      (Defendant's Exhibit D, a
13 letter dated October 23, 2012, Bates
14 stamped FG_000008 and FG_000010, was
15 marked for identification.)
16 BY MS. LASTORINO:
17 Q.  Can you take a look at what's
18 been marked as Exhibit D, please.
19      MR. KESHAVARZ:  Do you have a
20 copy for me?
21      MS. LASTORINO:  I don't have
22 any copies.  You don't have to --
23 you're asking me every time, it's
24 going to be the same answer.
25      Oh, actually, if you want to

18 (Pages 66 - 69)

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400

---

### Page 70
V. CALLENDER
1  
2  take a look at the first page.  I
3  just don't have the attachment.
4       MR. KESHAVARZ:  Thank you.
5       THE WITNESS:  (Document
6  review.)
7       Yeah, that's the letter.
8  BY MS. LASTORINO:
9  Q.  That's the letter that you just
10 testified to?
11 A.  Yep.
12 Q.  So that's your signature at the
13 bottom?
14 A.  Yeah.
15 Q.  And do you see -- do you see on
16 the bottom where it says, "CC:  FTC
17 Consumer Response Center, New York City
18 Department of Consumer Affairs"?
19 A.  Right.
20 Q.  You sent this letter to the
21 Department of Consumer Affairs?
22 A.  Right.  I must have sent it
23 to -- yeah.
24 Q.  And it's --
25      MR. KESHAVARZ:  May I?  Are you

### Page 71
V. CALLENDER
1  
2  saying the second page was with the
3  first page?
4       MS. LASTORINO:  Well, I'm going
5  to ask him.
6       MR. KESHAVARZ:  Okay.  Go
7  ahead.
8  BY MS. LASTORINO:
9  Q.  Do you see the bottom where it
10 says, "Enclosed excerpts from credit
11 report"?
12      Do you see that?
13 A.  Uh-huh.
14 Q.  Go to the second page.
15      Is that the excerpt from the
16 credit report that you enclosed --
17      MR. KESHAVARZ:  Objection to
18 the --
19 BY MS. LASTORINO:
20 Q.  -- in your letter?
21      MR. KESHAVARZ:  Objection to
22 the form of the question.
23      You may answer.
24      THE WITNESS:  Yeah.
25

### Page 72
V. CALLENDER
1  
2  BY MS. LASTORINO:
3  Q.  Now, did you file a complaint
4  with the Department of Consumer Affairs?
5  A.  Yeah.
6  Q.  Other than this letter?
7  A.  A complaint to the -- I know I
8  filed a complaint.  I filed a complaint
9  because I kept on getting a letter --
10 getting the letters after -- I kept on
11 getting their letters giving -- I wanted --
12 I filed a complaint, because the letters
13 weren't stopping and they weren't sending
14 any information to me to let me know that
15 there was this proof that this was my --
16 that this was my -- this was mine, that
17 the $9,000 that I had to pay was mine.
18 Q.  So --
19 A.  So I had to file.
20 Q.  Okay.  My question is --
21 because I haven't received a separate
22 complaint in this case, so I just didn't
23 know if this letter was your complaint.
24      Or if you filed something
25 separate with the Department of Consumer

### Page 73
V. CALLENDER
1  
2  Affairs?
3       MR. KESHAVARZ:  Objection to
4  the form of the question.
5       If you know the answer, you may
6  answer.
7       THE WITNESS:  I don't know if
8  you're trying to confuse me or what,
9  but --
10 BY MS. LASTORINO:
11 Q.  No, I'm not trying to confuse
12 you at all.
13 A.  This -- okay.
14 Q.  I'm just trying to clarify
15 something.
16 A.  (Reading.)
17      This is what I sent.
18 Q.  Okay.  You prepared this letter
19 yourself?
20 A.  I was assist -- I had help.
21 Q.  Who helped you?
22 A.  An attorney.
23 Q.  And who was that?
24 A.  I can't remember her name.  I
25 can't remember the company.

19 (Pages 70 - 73)

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400

---

### Page 74
V. CALLENDER
1  
2  Q.  And where was this attorney
3  located?
4  A.  I know it was the Lower East
5  Side, but I can't remember the name of the
6  company.
7  Q.  It was a he or a she?
8  A.  It was a he.
9  Q.  Did you pay him?
10 A.  No.
11 Q.  How did he help you with the
12 letter?
13 A.  He explained what the letter
14 was about and -- and told me where I needed
15 to sign.
16 Q.  And did he help you with what
17 language to use in it?
18 A.  Yeah, kind of.
19 Q.  Is everything in this letter
20 true and accurate?
21 A.  Yes.  Pertaining to the letters
22 I was receiving from Forster & Garbus, yes.
23 Q.  So do you --
24      Take a look at the letter,
25 Mr. Callender.

### Page 75
V. CALLENDER
1  
2  A.  Uh-huh.
3  Q.  Do you see in the middle where
4  it says, "I do not owe this debt and
5  dispute it because I believe I was a victim
6  of identity theft"?
7  A.  Right.  This is because I went
8  to court previous months and I had my -- it
9  was vacated.  Whatever cases I had against
10 me as far as judgments, they were vacated.
11 So if somebody's sending me a letter and
12 stating that I owe $10,000, then it must
13 have been -- it must be an identity theft.
14 That's what I'm assuming.  I'm not sure if
15 it's an identity theft, I'm just assuming
16 that's it.  And it must be identity theft
17 unless you show me that the copy of the
18 original application, copy of the
19 statements, copy of the judgments and all
20 that stuff.  That's what this letter was
21 about.
22 Q.  Did you ever report to the
23 police that you may have been a victim of
24 identity theft?
25 A.  Nope.

### Page 76
V. CALLENDER
1  
2  Q.  Never filed an incident report?
3  A.  No.  That might have been the
4  next step.
5  Q.  Do you see the sentence after
6  that that says, "I have never had an
7  account with Discover Bank"?
8  A.  Yeah, I see that.
9  Q.  And that's true, too?
10      MR. KESHAVARZ:  Well, that's
11 not what it says.
12      MS. LASTORINO:  I'm just asking
13 him.
14      MR. KESHAVARZ:  That's not what
15 the whole sentence says.
16      THE WITNESS:  Wait, wait, yeah.
17 A trick or something.
18 BY MS. LASTORINO:
19 Q.  Tell me whatever you want to
20 tell me about that sentence.
21      MR. KESHAVARZ:  Under this
22 account number.
23      THE WITNESS:  Okay.  You see
24 this account?  You see on the bottom
25 what it says there?

### Page 77
V. CALLENDER
1  
2  BY MS. LASTORINO:
3  Q.  Uh-huh.
4  A.  It says, "I have never had an
5  account with Discover Bank and this
6  creditor under account number
7  1030021307730716 does not appear on my
8  credit report."
9  Q.  So when you got your credit
10 report, there was a judgment on there by --
11 from Discover Bank, right?
12      MR. KESHAVARZ:  Objection to
13 the form of the question.
14      THE WITNESS:  Right.
15 BY MS. LASTORINO:
16 Q.  Was there anything else on that
17 credit report regarding Discover Bank?
18      MR. KESHAVARZ:  Objection to
19 the form of the question.
20      You may answer, if you know.
21      THE WITNESS:  I don't know.
22 Whatever judgment that was on there,
23 that's what I went to court for.
24 BY MS. LASTORINO:
25 Q.  Okay.  Now, after reading this

20 (Pages 74 - 77)

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400

## Page 78

V. CALLENDER

letter, isn't it true that you didn't mention that the default judgment had been vacated, that you vacated it?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: I didn't think I needed to.
BY MS. LASTORINO:
Q. And why is that?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: Because these people were stating that I owe money, so that's not -- it wasn't their business. They just needed to prove to me that I owed that money.
BY MS. LASTORINO:
Q. So you're saying --
A. That it wasn't --
Q. I'm sorry.
A. They needed to prove to me that I owed the $10,000 they were asking for.
Q. So you didn't think it was important to tell them that you --

## Page 79

V. CALLENDER

A. I didn't --
Q. -- went to court and vacated the default judgment?
A. No, I didn't think --
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: I didn't think I was supposed to do that, or I'm supposed to do that.
BY MS. LASTORINO:
Q. Now, that attorney that you met with, that male attorney in the Lower East Side, did he know that you vacated the default judgment?
MR. KESHAVARZ: Objection to the form of the question.
You may answer, if you know.
THE WITNESS: I can't remember.
BY MS. LASTORINO:
Q. You can't remember?
A. Uh-uh. I can't remember if I discussed it with him. I must have discussed it with him, but I don't know. I can't remember. Again, I didn't think it

## Page 80

V. CALLENDER

was important because I already vacated the case, so this was something completely new to me. So I wanted to attack this and figure out what this was, popping up months after I went to court and lost two days of pay.
Q. Was there a deliberate reason that you may not have told Forster & Garbus that you have vacated the default judgment?
MR. KESHAVARZ: Objection to the form of the question.
You may answer, if you know.
THE WITNESS: I didn't know who Forster & Garbus was.
BY MS. LASTORINO:
Q. But you were sending them a letter, correct?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: Because they were sending me a letter saying that I owed them money.
BY MS. LASTORINO:
Q. On the Discover Bank?

## Page 81

V. CALLENDER

A. They were sending me letters --
MR. KESHAVARZ: Just give me a pause for one second.
Objection to the form of the question.
You may answer.
THE WITNESS: They were sending me letters upon letters that I owed this money so I was sending the letters to ask them to prove to me that I owed, and they never did.
BY MS. LASTORINO:
Q. Do you have a copy of that credit report?
A. No.
Q. -- that you pulled in 2012?
A. I don't have it.
Q. Did you destroy it?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: No. I don't have it on me. I don't have it.
BY MS. LASTORINO:
Q. I am not asking if you have it

21 (Pages 78 - 81)
Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400

## Page 82

V. CALLENDER

on you.
Q. Do you have it at home?
A. No, I don't have it.
Q. So what happened to it?
A. I don't know. It disappeared.
Q. It disappeared?
A. I don't know. I don't have it.
Q. Well, how do you think it disappeared?
MR. KESHAVARZ: Objection to the form of the question. This is becoming abusive.
You may answer.
THE WITNESS: Because after -- I'm very meticulous with my paperwork. After a certain amount of years, I destroy certain things that I don't need clouding up my apartment.
BY MS. LASTORINO:
Q. So it's not in the secret compartment?
A. No, it's not in the secret compartment because the judge didn't tell

## Page 83

V. CALLENDER

me to keep my -- my credit report. He told me to keep the Discover Bank vacate motion.
Q. About how many pages was the credit report; do you remember?
A. I don't remember that.
Q. Did you have any conversations with any employee at the Department of Consumer Affairs on the Discover Bank matter after you filed the complaint?
A. I don't -- I don't know. I don't know. I can't remember.
Q. And would you have a copy of the complaint that you filed at home or -- or somewhere?
MR. KESHAVARZ: Objection to the form of the question.
You may answer, if you know.
THE WITNESS: I don't know.
BY MS. LASTORINO:
Q. Was it?
A. This is -- this --
Q. Go ahead.
A. This is 2012. Like -- like I won't -- no, I don't -- I don't have it.

## Page 84

V. CALLENDER

Q. Was the complaint that you sent to the Department of Consumer Affairs, was it a form -- was it a form that you had to fill out?
A. I don't remember.
Q. Was it in a letter format?
A. It was -- yeah, I think it was a letter format.
Q. And was it a letter addressed to the Department of Consumer Affairs?
A. Yeah.
MS. LASTORINO: I'm going to demand production of that letter that was sent to the Department of Consumer Affairs.
BY MS. LASTORINO:
Q. So after you filed a complaint with the Department of Consumer Affairs, what happened next?
MR. KESHAVARZ: Objection to the form of the question.
You may answer, if you know.
THE WITNESS: They sent me a letter and they said they were

## Page 85

V. CALLENDER

looking into it.
BY MS. LASTORINO:
Q. Did they -- they sent you a letter that said that?
A. Yeah.
Q. And did you have any communication with them after that?
A. No. They said they were looking into it so I trust their judgment.
Q. Did you ever follow up to see how the investigation went?
A. No. Because I got another letter.
Q. And what did that letter say?
A. I can't remember.
Q. So how many letters did you get from the Department of Consumer Affairs?
A. I think it's -- it's two. I'm not sure.
Q. You received two letters?
A. I think it's two. I'm not sure. I don't know if I -- I know I sent them a letter and they sent me a letter and then I got another letter. I don't know if

22 (Pages 82 - 85)
Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400

## Page 86

V. CALLENDER

the other letter was from Forster & Garbus or if the second letter was from the Consumer Affairs. I'm not sure. But I know I got -- I got two letters talking about what was going on with that case, but I can't remember off the top of my head.
Q. Now, after you filed the complaint with the Department of Consumer Affairs, did you receive a letter from Discover Bank at all?
MR. KESHAVARZ: Objection to the form of the question.
You may answer.
THE WITNESS: No, I don't recall. No, I don't recall. I don't think so. Everything at that point was getting from Forster & Garbus.
BY MS. LASTORINO:
Q. So did you ever learn from Discover Bank that they did a fraud investigation on your account?
MR. KESHAVARZ: Objection to the form of the question.
You may answer, if you know.

## Page 87

V. CALLENDER

THE WITNESS: From -- from Discover -- can you repeat that question, did you know.
MS. LASTORINO: Can you read it back.
(The requested portion of the record was read back.)
MR. KESHAVARZ: Objection to the form of the question.
You may answer.
THE WITNESS: No.
(Discussion off the record.)
(Defendant's Exhibit E, Order to Show Cause and Affidavit in Support of Order to Show Cause, Bates stamped Callender 114 through Callender 115, was marked for identification.)
BY MS. LASTORINO:
Q. Take a look at what's been marked as . . .
A. (Document review.)
Okay.
Q. Okay. Turn to the second page.

## Page 88

V. CALLENDER

Is that your signature?
A. Yeah.
Q. Okay. And is this the --
A. Uh-huh.
Q. -- document you filed?
A. That's correct.
Q. And this is what resulted in the Discover Bank judgment being vacated?
A. Yes.
(Defendant's Exhibit F, "Proposed" Written Answer Consumer Credit Transaction, Bates stamped Callender 116, was marked for identification.)
BY MS. LASTORINO:
Q. Take a look at what's been marked as Exhibit F.
A. (Document review.)
Q. Do you recognize that?
A. Yeah.
Q. Can you tell me what it is?
A. It's one of the forms I filled out when I went to the Bronx court.
Q. And that's your signature on

## Page 89

V. CALLENDER

the bottom?
A. Uh-huh.
Q. And you signed it before a notary? You see that on the left, notary?
A. Right.
Q. And what did you just point to?
A. Huh?
Q. You just pointed to something on the document.
A. What did you just point to?
A. I was pointing to Discover Bank.
Q. Do you see where it says "defenses"?
A. Uh-huh.
Q. And there's boxes next to it?
A. Uh-huh.
Q. Do you see box No. 7 where you checked off "I dispute the amount of the debt"?
A. Uh-huh.
Q. And that's the only box that's checked off under defenses, right?
MR. KESHAVARZ: Objection to

23 (Pages 86 - 89)
Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400

## Page 90

V. CALLENDER

the form of the question. The document speaks for itself.
BY MS. LASTORINO:
Q. You can answer.
A. The document speaks.
Q. So that's the only box that's marked off?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: Yes.
BY MS. LASTORINO:
Q. Okay. So do you see Defense No. 4, "I do not owe this debt"? You didn't mark that?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: Which box is that?
BY MS. LASTORINO:
Q. Number 4?
A. I didn't mark it.
Q. And why didn't you mark that one?
MR. KESHAVARZ: Objection to

## Page 91

V. CALLENDER

the form.
THE WITNESS: I didn't think I needed to.
BY MS. LASTORINO:
Q. Because you --
A. Whichever one I marked, that's the one I marked at that particular time. I would -- this was years ago. And so when I looked at it, I dispute the debt.
Q. So that was -- reading these, that was the only defense that you marked off?
MR. KESHAVARZ: Objection to the form of the question.
You may answer.
THE WITNESS: Yes, reading this, that's the only one I marked off.
BY MS. LASTORINO:
Q. And do you see No. 5, it said, "I did not incur this debt, I am a victim of identify theft or mistaken identity"?
A. Yes, I see that.
Q. You didn't mark that one

## Page 92

V. CALLENDER

either, correct?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: No, I didn't mark that one either.
BY MS. LASTORINO:
Q. And why is that?
MR. KESHAVARZ: Objection to the form of the question.
THE WITNESS: I had no clue. At that point in time, I marked No. 7.
BY MS. LASTORINO:
Q. And then did something change from when you did this proposed answer to when you sent Forster & Garbus the letter as to Discover Bank account?
MR. KESHAVARZ: Objection to the form of the question.
You may answer.
THE WITNESS: You're asking if something -- if anything changed? You're asking me if anything changed from the time I sent this -- wrote

## Page 93

V. CALLENDER

this letter to the time that --
BY MS. LASTORINO:
Q. From the time you filled out this proposed answer?
A. Right.
Until the time that I started getting the letters?
Q. No, until the time that you sent the letter to Forster & Garbus that was marked Exhibit --
THE COURT REPORTER: The letter was D.
BY MS. LASTORINO:
Q. -- Exhibit D?
A. Yeah, I think this -- after I filled this out, I had to go to court.
Q. In Exhibit D, you wrote that you don't owe the debt, correct?
MR. KESHAVARZ: Objection to the form of the question.
BY MS. LASTORINO:
Q. Do you see where it says that on D in the middle, "I do not owe this debt and dispute it because I was a victim of

24 (Pages 90 - 93)
Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400

---

Page 94
V. CALLENDER
1  identity theft"?
2  MR. KESHAVARZ: Well, that's
3  not what it says. You're stopping it
4  in the middle.
5  MS. LASTORINO: I'm saying what
6  that sentence says.
7  MR. KESHAVARZ: No, you're
8  stopping the sentence.
9  THE WITNESS: Okay. I think we
10 went over this before, right? I
11 don't know if I have to read the
12 whole line again.
13 BY MS. LASTORINO:
14 Q. Read whatever you want.
15 A. Okay. It's in accordance to
16 the account number 103002130730716.
17 Q. And where did you get that
18 account number from?
19 A. From -- from the paperwork that
20 I was getting, the letters from Forster &
21 Garbus.
22 Q. And do you know the account
23 number of the other --
24 Did you only have one account

Page 95
V. CALLENDER
1  with Discover Bank?
2  A. I have no clue. I can't
3  remember.
4  Q. You may have had more than one
5  account, credit card with Discover Bank?
6  A. When I went to the courts, they
7  gave me the judgment slip, this paper right
8  here, and whatever judgments are here, I
9  went to the court, I filled these things
10 out here and then I appeared in court. I
11 followed the steps. Discover Bank never
12 showed up, I lost two days of pay, they
13 said my case was vacated, then a couple of
14 years later I get garnished, illegally.
15 Q. Why illegally?
16 A. Why illegally?
17 Q. Yeah. You said "illegally."
18 What's the basis for that?
19 MR. KESHAVARZ: Objection to
20 the form of the question.
21 You may answer, if you know.
22 THE WITNESS: Because my cases
23 were vacated by a judge, right?
24

Page 96
V. CALLENDER
1  BY MS. LASTORINO:
2  Q. Uh-huh.
3  A. What "vacate" mean to you?
4  Q. I'm not the one here to answer
5  questions; you are.
6  A. Okay. So leave it at that.
7  Q. Did you ever tell Discover Bank
8  that your -- the judgment was vacated?
9  MR. KESHAVARZ: Objection to
10 the form of the question.
11 You may answer.
12 THE WITNESS: Don't -- don't
13 recall.
14 BY MS. LASTORINO:
15 Q. Did you ever tell the
16 Department of Consumer Affairs that the
17 judgment was vacated?
18 MR. KESHAVARZ: Objection to
19 form.
20 You may answer.
21 THE WITNESS: I don't recall.
22 Like I said, the only reason I was
23 writing letters to the Consumer
24 Affairs was because I was getting the

Page 97
V. CALLENDER
1  letters from Forster & Garbus after
2  my case was vacated. I had to pay on
3  one and the other two was vacated, so
4  there was no more.
5  Q. Like where is this $10,000
6  coming from, that I needed to pay?
7  So I needed them to show proof,
8  and they never showed me proof. So I
9  wrote a letter to Consumer Affairs so
10 they could look into it and have it
11 stopped.
12 (Defendant's Exhibit G, a
13 compilation of letters, was marked
14 for identification.)
15 BY MS. LASTORINO:
16 Q. Take a look at what's been
17 marked as Exhibit G. And it's -- for the
18 record, it's --
19 Actually, you know what, let me
20 see something. I think I made a mistake on
21 the last page.
22 Oh, no, maybe I didn't.
23 Can I just see that for a
24 second?

25 (Pages 94 - 97)

---

Page 98
V. CALLENDER
1  A. (Complies.)
2  Q. It's seven pages.
3  Take a look at that.
4  A. (Document review.)
5  MR. KESHAVARZ: So, for the
6  record, these are documents Forster &
7  Garbus 01, 181, 182, 178, 179, and
8  Callender 3, all but the last page
9  were produced by Forster & Garbus.
10 BY MS. LASTORINO:
11 Q. Did you look at them,
12 Mr. Callender?
13 A. I looked at them.
14 Q. Are these the letters that you
15 testified to earlier when you said you
16 received like five or approximately five
17 letters?
18 MR. KESHAVARZ: Objection to
19 the form of the question.
20 You can answer, if you know.
21 THE WITNESS: I can't tell you
22 if these are the letters.
23 BY MS. LASTORINO:
24 Q. Are these the types of letters

Page 99
V. CALLENDER
1  that you recall receiving from them?
2  MR. KESHAVARZ: Objection to
3  the form of the question.
4  You may answer, if you know.
5  THE WITNESS: I can't say that
6  either.
7  BY MS. LASTORINO:
8  Q. Do you have documents other
9  than these that you refer to when you said
10 you received five letters?
11 MR. KESHAVARZ: Objection to
12 the form of the question.
13 Document -- these -- this is
14 Forster & Garbus's document
15 production. This is not
16 Mr. Callender's document production.
17 I object to the form of the question.
18 You may answer, if you know.
19 THE WITNESS: Yeah, the letters
20 look similar to -- something like
21 this, that this says 8,000. The ones
22 I was getting were saying 9,000,
23 close to $10,000, so I don't know if
24 these -- the ones that I had, what

Page 100
V. CALLENDER
1  they said.
2  BY MS. LASTORINO:
3  Q. Do you have the --
4  A. I don't know.
5  Q. Do you have the letters that
6  you testified to that you received from
7  Forster & Garbus?
8  A. Yeah, I had to -- I kept --
9  yeah, I kept -- I kept it for my record
10 because I didn't understand what it was.
11 Q. You have the five letters?
12 MR. KESHAVARZ: Objection to
13 the form of the question.
14 THE WITNESS: I don't think I
15 have five. I think I have maybe one
16 or two. The ones that said 9,000 and
17 plus.
18 BY MS. LASTORINO:
19 Q. And did you provide your
20 attorney with those letters?
21 MR. KESHAVARZ: Objection to
22 the form of the question.
23 THE WITNESS: Yeah.
24 MS. LASTORINO: To the extent

Page 101
V. CALLENDER
1  that they haven't been produced, I'm
2  demanding the production of those
3  letters.
4  BY MS. LASTORINO:
5  Q. So you think you only have two
6  of the five?
7  MR. KESHAVARZ: Objection to
8  the form of the question.
9  THE WITNESS: Yeah. Yeah, I
10 think I only got two. I'm not sure.
11 BY MS. LASTORINO:
12 Q. And what happened to the other
13 three?
14 MR. KESHAVARZ: Objection to
15 the form of the question.
16 THE WITNESS: I have no clue.
17 Like I said before, I don't keep
18 backups of letters -- backups of
19 bills, I don't keep those. I shred
20 at the end of the year receipts and
21 bills. I keep my tax documents every
22 seven years. After seven years, they
23 go bye-bye.
24

26 (Pages 98 - 101)

---

Page 102
V. CALLENDER
1  BY MS. LASTORINO:
2  Q. Take a look at the last page of
3  that group of documents.
4  A. The last page?
5  Q. Yes.
6  MR. KESHAVARZ: Document
7  Callender 3?
8  MS. LASTORINO: Right.
9  BY MS. LASTORINO:
10 Q. Do you see "Callender 3" on the
11 bottom?
12 A. Yes.
13 Q. So this -- this document you
14 received, correct?
15 MR. KESHAVARZ: Objection to
16 the form of the question.
17 You may answer, if you know.
18 THE WITNESS: I don't know. I
19 have to pair it up with the letter
20 that I have at home.
21 BY MS. LASTORINO:
22 Q. Okay. Well, this came from
23 your document production.
24 A. It's probably --

Page 103
V. CALLENDER
1  Q. That's why your --
2  A. Probably one of them.
3  Q. Okay. So you received this
4  document?
5  MR. KESHAVARZ: Objection to
6  the form of the question.
7  You may answer, if you know.
8  THE WITNESS: Probably one of
9  them. If my lawyer gave it to you,
10 then it's probably one of the
11 letters.
12 BY MS. LASTORINO:
13 Q. Do you see on the Callender 3
14 document --
15 MS. LASTORINO: You know what,
16 I think it's clearer -- let me
17 just -- also just have that marked
18 separately, so we don't keep
19 referring to it as --
20 MR. KESHAVARZ: Just so the
21 record's clear, we're keeping
22 Callender 3 as part of Exhibit G, but
23 we're making another copy of
24 Callender 3 as Exhibit H?

Page 104
V. CALLENDER
1  MS. LASTORINO: Right. So it
2  will appear both places, yeah.
3  (Defendant's Exhibit H, a
4  letter dated July 2, 2012, Bates
5  stamped Callender 3, was marked for
6  identification.)
7  (A brief recess was taken from
8  2:06 p.m. to 2:23 p.m.)
9  (Defendant's Exhibit I, a
10 document, Bates stamped Callender 77,
11 was marked for identification.)
12 BY MS. LASTORINO:
13 Q. Take a look at what's been
14 marked as Exhibit I.
15 A. (Document review.)
16 Yes, I see it.
17 Q. Have you seen that before?
18 A. Yeah.
19 Q. Is that your signature on the
20 bottom?
21 A. Yes.
22 Q. Is that your handwriting --
23 A. Yes.
24 Q. -- in the middle?

Page 105
V. CALLENDER
1  Can you -- it looks like it
2  says, "To do" --
3  A. Yes.
4  Q. -- "send as" --
5  A. Right.
6  Q. What does it say after "copy
7  for proof" and then what does it say, "wait
8  till all cases"?
9  I just can't make out what that
10 says.
11 A. It says, "Wait till all cases
12 and then mail."
13 Q. I don't know what else was
14 there. It looks like a sticky note that
15 was there.
16 Q. Uh-huh.
17 Q. Was this something that you
18 sent to Forster & Garbus?
19 A. No, I don't think so. I don't
20 even -- I -- yeah, it says up there Forster
21 & Garbus.
22 Q. It's addressed to Forster &
23 Garbus.
24 Do you have a specific

27 (Pages 102 - 105)

---

Page 106
V. CALLENDER
1  recollection of sending it to Forster &
2  Garbus?
3  A. I don't know. I don't know if
4  I mailed it out, but . . .
5  Q. What does the reference mean
6  "wait till all cases are then mail"? What
7  does that mean?
8  A. I don't know. There's a sticky
9  note. There's a sticky pad that I had
10 here.
11 Q. Uh-huh?
12 A. And I was writing. I mean, at
13 that time, I had stuff in mind. This is
14 not Morse Code or anything. It's just
15 stuff that I was writing.
16 I can't -- 2012, I can't
17 remember what I was writing here, what it
18 was in reference to, but I know this was a
19 letter that had to be -- had to go to
20 Forster & Garbus in 2012.
21 Q. Okay. But that's your
22 handwriting -- the handwritten notations is
23 your handwriting?
24 A. Yeah.

Page 107
V. CALLENDER
1  Q. Okay.
2  (Defendant's Exhibit J, a
3  letter with attached application,
4  Bates stamped FG_000061, was marked
5  for identification.)
6  BY MS. LASTORINO:
7  Q. Is there something that you
8  wanted to add to your testimony?
9  I heard you say something
10 before.
11 Were you saying anything on the
12 record when the court reporter was marking
13 the exhibit?
14 A. No. What I just said just now
15 is just, it was 2012, I can't really
16 remember exactly what I was trying to say
17 on the sticky pad. I mean, "send as copy
18 for proof, wait till all cases are then
19 mail." I don't know what my thoughts were
20 at that point for the last sentence.
21 Q. Okay.
22 Take a look at what's been
23 marked as Exhibit J.
24 A. (Document review.)

Page 108
V. CALLENDER
1  MR. KESHAVARZ: Exhibit J is
2  one page, Forster & Garbus 61,
3  document produced by Forster &
4  Garbus.
5  THE COURT REPORTER: It's two
6  pages.
7  MR. KESHAVARZ: What?
8  MS. LASTORINO: It's two pages.
9  MR. KESHAVARZ: Oh, two pages.
10 Okay.
11 BY MS. LASTORINO:
12 Q. Did you take a look at that?
13 A. Yes, I took a look.
14 Q. Have you seen this before?
15 A. I can't recall.
16 This letter is saying in
17 March 2013. I wasn't living here in 2013
18 at 408 130th Street.
19 Q. And you testified earlier.
20 But where were you living at
21 that time in 2013?
22 A. Where was it in 2013? I didn't
23 say anything about 2013.
24 Q. I'm sorry?

Page 109
V. CALLENDER
1  A. Did I say anything about 2013?
2  Q. Well, I think we went through
3  your prior places --
4  A. Yeah, but --
5  Q. -- where you lived.
6  A. -- I don't think I said
7  anything about 2013.
8  Q. Okay. Then, I'll ask you now.
9  Where did you live in March of
10 2013?
11 A. 2013?
12 I didn't live at 408.
13 Q. Where did you live?
14 A. I lived at Bougadis
15 (phonetic) -- Bougadis.
16 Q. What does that mean?
17 A. That's a place -- that's an
18 apartment I had at Bougadis. I just can't
19 remember the exact address.
20 Q. And that's located where?
21 A. It's in Washington Heights.
22 Q. And this isn't one of the
23 reasons that you provided with me before?
24 A. No. You didn't ask about 2013.

28 (Pages 106 - 109)

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

```
                                                    Page 110
 1              V. CALLENDER
 2      Q.  And what period of time did you
 3  live in Washington Heights?
 4      A.  Short.  I went through a -- a
 5  difficult situation after -- see, when I
 6  moved to -- from -- from West 130th Street,
 7  I moved into an apartment that a friend
 8  said -- what's that kind of apartment
 9  again?  I don't know the type of apartment.
10  Like when you -- the person moves away and
11  then you get the -- you get the -- you
12  know, the rent the apartment.  I can't
13  remember the name of it, but you rent the
14  apartment for a certain amount of time.
15      But while we were there, they
16  didn't tell the landlord that we were
17  moving in and so we had some issues with
18  the landlord and we had to move.  And so we
19  got an apartment, it was owned by a
20  particular lady.  And we rented an
21  apartment, and the -- the chair of the
22  building said what she did was illegal.
23  And so that's when I had to find a place at
24  Leggett.
25      Q.  So --
```

```
                                                    Page 111
 1              V. CALLENDER
 2      A.  So to tell you the exact times
 3  and dates -- I lived at 379 for a couple of
 4  months, maybe like three or four months.
 5      Q.  And the Washington Heights
 6  apartment you said was for a couple of
 7  months?
 8      A.  Yeah.  I don't know exactly how
 9  much.
10      Q.  And who did you live there
11  with?
12      A.  I lived with my family.
13      Q.  So your wife and your three
14  kids?
15      A.  Yeah.
16      She actually knew the woman,
17  but the woman, freaking liar.
18      (Defendant's Exhibit K, a
19      document, Bates stamped Callender 65,
20      was marked for identification.)
21  BY MS. LASTORINO:
22      Q.  Can you take a look at what's
23  been marked as Exhibit K, which, for the
24  record, has been Bates stamped Callender
25  65.
```

```
                                                    Page 112
 1              V. CALLENDER
 2      A.  (Document review.)
 3      Yeah, I'm looking at it.
 4      Q.  Have you seen that before?
 5      A.  Not to my recollection.
 6      Q.  Do you know why it would have
 7  been produced in your document production?
 8      MR. KESHAVARZ:  Objection to
 9  the form of the question.
10      You may answer, if you know.
11      THE WITNESS:  No.  I don't
12  know.
13  BY MS. LASTORINO:
14      Q.  So you've never seen this
15  before?
16      MR. KESHAVARZ:  Objection to
17  the form of the question.
18      You may answer, if you know.
19      THE WITNESS:  No, I don't think
20  I've -- I haven't seen this before.
21  I don't think anybody could tell me
22  to speak -- what this say because I'm
23  not a judge, I'm not a lawyer.
24  Nothing that I've said here was
25  rehearsed.  Everything that I'm
```

```
                                                    Page 113
 1              V. CALLENDER
 2  telling you here is the truth,
 3  so . . .
 4  BY MS. LASTORINO:
 5      Q.  When did you first find out, as
 6  you allege in your Amended Complaint, that
 7  your wages were garnished?
 8      A.  Somewhere in January of 2015.
 9      Q.  And how did you find out?
10      A.  So I went out and got this job
11  because I didn't want to go on unemployment
12  and I didn't want to go on welfare, so I
13  just went and got whatever job I could get,
14  so I went to Dollar Tree, got this job.
15  And when I was working, you know, the
16  paycheck wasn't as big, it wasn't a lot of
17  money, but, you know, it helped out a
18  little bit.
19      So you're asking me how I
20  noticed?
21      Q.  Uh-huh.
22      A.  I noticed when the small amount
23  of money became really smaller.  It became
24  real -- it just shrunk.  And at the time we
25  didn't get -- we weren't getting pay stubs,
```

                    29 (Pages 110 - 113)

```
                                                    Page 114
 1              V. CALLENDER
 2  so I had to go, you know, through the
 3  channels and get a stub.  And when I got
 4  the pay stub, I saw the word "garnished" on
 5  the bottom and my jaw dropped.
 6      Q.  Where were you living in
 7  December of 2014?
 8      A.  2014 of December?
 9      Q.  Let me see.
10      A.  I'm mixing up these dates, man.
11  I was living at Leggett.  986
12  Leggett Avenue.
13      Q.  Were any of your bank accounts
14  restrained?
15      MR. KESHAVARZ:  Objection to
16  the form of the question.
17      You may answer, if you know.
18      THE WITNESS:  Around what time?
19  BY MS. LASTORINO:
20      Q.  In connection with the Discover
21  Bank matter?
22      A.  No.
23      Q.  So you haven't incurred any
24  bank fees in connection with the Discover
25  Bank matter?
```

```
                                                    Page 115
 1              V. CALLENDER
 2      A.  No.
 3      MR. KESHAVARZ:  Objection to --
 4  objection to the form of the
 5  question.
 6      You may answer.
 7      THE WITNESS:  No.
 8  BY MS. LASTORINO:
 9      Q.  And you haven't sustained any
10  bank charges in connection with the
11  Discover matter?
12      A.  Not that I --
13      MR. KESHAVARZ:  Object to the
14  form.
15      Go ahead, you can answer.
16      THE WITNESS:  Not that I can
17  recall.
18  BY MS. LASTORINO:
19      Q.  So January of 2015 is when you
20  said you learned about . . .
21      A.  Yes.
22      Q.  Did you lose time from work
23  after you learned about the -- the
24  garnishment?
25      A.  In -- what do you mean?
```

```
                                                    Page 116
 1              V. CALLENDER
 2      Q.  At Dollar Tree.
 3      A.  What do you mean if I lost time
 4  from work?
 5      Q.  Did you take time from work?
 6      A.  This is after I found out about
 7  the stub?
 8      Q.  Uh-huh.
 9      A.  Yeah, I mean I had to run
10  around and try to figure out what this was
11  about.
12      First of all, a couple of years
13  ago, I had this case vacated, and then
14  come 2015, I see the word "garnishment."  I
15  knew what the word mean, but I didn't
16  believe it.  So I went -- and I literally
17  took my phone out and typed up what the
18  meaning of the word because I didn't
19  believe it.
20      And then I asked a friend --
21  after I saw it on my phone, I asked a
22  friend, man, how could this happen?
23      And the first thing he told me
24  was, man, you must have got a girl pregnant
25  somewhere, and then my heart dropped even
```

```
                                                    Page 117
 1              V. CALLENDER
 2  further.  And I'm like, wait a minute, me
 3  get a girl pregnant somewhere?  It had to
 4  have been before I was married.  It had to
 5  have been before I got married.
 6      So I went -- I remember I went
 7  home and I was really stressed out because
 8  I'm thinking maybe some woman out there is
 9  garnishing my paycheck because I -- you
10  know, because -- because of some child.  So
11  all night I just stood up just trying to
12  figure out, like, what this was about.
13      But when I thought about it, by
14  the next day, I knew it was -- I knew I
15  was -- I didn't have any children by
16  anybody.  I thought about it really hard,
17  because I'm not that type of a guy.  But
18  I -- so what I did next was I went to my
19  files, my documents that I had and I
20  searched the documents and there was
21  nothing.
22      So I went down to the courts
23  and I got a form like this (indicating),
24  and there was nothing.  And I went back to
25  my files again, just to double-check, and
```

                    30 (Pages 114 - 117)

```
                                                    Page 118
 1              V. CALLENDER
 2  there was not -- I couldn't find anything.
 3      Then I called my -- I asked my
 4  boss.  My boss, he's from Pakistan.  He
 5  doesn't speak English that well.  He didn't
 6  understand what I was asking, so it was a
 7  bunch of runaround.
 8      At this time I'm like really --
 9  really, really getting stressed out,
10  because I really don't know what this was.
11  I don't know what this is about.  I'm not
12  thinking even debt because in 2012 I had
13  all the debt cleared away.  I'm not
14  thinking that at this point.  Right?
15      Then, to make matters even
16  worse, I was -- couple months before, I had
17  a job.  I lost my job.  I got this job,
18  wasn't paying well, to get my money
19  taken -- the little money that I was
20  getting taken away from me, it was just too
21  much.
22      Q.  So how many days -- how much
23  time did you lose from work as a result of
24  that?
25      A.  It was just maybe like two
```

```
                                                    Page 119
 1              V. CALLENDER
 2  days.
 3      Q.  Two full days?  Or a part of --
 4      A.  What do you mean full?  Like
 5  when I work.
 6      Q.  Well, what were your work hours
 7  when you worked at Dollar Tree?
 8      A.  When I work, it's like a day.
 9  You lose a day, it's a day's pay.
10      Q.  Well, what were your hours?
11  Was it 9:00 to 5:00?
12      A.  It switches up.
13      Q.  But it was a total of eight
14  hours a day?
15      A.  Yeah, eight, six to seven
16  hours.
17      Q.  So when you said that you had
18  to take days off, you took two full days,
19  so 16 hours?
20      A.  I had to go downtown.  I had to
21  go down to pull that, to pull this report,
22  you know, pull the report, run around
23  trying to figure out what -- my whole goal
24  was to try to figure out what was going on,
25  who was taking my money.  My job wasn't
```

```
                                                    Page 120
 1              V. CALLENDER
 2  telling me -- wasn't giving me any
 3  information.  Actually, the job that I was
 4  working for, the head office was in
 5  Virginia.  And I called Virginia and I had
 6  to leave a message.  You know, there was no
 7  voice to speak to anybody.
 8      So it took me like a week
 9  before I found out what really happened.
10  And the lady I spoke to told me that I was
11  being garnished for $11,000, and my heart
12  dropped even further to the ground and now
13  I'm going crazy in my head.  Because
14  $11,000, who do I owe $11,000?
15      As far as I know, I went to my
16  documents, and I didn't see any judgments
17  against me.  I went to this because I went
18  to the courts and I had pulled this, there
19  was no judgments.  So who do I owe $11,000
20  to?  That was my thought.
21      Q.  You allege that this was
22  stressful to you?
23      A.  Of course it was.
24      It wouldn't be stressful if you
25  were out of -- out of a job for a couple of
```

```
                                                    Page 121
 1              V. CALLENDER
 2  months, right?
 3      Out of work for a couple of
 4  months, behind on your bills, then to get a
 5  job which is not paying enough -- enough
 6  money that was covering the bills before,
 7  all right.  Then to get money taken out of
 8  your check, right?  It makes matters even
 9  worse than anything else.
10      Then to find out you're getting
11  garnished and you have to pay $11,000,
12  which you don't -- which you don't have.
13  Because for the apartment -- for the
14  apartment that I just moved into, I had to
15  pay like five grand just to move in.  Then
16  a month later I got laid off, found a job
17  in December.  Wasn't paying much, then I
18  have a garnishment and $11,000 debt on my
19  head.
20      Q.  Now, the garnishment occurred
21  before you were promoted to manager?
22      A.  Of course.  I was a stock boy,
23  stocking shelves.
24      Q.  And how did the stress affect
25  you?
```

                    31 (Pages 118 - 121)

```
                                                    Page 122
 1              V. CALLENDER
 2      A.  All right.  This is --
 3  everybody deals with stress in a different
 4  way.  Me, I deal with -- this is how I deal
 5  with stress, I deal with stress like this:
 6  I bottle everything in -- inside.
 7      First of all, when it comes to
 8  money, that's it, I completely shut down.
 9  I go with -- I get withdrawn, right.  And I
10  have a wife and I have kids, I don't say
11  anything.  My wife ask me what's up, I
12  don't say anything.  I come in from work, I
13  don't say anything.  I just stay there and
14  I just bottle everything up on the inside.
15      The next thing that happens is
16  my face becomes extremely hot -- it feels
17  like it's getting hot.  Not -- not by
18  touching it; it just feels like there's
19  fire.  But that's me stressing.  That's me
20  stressing.  Then the insides of my stomach
21  starts knotting up.  I don't eat, don't
22  sleep.  All right?  I become like, you
23  know, depressed.
24      And this is days leading up --
25  this is trying to figure out where this
```

```
                                                    Page 123
 1              V. CALLENDER
 2  debt came from, then finding out that I had
 3  a debt of $11,000, and then the next thing
 4  figuring out how I'm going to get out of
 5  this.  Plus, making the amount of money
 6  that I'm making at my job led to me
 7  stressing out and going into depression --
 8  into depression.
 9      Q.  So you didn't tell your wife
10  about it?
11      A.  My wife knew.  I didn't tell
12  her like in the beginning.  I didn't tell
13  her about the stuff about me having -- you
14  know, my friend telling me about the baby,
15  some baby somewhere, but I told her about
16  the other stuff.
17      Q.  So did you have hives or you
18  felt like hot like you had hives?
19      A.  Well, after the -- after the
20  heat -- after the heat -- the heat in my
21  face, that feeling that I get in my face,
22  that's what brings out the hives.
23      Look at -- you see this right
24  here?
25      This is -- this is one of them
```

```
                                                    Page 124
 1              V. CALLENDER
 2  that never went away, right there
 3  (indicating).  It's still on my face.
 4  Permanent mark.  Hard like a knot.  That's
 5  the one last remain there.
 6      It wouldn't come up in one
 7  place.  It would come up in a bunch of
 8  different places on my face.  That's the
 9  last one and it's still there.  It's just a
10  reminder of what used to happen.
11      Q.  And you never had hives before
12  that day?
13      A.  The last time I had hives
14  before that day was when my brother was
15  murdered in '98.  In '98.  That was the
16  last time.
17      Q.  So did you treat with any --
18  not in '98.
19      Did you treat with my health
20  care providers in connection with the
21  hives?
22      MR. KESHAVARZ:  Objection to
23  the form of the question.
24      You may answer.
25      THE WITNESS:  I didn't think
```

```
                                                    Page 125
 1              V. CALLENDER
 2  the hives -- the hives wasn't
 3  really -- I knew why the hives
 4  happen, it's because I'm stressed.  I
 5  knew why my stomach was turning into
 6  knots and why I wasn't eating, it was
 7  because of the stress.
 8  BY MS. LASTORINO:
 9      Q.  Did you see any doctors about
10  it, about the hives?
11      A.  I didn't see any doctors about
12  the hives.
13      Every six months I go see a
14  doctor or a dentist.  But to say that I'm
15  going to see the doctor about the hives,
16  no, I didn't see no doctor about the hives,
17  I wouldn't even go talk to anybody about
18  the issue I was dealing with.  Again, like
19  I said, I just bottle everything on the
20  inside.
21      Not too many people do that.
22  Some people go talk to other people.  Some
23  people go talk to their mom.  Some people
24  go ask for help.  Not me, I just hold
25  everything on the inside.  I didn't know
```

                    32 (Pages 122 - 125)

```
                                                      Page 126
 1               V. CALLENDER
 2   how to deal with it.  I just hold
 3   everything on the inside.  And at that time
 4   it was a lot of weight for me.  It was a
 5   whole lot of weight because of what I came
 6   from.
 7          Moving in -- you just read it,
 8   I just told you all the moves, the moves,
 9   because I move from 408, rent an apartment.
10   Was told that it was okay, it was safe and
11   all that stuff, that we were going to be
12   okay, and then months later we had to pack
13   up and leave.  Then I had to find another
14   place.
15          Spoke to this woman and she
16   told me everything is safe, this is my
17   apartment.  Yeah, it was her apartment, but
18   she didn't speak to the board, and so now
19   we had to find another place to live.
20          Moving from place to place.
21   Then I find another place, and then to lose
22   my job, all right, to lose my job that I
23   was supporting my family, stress, it mounts
24   and it mounts and it mounts and it mounts.
25          You know the next thing that
```

```
                                                      Page 127
 1               V. CALLENDER
 2   could have happened to me?  Death.  That's
 3   the next thing that comes, that's how
 4   serious this is, this type of stress that
 5   happens to me.  You just die, aneurysm
 6   because I keep everything on the inside.
 7          And talking about it right now,
 8   I'm feeling the same way.  On the inside,
 9   I'm starting to knot up and my face is
10   starting to get hot, just talking about it.
11       Q.   When you're saying that that --
12   the stress of the apartment and all that,
13   that was --
14       A.   It's compounded.  It all
15   compound.  Then when -- when you add to the
16   fact that this $11,000, because I had an
17   apartment, I had a place to live now.
18   Right?  I had a place to live.  I was back
19   in the rent just a little bit, but I was
20   making -- I had a little job.  And I know
21   myself, I know if I have -- if I work, I
22   can move to management because I know who I
23   am.  Right?
24          I'd rather start on the bottom
25   sweeping up floors and I know I'll have the
```

```
                                                      Page 128
 1               V. CALLENDER
 2   director or manager's position in months.
 3   That's the way I -- I know myself.  So I
 4   wasn't really worried about that.  What I
 5   was worried about was who was taking my
 6   money.
 7       Q.   So the stress that you
 8   testified to about that apartment, that was
 9   before your Dollar Tree job?
10       A.   No, no, no.
11          Okay.  You asked me about the
12   stress and you asked me about the hives,
13   right?
14       Q.   Yes.  And then you mentioned
15   the stress from that apartment situation.
16       A.   Okay.  Now --
17       Q.   I'm just trying to figure
18   out --
19       A.   No, no, no.  Don't try to
20   switch things up.
21       Q.   I'm not.
22       A.   Listen to what I'm saying,
23   listen to what I'm saying:  All the moves,
24   right, the movement and all that stuff had
25   its own particular, you know -- you know,
```

```
                                                      Page 129
 1               V. CALLENDER
 2   stress involved.  All right.  But I had
 3   found a place, all right, that I could have
 4   my own.  I signed the lease.  I paid like
 5   five grand just to move in.  All right.
 6       Q.   And when was that?
 7       A.   This was in 2014, I moved into
 8   Leggett.
 9       Q.   Okay.  And that was --
10       A.   And then a couple months later
11   I lost the job, right.  And then --
12       Q.   I think I'm just not following
13   you.
14          When you say you lost the job,
15   are you talking about the United?
16       A.   Yes, that's what I'm talking
17   about, United.
18       Q.   Okay.
19       A.   So that's when I got laid off
20   from United.
21       Q.   Okay.
22       A.   All right.  So I was stressed
23   out.  And then I went and got another job.
24   I'll take anything at this point because I
25   have a family and I just dipped into the
```

                      33 (Pages 126 - 129)

```
                                                      Page 130
 1               V. CALLENDER
 2   savings to get this apartment.  All right.
 3   So, yeah, I got the job and then months --
 4   a couple months later I'm being garnished.
 5   I mean . . .
 6       Q.   Do you recall the total amount
 7   that was garnished?
 8       A.   No, I don't remember the total
 9   amount.
10          What I remember seeing was my
11   check was one way and then the next it was
12   a different amount every -- the way that I
13   was -- I was making my budget at the time,
14   you know, it was helping out.  But then I
15   had to reconstruct like, you know, what
16   I -- what I was getting now, and that
17   wasn't fair.
18          And then when I found out how
19   much money it was, then I started thinking
20   like, man, if this -- if I really owe these
21   people that amount of money, do you know
22   how many years it's going to take me to pay
23   this off?  You know, all these type of
24   things was going through my mind.
25       Q.   Did you receive that money
```

```
                                                      Page 131
 1               V. CALLENDER
 2   back?
 3       A.   What money?
 4       Q.   The money that was garnished.
 5       A.   Yes.  That's after -- after
 6   nights of staying up trying to figure out
 7   who was garnishing my money, that was after
 8   days of running around in the city going to
 9   lawyer's office to try to figure out who
10   these people was, because I didn't -- I
11   didn't know who it was.
12       Q.   What lawyers did you speak to?
13       A.   I went to -- what's it called?
14   Urban Justice league [sic], that's where I
15   went.
16          If it wasn't for the woman who
17   helped me at the Urban, I don't -- I mean
18   she was wonderful.  Like in a couple of
19   days she figured out this stuff because I
20   couldn't do it myself.  She figured it out.
21       Q.   You testified earlier that you
22   were depressed?
23       A.   (Nods head.)
24       Q.   Did you treat with any mental
25   health care providers?
```

```
                                                      Page 132
 1               V. CALLENDER
 2       A.   I don't --
 3       Q.   Do you know what I mean by
 4   that?
 5       A.   No, because I don't think it's
 6   a mental health.  I think it had to do with
 7   me -- with me, with the issue I was faced
 8   with, a mental health provider wouldn't
 9   help me.  The only way they would have been
10   able to help me if they gave me $11,000 to
11   get this problem away.  I didn't think it
12   was a mental issue.  It was an issue of me
13   finding out that I was being garnished and
14   why was I being garnished.  And there was
15   no purpose in me being garnished because a
16   couple years before, in 2012, I thought I
17   cleaned everything up.  And that shouldn't
18   be being garnished because I cleaned
19   everything up.
20       Q.   Did you see any doctors, health
21   care providers on the stomach issues that
22   you testified about?
23       A.   No, because I know what that's
24   about.  I already know what that's about.
25   I know what my stress or how I deal with my
```

```
                                                      Page 133
 1               V. CALLENDER
 2   stress.  And when it got to that
 3   point . . .
 4       Q.   So you knew what the issue was
 5   and you didn't need, in your opinion, to
 6   seek medical care?
 7          MR. KESHAVARZ:  Objection to
 8       the form of the question.
 9          THE WITNESS:  What do you mean,
10       I knew what the issue was?
11   BY MS. LASTORINO:
12       Q.   You testified that you
13   understood why you were feeling the way
14   that you were feeling, right?
15       A.   Right.
16       Q.   And is that why you didn't seek
17   care of a health care provider, because you
18   knew what your symptoms were about?
19       A.   I knew -- I knew -- yes,
20   because I was stressed because my money was
21   being garnished and I didn't know who was
22   garnishing my money.
23       Q.   When is the last time you had
24   hives?
25       A.   I told you, when my brother had
```

                      34 (Pages 130 - 133)

```
                                                      Page 134
 1               V. CALLENDER
 2   passed.
 3       Q.   No, no, no.
 4          Since 2000 --
 5       A.   Since after that?
 6       Q.   You got the hives in 2015, is
 7   that when --
 8          When was it garnished?
 9          How long after the garnishment
10   did you get the hives?
11       A.   Rephrase that question.
12          When -- how long, you said?
13       Q.   How long after the garnishment
14   did you get the hives?
15       A.   It comes when the stress comes
16   and then it goes when that type of stress
17   goes away.  That's how that works.
18       Q.   I'm just trying to figure out a
19   time frame.
20          You said before that --
21       A.   I didn't -- I didn't look at my
22   face every day wondering when the bumps
23   going to go down.  I never did that.  All I
24   was thinking at that time was this money.
25       Q.   But was it a day after you
```

```
                                                      Page 135
 1               V. CALLENDER
 2   learned about the garnishment?  Was it a
 3   week?  A month?
 4       A.   I'm just trying to figure out a
 5   time frame.
 6       Q.   When did it go away?
 7       A.   No.
 8          When did you first get them?
 9       A.   Oh.  Like I explained to you in
10   the beginning, it's different steps.  Like
11   I withdraw.  I withdraw, right?  Withdraw
12   meaning, when I withdraw, that's me going
13   inside to try to figure out the problems.
14   People deal with problems different way,
15   and so that's mental, right?  So when the
16   mind comes in play, the stomach comes in
17   play, too, because I can't figure out how
18   I'm going to get out this problem.  Right?
19          So after that, I don't eat.
20   And until I figure out the problem, I'm
21   going to eat.  But I was not eating because
22   the problem still was there in my face
23   staring me down.  Then that causes -- since
24   I can't deal with the problem, started
25   getting headaches, then the heat in my face
```

```
                                                      Page 136
 1               V. CALLENDER
 2   started coming, and that's what brings out
 3   the hives.
 4       Q.   Yeah, I understand that you
 5   testified that way already.
 6       A.   Right.
 7       Q.   But what I'm trying to get at
 8   is the time frame, the month and the year
 9   as to when that started to happen.
10       A.   I can't -- I can't tell you --
11   I mean it started at the day I found out --
12   when I saw the word "garnished" -- when I
13   saw the word "garnished" and I asked my
14   friend what -- and I typed -- I knew what
15   garnished was, but I didn't believe it, it
16   started at that time.
17       Q.   Okay.  And when is the last
18   time you've had hives since that time?
19       A.   Man, I haven't had hives since
20   then.
21       Q.   So they went away?
22       A.   This one stayed.  Maybe this
23   one is waiting till this problem goes away,
24   it will disappear, this one right here
25   (indicating).  It's hard now.  Maybe that's
```

```
                                                      Page 137
 1               V. CALLENDER
 2   waiting for this to go away.  Because every
 3   time I think about this, I get mad, I get
 4   upset on the inside, you know.  That's how
 5   I get my knots in the stomach.  I'm not
 6   getting hives on my face, but my stomach,
 7   though.
 8       Q.   And have you ever seen a
 9   dermatologist about what --
10       A.   Yeah, I seen a dermatologist a
11   couple years.
12       Q.   When's the last time you saw a
13   dermatologist?
14       A.   I saw a dermatologist in 2001.
15   That was a long time ago.
16       Q.   Who was Dr. --
17       A.   That has nothing to do with no
18   dermatology.
19       Q.   Who was Dr. Emmanuel Peprah?
20       A.   That's my doctor.
21       Q.   How long have you been --
22       A.   I don't know.  Maybe --
23       Q.   -- seeing that doctor?
24       A.   Maybe two years.  I'm not sure.
25       Q.   And what do you go to
```

                      35 (Pages 134 - 137)

```
                                                      Page 138
 1               V. CALLENDER
 2   Dr. Peprah for?
 3       A.   I go to doc -- you know, I
 4   don't go to a doctor.  I only go to the
 5   doctor because -- because society says you
 6   need to go to a doctor and get a physical
 7   checkup or -- or go get your dentals.
 8   That's why I go to get a physical.  That's
 9   why I go to the doctor, only because
10   society says.
11       Q.   So you just basically go for
12   physicals, you're saying?
13       A.   I go for physical, blood tests.
14   Like I went to him to get a blood test to
15   find out what blood type I was, just to
16   find out what blood type, because I was
17   reading a book that, you know, if you eat
18   based on blood type, I was see if there was
19   evidence that -- I was trying to prove his
20   claim that was wrong, that was all.
21          MS. LASTORINO:  I think I'm
22       wrapping up, but I just want to go
23       through and just . . .
24   BY MS. LASTORINO:
25       Q.   Before your wages were
```

```
                                                      Page 139
 1               V. CALLENDER
 2   garnished, did you ever receive anything in
 3   the mail called an income execution?
 4       A.   No.  And that's what upset me
 5   more also.  That's what upset me more than
 6   anything else.  Because I don't know if I
 7   read somewhere -- I don't know if I read
 8   somewhere where, if you're going to get
 9   garnished, they should send you a letter in
10   the mail, and then I think you sign off on
11   it, or something like that.  I read it
12   somewhere.  And I was upset because I never
13   saw anything and -- and that people have
14   the power just to go into your stuff
15   without letting you know and just take away
16   your stuff.
17          I mean if I had done that, I
18   mean I would be in jail right now, to tell
19   you the truth.  But if I had done that to
20   somebody else, if I had done that to a
21   corporation, I would be in jail.
22          MS. LASTORINO:  One second.
23          (Discussion off the record.)
24          MS. LASTORINO:  I think I'm
25   done.
```

```
                                                      Page 140
 1               V. CALLENDER
 2          THE WITNESS:  Can I ask a
 3       question?
 4          MR. KESHAVARZ:  Unfortunately
 5       you don't get to ask questions.
 6          Let's just take a quick break
 7       for one second.
 8          (A brief recess was taken from
 9       2:59 p.m. to 3:03 p.m.)
10          (Defendant's Exhibit L, a
11       document, Bates stamped Callender 58
12       through Callender 65, was marked for
13       identification.)
14   EXAMINATION BY
15   MR. KESHAVARZ:
16       Q.   Okay.  Mr. Callender, I'm
17   showing you what's been marked previously
18   as Exhibit No. K.
19          Do you remember testifying you
20   weren't sure about what this document was?
21       A.   Yes, I remember that.
22       Q.   Okay.  Now that you look --
23   I'm showing you Exhibit L,
24   which is Callender 58 --
25       A.   Right.
```

```
                                                      Page 141
 1               V. CALLENDER
 2       Q.   -- through 65.
 3       A.   Right.
 4       Q.   Now that you see Exhibit K in
 5   context --
 6       A.   Uh-huh.
 7       Q.   -- do you remember --
 8          Well, let me just ask you this:
 9   Do you know what Exhibit L is, which is
10   Callender --
11       A.   Yes, I know what Exhibit L.
12       Q.   Just wait a second.
13          Do you know what Exhibit L is,
14   which is Callender 58 through 65?  What is
15   that?
16       A.   Well, that's a document that
17   I -- that I -- I was doing some research on
18   the company Forster & Garbus because I
19   wasn't really aware of who they were, and I
20   found out like the Attorney General had
21   sued them for gutter services and stuff
22   back in '07.  And so I copied -- I made
23   copies of that of all the information that
24   I found online, and this paperwork Exhibit
25   K is part of that.
```

                      36 (Pages 138 - 141)

Page 142

```
            V. CALLENDER
 1
 2     MR. KESHAVARZ: Okay. That's
 3   all I have.
 4     MS. LASTORINO: I have a
 5   question.
 6  EXAMINATION BY
 7  MS. LASTORINO:
 8     Q. Do you have any reason to
 9  believe that your -- in your underlying
10  action, I'm talking about the Discover Bank
11  that sued you.
12        You understand what I'm saying,
13  right?
14     A. (Nods head.)
15     Q. Do you have any understanding
16  as to what law firm was representing
17  Discover Bank when they commenced that
18  lawsuit?
19     MR. KESHAVARZ: Objection to
20   the form of the question.
21        You may answer, if you know.
22     THE WITNESS: I don't
23   understand what you're saying.
24  BY MS. LASTORINO:
25     Q. Discover Bank sued you in the
```

Page 143

```
            V. CALLENDER
 1
 2  underlying action which resulted in the
 3  default judgement, correct?
 4     A. Right.
 5     Q. Okay. Do you know who was
 6  representing Discover Bank?
 7     A. At the time I didn't know.
 8     Q. But you served the Order to
 9  Show Cause to a law firm, right?
10     A. Right. That's when I found
11  out.
12     Q. And that law firm, you didn't
13  sent it to Forster & Garbus, did you?
14     A. I sent it to whatever letter I
15  was getting in -- whatever that information
16  where the address was on --
17     Q. Uh-huh.
18     A. -- that's where I sent it to.
19     Q. Okay. So whichever address you
20  sent it, you sent it to the law firm other
21  than Forster & Garbus?
22     MR. KESHAVARZ: Objection to
23   the form of the question.
24     THE WITNESS: I don't know.
25
```

Page 144

```
            V. CALLENDER
 1
 2  BY MS. LASTORINO:
 3     Q. Well, let me ask you: Did you
 4  send that Order to Show Cause? Where did
 5  you send it?
 6     MR. KESHAVARZ: Objection to
 7   the form of the question.
 8        You may answer, if you know.
 9     THE WITNESS: This was in 2012,
10   right?
11  BY MS. LASTORINO:
12     Q. Uh-huh.
13     A. I sent the letter -- the Order
14  to Show Cause to whichever information --
15  it had a piece of paper that had the
16  address that I was supposed to send this
17  information to, that's where I sent it.
18     Q. Okay.
19     MS. LASTORINO: I have no other
20   questions.
21     MR. KESHAVARZ: All right.
22     We're free to go.
23     Can you e-mail me the exhibits
24   or --
25     MS. LASTORINO: Sure.
```

Page 145

```
            V. CALLENDER
 1
 2     (Discussion off the record.)
 3     MR. KESHAVARZ: I reserve the
 4   right to review and revise.
 5     You can e-mail me a copy. I
 6   only need an e-tran.
 7     (Time noted: 3:07 p.m.)
```

Page 146

```
 1
 2       A C K N O W L E D G M E N T
 3
 4     I, VICTOR CALLENDER, hereby certify
 5  that I have read the transcript of my
 6  testimony taken under oath in my deposition
 7  of October 25, 2016, that the transcript is
 8  a true, complete and correct record of my
 9  what was asked, answered and said during
10  the deposition, and that the answers on the
11  record as given by me are true and correct.
12
13
14   _____
        VICTOR CALLENDER
15
16
17
18  Signed and Subscribed to before me
19  this _____ day of _____, 20___.
20
21
22  _____
    Notary Public, State of New York
23
24
25
```

Page 147

```
 1
 2              I N D E X
 3  WITNESS      EXAMINATION BY      PAGE
 4  VICTOR CALLENDER  MS. LASTORINO    4
 5                    MR. KESHAVARZ   140
 6                    MS. LASTORINO   142
 7
 8
 9             E X H I B I T
10  DEFENDANT'S  DESCRIPTION          PAGE
11  Exhibit A   Notice to Take Oral     4
12              Deposition
13  Exhibit B   WebCivil Local Case    44
14              Search Results,
15              Bates stamped
16              Callender 17
17  Exhibit C   WebCivil Local Case    54
18              Detail
19  Exhibit D   a letter dated         69
20              October 23, 2012,
21              Bates stamped
22              FG_000008 and
23              FG_000010
24
25
```

Page 148

```
 1
 2            E X H I B I T S
 3  DEFENDANT'S  DESCRIPTION          PAGE
 4  Exhibit E   Order to Show Cause    87
 5              and Affidavit in
 6              Support of Order to
 7              Show Cause, Bates
 8              stamped Callender
 9              114 through
10              Callender 115
11  Exhibit F   "Proposed" Written     88
12              Answer Consumer
13              Credit Transaction,
14              Bates stamped
15              Callender 116
16  Exhibit G   a compilation of       97
17              letters
18  Exhibit H   a letter dated July   104
19              2, 2012, Bates
20              stamped Callender 3
21  Exhibit I   a document, Bates    104
22              stamped Callender
23              77
24
25
```

Page 149

```
 1
 2            E X H I B I T S
 3  DEFENDANT'S  DESCRIPTION          PAGE
 4  Exhibit J   a letter with        107
 5              attached
 6              application, Bates
 7              stamped FG_000061
 8  Exhibit K   a document, Bates    111
 9              stamped Callender
10              65
11  Exhibit L   a document, Bates    140
12              stamped Callender
13              58 through
14              Callender 65
15  (EXHIBITS RETAINED BY CAROL LASTORINO, ESQ.)
16
17
18       REQUESTS FOR DOCUMENTS
19          PAGE   LINE
20           84    13
21          100    25
22
23
24
25
```

Page 150

```
 1
 2        C E R T I F I C A T I O N
 3
 4     I, Ashley Shugar, a Notary Public
 5  within and for the State of New York, do
 6  hereby certify:
 7       That VICTOR CALLENDER, the witness
 8  whose deposition is herein before set
 9  forth, was duly sworn by me and that such
10  deposition is a true record of the
11  testimony given by such witness.
12       I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage; and that I am
15  in no way interested in the outcome of this
16  matter.
17       IN WITNESS WHEREOF, I have hereunto
18  set my hand this 1st day of November, 2016.
19
20       [signature]
21   _____
22        ASHLEY SHUGAR
23
24
25
```

Page 151

```
 1
 2              E R R A T A   S H E E T
 3       VERITEXT/NEW YORK REPORTING, LLC
 4  CASE NAME: CALLENDER v. FORSTER & GARBUS
    DATE OF DEPOSITION: OCTOBER 25, 2016
 5  WITNESS: VICTOR CALLENDER
 6  PAGE/LINE(S) /    CHANGE     REASON
 7  ___/____/_____/_____
 8  ___/____/_____/_____
 9  ___/____/_____/_____
10  ___/____/_____/_____
11  ___/____/_____/_____
12  ___/____/_____/_____
13  ___/____/_____/_____
14  ___/____/_____/_____
15  ___/____/_____/_____
16  ___/____/_____/_____
17  ___/____/_____/_____
18  ___/____/_____/_____
19  ___/____/_____/_____
20
21     _____
           VICTOR CALLENDER
22  Subscribed and Sworn to before me
    this_____day of_____, 20__.
23
24  NOTARY PUBLIC_____
25  MY COMMISSION EXPIRES_____
```