1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ------------------------------------------X
       VICTOR CALLENDER,
4
                                    PLAINTIFF,
5
                  -against-           Case No.:
6                                   15-CV-05813(AKH)

7      FORSTER & GARBUS, LLP et ano.,

8                                    DEFENDANT.
       ------------------------------------------X
9

10                          DATE: October 24, 2016

11                          TIME: 3:11 p.m.

12

13            DEPOSITION of a Non-Party, RONALD J.

14     FERRARO, taken by the Plaintiff, pursuant to

15     a Subpoena and to the Federal Rules of Civil

16     Procedure, held at The Law Office of Ahmad

17     Keshavarz, 16 Court Street, 26th Floor,

18     Brooklyn, New York 11241, before Anna

19     Vortsman, a Notary Public of the State of

20     New York.

21

22

23

24

25

```
 1

 2        A P P E A R A N C E S:

 3

          THE LAW OFFICE OF AHMAD KESHAVARZ
 4            Attorney for the Plaintiff
              VICTOR CALLENDER
 5            16 Court Street, 26th Floor
              Brooklyn, New York 11241
 6            BY: AHMAD KESHAVARZ, ESQ.

 7

 8

          RIVKIN RADLER LLP
 9            Attorneys for the Defendants
              FORSTER & GARBUS, LLP et ano.
10            926 RXR Plaza
              Uniondale, New York 11556
11            BY: MATTHEW T. FEINMAN, ESQ.

12

13

14        ALSO PRESENT:

15        JESSICA MOODY

16

17          *              *              *

18

19

20

21

22

23

24

25
```

```
1
2      F E D E R A L   S T I P U L A T I O N S
3
4           IT IS HEREBY STIPULATED AND AGREED by
5      and between the counsel for the respective
6      parties herein that the sealing, filing and
7      certification of the within deposition be
8      waived; that the original of the deposition
9      may be signed and sworn to by the witness
10     before anyone authorized to administer an
11     oath, with the same effect as if signed
12     before a Judge of the Court; that an
13     unsigned copy of the deposition may be used
14     with the same force and effect as if signed
15     by the witness, 30 days after service of the
16     original & 1 copy of same upon counsel for
17     the witness.
18
19           IT IS FURTHER STIPULATED AND AGREED
20     that all objections except as to form, are
21     reserved to the time of trial.
22
23                *     *     *     *
24
25
```

```
 1                        R.J. FERRARO
 2      R O N A L D  J.  F E R R A R O, called as a
 3      witness, having been first duly sworn by a
 4      Notary Public of the State of New York, was
 5      examined and testified as follows:
 6                  THE REPORTER:  Please state your
 7            name for the record.
 8                  THE WITNESS:  Ronald J. Ferraro.
 9                  THE REPORTER:  What is your
10            address?
11                  THE WITNESS:  103 Franklin Street,
12            2nd Floor, Elmont, New York 11003.
13      EXAMINATION BY
14      MR. KESHAVARZ:
15            Q.    Ferraro?
16            A.    Yep.
17            Q.    Thank you, Mr. Ferraro, for being
18      here.
19            A.    Sure.
20            Q.    In preparation for your deposition
21      today, have you spoken with anyone?
22            A.    Just my attorneys.
23            Q.    And who are your attorneys?
24            A.    Rivkin Radler.
25            Q.    Anyone else?
```

```
 1                     R.J. FERRARO
 2        A.   Nope.
 3        Q.   Who at Rivkin Radler?
 4        A.   Mr. Feinman.
 5        Q.   Anyone else?
 6        A.   Ms. Lastorino.
 7        Q.   Anyone else?
 8        A.   Nope.
 9        Q.   Did you retain Rivkin Radler?
10        A.   I didn't.
11        Q.   To your knowledge, has anyone
12   retained Rivkin Radler for you?
13             MR. FEINMAN:  Let's be careful
14        about privilege here.
15             MR. KESHAVARZ:  No.  That's not
16        the question.
17        Q.   The question is:  You said you
18   have not retained Rivkin Radler to represent
19   you for this deposition.  You have not or
20   you have?
21        A.   I have not.
22        Q.   So has anyone, to your knowledge,
23   retained Rivkin and Radler to represent you
24   at this deposition?
25        A.   I'm assuming.
```

```
 1                    R.J. FERRARO
 2              MR. FEINMAN:  I just want to make
 3         sure he's understanding the question.
 4              THE WITNESS:  Right.
 5         Q.   I apologize in advance.  I'm going
 6    to cough a bit today.
 7         A.   It's okay.
 8         Q.   And I apologize for that.
 9              Maybe we can take one step at a
10    time.
11              (Whereupon, the subpoena was
12         marked as Plaintiff's Exhibit 1 for
13         identification as of this date by the
14         Reporter.)
15  BY MR. KESHAVARZ:
16         Q.   A few ground rules for a
17    deposition:  Have you ever had your
18    deposition taken before, sir?
19         A.   Nope.
20         Q.   Have you ever deposed anyone
21    before?
22         A.   No.
23         Q.   If I ask you a question that you
24    don't understand, will you please ask me to
25    rephrase it?
```

```
 1                    R.J. FERRARO
 2          A.   Okay.
 3          Q.   If I ask you a question and you
 4     don't ask me to rephrase it, is it
 5     reasonable for me to assume that you
 6     understood the question?
 7          A.   I think it's fair.
 8          Q.   During the course of the
 9     deposition, opposing counsel might make an
10     objection as to form, but unless you're
11     instructed otherwise, you're still to answer
12     the question.
13               Do you understand that?
14          A.   Yep.
15          Q.   Let me show you what's been marked
16     as Plaintiff's Exhibit 1.  Is this the
17     subpoena by which you're attending today's
18     deposition?
19          A.   Yes.
20          Q.   Did you review a copy of this
21     deposition subpoena prior to your deposition
22     today?
23          A.   I probably looked at it the night
24     that I got it and that was it.
25          Q.   If you will go to the last page,
```

```
 1                    R.J. FERRARO
 2    and let me know when you're there.
 3              You see the list of documents to
 4    produce for your deposition?
 5         A.   Yes.
 6         Q.   Have you brought any documents
 7    responsive to these requests to the
 8    deposition?
 9         A.   No.
10         Q.   Why not?
11         A.   Don't have any of the documents in
12    my possession.
13         Q.   You don't have any documents in
14    your possession, custody, or control
15    regarding the lawsuit by Discover Bank
16    against Mr. Callender?
17         A.   I just have a copy of the subpoena
18    with me.  That's it.
19         Q.   Do you have any other documents in
20    your possession, custody, or control at any
21    location regarding the Discover lawsuit
22    against Mr. Callender?
23         A.   No.
24         Q.   Do you have any written documents
25    reflecting communications between yourself
```

```
1                      R.J. FERRARO

2       and Forster & Garbus regarding the Plaintiff

3       or the lawsuit -- or this lawsuit?

4            A.    No.

5            Q.    Any documents with Forster &

6       Garbus regarding your deposition today?

7            A.    No.

8            Q.    Any documents with -- without

9       telling me what they are, do you have any

10      documents with Rivkin and Radler regarding

11      your deposition today?

12           A.    No.

13           Q.    No e-mails?

14           A.    No e-mails.

15           Q.    Did you sign a retainer agreement

16      with Rivkin and Radler?

17           A.    No.

18           Q.    Do you have any documents

19      reflecting an attorney-client relationship

20      with Rivkin and Radler?

21                 MR. FEINMAN:  I'm going to object.

22                 MR. KESHAVARZ:  Okay.  You can

23           answer.

24           A.    Can you repeat the question?

25                 MR. KESHAVARZ:  Sure.  Can you
```

```
 1                    R.J. FERRARO

 2           re-read the question?

 3                (Whereupon, the referred-to

 4           question was read back by the

 5           Reporter.)

 6                THE WITNESS:  No, I don't have any

 7           documents in my possession.

 8   BY MR. KESHAVARZ:

 9           Q.   Possession, custody, or control at

10      any location?

11           A.   Nothing.

12           Q.   Have you e-mailed anyone regarding

13      your deposition today?

14           A.   Yes.

15           Q.   Who?

16                MR. FEINMAN:  To the extent that

17           includes counsel.

18           Q.   Well, you can identify who.  Don't

19      tell me the contents.  If it is to counsel,

20      you can identify them.

21                Who have you e-mailed regarding

22      your deposition testimony today?

23           A.   Mr. Feinman.  I know there are

24      e-mails there.

25           Q.   Mr. Feinman, and what was the last
```

```
 1                    R.J. FERRARO
 2    thing?
 3         A.   I said, I'm pretty sure there are
 4    e-mails there between myself and him.
 5         Q.   Have you e-mailed with anyone else
 6    regarding your deposition testimony today?
 7         A.   Ms. Lastorino, I believe.
 8         Q.   Anyone else?
 9         A.   No.
10         Q.   How many e-mails have you
11    exchanged with Mr. Feinman or Ms. Lastorino
12    regarding your deposition today?
13         A.   I don't know.
14         Q.   More than one?
15         A.   I don't want to take a guess.
16         Q.   Well, do you know if it's more
17    than one?
18         A.   It could be.  I don't remember.
19         Q.   When was that e-mail?
20         A.   I believe Mr. Feinman sent me an
21    e-mail earlier today giving me the address.
22              MR. FEINMAN:  To the extent you're
23         trying --
24              MR. KESHAVARZ:  All I asked is
25         when.  My only question was when.
```

```
 1                      R.J. FERRARO
 2               MR. FEINMAN:  So if you could --
 3               THE WITNESS:  Earlier today.
 4  BY MR. KESHAVARZ:
 5          Q.   Were there any other e-mails other
 6      than the e-mail earlier today with
 7      Mr. Feinman?
 8          A.   Probably.  I just can't quantify
 9      it.
10          Q.   So there were other e-mails, but
11      you don't remember how many?
12          A.   Correct.
13          Q.   What is your understanding of the
14      nature of this federal lawsuit, Victor
15      Callender versus Forster & Garbus?
16               MR. FEINMAN:  Objection to form.
17          A.   It's -- to my understanding, there
18      is a lawsuit from Mr. Callender against my
19      old firm.
20          Q.   And what's your understanding, if
21      any, regarding the allegations in the
22      federal lawsuit?
23          A.   I don't have any knowledge as to
24      the exact nature of the lawsuit.
25          Q.   Generally speaking, what is your
```

```
 1                     R.J. FERRARO
 2       understanding about what this federal
 3       lawsuit is about?
 4               MR. FEINMAN:  Objection to form.
 5           A.   My guess would be an FDCPA
 6       lawsuit.
 7           Q.   Anything else?
 8           A.   No.
 9           Q.   What's your understanding about
10       what the claims in the FDCPA lawsuit are?
11               MR. FEINMAN:  Objection.
12           A.   That, I don't know.
13           Q.   Do you know of -- what your
14       involvement was in relation to the
15       allegations in the federal lawsuit?
16               MR. FEINMAN:  Objection to form.
17           A.   No.
18           Q.   Do you know why you're here today?
19               MR. FEINMAN:  Objection to form.
20           A.   My guess is only that because I'm
21       no longer with the firm, there is an idea as
22       to I might have some information that could
23       help.
24           Q.   What information do you have that
25       you believe might help?
```

```
 1                         R.J. FERRARO
 2              MR. FEINMAN:  Objection to form.
 3         A.   I don't know.
 4         Q.   What is your full legal name?
 5         A.   Ronald James Ferraro.
 6         Q.   Have you ever been known by any
 7    name other than Ronald James Ferraro?
 8         A.   I usually just use my initial for
 9    my middle name.  That's it.  So it would be
10    Ronald J. Ferraro.
11         Q.   How long have you been an
12    attorney, sir?
13         A.   I was admitted January 2011.
14         Q.   In what --
15         A.   In New York.  And New Jersey,
16    November 2012.
17         Q.   Where did you go to school?
18         A.   Penn State.
19         Q.   What did you do after you
20    graduated law school?
21         A.   With regard to what?
22         Q.   For work.
23         A.   After taking the bar, I went to
24    work for a restaurant, pizzeria.
25         Q.   What about after that?
```

1                         R.J. FERRARO
2              A.    I worked for that place for about
3      a year.  And I worked as a paralegal for a
4      Dennis Biancanello.
5              Q.    Say it again.
6              A.    Biancanello.  His first name is
7      Dennis; last name, B as in
8      "boy"-I-A-N-C-A-N-E-L-L-O.
9              Q.    When was that, approximately?
10             A.    I worked for him as a paralegal
11     full-time from about August 2010 through
12     August 2011.
13             Q.    And what did you do there?
14             A.    So until I got admitted, I was
15     working as a full-time paralegal, doing
16     basic paralegal, clerical stuff, answering
17     phones.  From there, after that, in
18     January 2011, after I was sworn in, I worked
19     as an attorney.
20             Q.    Where?
21             A.    For him.
22             Q.    Does he do debt collection work?
23             A.    I know he had a book of business.
24     I don't know if he still does it.  That was
25     per diem appearances, and it could range

```
 1                     R.J. FERRARO
 2     from personal injury stuff to, perhaps, it
 3     could be some debt collection stuff.
 4          Q.   Would you be the per diem attorney
 5     for his firm?
 6          A.   He usually made most of the
 7     appearances, but I did make some.
 8          Q.   Tell a jury what a per diem
 9     attorney is.
10               MR. FEINMAN:  I'm going to object
11          to the form of the question there.
12               MR. KESHAVARZ:  You can answer the
13          question.
14          A.   Per diem attorney is an attorney
15     that gets hired to make one appearance or
16     for a particular situation, if the named
17     attorney can't appear.
18          Q.   What did you do after that?
19          A.   I then began, in August of 2011,
20     working for Forster & Garbus.
21          Q.   And how long did you work there
22     until?
23          A.   Until April of this year, 2016.
24          Q.   Is there any particular reason why
25     you left Forster & Garbus in April 2016?
```

1                          R.J. FERRARO

2          A.   Yeah.  I had a better job

3     opportunity elsewhere.

4          Q.   Where did you go?

5          A.   I went to work as a law clerk for

6     a judge.

7          Q.   Which judge?

8          A.   Judge Diamond.

9          Q.   And where is Judge Diamond a judge

10    at?

11         A.   Nassau County Supreme Court.

12         Q.   How do you like it?

13         A.   Good.

14         Q.   What was your title while you were

15    working at Forster & Garbus?

16         A.   Associate.

17         Q.   Has your title changed from when

18    you began in 2011 to when you left in 2016?

19         A.   No.

20         Q.   Did your workload change in any

21    significant way between that period?

22              MR. FEINMAN:  Objection to form.

23         A.   I don't understand what you mean

24    by "workload."

25              (Whereupon, the following document

```
 1                    R.J. FERRARO
 2              was marked as Plaintiff's Exhibit 2 for
 3              identification as of this date by the
 4              Reporter.)
 5    BY MR. KESHAVARZ:
 6              Q.   Mr. Ferraro, is this your copy of
 7         your LinkedIn page?
 8              A.   I can't authenticate it, because
 9         it's not -- I didn't print it out.  So I
10         don't know if there has been any changes
11         here, but it does look substantially similar
12         to what I have on my LinkedIn page.
13              Q.   Okay.  Please review the document
14         and let me know when you're done.
15              A.   Okay.
16              Q.   Are all the statements in
17         Exhibit 2 true?
18              A.   Again, I can't authenticate the
19         document, but it does look substantially
20         similar to what I had on my LinkedIn
21         profile.
22              Q.   My question is:  You've read
23         Exhibit 2, correct?
24              A.   Yeah.
25              Q.   Are the contents in Exhibit 2
```

1                           R.J. FERRARO

2      true?

3            A.   Again, I can't authenticate what's

4      in here.

5            Q.   We can take one line at a time, if

6      you'd like.

7                 It says you're a principal as a

8      law clerk to the Honorable Arthur M.

9      Diamond; is that correct?

10           A.   Yes.

11           Q.   Is that statement true?

12           A.   Yes.

13           Q.   It says below that you were an

14     associate attorney at Forster & Garbus LLP.

15     Is that statement true?

16           A.   Yes.

17           Q.   It says that you worked at Forster

18     & Garbus from August '11 to April of 2016.

19     Is that statement true?

20           A.   Yes.

21           Q.   Okay.  Read all of the sentences

22     to yourself below that and through the next

23     page, and let me know when you're done.

24           A.   Okay.

25           Q.   Are all the statements beneath

```
 1                    R.J. FERRARO
 2      where it says "associate attorney" -- are
 3      all the statements on the bottom of page 1
 4      true?
 5          A.   Yes.
 6          Q.   Go to the next page, page 2, under
 7      "associate attorney," are all the statements
 8      underneath that true?
 9          A.   Yep.
10          Q.   Did you review the deposition
11      testimony of Joe Leiderman prior to your
12      testimony today?
13          A.   No.
14          Q.   Do you have any knowledge of the
15      contents of the deposition testimony of Joe
16      Leiderman?
17          A.   No.
18          Q.   Tell me what you did at Forster &
19      Garbus.
20          A.   Didn't we just go over that?
21          Q.   What were your hours at Forster &
22      Garbus?
23          A.   They varied.
24          Q.   What were your typical hours at
25      Forster & Garbus?
```

```
 1                        R.J. FERRARO
 2          A.   I mean, I was full-time.
 3          Q.   Yes.  So, typically, what were
 4     your hours, 9:00 to 5:00?
 5               MR. FEINMAN:  Objection to form.
 6          A.   No.
 7          Q.   Typically, what were your hours at
 8     Forster & Garbus?  It's a simple question.
 9               MR. FEINMAN:  Objection to form.
10          A.   It depended on the day and the
11     week.
12          Q.   What were your typical hours at
13     Forster & Garbus?
14               MR. FEINMAN:  Objection.
15          A.   On any given week, I would work
16     between 50 and 65 hours.
17          Q.   Would that be your normal range of
18     hours?
19          A.   On any given week, yeah.
20          Q.   You worked weekends or only
21     weekdays?
22          A.   Sometimes weekends.
23          Q.   Tell me about what work you did to
24     manage a caseload for matters throughout New
25     York State Supreme Court and district courts
```

1                         R.J. FERRARO

2      varying between 700 and 1400 matters at any

3      given time, from inception to trial.  That's

4      what your web --

5                  MR. FEINMAN:  Objection to the

6            form of the question.

7            A.   And that's not what it says.

8            Q.   Will you read the line "managing

9      caseload."  Read that on the record, please.

10           A.   "Manage caseload for matters

11     throughout New York State Supreme, City, and

12     District Courts, varying between 700 and

13     1400 matters at any given time, from

14     inception through trial."

15           Q.   And what do you mean by that?

16           A.   I had a responsibility as far as

17     not only whatever cases I was assigned to

18     manage from a paper standpoint, but also

19     making court appearances regularly.

20           Q.   Do you mean anything else by that?

21                 MR. FEINMAN:  Objection to the

22           form of the question.

23           A.   I don't recall when exactly I put

24     this together, but -- I don't know what

25     other explanation you're looking for.

```
1                        R.J. FERRARO
2           Q.   Well, let me just put this in lay
3    terms.
4           A.   Please.
5           Q.   What were your major
6    responsibilities at Forster & Garbus?
7           A.   Daily court appearances, handling
8    trials.
9           Q.   Did you have any other main
10   responsibilities at Forster & Garbus, other
11   than to have daily court appearances and
12   handling trials?
13              MR. FEINMAN:  Objection.
14          A.   Yeah.  Some of the other
15   responsibilities included having whatever
16   cases were assigned to my venue, reviewing
17   whatever paperwork came in on those cases.
18          Q.   Any other major responsibilities
19   at Forster & Garbus?
20              MR. FEINMAN:  Objection to the
21          form of the question.
22          A.   Not that I can recall.
23          Q.   Tell me what you mean by "daily
24   court appearances."
25              MR. FEINMAN:  Objection to the
```

```
 1                    R.J. FERRARO
 2          form of the question.
 3          A.   So whenever -- obviously, I think
 4     you understand what it means when a case is
 5     put on a calendar for a pretrial conference,
 6     conferences.  Cases get adjourned three,
 7     four, five times.  So someone needs to go
 8     appear on behalf of the firm to answer on
 9     those cases and discuss maybe a possible
10     resolution, or if there is any motion
11     practice going on, discuss those issues.
12               My responsibility was to go and
13     make those appearances on behalf of the
14     firm.
15          Q.   In which counties?
16          A.   Do you need to know all the
17     counties I've appeared in?
18          Q.   Well, typically speaking, you said
19     later on about certain venues.  Were there
20     any particular courts that you would do your
21     appearances in more than others?
22          A.   Yes.
23          Q.   Where would you primarily do your
24     appearances?
25               MR. FEINMAN:  Objection to the
```

```
 1                    R.J. FERRARO
 2         form of the question.
 3         A.   It depends on the time period
 4    we're discussing.
 5         Q.   Well, let me ask you this:  Did
 6    your work change significantly during the
 7    time period while you were there, from 2011
 8    to 2016?
 9         A.   I don't think my work changed
10    significantly.  I think I was given maybe
11    more complicated matters to handle or more
12    difficult cases.
13         Q.   In what way?
14         A.   Well, instead of, perhaps, dealing
15    with a pro se, it'd be a two-attorney
16    matter.
17         Q.   Would that be the main difference
18    in your workload while you were at Forster &
19    Garbus?
20         A.   I don't understand the question,
21    really.  Could you rephrase?
22         Q.   Sure.  Well, I was just trying to
23    ask -- you started saying the courts you
24    would go to changed to some extent during
25    your time at Forster & Garbus --
```

```
 1                    R.J. FERRARO
 2              MR. FEINMAN:  Objection to the
 3         form.
 4         Q.    -- is that correct?
 5         A.    There was, when I first started,
 6    more cases on a day-to-day basis.  By the
 7    time I left, it's a matter of efficiency.
 8    It seemed as if the calendars, there were
 9    less adjournments.
10         Q.    So what did that do for your work?
11         A.    Didn't feel like much.
12         Q.    Would you go to do court
13    appearances every day?
14         A.    Yes.  The only days that I didn't
15    make court appearances, I think I called out
16    sick once when I was there and there was a
17    court holiday, something like that.
18         Q.    You timed your sickness very well.
19              So when did you travel to go to
20    court?  When did you come back?
21              What were your hours in court, I
22    guess, generally speaking?
23         A.    It also depends on the venue.
24         Q.    Primarily, what venues were you
25    in?  You said it changed to some extent.  In
```

```
 1                    R.J. FERRARO
 2    what way?
 3          A.   When I was first hired, I was
 4    hired to go to Queens.  And there were two
 5    attorneys assigned to go to Queens at that
 6    time, and I was going to be the third.
 7               By the time I started there, they
 8    asked if I'd go to the Bronx once or twice a
 9    week.  So I did that.  But because I did the
10    trials, I was also considered a -- I guess
11    you would say a floater.  I didn't have
12    cases just in one venue.
13          Q.   You'd do other cases around New
14    York City?
15          A.   Yes.
16          Q.   And primarily in the five
17    boroughs?
18          A.   I've done -- yes.  At one point or
19    another, yes.
20          Q.   So your court appearances would be
21    how you spent most of your days?
22          A.   Yeah.  They would monopolize the
23    morning.
24          Q.   And what would you do in the
25    afternoon?
```

```
 1                     R.J. FERRARO
 2          A.   Whenever I would get back to the
 3     office, I'd put in my notes from the day,
 4     prepare myself for the next day's
 5     appearances, respond to any phone calls,
 6     typical attorney stuff.
 7          Q.   And that was pretty much your
 8     typical day?
 9          A.   Yes.
10          Q.   You said for your cases work
11     received papers -- excuse me.  You said,
12     "Cases work reviewing papers."  What did you
13     mean by that?  Maybe I'm misstating your
14     testimony, in which case I don't mean to.
15     Well, strike that.  I think you just
16     answered the question.
17               So you're saying that what you
18     did, typically, at Forster & Garbus is that
19     you made court appearances, you came back,
20     you typed up what happened in court, and
21     then you got prepared for the next day's
22     hearings or trials.  Is that --
23               MR. FEINMAN:  Objection to form.
24          Q.   Is that an accurate summary of
25     your basic responsibilities at Forster &
```

```
1                     R.J. FERRARO

2      Garbus?

3           A.   Yes.

4           Q.   Did you sign income executions

5      while you were at Forster & Garbus?

6           A.   Yes.

7           Q.   Did you file -- sign information

8      subpoenas?

9           A.   I don't remember.

10          Q.   But you do remember signing wage

11     garnishments, right?

12          A.   Income executions, yeah.

13          Q.   Income executions.  Thank you.

14               Would you sign any other documents

15     attempting to collect on judgments, or was

16     that primarily your income executions?

17          A.   I'm going to ask you to rephrase.

18          Q.   Sure.  I mean, one way you can

19     collect on a judgment is just to sign an

20     information subpoena and bank restraint,

21     correct?

22               MR. FEINMAN:  Objection to form.

23               MR. KESHAVARZ:  You can answer.

24          A.   I mean, I think your question is

25     too broad as to how to collect on it.
```

```
 1                    R.J. FERRARO
 2      You're asking how to collect on a debt or
 3      how to collect on a judgment?
 4           Q.   I'm just trying to get an idea
 5      about -- you talked about your work during
 6      the day and preparing for the next day's
 7      hearing, right?  You talked about that.
 8                I'm just trying to figure out what
 9      involvement, if any, you had in terms of
10      collecting on judgments.
11                MR. FEINMAN:  Objection to form.
12           Q.   Well, let me just ask you that.
13      What involvement, if any, did you have on
14      the collection of judgments?
15           A.   I think it would depend on the
16      case.
17           Q.   Generally speaking, what would you
18      do to collect on judgments?  Would that be a
19      significant part of your responsibility at
20      Forster & Garbus?
21                MR. FEINMAN:  Objection to form.
22           A.   Again, I think it was a
23      case-by-case basis.
24                (Whereupon, the following document
25                was marked as Plaintiff's Exhibit 3 for
```

```
 1                    R.J. FERRARO
 2          identification as of this date by the
 3          Reporter.)
 4  BY MR. KESHAVARZ:
 5          Q.   I'm showing you what's been marked
 6      as Plaintiff's Exhibit 3.  Are you able to
 7      identify what that document is?
 8          A.   This appears to be an income
 9      execution from our office.
10          Q.   And is that your signature on the
11      bottom, on the first page?
12          A.   Yes.
13          Q.   It says your name and it says the
14      name of Olivia DeBellis next to you; is that
15      correct?
16          A.   Mm-hmm.
17          Q.   You have to say "yes" or "no" for
18      the court reporter.
19          A.   That's right.
20          Q.   And were you and Ms. DeBellis the
21      persons who would primarily be responsible
22      for signing income executions in 2014 --
23              MR. FEINMAN:  Objection to form.
24          Q.   -- the date of this subpoena?
25          A.   It always changed who was the
```

1                        R.J. FERRARO

2     person that had to sign them.  At this time,

3     when this was printed, it was either myself

4     was the primary and she would've been the

5     secondary on this date.

6          Q.   You said the people who signed the

7     income executions changed.  Would there be,

8     generally, one or two people at any

9     particular time who would sign the income

10    executions?

11               MR. FEINMAN:  Objection to form.

12         A.   Yes.

13         Q.   What about bank restraints; would

14    there generally be one or two people who

15    would sign the bank restraints?

16         A.   Yes.

17         Q.   Would the people who signed the

18    income executions, generally, be the same

19    people who signed the bank restraints?

20               MR. FEINMAN:  Objection to form.

21         A.   Sometimes.

22         Q.   You, typically, didn't sign the

23    bank restraints, right?

24         A.   Again, it depended on the time

25    period we're talking about.

1                        R.J. FERRARO
2              Q.   In what way did it change over at
3        the time?
4              MR. FEINMAN:  Objection to form.
5              A.   Well, for example, let's say I had
6        a calendar in Manhattan on a particular
7        morning with 20-something cases.  Trial got
8        adjourned to the afternoon, and the computer
9        system generated it for that afternoon to be
10       signed, and I wasn't going to get back to
11       the office.  Somebody else would sign them.
12             Q.   So how would that work?  You would
13       come to the office and there would be a
14       computer-generated income execution for you
15       to sign; is that right?
16             A.   Yes.
17             Q.   And then you would sign it and you
18       would give it to someone else in the office?
19             MR. FEINMAN:  Objection to form.
20             A.   I would give it back to the people
21       who were responsible for mailing them out.
22             Q.   Other than someone handing you the
23       income execution for you to sign and then
24       giving it to somebody else in the office,
25       was that your only involvement in issuing

1                    R.J. FERRARO

2       the income execution?

3                    MR. FEINMAN:  Objection to form.

4            A.    At this point in time, most

5       likely.

6            Q.    And why do you say that?

7            A.    Because after being there for a

8       period of time and understanding the

9       computer system better and the process

10      better, I would understand that this is all

11      that I needed to do at this point in time.

12           Q.    What was all that you needed to do

13      at this point in time?

14           A.    Someone hands me the income

15      execution that's generated by our computer

16      system, I can sign it.

17           Q.    And that's your only involvement

18      in the process of garnishing someone's

19      wages; is that right?

20                   MR. FEINMAN:  Objection to form.

21           A.    At this point in time, yes.

22           Q.    And "at this point in time," what

23      do you mean?

24           A.    In December 2014, as I indicated

25      previously, I understood our computer

1                          R.J. FERRARO

2      process and our checks and balances with the

3      system.  So at this point in time, there is

4      no further review that would've been

5      necessary, other than signing this.

6          Q.   From 2011 through 2014, your only

7      reviewing -- executing on someone's wages

8      would be for someone to give you a completed

9      income execution to sign?  Is that accurate.

10              MR. FEINMAN:  Objection to form.

11         A.   I'm going to ask if you can repeat

12     the question.

13         Q.   Let me rephrase the question.

14              From when you started at Forster &

15     Garbus, in 2011, through the date of the

16     income execution that's Exhibit 3, December

17     of 2014, are you saying that your only

18     involvement in the garnishing of someone's

19     wages would be for someone to give you a

20     completed income execution for you to sign

21     it and to return it?  Is that accurate?

22              MR. FEINMAN:  Objection to form.

23         A.   I remember when I first started,

24     like most -- I think it's very natural for

25     most attorneys to ask questions, you know.

1                          R.J. FERRARO

2         How am I getting this?  Why am I being asked

3         to sign this?

4                   By this point in time, I

5         understood the way our systems worked and

6         had, you know, I guess, used our computer

7         system long enough to know what it's capable

8         of and what it's not capable of as well as,

9         I guess, you could say, the people that I

10        worked with, of what they're capable of and

11        what they're not capable of.

12            Q.   Let me just ask you if this is an

13        accurate statement.  Your role was just to

14        sign the income executions that were handed

15        for you to sign?  Is that accurate?

16                 MR. FEINMAN:  Objection to form.

17            A.   As I stated earlier, by this time,

18        my involvement was just signing the income

19        execution put before me.

20            Q.   Did that role change after

21        December of 2014?

22            A.   Did it change as to my step in the

23        process?

24            Q.   Yes.

25            A.   No.

```
 1                    R.J. FERRARO
 2        Q.   Did it change in any way, to your
 3   knowledge?
 4             MR. FEINMAN:  Objection to form.
 5        A.   Did my role change, to my
 6   knowledge?  I don't believe it did.
 7        Q.   Let me ask you:  Did the process
 8   that Forster & Garbus took prior to issuing
 9   an income execution, did it change at any
10   point while you worked at Forster & Garbus?
11             MR. FEINMAN:  Objection to form.
12        A.   To my knowledge, our technology
13   was getting better and our checks were more
14   thorough.
15        Q.   In what way?
16        A.   Well, I guess, for example,
17   instead of one person skiptracing or
18   verifying information about a place of
19   business, they would have two and a computer
20   system that did its own independent, let's
21   say, review.
22        Q.   Independent review of what or for
23   what?
24        A.   To my understanding, there is
25   additional technologies out there that could
```

1                    R.J. FERRARO

2      verify, you know, people's locations, where

3      they live, where they work.  And it was, to

4      my understanding, that we were updating and

5      expanding on those checks to avoid any

6      issues.

7            Q.    Any issues of what?

8            A.    You know, as we discussed before,

9      what someone's name is.  You asked me if I

10     was known by any other names.  Some people

11     use their middle initial, some people don't.

12     You could get a hit for how many John Smiths

13     are out there.

14           Q.    What you're talking about now, is

15     that the major difference in the computer

16     system that you mean over time?

17           A.    From the time I started there to

18     the time I left, I think they got much more

19     efficient and much more -- they checked

20     things over more and had more levels of

21     review.

22           Q.    And I'm just asking, by "more

23     levels of review," you mean more levels of

24     review to make sure it's the same person,

25     that they're restraining the right bank,

```
 1                    R.J. FERRARO
 2     that they're restraining the right employer?
 3     Is that what you mean?
 4          A.   That the income execution contains
 5     the right information, from the name to the
 6     social to the judgment balance to the date
 7     it was entered, the judgment, all that
 8     information.
 9          Q.   To your knowledge, that's the only
10     steps that were taken in terms of the
11     improvements over the computer system while
12     you worked there; is that right?
13               MR. FEINMAN:  Objection to form.
14          A.   Yes.
15          Q.   The change in that computer method
16     that you talked about, that's, to your
17     knowledge, the only way that Forster &
18     Garbus' policy changed in terms of executing
19     on someone's wages?  Is that accurate?
20               MR. FEINMAN:  Objection to form.
21          A.   I'm going to ask you to rephrase.
22     I apologize.
23          Q.   For the entire time you were
24     there, was this change in the computer
25     program the only change that was made at
```

```
 1                        R.J. FERRARO
 2      Forster & Garbus in terms of executing on
 3      someone's income?
 4                 MR. FEINMAN:  Objection to the
 5           form.
 6           A.    Personnel changed as well.
 7           Q.    Did that change the steps that
 8      were taken prior to restraining -- executing
 9      on someone's income?
10                 MR. FEINMAN:  Objection to the
11           form.
12           A.    As I indicated earlier, you had
13      different levels of checking.  So whereas,
14      perhaps, in 2011, there might've been six
15      steps; by 2016, there might've been eight.
16      And a different person may be required to do
17      each step.
18           Q.    To your knowledge, did any of
19      those steps involve checking e-Courts to see
20      if the judgment had been vacated?
21           A.    Never.  Not to my knowledge.
22           Q.    So Forster & Garbus never checked
23      e-Courts to determine whether a judgment it
24      was collecting on had been vacated; is that
25      correct?
```

```
 1                    R.J. FERRARO
 2           MR. FEINMAN:  Objection to form.
 3           A.   It's common knowledge that there
 4      is not enough information available to an
 5      attorney on e-Courts, other than a court
 6      date; and even that is inaccurate depending
 7      on a venue.  So if someone was tasked with
 8      checking e-Courts for information about a
 9      case, it's almost a fool's errand.
10           Q.   Does anyone at Forster & Garbus
11      check whether a judgment has been vacated
12      prior to either issuing an income execution
13      or a bank restraint?
14           MR. FEINMAN:  Objection to form.
15           A.   If we had knowledge of a judgment
16      having been vacated, we would never get to
17      the step of an income execution put on my
18      desk.
19           Q.   When you sign income executions,
20      such as Exhibit 3, you're not involved in
21      determining whether the judgment for the
22      income execution you're signing has been
23      vacated; is that correct?
24           MR. FEINMAN:  Objection to the
25           form.
```

```
 1                        R.J. FERRARO
 2           A.   Could you repeat the question?  I
 3      was just going to ask to read it back.  It's
 4      up to you.
 5           Q.   Let me just rephrase it.
 6                Prior to Forster & Garbus signing
 7      income executions, including your signing of
 8      the income execution that's Exhibit 3,
 9      Forster & Garbus doesn't take any steps to
10      determine whether the judgment had been
11      vacated?  Is that true?
12                MR. FEINMAN:  Objection to the
13           form.
14           A.   There would be steps taken to
15      verify that a judgment is valid, but there
16      are certain things you can't account for.
17           Q.   What steps, if any, did you take
18      to determine whether a judgment has been
19      vacated, prior to you signing an income
20      execution?
21                MR. FEINMAN:  Objection to form.
22           I want to note on the record, are we
23           speaking about this?
24           Q.   Did you treat Mr. Callender
25      differently than you treated anyone else
```

1                    R.J. FERRARO

2      whose wages you were garnishing?

3           A.   Did I treat Mr. Callender any

4      different than I treated anybody else at

5      this point in time?

6                MR. FEINMAN:  Objection to form.

7           A.   That's the question?

8           Q.   Yeah.

9           A.   No.

10          Q.   So when you sign income

11     executions, to your knowledge, are there any

12     steps that were taken by Forster & Garbus to

13     determine whether a judgment had been

14     vacated prior to your signing of an income

15     execution?

16               MR. FEINMAN:  Objection to the

17          form.

18          A.   Yes.

19          Q.   What?

20          A.   I wouldn't be able to point to

21     anything in particular with this case, if

22     that's what your question is.

23          Q.   By "this case," you mean

24     Mr. Callender, correct?

25          A.   Correct.

```
 1                    R.J. FERRARO
 2        Q.   To your knowledge, when you were
 3   signing income executions, did Forster &
 4   Garbus do anything to determine whether the
 5   judgments that you were signing income
 6   executions on had been vacated?
 7             MR. FEINMAN:  Again, I'm not --
 8        are we talking about --
 9        Q.   If you don't understand the
10   question, will you ask me to rephrase?
11             MR. FEINMAN:  What I'm trying to
12        do, as my role as the attorney, to just
13        see where within the court's order this
14        fits.  So I'm not sure if you're asking
15        about -- he is not here as a 30(b)(6)
16        witness.
17             MR. KESHAVARZ:  That's fine.  I'm
18        just asking what you know.
19        Q.   So let me ask you this:  To your
20   knowledge, does Forster & Garbus take any
21   steps to determine whether any of the
22   judgments that they're asking you to sign
23   income executions on were vacated?
24        A.   Yes.
25        Q.   To your personal knowledge, what
```

1                      R.J. FERRARO

2      steps, if any, did Forster & Garbus do to

3      determine whether the income executions that

4      you were signing were for judgments that had

5      not been vacated?

6               MR. FEINMAN:  Put an objection.

7               MR. KESHAVARZ:  Go ahead.  You can

8          answer.

9          A.   You're asking what steps they took

10     on any particular case or on this particular

11     case?

12         Q.   Well, you don't remember anything

13     about Mr. Callender, specifically, do you?

14         A.   No.

15         Q.   You don't have any recollection of

16     Mr. Callender's account, correct?

17         A.   Correct.

18         Q.   Because you sign thousands of

19     income executions?

20              MR. FEINMAN:  Objection to form,

21          and there is a court order.

22              MR. KESHAVARZ:  You can answer.

23              MR. FEINMAN:  Well, he doesn't

24          have to answer the portion of the

25          number.

```
 1                    R.J. FERRARO
 2             MR. KESHAVARZ:  No.  He testified
 3        to this already.  You can answer the
 4        question.
 5             MR. FEINMAN:  I'm going to object,
 6        again.  He testified to which portion
 7        of that?
 8             MR. KESHAVARZ:  You can answer the
 9        question.
10             THE WITNESS:  Which question am I
11        answering?
12             MR. KESHAVARZ:  Can you read the
13        question?
14             (Whereupon, the referred-to
15        question was read back by the
16        Reporter.)
17             THE WITNESS:  Are you asking if I
18        signed thousands on December 3rd of
19        2014, or have I signed thousands over
20        the course of August 2011 through
21        April 2016?
22  BY MR. KESHAVARZ:
23        Q.   Take one at a time.
24             MR. FEINMAN:  I'm going to object.
25        The number of income executions has
```

1                        R.J. FERRARO

2              been already addressed by the Court as

3              the number of income executions are --

4                   MR. KESHAVARZ:  That's not

5              accurate.  You objected to the form of

6              the question.  That preserves your

7              objection.

8                   MR. FEINMAN:  Sure.

9                   MR. KESHAVARZ:  So if you're

10             correct, then there will be a

11             determination whether the testimony can

12             be used or can't be used.

13                  MR. FEINMAN:  What I was trying,

14             before instructing the witness not to

15             answer, to navigate this, just to put

16             my objection, too.  Maybe there is a

17             way to ask the question that I will

18             allow -- that I'll allow the question

19             as opposed to instructing him not to

20             answer it in light of the Court's

21             order.

22        Q.   Well, you asked if by signing

23   thousands of income executions -- let me

24   ask:  Do you know how many income executions

25   you sign on a regular basis?

```
 1                    R.J. FERRARO
 2              MR. FEINMAN:  Objection.  It goes
 3         to the heart of what I'm saying.  The
 4         Court's order -- the Court has already
 5         ordered:  The number of income
 6         executions are not an issue in this
 7         litigation.
 8  BY MR. KESHAVARZ:
 9              Q.   How much time would you spend
10      signing income executions?
11              A.   On this particular date or over
12      the course of my employment there?
13              Q.   While you sign income
14      executions -- well, strike that.  He already
15      testified to what the answer is.
16              Let me ask you this:  Do you have
17      any personal knowledge of what steps that
18      Forster & Garbus took to determine whether a
19      judgment they were asking you to sign an
20      income execution for was vacated?  Do you
21      have any personal knowledge?
22              A.   For any particular case, no.
23              Q.   What do you mean "for any
24      particular case"?
25              A.   Well, again, I'm not clear if
```

```
1                        R.J. FERRARO
2      you're asking about Mr. Callender or if over
3      the course of my five years, there was a
4      case that, perhaps, there was a question
5      that came up as to whether a judgment was
6      valid or not.
7           Q.   So you're saying, during the time
8      that you were at Forster & Garbus, sometimes
9      you would sign income executions and it came
10     to light later that the judgment had been
11     vacated?  Is that what you're saying?
12               MR. FEINMAN:  Objection to form.
13          A.   Not to my knowledge, but I'll give
14     you an example.
15          Q.   Please.
16          A.   If perhaps, let's say, a case was
17     ready for an income execution, they found a
18     place of business that the person -- that
19     was valid.  And then on Tuesday, we got an
20     order to show cause in, but we didn't
21     actually get served with it.  Instead, I
22     appeared in court randomly or a colleague of
23     mine appeared in court.  It showed up on the
24     calendar, and sure enough there is a
25     defendant there.  And then when I came back
```

```
 1                     R.J. FERRARO
 2      and I said, "Look, there is an order to show
 3      cause.  We can't send this out," they would
 4      pull it back.
 5           Q.   I see.  Other than something like
 6      that, to your knowledge, does Forster &
 7      Garbus do anything to check to see if a
 8      judgment has been vacated prior to you
 9      signing an income execution, from your own
10      personal knowledge?
11           A.   I wouldn't be able to recall at
12      this period of time what checks were in
13      place.
14           Q.   At any period of time, to your
15      personal knowledge, did Forster & Garbus
16      take any steps to determine whether a
17      judgment had been vacated prior to you
18      signing an income execution on that
19      judgment?
20           MR. FEINMAN:  Objection to form.
21           Q.   Based on your own personal
22      knowledge.
23           A.   At the very least, I know they get
24      information from the client if there is a
25      judgment valid on the case.
```

```
 1                    R.J. FERRARO
 2          Q.   Anything else?
 3          A.   Again, it would depend on a
 4     case-by-case basis.
 5          Q.   But to your personal knowledge,
 6     other than being informed by the client that
 7     there is a judgment, to your personal
 8     knowledge, does Forster & Garbus take any
 9     other steps to determine whether a judgment
10     has been vacated prior to you signing an
11     income execution?
12               MR. FEINMAN:  Objection to form.
13          Q.   To your personal knowledge, do you
14     know of anything else or not?
15          A.   It would depend -- it would have
16     to depend on a case.
17          Q.   Sitting here today, do you have
18     any personal knowledge of any other steps
19     Forster & Garbus took before giving you an
20     income execution to sign to determine
21     whether the judgment had been vacated?
22               MR. FEINMAN:  Objection.
23          Q.   Sitting here today, do you have
24     any personal knowledge?
25               MR. FEINMAN:  Objection to form.
```

1                      R.J. FERRARO

2          A.   I can't give you personal

3     knowledge on any -- it depends on the case.

4     It's too broad of a question.

5          Q.   Okay.  Sitting here today, can you

6     think of any time that Forster & Garbus had

7     reviewed an income execution prior to --

8     strike that.

9               Sitting here today, can you recall

10    any time where you knew that Forster &

11    Garbus had checked to see whether a judgment

12    had been vacated prior to having you sign an

13    income execution?

14               MR. FEINMAN:  Objection.

15          A.   You're asking me about any

16    particular case, if an additional step was

17    taken, other than asking the client?

18          Q.   Yes.  To your knowledge, sitting

19    here today, can you recall any other step

20    taken to determine whether a judgment had

21    been vacated, prior to you signing an income

22    execution?

23               MR. FEINMAN:  Objection to form.

24               And I'm letting the questioning go a

25               little, but he's here --

1              R.J. FERRARO

2          MR. KESHAVARZ:  Go ahead.  You can

3      answer.

4          MR. FEINMAN:  You understand the

5      problem?

6          MR. KESHAVARZ:  I understand, but

7      you can answer the question.

8      Q.   If you know, you know; if you

9  don't know, you don't know.  I'm just

10  asking.

11      A.   I understand you're just asking.

12  I just cannot recall a particular case where

13  they took a particular step.  There always

14  had to be a trigger.

15          So, for example, if let's say the

16  defendant was -- had many cases, had

17  multiple debts and we knew we had three of

18  them, two of them appeared in court with an

19  order to show cause, then they would give

20  pause for maybe that third one; perhaps,

21  there is an order to show cause coming.

22      Q.   Any other examples, other than

23  that, you can specifically recall?

24      A.   If, perhaps, a case was handled by

25  a prior attorney, we would ask -- depending

1                    R.J. FERRARO

2       on the case, if maybe you can look at their

3       file to confirm at what stage the litigation

4       is at or if there was a judgment in place.

5            Q.   Do you know, from your own

6       personal knowledge, or not -- if you don't

7       know, that's fine.  I'm just asking if you

8       know.  Do you know if one reason Forster &

9       Garbus does not track e-Courts prior to

10      having its attorneys sign income executions,

11      do you know -- strike that.  Let me rephrase

12      the question.

13               Do you know why Forster & Garbus

14      does not have its attorneys or anyone else

15      check on e-Courts on a regular basis to

16      determine whether a judgment it's executing

17      on has been vacated?

18               MR. FEINMAN:  Objection.

19           Q.   Do you know or do you not know?

20           A.   As I indicated earlier --

21      actually, I think I said it specifically --

22      e-Courts is not an accurate way to check to

23      see if a case has had a judgment vacated on

24      it.

25           Q.   Sometimes it would show and

1                    R.J. FERRARO

2      sometimes it won't?

3           A.    It depends on the venue.   It

4      depends on the clerk that day.   It depends

5      on when you look.   I've seen cases where I

6      knew a motion that I filed was submitted or

7      scheduled to be submitted on December 1st,

8      and it wouldn't actually reflect it was

9      submitted until sometime in February, and at

10     that point the Judge made a decision.

11     That's why e-Courts is not accurate.

12          Q.    To your personal knowledge, is

13     that the reason that Forster & Garbus does

14     not check e-Courts prior to you signing

15     income executions?

16               MR. FEINMAN:   Objection to form.

17          A.    I'm sure it's part of the

18     equation.

19          Q.    Do you ever think of checking

20     e-Courts to see if the income execution

21     you're signing is on a punitive judgment

22     that, in fact, been vacated?

23               MR. FEINMAN:   Objection to form.

24          A.    If a case had a judgment on it, it

25     wouldn't reflect it on e-Courts,

```
 1                    R.J. FERRARO
 2      necessarily.  If the judgment was vacated as
 3      a result of a motion, that's one thing.  If
 4      it was vacated as a result of a settlement
 5      stipulation, it would never show up on
 6      e-Courts.
 7                    (Whereupon, the following document
 8                    was marked as Plaintiff's Exhibit 4 for
 9                    identification as of this date by the
10                    Reporter.)
11  BY MR. KESHAVARZ:
12           Q.   So most of the court appearances
13      you handled were -- the vast majority were
14      in New York City, Bronx, or Queens, or one
15      of the other boroughs?  Is that accurate?
16           A.   Yes.
17           Q.   In order to pull up something on
18      e-Courts, you just -- you can just type in
19      the index number, hit "return," and it'll
20      show you what's on e-Courts, correct?
21                MR. FEINMAN:  Objection to form.
22           A.   Depending on a venue, yes.
23           Q.   But, I mean, the New York City
24      courts, right?
25           A.   If there was a court appearance, I
```

```
 1                    R.J. FERRARO
 2      believe it would show up on there,
 3      generally.  If there was no appearance, it
 4      may not.
 5          Q.   So Exhibit No. 4 is -- does that
 6      appear to be the e-Courts Web site printout
 7      for Mr. Callender?  Is that what it appears
 8      to be?
 9               MR. FEINMAN:  Objection.
10          A.   I can't authenticate this because
11      I didn't print it out.  To my knowledge,
12      anytime you're on a New York State e-Courts
13      Web site, there would be a banner up here
14      indicating such, and I don't see that here.
15               MR. KESHAVARZ:  Do you want to
16           print this out in color?
17               MS. MOODY:  Sure.
18          Q.   Looking at the first page,
19      Callender-47, is that the screen that you
20      would see when you type in an index number
21      into e-Courts?
22               MR. FEINMAN:  Objection to form.
23          Q.   Is that the format of what you
24      would see?
25          A.   You could've typed in any of
```

1                       R.J. FERRARO

2        these.  Well, Discover Bank probably would

3        have too many hits, but if I,

4        hypothetically, had typed in this index

5        number, if this is the correct information

6        from there, this appears to be what it would

7        look like.

8              Q.   This screen that's Exhibit 4, page

9        47, correct?

10             A.   Yes.

11             Q.   So how long would it take you to

12       type in an index number?

13             A.   Can't quantify it.

14             Q.   How many numbers?  Ten digits?

15       You think it would take you less than

16       30 seconds to type in ten digits?

17                  MR. FEINMAN:  Objection.

18             A.   To type in the digits themselves,

19       assuming no interruptions and my Internet is

20       working, you know, quickly that day,

21       perhaps.

22             Q.   So if there has been an order to

23       show cause, typically speaking, you would

24       see the screen that's page 47, and then you

25       would click to see either "motions" or

```
 1                    R.J. FERRARO
 2      "showing all appearances," right?
 3                MR. FEINMAN:  Objection.
 4           A.   What was I looking for?  If I hit
 5      "show all appearances," I would hope that it
 6      would show me whatever all the appearances
 7      were when I'm looking.  If I hit "show all
 8      motions" and I click that, I would hope that
 9      it would show me all the motions.  But,
10      again, my experience has been:  It's never
11      accurate.  I shouldn't say "never accurate."
12      It's not reliable.
13           Q.   Why is it not reliable?
14           A.   As I indicated earlier, you have
15      people updating these systems, they're
16      clerks.  Sometimes it gets put in right
17      away; sometimes it doesn't; sometimes the
18      information is never put in.
19           Q.   So one thing, it's inaccurate
20      because there might be a lag time of a
21      couple of months between when something
22      happens and when it gets put into e-Courts,
23      correct?
24                MR. FEINMAN:  Objection.
25           A.   The lag time sometimes could be
```

```
 1                    R.J. FERRARO
 2    significant, and it could be not at all.
 3         Q.   You used e-Courts on a regular
 4    basis, right, while you worked at Forster &
 5    Garbus?
 6              MR. FEINMAN:  Objection to form.
 7         A.   No.
 8         Q.   If judgment was vacated, the vast
 9    majority of the time there would be an
10    e-Courts something showing that there is no
11    order to show cause to vacate the judgment,
12    right?
13              MR. FEINMAN:  Objection to form.
14         A.   Again, it depended on the time and
15    the venue.  It's possible that it would
16    appear on e-Courts.
17         Q.   Well, let's nail this down,
18    because you were working mostly in New York
19    City.  You signed income executions in New
20    York City?
21         A.   I have in the past signed income
22    executions in the five boroughs.
23         Q.   And most of the income executions
24    you signed at Forster & Garbus was in New
25    York City?
```

```
 1                      R.J. FERRARO
 2          A.   I can't quantify it.
 3          Q.   You don't know if most of them
 4     were in New York City?
 5               MR. FEINMAN:  Objection to form.
 6          A.   You're asking me to take a guess.
 7     There are 62 counties in the state.
 8          Q.   Yeah, I know, but there are
 9     17 million people living in New York.
10               You don't remember, you have no
11     idea whatsoever most of the cases --
12               MR. FEINMAN:  Objection.
13          A.   I would only be taking a guess.
14               MR. FEINMAN:  Objection to form.
15          If you're done with the question, then
16          objection to form.
17          Q.   You have no idea whether the
18     majority of income executions you were
19     signing were from New York City?  You have
20     no idea whatsoever; is that right?
21               MR. FEINMAN:  Objection to form.
22          A.   I would only be taking a guess.
23          Q.   You have no idea, right?
24               MR. FEINMAN:  Objection to form.
25          A.   I think we've gone over this.  I'd
```

1                        R.J. FERRARO

2       only be taking a guess.  I'm not going to

3       take a guess.

4            Q.   You don't know if it's most of

5       them or not?

6                 MR. FEINMAN:  Objection to form.

7            A.   No.

8            Q.   Okay.  If that's your testimony,

9       that's your testimony.

10                MR. FEINMAN:  Objection to form to

11               the extent that's a question.

12           Q.   So let's talk about venue.  Are

13      you saying that if an income execution --

14      strike that.

15                An order to show cause, let's say,

16      was filed a year ago, in New York City, five

17      boroughs.  The majority -- that would

18      usually be reflected on e-Courts, right --

19                MR. FEINMAN:  Objection.

20           Q.   -- that an order to show cause has

21      been filed?

22           A.   Sometimes.

23           Q.   Isn't that typically true?

24                MR. FEINMAN:  Objection to form.

25           A.   Again, my experience has been it's

```
 1                      R.J. FERRARO
 2      not always true.
 3           Q.   I didn't ask you if it was always
 4      true.  My question is -- you try to narrow
 5      it down by venue, by time.
 6                Let me just ask you:  If a case is
 7      in New York City, if an order to show cause
 8      had been filed more than six months ago,
 9      isn't that usually reflected on e-Courts?
10                MR. FEINMAN:  Objection to form.
11           A.   We're going in circles, because
12      you want to break it down as a generality.
13      It's not.  If you've been to Staten Island,
14      if you've been to Brooklyn, Manhattan,
15      Bronx, and Queens, they all operate
16      differently.  The way things are updated are
17      totally different, from the judges' markings
18      to the way the calendar is called.  So the
19      way e-Courts is updated is not uniformed.
20           Q.   So?  That wasn't my question.  The
21      question wasn't if it's updated or
22      uniformed.  My question is this --
23           A.   And I've indicated to you, it's
24      possible.
25           Q.   Most of the time, in New York
```

```
1                    R.J. FERRARO
2     City, when it's a motion to vacate a
3     judgment or to show cause to vacate, most of
4     the time -- so long as the order to show
5     cause was filed more than six months ago,
6     most of the time that's reflected on
7     e-Courts, right?
8              MR. FEINMAN:  Objection to the
9          form of the question.
10         A.   I think most likely it'll show a
11    motion was filed by a defendant or a motion
12    was filed by a plaintiff.  It doesn't always
13    say the relief.  It doesn't always say the
14    result.
15         Q.   Yeah.  But, typically, it shows
16    that the order to show cause has been filed,
17    right?
18              MR. FEINMAN:  Objection to form.
19         A.   If we're going to say "typically,"
20    what it typically would show, would be the
21    motion was filed.  That's the only thing I
22    can say with certainty is most likely to
23    appear.
24         Q.   Well, if you were going to take
25    someone's wages away and you knew that
```

1                     R.J. FERRARO

2          e-Courts said that there was an order to

3          show cause to vacate the judgment, would you

4          take any steps before taking some of the

5          wages, or would you sign that income

6          execution?

7                     MR. FEINMAN:  Objection to form.

8          A.    I'm going to ask you to rephrase.

9                     MR. KESHAVARZ:  You can read the

10              question.

11                   (Whereupon, the referred-to

12              question was read back by the

13              Reporter.)

14                   THE WITNESS:  Your question is

15              still too broad.

16   BY MR. KESHAVARZ:

17              Q.    In what way?

18              A.    If I knew with absolute certainty

19          that a judgment was vacated on a case, this

20          income execution would've never come to me

21          to be signed.

22                   MR. FEINMAN:  I'd just like my

23              objection to run through, because he

24              has not rephrased the question.

25              Q.    My question was a little

1                     R.J. FERRARO

2      different.  You know, when you garnish

3      someone's wages, that's pretty serious,

4      right?  These people live under wages,

5      right?

6              MR. FEINMAN:  Objection to form.

7          A.   Yes.

8          Q.   So if you take 10 percent of

9      someone's wages over, what, 30 hours minimum

10     wage, that could make a difference between

11     someone paying their rent or paying their

12     food or paying their hospital bills or not,

13     right?

14             MR. FEINMAN:  Objection to form.

15         A.   Yes.

16         Q.   All right.  So before you take

17     away someone's wages that they might need to

18     pay their rent or groceries or medicine, if

19     you saw on e-Courts that there was an order

20     to show cause that was filed, would you take

21     any other steps to determine whether the

22     judgment has been executed, or would you

23     just sign that income execution?

24             MR. FEINMAN:  Objection to form.

25         A.   If someone presented me with

```
 1                    R.J. FERRARO
 2     information that someone filed a motion and
 3     a judgment was vacated, we would take an
 4     additional step to take a look and see what
 5     the results were.
 6          Q.   That wasn't my question.
 7               MR. KESHAVARZ:  Re-read my
 8          question, please.
 9               (Whereupon, the referred-to
10          question was read back by the
11          Reporter.)
12          Q.   Let me rephrase the question.  Let
13     me restate the question.  It's a yes-or-no
14     question.
15               MR. FEINMAN:  Objection to form.
16          Q.   Yes or no.  Before you sign an
17     income execution -- strike that.
18               Let me ask you a yes-or-no
19     question.  If you saw on e-Courts that there
20     was an order to show cause filed to vacate
21     the judgment, would you take any other steps
22     to determine --
23          A.   Yes.
24          Q.   You have to wait until I finish
25     the question.
```

1                          R.J. FERRARO
2                    If you saw on e-Courts that there
3     was order to show cause to vacate a
4     judgment, would you take any other steps to
5     determine whether the judgment had been
6     vacated before signing an income execution
7     that could take away people's money that
8     they need for their rent or food or
9     medicine?
10                   MR. FEINMAN:  Objection to form.
11         A.   Yes.
12         Q.   What steps would you take?
13                   MR. FEINMAN:  Objection to form.
14         A.   Well, again, I would probably --
15    the easiest way to do it would be to see
16    when it was filed and when it was
17    returnable.  Perhaps, ask the colleague,
18    because most of our colleagues do go to
19    court, to see if they appeared on this case.
20    Something like that would take place if
21    someone presented me with this e-Courts and
22    said, "An order to show cause to vacate a
23    judgment has been filed."
24         Q.   If you check to see the first page
25    of Exhibit 4 and then you saw that there was

```
 1                    R.J. FERRARO
 2      an order to show cause that was filed, by
 3      clicking through, would you -- strike that.
 4      Let's just take a break.
 5              (Whereupon, a short recess was
 6              taken from 4:25 p.m. to 4:31 p.m.)
 7 BY MR. KESHAVARZ:
 8          Q.   We talked about checking on
 9      e-Courts to determine whether there has been
10      an order to show cause to vacate a judgment.
11      Do you remember that testimony?
12          A.   Yeah.
13          Q.   And putting aside the issue of
14      timing, you know, whether the order to show
15      cause has been filed this month or last
16      month.  Put that issue aside for a second.
17              If an order to show cause had been
18      filed, e-Courts would normally show that, at
19      least, the order to show cause had been
20      filed, right?
21          A.   No.
22          Q.   It wouldn't usually show that?
23              MR. FEINMAN:  Objection.
24              MR. KESHAVARZ:  Go ahead.  You can
25              answer.
```

```
1                    R.J. FERRARO

2              Wait.  Wait.

3              MR. FEINMAN:  No, no.  Excuse me.

4         You have to let me get my objection

5         out.

6              MR. KESHAVARZ:  No.  You say

7         objection to form.  You can't do

8         anything beyond that.

9              MR. FEINMAN:  Right.  So when I go

10        to object, you cannot hold up your

11        finger and say "excuse me."  You have

12        to let me get my objection on the

13        record.

14             MR. KESHAVARZ:  Objection to form.

15        Okay.  Go ahead.  You can answer the

16        question.

17        Q.   So my question is:  Are you saying

18   you're disputing that the vast majority of

19   the time when someone files an order to show

20   cause, that order to show cause filing would

21   be reflected on e-Courts?  Is that your

22   sworn testimony?

23             MR. FEINMAN:  Objection to form.

24        A.   I'm saying that if someone were to

25   file a motion, that it could be reflected on
```

```
 1                    R.J. FERRARO
 2      e-Courts but it's not always the case.
 3           Q.   Let me ask you the other way
 4      around:  The vast majority -- if you wanted
 5      to find out whether an order to show cause
 6      has been filed in a case, the first thing
 7      you would do is check e-Courts, right?
 8                MR. FEINMAN:  Objection to form.
 9           A.   There would be nothing that
10      randomly would happen that would -- I mean,
11      I don't just take random stock of e-Courts
12      and say, "I wonder if there is a case where
13      a judgment has been vacated on," and go to
14      e-Courts.
15           Q.   That wasn't my question.  My
16      question is:  If you wanted to check to see
17      if an order to show cause has been filed to
18      vacate a judgment on a case, the first thing
19      you would do is check on e-Courts, right?
20                MR. FEINMAN:  Objection to form.
21           A.   No.
22           Q.   Really?
23                MR. FEINMAN:  Objection to form.
24           Q.   What would you do?
25           A.   Well, first, I'd go to my case
```

1                    R.J. FERRARO

2      file and see if we received a motion in the

3      mail.

4           Q.   What's the next thing you would

5      do?

6           A.   It depends on the results of that.

7      If the motion had been received, I would

8      take a look, find out if it was calendared

9      and go from there.  If the motion had not

10     been received, then, perhaps, I would

11     contact the court and see if it was actually

12     filed and when it's scheduled for.

13          Q.   Okay.  You'd do all of that

14     instead of checking on e-Courts, right?

15               MR. FEINMAN:  Objection to form.

16          A.   Probably.

17          Q.   Why is that?

18          A.   My responsibility is not to check

19     e-Courts for every case.  That's what the

20     calendar person would do.

21          Q.   Who is the calendar person?

22          A.   The person that manages our

23     calendar, updating when appearances are, who

24     is going where, et cetera, et cetera.

25               It's not my responsibility to

1          R.J. FERRARO

2     randomly check e-Courts to see what's going

3     on on every case we have in the office.

4          Q.   That wasn't my question.  My

5     question is:  If you're trying to find out

6     whether there has been an order to show

7     cause filed in the case, in any case, where

8     you're signing an income execution, the

9     first thing you would do is check e-Courts,

10    right?

11          MR. FEINMAN:  Objection to form.

12          A.   No.  We already went over that.  I

13    wouldn't check e-Courts first.  I would

14    check my file and see if we received

15    anything.  If we hadn't received anything,

16    again, I would, perhaps, contact the court

17    if there was information that there might've

18    been a motion filed.

19          Q.   Do you know if any of the income

20    executions you're signing are to collect on

21    judgments that were obtained by a firm other

22    than Forster & Garbus?

23          A.   If a judgment was obtained by

24    another firm and they gave us the

25    information that a judgment was entered and

```
 1                          R.J. FERRARO
 2      valid in the case, then this income
 3      execution would come to my desk and I can
 4      sign it, because we haven't been given that
 5      information.  If there has been a judgment,
 6      let's say, from another firm and that
 7      judgment was vacated and they knew about it
 8      and we knew about it, this would've never
 9      come to my desk.
10           Q.   If that's your sworn testimony, it
11      is.
12               MR. FEINMAN:  Nothing further from
13           me.
14               MR. KESHAVARZ:  I appreciate your
15           time.
16               (Whereupon, at 4:36 p.m., the
17           examination of this witness was
18           concluded.)
19
20                   _____
                        RONALD J. FERRARO
21      Subscribed and sworn to before me
22      this _____ day of _____ 20___.
23
24      _____
             NOTARY PUBLIC
25
```

```
1                         R.J. FERRARO

2                       E X H I B I T S

3

4      PLAINTIFF(S) EXHIBITS:

5      EXHIBIT        EXHIBIT

6      NUMBER    DESCRIPTION                      PAGE

7      1         Subpoena                         6

8      2         LinkedIn résumé                  18

9      3         Income Execution                 30

10     4         e-Courts Web site printout
                 for Mr. Callender                56
11

12     (Exhibits retained by Counsel.)

13

14                       I N D E X

15     EXAMINATION BY                             PAGE

16     MR. KESHAVARZ                              4

17

18

19        INFORMATION AND/OR DOCUMENTS REQUESTED

20                     N O N E

21

22

23        QUESTIONS MARKED FOR RULINGS

24                     N O N E

25
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

1                    R.J. FERRARO

2              C E R T I F I C A T E

3

4     STATE OF NEW YORK    )
                          :  SS.:
5     COUNTY OF KINGS      )

6

7          I, ANNA VORTSMAN, a Notary Public for

8     and within the State of New York, do hereby

9     certify:

10          That the witness whose examination is

11     hereinbefore set forth was duly sworn and

12     that such examination is a true record of

13     the testimony given by that witness.

14          I further certify that I am not related

15     to any of the parties to this action by

16     blood or by marriage and that I am in no way

17     interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand this 4th day of November, 2016.

20

21                      _Anna Vortsman_

22                      ANNA VORTSMAN

23

24

25

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com