# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

VICTOR CALLENDER

                                **Plaintiff,**

        -against-

FORSTER & GARBUS, LLP

                                **Defendants.**

Case No.: 1:15-cv-05813-AKH

------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Victor Callender brings suit against Defendants for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, N.Y. Gen. Bus. Law § 349 *et seq* and for Conversion, and in support would show as follows.

In 2005, Discovery Bank sued Victor Callender for approximately $6,000 and obtained a default judgment by using a false affidavit of service. Seven years later, in 2012, Mr. Callender learned of the sewer service for the first time, and successfully moved *pro se* to have the judgment vacated for lack of service, and had the case dismissed. Nevertheless two years later, in 2014, the debt collection law firm Forster & Garbus ("F&G") executed on Mr. Callender's wages for three months based on the vacated judgment.

This was no accident. F&G made the conscious business decision to issue executions on thousands of very old judgments obtained by other firms knowing that some number of those judgments have been vacated. F&G has a computer print out hundreds of executions and places them in front of an attorney who signs the executions blindly. Neither the attorney signing the executions nor F&G itself takes any steps to determine whether the judgments they are executing on have been vacated. F&G admits it knows how widespread sewer service is, especially before 2007. F&G could spend 2 minutes to check on the state court's free, publicly available website

1

to see of the judgment on which they are about to execute on has been vacated. Had F&G bothered to type in Mr. Callender's name into the ecourts website, it would have seen the judgment against him was vacated. F&G's position it that it would be unreasonable and costly to type in a consumer's name to the ecourts website prior to executing because only a small number of those judgments would have been vacated.

Thus F&G consciously disregards the rights of Mr. Callender and other consumers whose judgments were vacated. Essentially, F&G was shooting blindly into a crowd of people knowing that it would be injure some number of people, even if they did not know it would specifically injure Mr. Callender. This is why a jury should decide whether F&G should be liable for punitive damages for consciously disregarding the rights of former judgment debtors such as Mr. Callender.

While F&G "only" garnished approximately $200 in wages from Mr. Callender and "promptly" returned the illegally garnished funds after Mr. Callender retained a legal services attorney to figure out what was going on and to send a demand letter to F&G, this misses the point. First, $200 is not an insignificant amount to a father struggling to support his wife and small children on meager wages. Second, Mr. Callender should not have to take off days from work to go to the courthouse and find a legal services attorney to figure out why he was being garnished and what to do about it. Mr. Callender did not know that he was being executed on the same judgment he vacated two years earlier. Third, Mr. Calendar should not have to suffer because of F&G's business decision to blindly sign executions with no attorney review.

While Mr. Callender was fortunate enough to get a legal services attorney to demand the return of the money, F&G knows that most low-income *pro se* consumers would not easily be able to navigate the legal issues, so that F&G would be able to keep illegally executing funds

from most former judgment debtors. Fourth, because of post judgment interest, the post-judgment execution was for over $11,000, with continued interest accruing at 9%. Mr. Callender rightfully thought that given how little he was earning that he would be garnished for the next decade and still barely be able to get past the accruing 9 percent interest.

## A. JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution. The Court specifically has jurisdiction over Defendant Discover Bank under 28 U.S.C. § 1367(a) (the federal court's "supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties").

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Bronx County, New York.

## B. PARTIES

3.      Plaintiff Victor Callender is an individual residing in Bronx County, New York.

4.      Defendant Forster and Garbus, LLP ("F&G") is a New York law firm that has its principal place of business in Commack, NY 11725.

5.      F&G regularly collects or attempts to collect, directly or indirectly, debts owed, or due or

asserted to be due to another. It is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

6.      Defendant Discover Bank ("Discover") is a foreign business corporation organized under the laws of the State of Delaware. Discover transacts business in the State of New York.

## C.  STATEMENT OF FACTS

7.      F&G is a debt collection law firm. Each year, F&G is referred 3,500 judgment accounts, collects on thousands of judgments, and issues thousands of information Subpoenas and Restraining Notices. Exhibit A, the April 15, 2016 Response to Plaintiff's Request for Admissions of Forster & Garbus, LLP, p. 2.

8.      On July 27, 2005, Discover Bank initiated a lawsuit against Mr. Callender in New York County Civil Court. Discover Bank alleged that Mr. Callender had entered into a credit card agreement with it and subsequently defaulted on his monthly payments, incurring a debt of $5,896.87. The case was captioned *Discover Bank IOT Discover Card v. Victor Callender*, Index No. CV-032484-05/NY (Supreme Court of the State of New York, New York County). Exhibit D.

9.      Discover Bank obtained a default judgment against Mr. Callender on December 21, 2005 when Mr. Callender failed to answer the complaint. Exhibit F.

10.     Mr. Callender was not served and had no knowledge of the lawsuit's existence until on or about May 2012 when he obtained a copy of his credit report. Exhibit E; Exhibit H, pp. 36:21-37:10.

11.     The affidavit of service in the collection lawsuit alleges service upon Mr. Callender's 17 year old son, "Jason." Exhibit I.

12.     Mr. Callender had no children at the time service was alleged, let alone a 17 year old son named "Jason." Exhibit E; Exhibit H, pp. 16:08-16:19.

4

13.     On May 22, 2012, Mr. Callender filed a pro se order to show cause in New York County Civil Court to vacate the judgment for lack of jurisdiction. Exhibit J.

14.     As directed by the Court, Mr. Callender served the order to show cause on Discover's counsel of record in the case, Mann Bracken LLP, at their address in Rochester, NY.

15.     No one appeared on behalf of Discover Bank at the return date of the order to show cause on June 20, 2012.  Exhibit K; Exhibit E; Exhibit H, pp. 41:20-42:20.

16.     The Court accordingly vacated the judgment and accepted Mr. Callender's answer as filed. The Court then restored the matter to the calendar for August 20, 2012. In its written order, the Court stated that it would be responsible for notifying the Discover Bank's counsel of the next court date. Exhibit L

17.     When no one appeared on behalf of Discover Bank at the August 20, 2012 court date, the Court dismissed the case. Exhibit M.

18.     During roughly this same time, Mr. Callender began to receive a series of letters from F&G seeking to collect an alleged debt owing to Discover Bank. Exhibit N; Exhibit E.

19.     Mr. Callender assumed that this was a different alleged debt than the one involved in the case pending in the New York County Civil Court because the letters came from a different law firm, did not refer to a judgment, and the amount of the debt was different. Mr. Callender thought he had been the victim of identity theft. Exhibit N; Exhibit E; Exhibit O; Exhibit H, pp. 75:03-21.

20.     When letters continued to come from F&G, Mr. Callender filed a complaint with the New York City Department of Consumer Affairs ("DCA") stating that he had been a victim of identity theft and that F&G was attempting to collect a debt that was not his.  Exhibit O.

21.     In January 2013, Mr. Callender received a response from the DCA with an enclosed letter from F&G. Exhibit P.

22.     The letter acknowledged that F&G had received the complaint letter and stated that it had been "advised by Discover Bank to cease all collection activity and that the account would be investigated by their fraud department." Exhibit P.

23.     After F&G forwarded the complaint to Discover Bank, Discover Bank advised F&G to send it "copies of any answer filed, all internal notes, judgment (if applicable) and all other documents pertaining to this account." Exhibit Q, pp. 3-4; Exhibit B, pp. 136:22-137:14.

24.     However, F&G did not search for nor did it forward not forward the requested documents to Discover Bank. It did not check the court file. F&G did not event check ecourts to find out whether Mr. Callender had filed a motion to vacate the default judgment. Exhibit B, pp. 136:22-137:14.

25.     Mr. Callender never received the results of the purported investigation, nor did he receive any further communications from F&G regarding his complaint or the status of his account. Exhibit E.

26.     Mr. Callender therefore assumed the matter was resolved. Exhibit E.

27.     On or around January 2, 2015, Discover Bank, through its debt collection law firm F&G, filed an income execution with New York City Marshal Ronald Moses seeking enforcement of the vacated judgment against Mr. Callender—the same judgment that Discover Bank had obtained in 2005 and that the Court had vacated in 2012. Exhibit R; Exhibit CC.

28.     On or around January 5, 2015, the New York City Marshal, on behalf of Discover and F&G, served the income execution on Dollar Tree Stores, Inc., Mr. Callender's employer. Exhibit R.

29.     Thereupon, Mr. Callender's employer began to garnish his wages. Exhibit R, Exhibit CC; Exhibit E; Exhibit S.

30.     F&G's computer system automatically generates income executions for its attorneys to sign. Exhibit T, pp. 33:12-35:05.

31.     Ronald Ferraro was the lawyer who signed the income execution in this case. Exhibit CC; Exhibit T, pp. 31:05-12.

32.     Mr. Ferraro trusted that the information contained in the computer system was accurate, and therefore did not take steps to independently verify that the income executions he signed were for valid judgments. Exhibit T, pp. 33:12-35:05.

33.     Mr. Ferraro's involvement with the garnishment was limited to merely signing the income execution, then passing it on to an employee who mailed it to Mr. Callender's employer. Exhibit T, pp. 33:12-34:05; 34:12-35:05; 36:12-25.

34.     Mr. Ferraro took no steps to independently verify that the information contained in the income execution was accurate. Exhibit T, pp. 34:12-35:05.

35.     It takes about two minutes to check the e-courts website to find out whether a judgment has been vacated. Exhibit U; Exhibit B, pp. 49:07-16.

36.     However, F&G believe that it would be unreasonably burdensome to take two minutes to check the ecourts website prior to issuing an income execution to ensure that the putative judgment is valid.  Exhibit B, pp. 49:07-50:23.

37.     In the retainer agreement between F&G and Discover Bank that governs F&G's handling of Mr. Callender's account, F&G expressly warrants that it "shall exercise reasonable care and best efforts in attempting to collect Accounts and shall not engage in any collection or judicial

enforcement action which may be deemed unfair, abusive, deceptive or harassing." Exhibit C, pp. 5-6.

38.     The retainer agreements further provides that Discover Bank "is relying upon the expertise of [F&G] in regard to the matters assigned to it and [Discover Bank] expects [F&G] to proactively utilize its expertise with regard to matters in this paragraph, whether specifically directed by [Discover Bank] or not." Exhibit C, pp. 5-6.

39.     Still, F&G maintains that it is under no obligation—contractual or otherwise—to independently verify that the judgments it executes on have not been vacated. Exhibit B, 49:07-16: 165:16-24.

40.     Mr. Callender realized he was being garnished when he received his paycheck on or about January 23, 2015. Exhibit R; Exhibit E; Exhibit H, pp. 113:05-114:05.

41.     After considerable delay and aggravation, Mr. Callender was able to obtain legal representation. Exhibit E; Exhibit V.

42.     With the assistance of counsel, he ascertained that the debt for which his wages were being garnished was the same Discover Bank claim that formed the basis of the 2005 lawsuit and the judgment he had successfully vacated in 2012. Exhibit E.

43.     On April 15, 2015, Mr. Callender's counsel wrote F&G, demanding that it cease garnishing his wages and restore to him all monies collected. After repeated phone calls and messages, F&G complied with this demand on April 23, 2015. Exhibit W; Exhibit E.

44.     F&G admits that it was unfair to Mr. Callender to garnish his wages based on a vacated judgment.  Exhibit B.

45.     F&G have repeatedly been sued for collecting on vacated judgments. Exhibit Y, Exhibit Z; Exhibit B, pp. 40:03-07.

46.     F&G was a Defendant in a special proceeding brought by the Chief Administrative Judge Pfau for the New York State Unified Court System alleging that F&G, along with 36 other law firms, utilized process servers that systematically engaged in sewer service. Exhibit AA.

47.     F&G entered into a consent agreement in the *Pfau* case whereby it agreed to implement a series of policies and procedures designed to prevent sewer service. Exhibit BB.

48.     F&G was also aware of a recent class action in the United States District Court for the Southern District of New York whereby debt collection law firm Mel S. Harris and Associates, LLC was sued for obtaining over one hundred thousand default judgments using sewer service affidavits. Exhibit B, pp. 94:24-95:06; *See Sykes v. Mel S. Harris*, et al, Case No: 1:09-cv-08486-DC.

49.     Thus, in 2015 when F&G executed on Mr. Callender's bank account based on the 2005 default judgment, it was aware that New York had a serious problem with sewer service. Exhibit AA; Exhibit B, pp. 85:03-21; 91:06-17; 93:22-94:01; 94:24-95:06.

50.     F&G further knew that default judgments that were obtained prior to *Pfau*—such as the collection suit against Mr. Callender—were especially likely to be based on sewer service. Exhibit B, 95:07-17; 96:02-9703; 97:09-14.

51.     However, F&G nonetheless maintains that it would be unreasonable for it to check e-courts to see if default judgments it is attempting to execute on have been vacated due to improper service. Exhibit B, pp. 49:07-50:23.

52.     The conduct of Discover Bank, through its debt collection law firm, F&G, inflicted damages on Mr. Callender. Defendants' conduct caused Mr. Callender to experience emotional and mental pain and anguish, embarrassment and humiliation. *See* Exhibit E; Exhibit H, pp. 118:08-15; 122:02-123-08.

53.     Defendants' unlawful conduct occurred at an especially vulnerable time for Mr. Callender and his family in that he had just lost a well-paying job that had enabled him to support his wife and three children in reasonable comfort and security for seven years. *See* Exhibit E; Exhibit H

54.     He had been unemployed for over 4 months. *See* Exhibit E; Exhibit H.

55.     The job he managed to obtain (and whose first paycheck F&G garnished) paid little more than half of his previous employment. *See* Exhibit E; Exhibit H.

56.     His wife was obliged to work outside the home for the first time in their married life. Exhibit E; Exhibit H.

57.     Mr. Callender was obliged to place his children in day care or extended-day after-school programs, at additional and considerable expense to the family. Exhibit E; Exhibit H, pp. 118:08-21; 119:17-121:19;122:02-123-08.

58.     Defendants' conduct caused Mr. Callender actual damages of emotional and mental pain, anguish, embarrassment and humiliation. Exhibit E; Exhibit H, pp. 118:08-21; 122:02-123-08.

59.     The stress brought on by the wrongful garnishment caused hives to break out on Mr. Callender's face during the period of time that his wages were being garnished. Exhibit E,; Exhibit H, pp. 122:15-23; 123:19-125:07.

60.     Mr. Callender could not eat, his stomach turning and twisting into knots. Exhibit E,; Exhibit H, pp. 122:19-23.

61.     He felt withdrawn and bottled up his feelings, even as he suffered from the stress. Exhibit E; Exhibit H, pp. 122:06.

62.     He was afraid about how he could ever pay a ten thousand dollar judgment, and how this would affect his ability to provide for his wife and three young children. Exhibit E.

63.    Mr. Callender believed that F&G would continue to garnish his wages for ten or more years.

64.    The execution stated Mr. Callender owed over $11,000 (including ten years of 9% post judgment interest).  Mr. Callender was afraid not just as to the harm in losing the amounts garnished, but that he would continue to be garnished for more than a decade because the of the amount of the judgment balance, and that the $11,000 was continuing to accrue interest at 9 percent a year.  Exhibit R; Exhibit CC; Exhibit E.

65.    He could not sleep, tossing and turning, and staying up until 3:00 AM worrying about what he was going to do. When he did doze off, his sleep was not restful. He would only be able to sleep for an hour or two at a time. Exhibit E; Exhibit H, pp. 122:20-23.

66.    He was unable to pay his full rent, on time, for the month of April 2015. Exhibit E.

67.    Not only did Defendants collect on a vacated judgment, they collected on a vacated judgement that itself was procured by the fraud of sewer service. Exhibit E.

68.    This made Defendants' wrongful execution even more outrageous and offensive to Mr. Callender. Exhibit E.

69.    And of course, Defendants' conduct caused Mr. Callender actual damages of being deprived of his wages for months. Exhibit E; Exhibit H.

70.    He also lost time and incurred expenses fighting to understand what caused the money to be taken out of his wages. He also lost time seeking and obtaining legal representation. Exhibit E.

## D.    COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

71.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

11

72.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

73.     Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

74.     The obligation allege to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes.

75.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

76.     Defendant F&G is a law firm engaged in the business of collecting debts by filing thousands of collection lawsuits on behalf of putative creditors or debt buyers; by making

thousands of collection phone calls; and by sending out thousands of collection letters. Defendant regularly collects consumer debts alleged to be due to another, and that is its primary purpose. Defendant is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

77.     The actions of Defendant enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

78.     F&G is a debt collection law firm.

79.     Each year, F&G is referred roughly 3,500 judgment accounts, collects on thousands of judgments, and issues thousands of information Subpoenas and Restraining Notices each year. Exhibit A, the April 15, 2016 Response to Plaintiff's Request for Admissions of Forster & Garbus, LLP, p. 2.

80.     As such, F&G regularly collects or attempts to collect consumer debts allegedly due to another. Therefore, F&G is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

81.     The debt F&G sought to collect from Mr. Callender was incurred primarily for family, personal or household purposes. Exhibit E.

82.     Therefore the obligation F&G sought to collect from Mr. Callender was a "debt" within the meaning of 15 U.S.C. § 1692a(5).

83.     Consequently, Mr. Callender is a "consumer" as defined by 1692a(3)

84.     By executing on a vacated judgment, F&G violated the following prohibitions of the FDCPA: 15 U.S.C. § 1692e (using "use any false, deceptive, or misleading representation or means in connection with the collection of any debt"), 1692(2)(A) (the "false representation of … the character… or legal status of any debt"), 1692e(2)(B) (the "false representation of … and … compensation which may be lawfully received…"), 1692e(3) (the "false representation or

implication that any individual is an attorney or that any communication is from an attorney"),
1692e(10) ("false representation or deceptive means to collect or attempt to collect any debt…")
1692f ("unfair or unconscionable means to collect or attempt to collect any debt.")

85.     F&G very powerfully and directly misrepresented to Mr. Callender that they had a valid
judgment against him: they garnished his wages. A wage garnishment is an effective, if brutal,
means of communicating that misrepresentation. See 15 U.S.C. § 1692(a)(2) (Defining
"communication" as "the conveying of information regarding a debt directly or indirectly to any
person through any medium.")

### F&G executed on a vacated judgment

86.     Executing on a vacated judgment violates the FDCPA. *Mateer v. Ross, Suchoff, Egert,
Hankin, Maidenbaum & Mazel, P.C.*, No. 96 CIV. 1756 (LAP), 1997 WL 171011, at *4
(S.D.N.Y. Apr. 10, 1997).

87.     Collecting on a judgment that does not exist is similar to collecting on a debt that cannot
legally be collected because the debt has been discharged in bankruptcy, is subject to a
bankruptcy stay, is not owed by the consumer from whom it is sought, or has been satisfied, all
of which has been held to violate the FDCPA. Among other violations, these acts misrepresent
the character and legal status of the debt.

88.     Collecting on a non-existent judgment is similar to the FDCPA violation of representing
to a consumer that her student loan was "ineligible for bankruptcy," when in fact the loan could
have been discharged under certain (albeit unlikely) conditions. *Easterling v. Collecto, Inc.*, 692
F.3d 229, 235 (2d Cir. 2012).

89.     By executing on a vacated judgment, F&G not only made "representations" that violated
the FDCPA, they also utilized "means" that violated the FDCPA. F&G's execution on a vacated

14

judgment constitutes debt collection means constitutes prohibited conduct that "falls within the FDCPA's broad purpose to protect consumers from such alleged abusive and unfair tactics." *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 552 (S.D.N.Y. 2013) (failing to promptly comply with a court order to return money previously garnished because of a sewer service affidavit violates 1692e and 1692f). F&G's misconduct is similar to using an expired (and thus invalid) execution to access a judgement debtor's bank account. *Dina v. Cuda & Associates*, 950 F. Supp. 2d 396, 406 (D. Conn. 2013) ("Such conduct is the essence of using a deceptive means to collect a debt [and violates 1692e]").

90.     F&G's misconduct also violates 1692f, which forbids the use of "unfair or unconscionable means to collect or attempt to collect any debt." The same practices can be both "misleading" under § 1692e and "unfair" under § 1692f. *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 536 (6th Cir. 2014) (describing § 1692e and § 1692f as "broad, potentially overlapping" and "not mutually exclusive"); *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185 (11th Cir. 2012) (unlicensed debt collector violated § 1692e and § 1692f by threatening lawsuit when debt collection license was required in order to sue); *Sykes v. Mel Harris & Assocs., LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (scheme to obtain default judgments on the basis of false affidavits raised claims under § 1692e and § 1692f); *Polanco*, supra (delay in returning money order to be returned forthwith violates both 1692e and 1692f).

91.     Courts interpret "unfair" and "unconscionable" according to their plain meaning, *Gallego v. Northland Group*, Inc., 814 F.3d 123, 127 (2d Cir. 2016) (quotations omitted), and from the perspective of the least sophisticated consumer. *Currier*, 762 F.3d at 533. "Unfair" means "marked by injustice, partiality, or deception." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010). "Unconscionable" means "affronting the sense of justice, decency,

or reasonableness" or "shockingly unjust or unfair." *Gallego*, 814 F.3d at 128.

92.     F&G admits that it was unfair to Mr. Callender to garnish his wages based on a vacated judgment.

93.     Viable claims under § 1692f include "the unauthorized taking of money or property," such as "collecting amounts not authorized by law" or "unlawfully garnishing money or property." *Sutton v. Fin. Recovery Servs.*, 121 F. Supp. 3d 309 (E.D.N.Y. 2015).

94.     Such claims include maintaining an invalid lien against a person's home, *Currier*, 762 F.2d at 534; seeking a writ of garnishment against a person who was current in her payments, *Fox v. Citicorp. Credit Servs.*, Inc., 15 F.3d 1507, 1517 (9th Cir. 1994); taking unauthorized withdrawals from a bank account, *Lovelace v. Stephens & Michaels Associates, Inc.*, 2007 WL 3333019 at * 4, 5 (E.D. Mich. 2007); garnishing a bank account containing exempt funds. *Bray v. Cadle Co.*, No. 4:09-cv-663, 2010 WL 4053794 at * 15 (S.D. Tex. 2010); *Hogue v. Palisades Collection, LLC*, 494 F. Supp. 2d 1043, 1051 (S.D. Iowa 2007); *Todd v. Weltman, Weinberg & Reis, Co., L.P.A.*, 348 F.Supp.2d 903, 915 (S.D. Ohio 2004), aff'd 434 F.3d 432 (6th Cir. 2006); and failing to comply with a court order mandating the return of garnished funds, *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522 (S.D.N.Y. 2013) (adopting *Fox, Bray, Hogue, Todd,* and *Lovelace*). F&G's garnishment of Mr. Callender's wages based on a vacated judgment is similar to the above cases that find violations of 1692f.

### F&G falsely represented to Mr. Callender that it had performed a meaningful attorney review in issuing the income execution

95.     F&G violated 1692e, 1692e(3), and 1692e(10) by robo-issuing income executions as to Mr. Callender (and thousands of others).

96.     F&G put a stack of income executions in front of a young attorney, and had him sign them blindly.

97.     Ronald Ferraro was the lawyer who signed the income execution in this case. Exhibit CC; Exhibit T, pp. 31:05-12.

98.     F&G's computer system automatically generates income executions for its attorneys to sign. Exhibit T, pp. 33:12-35:05.

99.     Mr. Ferraro trusted that the information contained in the computer system was accurate, and therefore did not take steps to independently verify that the income executions he signed were for valid judgments. Exhibit T, pp. 33:12-35:05.

100.    Mr. Ferraro's involvement with the garnishment was limited to merely signing the income execution, then passing it on to an employee who mailed it to Mr. Callender's employer. Exhibit T, pp. 33:12-34:05; 34:12-35:05; 36:12-25.

101.    Mr. Ferraro took no steps to independently verify that the information contained in the income execution was accurate. Exhibit T, pp. 34:12-35:05.

102.    It takes about two minutes to check the e-courts website to find out whether a judgment has been vacated. Exhibit U; Exhibit B, pp. 49:07-16.

103.    Had F&G exercised professional judgment as required by the FDCPA, by its collection agreement with Discover Bank, and as its basic responsibility as an attorney, and conducted a meaningful attorney review as to whether there was a valid judgment prior to issuing the income execution, it would have noted that the judgment was vacated and (hopefully) not issued the wage execution. Its failure to do so for Mr. Callender – and its policy and procedure of never doing that for any of the thousands of judgment accounts – violates the FDCPA.

104.    The least sophisticated consumer having his wages garnished may think that a law firm must have had an attorney to make a professional judgment to conclude it had some right to garnish his wages.

105.    Certainly the least sophisticated consumer would have more reason to think so than if he received a form letter under an attorney letterhead. Certainly, the least sophisticated consumer has no less of a reason to do so. And as explained below, the Second Circuit has long required professional attorney judgment and meaningful attorney review prior to sending a collection letter under firm letterhead.

106.    As previously noted, 1692e bars debt collectors from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. This includes, without limitation, the "false representation or implication . . . that any communication is from an attorney," § 1692e(3), and the "use of any false representation or deceptive means to collect or attempt to collect any debt." § 1692e(10). The prohibition "applies to the litigation activities of lawyers" collecting debts in state court. *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995); see also *Goldman v. Cohen*, 445 F.3d 152, 155 (2d Cir. 2006).

107.    The Second Circuit long held that sending a collection letter on attorney letterhead or under attorney signature is "false and misleading" if the attorney has not conducted a meaningful review of the file and determined based on the facts of the individual case that a letter should be sent. *Clomon*, 988 F.2d at 1320.

108.    Such practices violate § 1692e, e(3), and e(10). Id. "[S]ome degree of attorney involvement is required before a letter will be considered 'from an attorney' within the meaning of the FDCPA." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 301 (2d Cir.2003).

109.    The use of the attorney's signature represents to the least sophisticated consumer "that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent." *Id.* (quoting *Clomon*, 988 F.2d at 1321); see also *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996) (attorney letter implies that attorney "has reached a considered,

professional judgment").

110.    Such representations are false if the attorney has not actually engaged in a meaningful

analysis and made a considered decision.

111.    Since *Clomon*, every appellate court that has considered this question has come to the

same conclusion: the attorney who has sent a letter without conducting a meaningful review of

the file has falsely represented that his communication is "from an attorney" within the meaning

of § 1692e(3). See, e.g., *Lesher v. Law Offices of Mitchell N. Kay, P.C.*, 650 F.3d 993, 1003 (3d

Cir. 2011); *Gonzalez v. Kay*, 577 F.3d 600, 604-07 (5th Cir. 2009); *Kistner v. Law Office of

Michael P. Margelefsky, LLC*, 518 F.3d 433, 440 (6th Cir. 2008); *Avila*, 84 F.3d 222, 228-29

(7th Cir. 1996).

112.    Likewise, though no appellate court has yet considered the question, district courts have

held that the filing of legal papers without meaningful attorney review violates the FDCPA. See

*Bock v. Pressler and Pressler, LLP*, 30 F. Supp. 3d 283, 297 (D. N.J. 2016), remanded on other

grounds, 2016 U.S. App. LEXIS 13681 (3d Cir. 2016) (rationales of appellate cases discussing

collection letters apply equally to pleadings filed in state court collection actions); *Consumer

Fin. Prot. Bureau v. Frederick J. Hanna & Associates, P.C.*, 114 F. Supp. 3d 1342, 1365 (N.D.

Ga. 2015) (meaningful attorney review doctrine applies to "communications," and

"communications" include legal pleadings); *Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV

3920 MKB CLP, 2012 WL 1882976, at *5 (E.D.N.Y. May 24, 2012) (claims that attorneys filed

lawsuits without meaningful review survived motion to dismiss); *Miller v. Upton*, 687 F. Supp.

2d 86, 96 (E.D.N.Y. 2009) (applying same standard to collection letters and legal pleadings); see

also *Mohr v. Sec. Credit Servs., LLC*, 141 F. Supp. 3d. 179, 186 (N.D.N.Y. 2015) (allowing

discovery of attorney time records in connection with claim of lack of meaningful attorney

review); *Tourgeman v. Collins Fin. Servs.*, No. 08-CV-1392, 2011 U.S. Dist. LEXIS 81070, *29 (S.D. Cal. Jul. 26, 2011) (applying meaningful attorney review doctrine to legal pleadings); *Berg v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 07-C-4887, 2009 U.S. Dist. LEXIS 26808 (N.D. Ill. Mar, 31, 2009) (same).

113.    As with collection letters, such legal pleadings may be "from" attorneys in the literal sense, but they are not the product of the attorney's professional judgment. *Clomon*, 988 F.2d at 1320.

114.    Filing legal pleadings without meaningful attorney review has serious, negative consequences and is materially misleading to the least sophisticated consumer. *Gabriele*, 503 F. App'x at 95 (citing *Clomon* to hold that communications are materially misleading if they are deceptive as to the involvement of the debt collector).

115.    "The least sophisticated consumer is likely to believe when served with a debt collection complaint that a lawyer has reviewed his account and determined that the creditor has a valid claim." *Hanna*, 114 F. Supp. 3d at 1366.

116.    The least sophisticated consumer—who generally lacks legal counsel—may decide not to raise a defense, wrongly assuming that "a real lawyer, acting like a lawyer usually acts" has apparently "made a considered, professional judgment that the debtor . . . is a candidate for legal action." *Avila*, 84 F.3d at 229. The deception could lead the least sophisticated consumer to abandon valid defenses and pay invalid claims.

117.    Furthermore, the FDCPA requires that the attorney do what is necessary to satisfy himself or herself that the legal claims are reasonably supported by fact and law. *Miller*, 321 F.3d at 305.

118.    A mere ministerial review, such as comparing data that appears on a computer screen

with data that appears in a legal pleading, is insufficient. *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002) (ministerial review and knowledge of client's general debt collection procedures did not constitute "professional judgment as to the delinquency and validity of any individual cardholder's debt"); see also *Bock*, 30 F. Supp. 3d at 304-305.

119.    As previously noted, Mr. Ferraro does not even perform the ministerial review that courts have found insufficient for a meaningful attorney review. He just signs whatever the computer prints out. Mr. Ferraro just assumed that the information contained in the computer system was accurate, and therefore did not take steps to independently verify that the income executions he signed were for valid judgments.

120.    Requiring professional judgment and meaningful attorney review also applies to post-judgment collection activities such as issuing information subpoenas. See *Musah v. Houslanger & Associates, PLLC*, 962 F. Supp. 2d 636, 640–41 (S.D.N.Y. 2013). "While there is no bright-line test to determine whether a sufficiently meaningful attorney review has occurred in a given case… the analysis would turn on, among other things, whether the attorney's examination of the case file was adequate to permit determination of "whether [the debtor] was or was not obligated to pay the debt…" (emphasis added)." *Id.* at 640, 641 citing to and quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 301 (2d Cir.2003).

121.    In *Musha* the debt collection law firm was seeking to collect a judgment that was assigned from the original judgment creditor to its client. State law requires a notice of assignment of the judgment to be received by the judgment debtor as a precondition to collection. Therefore, "where the judgment was assigned to a third party, § 1692e(3) requires that an attorney seeking to collect that judgment engage in a review the case file sufficient to determine that the judgment debtor received notice of the assignment." *Id.* at 641.

122.   Applying *Musah* – and the Second Circuit Miller decision upon which it relied -- to the case at bar, F&G was required to determine whether or not it had the right to execute on Mr. Callender's wages.

123.   Moreover, while there was no dispute of the validity of the judgment in *Musah*, the court thought it so obvious that before executing on a putative judgment "ordinarily an attorney's determination that there exists a valid judgment" would fulfill the attorney's 1692e(3) obligation for a meaningful attorney review.

124.   But F&G made no "attorney's determination that there exists a valid judgment" before executing on Mr. Callender's wages – and it never does for thousands of other consumers. Applying *Musah*, F&G clearly violated 1692e(3).

**F&G inflated the amount of the debt by including costs of court and post-judgment interest**

125.   F&G was executing on the judgment amount, which included costs of court (and interest on the same). Exhibit R; Exhibit CC.

126.   This misrepresents the amount of the debt as the Court in Mr. Callender's collection lawsuit vacated the judgment and dismissed the action. Since there was no longer an adjudication that costs of court were owed, rolling in costs of court (and post-judgment interest on those costs) into the amount alleged to be owed inflates the debt in violation of 1692e, 1692(2)(A) (the "false representation of  … the amount… of any debt"), and 1692f(1) ("The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.") See *Fritz v. Resurgent Capital Servs., LP*, 955 F.Supp.2d 163, 172 (E.D.N.Y.2013) (By rolling costs of court to the amount claimed to be due debt collector violated the FDCPA, 1692(2)(A), as there was no judgment adjudicating liability for costs of court). See also *Picht v.*

*Hawks*, 236 F.3d 446 (8th Cir. 2001) (defendants violated the FDCPA because they had no authority under Minnesota law to garnish consumer's bank account for dishonored check penalties as penalties had not yet been set by court).

### E.   COUNT 2: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.* (AS TO F&G ONLY)

127.   Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

128.   In order to state a claim under Section 349, a plaintiff must plausibly allege three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was [deceptive or] misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (Ct.App.2000) (internal citations omitted).

### Defendant's misconduct was "consumer oriented"

129.   In order to demonstrate misconduct is consumer oriented, the consumer must demonstrate "that the acts or practices have a broader impact on consumers at large," but the statute does "not require a repetition or pattern of deceptive behavior." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741 (1995). "Plaintiff, thus, need not show that the defendant committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers—but instead must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." *Id.*

130.   The test is whether the actions complained of "potentially affect similarly situated consumers." *Id.* at 26–27, 623 N.Y.S.2d 529, 647 N.E.2d 741. Plaintiffs in Oswego were union pension funds that opened accounts with the defendant bank. Plaintiffs complained that the bank

Case 1:15-cv-05813-AKH Document 73 Filed 05/10/17 Page 25 of 39

failed to pay appropriate interest on the balances in their accounts. The Court of Appeals held that plaintiffs satisfied the "consumer-oriented" element of Section 349, reasoning that "defendant Bank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the [plaintiff] Funds with standard documents presented to customers upon the opening of accounts." 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741.

131.   As in *Oswego*, Defendant's dealt with Mr. Callender's account in the same manner it deals with the thousands of other judgments it attempts to execute upon.

132.   Defendant sends out thousands of wage executions and bank restraints each year for putative judgments obtained years earlier by different law firms. Exhibit A, the April 15, 2016 Response to Plaintiff's Request for Admissions of Forster & Garbus, LLP, p. 2.

133.   Plaintiff knows that sewer service is widespread in New York and that a certain number of judgments it collects on with inevitably be vacated after being placed with Defendant.

134.   This conduct directly affected the consuming public at large because it assured that any consumer whose judgment account was placed with Defendant and who thereafter vacated that judgment might nonetheless be targeted by Defendant for enforcement of the vacated judgment. \

135.   By failing to file a substitution of attorney or to inform Mr. Callender that it had been retained by Discover Bank, Defendant further ensured that it would not be informed about Plaintiff's order to show cause.

136.   Thus, F&G was aware that, absent a meaningful policy change, F&G would inevitably issue income executions and bank restraints against many consumers based on judgments that had been vacated.

137.   F&G's conduct was analogous to shooting a loaded gun into a crowd of consumers; F&G may not have known specifically that Mr. Callender would be garnished based on a vacated

judgment, but it knew that some consumers inevitably would be unfairly garnished.

## Defendant's conduct was "deceptive or misleading"

138.    The Defendant's "deceptive or misleading" conduct is blindly issuing wage garnishments (and bank restraints) without taking any steps—much less conducting a meaningful attorney review—to determine whether the judgment they are executing on has been vacated.  F&G is a debt collection law firm.

139.    In *Midland Funding, LLC v. Giraldo*, a consumer defendant adequately stated a GBL 349 counterclaim against a debt collector plaintiff who allegedly filed a collections lawsuit without any evidence that the defendant owed the debt. 39 Misc. 3d 936, 961 N.Y.S.2d 743, 752 (Dist. Ct. 2013).

140.    The *Giraldo* court found the conduct consumer-oriented because: "[T]he conduct complained of," at its heart, involves the "routine filing" of assigned debt lawsuits by plaintiff "despite a lack of crucial, legally admissible information" or "sufficient inquiry" into whether the claims are meritorious. When considered together with defendant's allegation that plaintiff's deceptive acts and practices "affect the consuming public at large" and are "not limited to the defendant," the challenged conduct and practices clearly raise issues beyond any "private contract disputes." Such allegations therefore fall within the broad scope of GBL § 349. *Id.* at 752.

141.    The *Giraldo* decision is instructive. F&G's blind signing of stacks of executions is similar to Midland's "routine filing" of collection lawsuits without sufficient inquiry into whether the claims are meritorious.  Both is routine conduct that is consumer oriented.

142.    In *Giraldo* the "routine filing" of collection lawsuits without "As here, the claim there arose from misrepresentations in an individual collections lawsuit.

25

143.    Likewise, the *Giraldo* plaintiff alleged that the "deceptive acts and practices affect the consuming public at large and are not limited to the defendant". *Midland Funding, LLC v. Giraldo*, at 752 (internal qoutations omitted).

144.    Like the defendant in *Giraldo*, Defendant's misconduct was "deceptive or misleading."

145.    "[I]t is not necessary under [GBL 349 to] establish the defendant's intent to defraud or mislead." *Id.*, 85 N.Y.2d at 26, 647 N.E.2d at 745.

146.    In the case at bar, Plaintiff alleges the Defendant's "deceptive or misleading" conduct is blindly issuing wage garnishments (and bank restraints) without taking any steps—much less conducting a meaningful attorney review—to determine whether the judgments it executes on have been vacated. Executing on vacated judgments are "act[s] or practice[s]" that are materially "deceptive or misleading" because it represents to consumers such as Plaintiff that 1) there is a valid judgment when there is not, 2) Defendant has a right to execute on their wages when it does not, 3) that an attorney has performed a meaningful attorney review to determine that there exists a valid judgment when there is not, and 4) the consumers owe costs of court and post-judgment interest when, given the absence of a judgment, there is no adjudication that those amounts are owed.

147.    This blind signing of judicial papers, be it post-judgment wage executions and bank restraints, collection lawsuits, or affidavits in support of default judgments is colloquially known (and occasionally referred to in judicial decisions) as "robo-signing," and has been held as to state a GBL 349 claim, as well as an FDCPA claim.

148.    In *Samms III*, the District Court denied summary judgment for Defendant on Plaintiff's GBL 349 claim for Defendant's practice of seeking attorneys' fees in its consumer collection cases. The court found that this practice could be construed as a deceptive communication

26

because it communicated to the consumer that Defendant had a legal or contractual right to collect attorneys' fees when, in fact, it had no such right. *Id.* The misconduct must be "deceptive or misleading" to a "reasonable consumer" in order to be material. *Samms* at 117 citing to *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir.2009). See also *Campbell v. MBI Associates, Inc.*, 98 F.Supp.3d 568 (E.D.N.Y. 2015)(Defendant debt collector's practice of sending dunning letters stating that credit card payments would be subject to a five dollar processing fee was "deceptive" under GBL 349 because it would mislead the reasonable consumer into thinking that Defendant had a legal right to a processing fee.); *Diaz v. Portfolia Recover Associates, LLC*, 2012 WL 1882976 (E.D.N.Y. May 24, 2012)(Intentionally filing time-barred lawsuit with the intent to deceive the court or a party is a deceptive act under GBL § 349 and N.Y. Judiciary Law § 487).

149.    Indeed, in *Gomez* itself, one of the GBL 349 claims was the "robo-signing post-judgment executions [that] impliedly represented to consumers that an attorney had done a meaningful review prior to issuing the execution when none was done." *Gomez* at 158. The *Gomez* decision suggested this robo-signing would state a GBL 349 claim but for the 601 preclusion of a 349 claim. *Gomez* at 158. "A claim [under GBL 349] based on the enforcement of the judgment against her, or on the "robo-signing" of the execution paperwork would not be time-barred, but fails for a different procedural reason," that is, the 601 preclusion of the 349 claim.

150.    Since *Conboy*, many Courts have held that deceptive debt collection practices state a GBL § 349 claim, finding that the issue is whether the consumer meets the elements of 349 itself, not whether the deceptive conduct would also violate the state debt collection act. See *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 700 (S.D.N.Y. 2015)("Defendants argue that the alleged fraudulent activities were not "consumer-oriented" in that they were directed at the

court and at Plaintiffs' employers, rather than at the consumers themselves."); *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14 CV 5449 (NSR), 2015 WL 7758894, at *15 (S.D.N.Y. Dec. 1, 2015)("Defendants have routinely filed allegedly fraudulent lawsuits in New York courts and obtained default judgments against various consumers"). See also *Sykes v. Mel Harris and Assoc, LLC*, 757 F.Supp.2d 413 (S.D.N.Y 2010) (Allegation of robo-signing thousands of affidavits of merit falsely claiming personal knowledge of key facts necessary for the entry of default judgments states a claim for violations of GBL 349 (as well as the FDCPA); and *Diaz v. Portfolio Recovery Services Assoc. LLC.*, 10 CV 3920 MKB CLP, 2012 WL 1882976 (E.D.N.Y. May 24, 2012)(debt buyers' and debt collection attorneys' regularly filing time barred lawsuits without meaningful attorney review is consumer oriented conduct in violation of the GBL).

151. Notwithstanding the *Gomez* decision, Defendant's argument that GBL § 601 bars or preempts a GBL 349 claim is belied by the entire foregoing body of case law, finding deceptive debt collection practices to support GBL 349 claims.

152. The misconduct must be "deceptive or misleading" to a "reasonable consumer" in order to be material. *Samms* at 117 citing to *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir.2009). Obviously, the above referenced misconduct would be "deceptive or misleading" to any consumer, least sophisticated, reasonable, or otherwise.

## Plaintiff was injured as a result of Defendant's wrongful conduct

153. Defendant argues that Plaintiff is required to prove injury to Plaintiff and to the public generally in order to sustain a GBL 349 violation. This argument conflates the requirement that deceptive acts be "consumer oriented" with the requirement that the acts cause injury to the Plaintiff. See *Samms III* (evidence that Plaintiff had suffered individualized harm as a result of Defendant's misrepresentations was sufficient to survive Defendant's motion to dismiss a GBL

349 claim).

154.    The conduct of Discover Bank, through its debt collection law firm, F&G, inflicted damages on Mr. Callender. Defendants' conduct caused Mr. Callender to experience emotional and mental pain and anguish, embarrassment and humiliation. *See* Exhibit E; Exhibit H, pp. 118:08-15; 122:02-123-08.

155.    Defendants' unlawful conduct occurred at an especially vulnerable time for Mr. Callender and his family in that he had just lost a well-paying job that had enabled him to support his wife and three children in reasonable comfort and security for seven years. *See* Exhibit E; Exhibit H

156.    He had been unemployed for over 4 months. *See* Exhibit E; Exhibit H.

157.    The job he managed to obtain (and whose first paycheck F&G garnished) paid little more than half of his previous employment. *See* Exhibit E; Exhibit H.

158.    His wife was obliged to work outside the home for the first time in their married life. Exhibit E; Exhibit H.

159.    Mr. Callender was obliged to place his children in day care or extended-day after-school programs, at additional and considerable expense to the family. Exhibit E; Exhibit H, pp. 118:08-21; 119:17-121:19;122:02-123-08.

160.    Defendants' conduct caused Mr. Callender actual damages of emotional and mental pain, anguish, embarrassment and humiliation. Exhibit E; Exhibit H, pp. 118:08-21; 122:02-123-08.

161.    The stress brought on by the wrongful garnishment caused hives to break out on Mr. Callender's face during the period of time that his wages were being garnished. xhibit E,; Exhibit H, pp. 122:15-23; 123:19-125:07.

162.    Mr. Callender could not eat, his stomach turning and twisting into knots. Exhibit E,;

Case 1:15-cv-05813-AKH  Document 73  Filed 05/10/17  Page 31 of 39

Exhibit H, pp. 122:19-23.

163.    He felt withdrawn and bottled up his feelings, even as he suffered from the stress. Exhibit E; Exhibit H, pp. 122:06.

164.    He was afraid about how he could ever pay a ten thousand dollar judgment, and how this would affect his ability to provide for his wife and three young children. Exhibit E.

165.    Mr. Callender believed that F&G would continue to garnish his wages for ten or more years.

166.    The execution stated Mr. Callender owed over $11,000 (including ten years of 9% post judgment interest).  Mr. Callender was afraid not just as to the harm in losing the amounts garnished, but that he would continue to be garnished for more than a decade because the of the amount of the judgment balance, and that the $11,000 was continuing to accrue interest at 9 percent a year.  Exhibit R; Exhibit CC; Exhibit E.

167.    He could not sleep, tossing and turning, and staying up until 3:00 AM worrying about what he was going to do. When he did doze off, his sleep was not restful. He would only be able to sleep for an hour or two at a time. Exhibit E; Exhibit H, pp. 122:20-23.

168.    He was unable to pay his full rent, on time, for the month of April 2015. Exhibit E.

169.    Not only did Defendants collect on a vacated judgment, they collected on a vacated judgement that itself was procured by the fraud of sewer service. Exhibit E.

170.    This made Defendants' wrongful execution even more outrageous and offensive to Mr. Callender. Exhibit E.

171.    And of course, Defendants' conduct caused Mr. Callender actual damages of being deprived of his wages for months. Exhibit E; Exhibit H.

172.    He also lost time and incurred expenses fighting to understand what caused the money to

be taken out of his wages. He also lost time seeking and obtaining legal representation. Exhibit E.

### Defendant's conduct gives rise to a claim for punitive damages

173.    New York law provides for punitive damages for conversion where the conversion was accomplished with malice or insult, or with reckless or willful disregard for plaintiff's rights. 23 N.Y.Jur.2d Conversion, § 74 (1982); *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984).

174.    Indeed, New York courts have long recognized that a tort defendant's reckless conduct can form the basis for an imposition of punitive damages. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 586 (S.D.N.Y. 1989) ("Under New York law, punitive damages may be recovered for an act of conversion where the circumstances establish that the conversion was accomplished by malice or reckless or willful disregard of the plaintiff's right.")(internal quotations omitted).

175.    Additionally, "punitive damages may be awarded for a violation of GBL § 349." *Barkley v. Olympia Mortg. Co.*, 557 Fed.Appx. 22, note 1 (2d Cir. 2014)(citing Wilner v. Allstate Ins. Co., 893 N.Y.S.2d 208, 218 (2d Div, 2010)).

176.    A plaintiff may recover punitive damages where the defendant's violation of GBL § 349 is "so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness." *Wilner* 893 N.Y.S.2d at 218. There, the New York Court Appellate Division, Second Department held that  a defendant's failure to reach a timely decision on an insurance claim, in violation of GBL § 349, could support the imposition of punitive damages because a jury could determine that the defendant's conduct was "so flagrant as to transcend mere carelessness." *Id.*

31

Case 1:15-cv-05813-AKH Document 73 Filed 05/10/17 Page 32 of 39

177.    Defendant argues that punitive damages are unavailable unless Defendant's conduct evinces a "high degree of moral turpitude" or the "type of wanton dishonestly typically associated with crime." Moreover, Defendant argues that punitive damages are unavailable because Plaintiff cannot demonstrate that Defendant's conduct was directed toward the public generally. This formulation misstates the relevant law and confuses the standard for punitive damages for conversion and GBL § 349 claims with the heightened standard applicable to contract claims and certain fraud claims. See *Rocanova v. Equitable Life Assur. Soc. Of U.S.*, 83 N.Y.2d 603, 613 (1994). These additional requirements—"known, respectively, as the "public wrong" and "extraordinary egregiousness" requirements"—are not applicable for typical punitive damages claims. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F.Supp.2d 250, 262 (S.D.N.Y. 2005).

178.    The imposition of this higher standard for punitive damages in contract and related fraud cases is justified by the principle that contract law seeks merely to restore the parties to the positions they would have occupied if the breaching party had performed under the contract. Id. This factor is simply not present in conversion and GBL § 349 cases. Moreover, a higher standard for punitive damages in contract cases is appropriate because the imposition of punitive damages could discourage breaches of contract that the law endeavors to protect. Id. at note 12. This justification is inapplicable to this case because the law does not seek to encourage acts of conversion or violations of GBL § 349.

179.    Established case law in New York and the Southern District holds that a defendant's reckless conduct can support the imposition of punitive damages for conversion. 23 N.Y.Jur.2d Conversion, § 74 (1982); *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984). Violations of GBL § 349 can also warrant an award of punitive damages where

Defendant's conduct evinces a reckless or willful disregard for Plaintiff's rights. *Wilner v. Allstate Inc. Co.*, 893 N.Y.S.2d 208, 218 (2d Div, 2010). Accordingly, a plaintiff seeking punitive damages under this standard can survive a motion for summary judgment if a reasonable jury could conclude, based on the record, that the defendant acted with a reckless disregard for the plaintiff's rights. Plaintiff meets that standard.

180.     Defendant argues—in conclusory terms—that Plaintiff is not entitled to punitive damages as a matter of law. However, the record is replete with evidence of Defendant's reckless, knowing, and willful misconduct directed at Plaintiff and toward the public generally.

181.     Defendant acknowledges that it takes about two minutes to check the e-courts website to find out whether a judgment has been vacated.

182.     Yet, Defendant denies that it is required to do so for any of the thousands of judgment accounts it collects on annually. ("I think it's unreasonable. I don't think it's a reasonable required practice.").

183.     The record makes clear that Defendant chose not to check the e-courts website to confirm the validity of the thousands of judgments it collected on, despite knowing that many of the judgments had likely been vacated.

184.     When Defendant executed on Plaintiff's wages in 2015, it was aware that New York had a problem with sewer service, particularly in consumer collections cases, and that consumer defendants are therefore likely to attempt to vacate those judgments.

185.     Thus, when Defendant executed on thousands of judgment accounts, it knew that many among them had been vacated. A jury could reasonably determine that this reckless misconduct—which resulted in the unlawful taking of Plaintiff's property—justifies a punitive damages award.

186.   As Defendant acknowledges, default judgments obtained prior to the 2009 *Pfau* consent order are even more likely to be the result of sewer service, and therefore more likely to be vacated by the consumer.

187.   Defendant did not represent Discover Bank in the collections case and did not procure the false affidavit of service that led to the default judgment.

188.   Thus, given Defendant's knowledge of the prevalence of sewer service in consumer collection cases, Defendant had even greater reason to question the validity of default judgments obtained by other law firms.

189.   By failing to file a substitution of attorney or to inform Mr. Callender that it had been retained by Discover Bank, Defendant further ensured that it would not be informed about Plaintiff's order to show cause.

190.   In short, Defendant executed on thousands of default judgments with the knowledge that a number of the judgments had been vacated. It's only justification for this flagrant disregard for Plaintiff's rights—and the rights of other consumers—was that it would be too burdensome to verify the judgment before issuing the income execution. A reasonably jury could find that this reckless conduct, and the palpable harm it caused, warrants the imposition of punitive damages against Defendant.

191.   F&G made a willful and deliberate business decision to save time and expense by taking no steps whatsoever—either when it is assigned the judgments for execution, when it signs the execution, or at any other point—to determine whether the putative judgments it is executing upon have in fact been vacated.

192.   F&G's willful misconduct resulted in an unlawful seizure of Mr. Callender's wages at a time when Mr. Callender was struggling to provide for his family.

34

193.     F&G's wrongdoing therefore evinces a high degree of moral turpitude, justifying the imposition of punitive damages.

194.     Defendant's wrongful and deceptive acts caused injury and damages to Plaintiff.

195.     As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

## F.     COUNT 3: CONVERSION

196.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

197.     The execution stated Mr. Callender owed over $11,000 (including ten years of 9% post judgment interest).  Mr. Callender was afraid not just as to the harm in losing the amounts garnished, but that he would continue to be garnished for more than a decade because the of the amount of the judgment balance, and that the $11,000 was continuing to accrue interest at 9 percent a year.  Exhibit R; Exhibit CC; Exhibit E.

198.     The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

199.     Property subject to conversion includes readily identifiable funds such as earned wages.

200.     Defendants intentionally and without authority, assumed and exercised control over Mr. Callender's wages and money, interfering with his right to possession of the same, by: a) directing a New York City Marshal to seize his wages; and b) directing the Marshal to place Callender's money in trust for the benefit and use of Defendants.

201.    Defendants' improper restraint of Mr. Callender's money, which harmfully interfered with Mr. Callender's rights to control his own property, constitutes conversion.

202.    F&G made a willful and deliberate business decision to save time and expense by taking no steps whatsoever—either when it is assigned the judgments for execution, when it signs the execution, or at any other point—to determine whether the putative judgments it is executing upon have in fact been vacated.

203.    F&G's willful misconduct resulted in an unlawful seizure of Mr. Callender's wages at a time when Mr. Callender was struggling to provide for his family.

204.    F&G's wrongdoing therefore evinces a high degree of moral turpitude, justifying the imposition of punitive damages.

205.    Defendant's wrongful and deceptive acts caused injury and damages to Plaintiff.

206.    For the reasons stated in the statement of facts, and under the aforementioned Counts, Defendants' conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Mr. Callender's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

207.    For these reasons, Plaintiff is entitled to exemplary and punitive damages, in addition to actual damages. Actual damages are outlined in the above statement of facts, and incorporated by reference.

## G.    JURY DEMAND.

208.    Plaintiff demands a trial by jury.

## H.    PRAYER

209.    WHEREFORE, Plaintiff requests the following relief:

a.    A declaration that Defendants have committed the violations of law alleged in this action;

b.    An order enjoining and directing F&G to cease violating G.B.L. § 349 *et seq.*;

c.    Actual damages, treble, exemplary, and punitive damages;

d.    Statutory damages under 15 U.S.C. § 1692k and GBL 349;

e.    An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k and GBL 349;

f.    Prejudgment and post judgment interest as allowed by law;

g.    All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.


Dated: Brooklyn, New York
          March 10, 2017

Respectfully submitted,
*/s/*
Ahmad Keshavarz
ATTORNEY FOR PLAINTIFF
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:     (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Carol Lastorino, Esq.,
Attorneys for Defendant Forster & Garbus, LLP
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11566

Tel. (516) 357-3000
Fax. (516) 357-3333
carol.lastorino@rivkin.com


Dated:  Brooklyn, NY
        <u>March 10, 2017</u>
         /s/
        Ahmad Keshavarz